# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

IN RE:                                    §
                                          §
ARETHUSA OFF-SHORE, *et al*               §        CASE NO. 20-32321 (DRJ
                                          §        (Jointly Administered)
                                          §
                                          §

---

## EXHIBIT ADDENDUM TO PATRICIA ORMAND'S
## RESPONSE TO DEBTORS' MOTION TO VACATE

---

Tom Kirkendall
State Bar No. 11517300
**LAW OFFICE OF TOM KIRKENDALL**
2 Violetta Ct
The Woodlands, Texas 77381-4550
713.703.3536
bigtkirk@gmail.com (email)

Michael Patrick Doyle
State Bar No. 06095650
Patrick M. Dennis
State Bar No. 24045777
**DOYLE DENNIS LLP**
3401 Allen Parkway, Suite 100
Houston, Texas 77019
Telephone: (713) 571-1146
Facsimile: (713) 571-1148
service@doylelawfirm.com

**CO-COUNSEL FOR PATRICIA ORMOND,
CLAIMANT**

**EXHIBITS**

| 1 | Deposition transcript of Patricia Diana Ormand taken on October 13, 2021 |
|---|---|
| 2 | Deposition transcript of Nicholas Brian Vandergriff taken on January 25, 2022 |
| 3 | Patricia D. Ormond Notice of Injury to Diamond dated August 16, 2019 |
| 4 | Patricia Ormond Accidental Injury Questionnaire dated January 18, 2020 |
| 5 | Original proof of claim of Patricia Ormond dated August 16, 2020 |
| 6 | Email from counsel for Ms. Ormond to counsel for Diamond dated September 28, 2020 |
| 7 | Amended proof of claim of Patricia Ormond dated January 12, 2021 |
| 8 | Plaintiff's Response to Defendant's Motion for Summary Judgment on Plaintiff's Denial of Maintenance and Cure Claim in the state court case |

**Exhibit 1**

**Deposition transcript of Patricia Diana Ormand
taken on October 13, 2021**

Patricia Diana Ormond                                    Pages

---

**[Page 1]**

CAUSE NO. 2021-29362

```
PATRICIA ORMOND        : IN THE DISTRICT COURT OF
                       :
    Plaintiff          :
                       :
VS.                    : HARRIS COUNTY, TEXAS
                       :
DIAMOND OFFSHORE       :
MANAGEMENT COMPANY,    :
DIAMOND OFFSHORE LIMITED,:
AND DIAMOND OFFSHORE   :
COMPANY                :
                       :
    Defendants         : 127TH JUDICIAL DISTRICT
```

*************************************************
VIDEOTAPED ORAL DEPOSITION OF
PATRICIA DIANA ORMOND
OCTOBER 13, 2021
*************************************************

        THE VIDEOTAPED ORAL DEPOSITION OF PATRICIA DIANA
ORMOND, produced as a witness at the instance of the
DEFENDANTS, and duly sworn, was taken in the
above-styled and numbered cause on OCTOBER 13, 2021,
from 9:36 a.m. to 2:00 p.m., before Craig Michael
Bechtel, CSR in and for the State of Texas, reported by

---

**[Page 2]**

1   stenographic means and videotape at the offices of
2   Doyle, 3401 Allen Parkway, Suite 100, Houston, Texas,
3   pursuant to the Texas Rules of Civil Procedure; and the
4   provisions stated on the record or attached hereto.
5
6       IT IS STIPULATED AND AGREED by and between
7   counsel for the respective parties hereto that all
8   objections are reserved until the time of trial, except
9   those as to the form of the question and/or
10  responsiveness of the answer; and that the original
11  transcript of this deposition may be signed by the
12  witness thereon before any notary public or other
13  officer authorized to administer oaths.

---

**[Page 3]**

1                    INDEX
2   Stipulations.................................. 2
3   Appearances................................... 5
4   PATRICIA DIANA ORMOND
5       Examination by Mr. Norris .............. 6
6   Signature and Changes......................... 219
7   Reporter's Certificate........................ 221
8
9                  EXHIBITS
10  NO.   DESCRIPTION                        PAGE
11  Exhibit 1..................................... 104
12      Permits
13  Exhibit 2..................................... 120
14      Medical Records
15  Exhibit 3..................................... 126
16      Medical Records
17  Exhibit 4..................................... 133
18      Report
19  Exhibit 5..................................... 139
20      Letter
21  Exhibit 6..................................... 148
22      Medical Records
23  Exhibit 7..................................... 156
24      Questionnaire
25

---

**[Page 4]**

1   Exhibit 8..................................... 179
2       Medical Records
3   Exhibit 9..................................... 184
4       Letter
5   Exhibit 10.................................... 188
6       Medical Records
7   Exhibit 11.................................... 196
8       Medical Records
9   Exhibit 12.................................... 201
10      Medical Records
11  Exhibit 13.................................... 207
12      Medical Records

**EXHIBIT**

**Ormond 1**

---

[1]  (Pages 1 to 4)

Patricia Diana Ormond                                    Pages

[Page 5]

1    A P P E A R A N C E S
2    COUNSEL FOR PLAINTIFF:
3       Mr. Jeff Avery
        Doyle
        3401 Allen Parkway, Suite 100
4       Houston, Texas 77019
        713-571-1146
5       javery@doylelawfirm.com
6    COUNSEL FOR DEFENDANTS:
        Mr. Joshua A. Norris
7       Mr. Patrick J. Fackrell
        Jones Walker
8       811 Main Street, Suite 2900
        Houston, Texas 77002
9       713-437-1800
        jnorris@joneswalker.com
10      pfackrell@joneswalker.com
11   ALSO PRESENT:
        Mr. Mike Davis, Videographer
12      Ms. Emma Brockway
13
14
15
16
17
18
19
20
21
22
23
24
25

[Page 6]

1              THE VIDEOGRAPHER:  Okay.  Today is
2    Wednesday, October 13th, 2021.  We are on the record at
3    9:36.
4              PATRICIA DIANA ORMOND,
5    having been first duly sworn, testified as follows:
6                   EXAMINATION
7    BY MR. NORRIS:
8         Q.  Could you state your name for us?
9         A.  Patricia Diana Ormond.
10        Q.  And you are the plaintiff in the lawsuit
11   that brings us here today?
12        A.  Yes, sir.
13        Q.  Where do you currently reside?
14        A.  Silver Creek, Mississippi.
15        Q.  What's your specific street address there?
16        A.  524 Stumptown Road, Silver Creek,
17   Mississippi.
18        Q.  Great.  Thank you.  Who do you live with, if
19   anyone?
20        A.  My fiance.
21        Q.  What is his name?
22        A.  Jeffrey Letchworth.
23        Q.  How long have you lived with Mr. Letchworth
24   at that address?
25        A.  Since August of 2019.

[Page 7]

1         Q.  Prior to August of 2019, where did you
2    reside?
3         A.  In -- 1328 Park Lane Avenue, I think,
4    McComb, Mississippi, apartment 215.
5         Q.  How far apart are those two addresses?
6         A.  About an hour.
7         Q.  Why did you move in August of 2019?
8         A.  Because I bought a house and moved out of
9    the apartment.
10        Q.  Did you reside with Mr. Letchworth prior to
11   August 2019?
12        A.  No, sir.
13        Q.  When did you first meet Mr. Letchworth?
14        A.  I don't remember exactly.  It was sometime
15   in 2018.
16        Q.  Did you meet Mr. Letchworth on a Diamond
17   offshore rig?
18        A.  Yes, sir.
19        Q.  When did you and Mr. -- well, let me back
20   up.
21             You and Mr. Letchworth are currently
22   engaged to be married?
23        A.  Yes, sir.
24        Q.  When did your relationship begin?
25        A.  I don't really recall the exact time frame

[Page 8]

1    of that, either.  It just kind of started.
2         Q.  When did you and Mr. Letchworth become
3    engaged?
4         A.  Christmas of last year.
5         Q.  So Christmas of 2020?
6         A.  Yes, sir.
7         Q.  Do you have plans to become married at some
8    point?
9         A.  Friday.
10        Q.  Oh.  Like, in three days?
11        A.  Yes, sir.
12        Q.  Well, congratulations.
13        A.  Thank you.
14        Q.  Where are you getting married?
15        A.  The Hattiesburg courthouse in Mississippi.
16        Q.  Okay.  Shift gears on you a little bit.
17        A.  Okay.
18        Q.  You filed a lawsuit that alleges you were
19   injured at work on February 20th, 2019, correct?
20        A.  Yes, sir.
21        Q.  Is that in fact the date that you at least
22   claim you were injured?
23        A.  Yes, sir.
24        Q.  How do you know it was February 20th, 2019?
25        A.  It was the first night of my hitch for that

Patricia Diana Ormond                                    Pages

1   time frame.
2       Q.  Did you make any notes at that time about
3   your injury?
4       A.  No, sir.
5       Q.  Did you send any e-mails to anybody at that
6   time about your injury?
7       A.  I don't believe so.
8       Q.  Did you talk to anyone at Diamond
9   specifically about your injury that occurred on that
10  day on that day that it -- you allege it occurred?
11      A.  Probably just Jeffrey.
12      Q.  So you spoke with Mr. Letchworth --
13      A.  Yes, sir.
14      Q.  I am sorry.
15          -- on the day of your injury on the
16  rig?
17      A.  Yes, sir.
18      Q.  And what did you tell Mr. Letchworth?
19      A.  At that point I was more concerned about the
20  hot water hitting me, and I asked him if he had any
21  burn cream.  And then it's just the achiness.  As the
22  adrenaline started to wear off, I guess the pain
23  started to set in.
24      Q.  Now, at that time Mr. Letchworth was an
25  electrician, correct?

1   lower engine room level, but I don't know if he could
2   actually see what was happening from where he was at.
3       Q.  Okay.  Why didn't you report the incident to
4   Diamond that day?
5       A.  I was afraid of losing my job.  I was -- I
6   wanted to prove that I could perform in the position
7   they put me in, as they temporarily bumped me up to a
8   third assistant engineer for those first two weeks.  I
9   felt that I wasn't, like, having this go -- having this
10  incident happen, that they wouldn't think that I was
11  capable of performing the job as a third assistant
12  engineer.
13      Q.  And you agree that you had been injured on a
14  separate occasion on your very first hitch with Diamond
15  months before February of 2019, correct?
16      A.  Yes, sir.  It was almost a year -- almost a
17  year before.
18      Q.  And you had in fact on that occasion,
19  immediately reported that incident to Diamond, correct?
20      A.  Yes, sir.
21      Q.  So you knew you were required to report any
22  injuries or illnesses to Diamond, correct?
23      A.  Yes, sir.
24      Q.  And you were trained on that requirement by
25  Diamond, correct?

1       A.  Yes, sir.
2       Q.  Was he in the engine room at the time that
3   you allege you were injured on February 20th, 2019?
4       A.  No, sir.
5       Q.  Did he have any -- did he witness your
6   injury at all?
7       A.  No, sir.
8       Q.  So other than what you told him, he knows
9   nothing -- I am sorry -- about your injury?
10      A.  Right.  I mean, he knows -- like, I told him
11  what happened, but he wasn't there to witness it, no,
12  sir.
13      Q.  Was anyone there to witness your injury?
14      A.  Yes, sir.
15      Q.  Who was that?
16      A.  Pedro -- I forget his last name.  I think
17  it's Hernandez.  He was the engine tech that was there
18  helping us rebuild the engine.
19          And then Nick -- I think it's Nicholas
20  Ryan or Ryan Nick.  I don't remember.  We always called
21  him Rick just because you never know what name he went
22  by, Vandergriff.
23          They were standing across from me while
24  we were completing our work.
25          And Blake Clodfelter was down in the

1       A.  Yes, we were.
2       Q.  And you chose, however, on February 20th,
3   2019, not to disclose or otherwise notify Diamond of
4   the incident that now serves as the basis of this
5   lawsuit?
6       A.  I was trying to protect my job.
7       Q.  Okay.  Were you fired or otherwise
8   reprimanded when you reported the first incident almost
9   a year prior to February 20th, 2019?
10      A.  I was treated very differently.
11      Q.  By whom?
12      A.  Specifically the chief engineer, but also
13  some of the other, more senior engineers.  They learned
14  that -- they started treating me like I didn't know
15  what I was doing.
16          And the chief engineer just acted like
17  I wasn't ready for that job.
18      Q.  Who was that?
19      A.  Curt Madsen.
20      Q.  And did Mr. Madsen -- what specifically did
21  Mr. Madsen say to you that led you to that opinion?
22      A.  It became apparent when -- for each position
23  you work on that shift, you have to do your
24  competencies.  There is general safety competencies
25  that everyone has to do, and then there is position

Patricia Diana Ormond                           Pages

[Page 13]

1    specific.
2           And I completed my competencies, but
3    they had to be signed off by the chief engineer and the
4    captain.
5           When I went to have them signed off by
6    the chief engineer, he told me that we should wait
7    off -- like, hold off, that I needed to slow down, that
8    maybe I was moving too fast trying to get these
9    competencies signed and that he didn't feel I was quite
10   ready for them yet.
11       Q.  About when was that?
12       A.  Maybe a couple months after the original,
13   the first incident, my first hitch on the rig.
14       Q.  We are going to talk a lot more details
15   about your training and the training programs at
16   Diamond.
17       A.  Yes, sir.
18       Q.  If I understand your testimony, you made the
19   report of the first incident, and then in the weeks and
20   months that followed that, you were engaged in
21   Diamond's training competency assessments?
22       A.  Yes.
23       Q.  In those conversations that -- you say
24   Mr. Madsen said you needed to slow down and make sure
25   that you had those competencies?

[Page 14]

1        A.  Yes, sir.
2        Q.  And you, therefore, believe now that that
3    was some type of reaction to you reporting the first
4    incident?
5        A.  I do, because before those competencies ever
6    get signed by the chief or the captain, they have to be
7    signed by either the -- I think it's the third, second,
8    or first engineer.  It's each individual competency has
9    to be signed.  Then the whole group gets signed by the
10   chief and the captain.
11          So I had a third, a second, and a first
12   engineer that signed off saying that I knew what I was
13   doing for those tasks, and yet the chief didn't think
14   that I was capable of it still.
15       Q.  Okay.  Anyone else other than Mr. Madsen in
16   your opinion say anything to you that was directly
17   related or a reaction to you reporting the first
18   incident?
19       A.  Not that I recall.
20       Q.  Okay.  Would you agree that rules are
21   important?
22       A.  Yes, sir.
23       Q.  Would you agree that all the policies and
24   procedures that Diamond has in place and actually
25   trained you on are important to follow?

[Page 15]

1        A.  Within reason, yes, sir.
2        Q.  You were in the military, right?
3        A.  I am.
4        Q.  Are you still in the military?
5        A.  I am.
6        Q.  You are a commissioned officer, my
7    understanding, in the United States Navy?
8        A.  Yes, sir, the Reserves.
9        Q.  What is your rank?
10       A.  Lieutenant.
11       Q.  So as a commissioned officer in the
12   U.S. Navy with the rank of lieutenant, do you believe
13   personally that it's important to follow rules and
14   policies?
15       A.  Yes, I do.
16       Q.  And it's important for subordinates and
17   employees to follow rules and procedures, correct?
18       A.  Yes, sir.
19       Q.  You don't get to choose, when you are in the
20   military, which rules you are going to follow and which
21   ones you aren't, correct?
22       A.  You can, but there is going to be
23   consequences, yes, sir.
24       Q.  Such as?
25       A.  It depends.  I don't have a whole -- with

[Page 16]

1    what I am in the military, I don't have a whole lot of,
2    I guess, face-to-face interaction with the military.  I
3    am just a reservist.
4           So I mean, there is rules I follow, but
5    I don't have a lot of experience of people breaking
6    those rules.  I don't know what the consequences would
7    be.
8        Q.  Well, that's a good thing.
9           But you understand there is an entire
10   set of laws called the USMJ, Uniform Code of Military
11   Justice, that is in place to ensure that subordinates
12   in the military follow rules and policies?
13       A.  Yes.
14       Q.  If they don't, they go to jail?
15       A.  Yes, sir.
16       Q.  And you understand that there were people
17   like me -- I have to be fair with you.  I was in the --
18       A.  I understand.
19       Q.  -- Army JAG Corps.  So that was my whole job
20   for years, was to counsel people like you and help you
21   make sure your subordinates were following the rules
22   and the policies.
23       A.  Yes, sir.
24       Q.  Do you understand that?
25       A.  Yes, sir.

[4]  (Pages 13 to 16)

Patricia Diana Ormond                                    Pages

[Page 17]

1    Q.  So it's important, offshore especially, to
2  follow rules and policies, right?
3    A.  Yes, sir.
4    Q.  And you were trained by Diamond for a long
5  time on those rules and policies, correct?
6    A.  About six months, yes, sir.
7    Q.  Did Mr. Letchworth tell you not to report
8  this incident?
9    A.  No, sir.
10    Q.  Mr. Letchworth, likewise, was trained by
11  Diamond on those same safety policies and procedures,
12  correct?
13    A.  Yes, sir.
14    Q.  And one of those safety policies and
15  procedures that is really important -- not only to you,
16  but to everyone -- is to report incidents immediately,
17  correct?
18    A.  Yes.
19    Q.  Did Mr. Letchworth ever tell you not to
20  report the incident?
21    A.  No, he did not.
22    Q.  Did he ever tell you to report it?
23    A.  He left it up to me.
24    Q.  So you-all had a conversation about whether
25  to report the incident?

[Page 18]

1    A.  He was -- we never actually had that
2  conversation.  He was just more concerned about if I
3  was okay.
4    Q.  Well, sure.  But did he tell you:  Hey,
5  Patricia, we are in an offshore environment.  We both
6  received this training.  We both have these obligations
7  to follow these rules and regulations, or we could be
8  terminated.  You need to go report this incident?
9    A.  No, he did not.
10    Q.  How long had Mr. Letchworth been at Diamond
11  at the time of the alleged incident on February 20th,
12  2019?
13    A.  Just a few years.
14    Q.  Many years, right?
15    A.  Yes, sir.
16    Q.  He was an experienced electrician, correct?
17    A.  Yes, sir.
18    Q.  And been offshore a lot, right?
19    A.  (Witness moves head up and down.)
20    Q.  Correct?
21    A.  Yes, sir.
22    Q.  And it's your testimony that he never told
23  you:  Hey, Patricia, it's important to go report this
24  incident?
25    A.  Nobody did.

[Page 19]

1    Q.  Okay.
2    A.  None of the engineers or anyone.
3    Q.  Let's go back.
4        If I understand the claims in your
5  lawsuit, part of it is that you were burned by some
6  type of liquid.  Is that correct?
7    A.  Yes, sir.
8    Q.  Did you ever go to the doctor for those
9  burns?
10    A.  No, sir.  It was more of an -- I guess an
11  irritation.  It didn't burn, like leave marks on my
12  skin, but it was burning -- I mean, it was very, very
13  high temperature water.  I don't remember the exact
14  temperature, and it's chemically treated water, which
15  when we add those chemicals, we have to do a whole
16  bunch of -- like, wear a whole bunch of safety stuff to
17  put them in.  It's not stuff you just want on your
18  skin.
19        So it was -- like I was explaining,
20  it's kind of like if you get brake cleaner on your skin
21  and it burns for a little bit, but then it goes away.
22  That kind of the sensation, but with the
23  temperature to it, as well.  That sensation lasted a
24  lot longer.
25    Q.  Can you show the jury any marks or scars or

[Page 20]

1  abrasions --
2    A.  I don't have any, sir.
3    Q.  Sorry.  Let me finish.
4    A.  Sorry.
5    Q.  Have you ever given a deposition before?
6    A.  No.
7    Q.  Normally I go over all the rules and
8  regulations with you --
9    A.  Yes, sir.
10    Q.  -- of a deposition, but you are doing great.
11        Just let me finish my question before
12  you start your answer, and I will try to do the same
13  thing, which is not fire another question at you before
14  you finish your answer.  Is that fair?
15    A.  Yes, sir.
16    Q.  If you need a break at any point or
17  something to drink, just let me know.  We will come to
18  a logical conclusion in my questions and take as much
19  time as you need.
20    A.  Okay.
21    Q.  I forgot my question.
22        It was something along the lines of
23  show the jury any marks or abrasions or scars that you
24  have from these alleged burns?
25    A.  I don't have any.

[5]  (Pages 17 to 20)

Patricia Diana Ormond                                    Pages

[Page 21]

1   Q.  Did you ever have any?
2   A.  No, sir.
3   Q.  Did you know that there was this hot water
4   in the engine prior to conducting the operation that
5   you say caused the injury?
6   A.  No, sir.  I thought it was locked out.
7   Q.  Okay.  It was your first day on shift?
8   A.  Yes, sir.
9   Q.  Explain to the jury exactly what you were
10  doing and what, in your opinion, caused this injury.
11  A.  Okay.  I was directed to start taking what
12  the second engineer called the jewelry off the top of
13  the cylinder head that we were going to start
14  rebuilding, as we were starting on this new engine that
15  evening.
16        And I was sitting on the exhaust
17  manifold of the engine, and I had two gentlemen, Pedro
18  and Nick, standing across me from the catwalk.  We were
19  all working on different parts of taking little oil
20  lines or whatnot off the cylinder head.
21        Pedro handed me the tool that its one
22  job is to take out the high temp water manifold pipe
23  that is a whole manifold that runs the length of an
24  engine and that each cylinder has its own section of
25  that that can come out.  And it's got brackets on both

[Page 22]

1   sides, so to get that out, you have to take the
2   brackets off.  And then you, like, push the pipe into
3   one side, and you can take it out the other.
4         So that tool sits in a notch on the
5   pipe that you can hit it into the one side and take it
6   out the other.
7         So he handed me that tool.  I just set
8   it in place, because I wasn't done taking the brackets
9   off yet.  Once I completed that, I put my hand on the
10  tool.  I looked at him for confirmation, like can I go
11  ahead and do it.
12        He gave a thumbs up.
13        I bumped it, because that's all it
14  takes is a little bump to get the pipe out.  At that
15  time the boiling hot water started spraying everywhere.
16        And I mean, it sprayed all the way -- I
17  was straddling the cylinder head.  So it sprayed all
18  the way down my neck, chest, and my legs and
19  everything.
20        I jumped up and I twisted and I ran
21  down the engine.  I jumped up onto the next -- like,
22  catwalk railing, climbed over the railing.  And I just
23  froze there until the water got shut off, pretty much
24  in shock.
25        I couldn't -- they were yelling at me

[Page 23]

1   to do something, and I have no idea what they were
2   telling me to do.  But I just stood there until the
3   water got shut off.
4   Q.  How far was it that you ran and -- down the
5   catwalk?
6   A.  It was probably from here to the end of this
7   table.
8   Q.  So would you agree that's about 20 feet?
9   A.  Yes, sir.
10  Q.  It's a big table.
11  A.  Yes, sir.  It's a big engine.
12  Q.  Okay.  And --
13  A.  Maybe a little less.
14  Q.  Did you have the proper PPE on that day?
15  A.  Yes, sir.
16  Q.  What -- describe what you had on.
17  A.  We are required to wear flame retardant --
18  or FR, fire resistant, whatever it stands for,
19  clothing, our work gloves -- impact resistant work
20  gloves, hardhat, safety glasses, earplugs, steel-toed
21  shoes.
22  Q.  You had all that on?
23  A.  Yes, sir.
24  Q.  Is it your understanding that that's why you
25  weren't burned more seriously?

[Page 24]

1   A.  Yes, sir.
2   Q.  Okay.
3   A.  I think the clothes absorbed a lot of it.
4   Q.  Okay.  Now, if I understand your lawsuit and
5   discovery filed in this case, you are not pursuing
6   damages for the actual burns that you allege?
7   A.  Not for the burns, no, sir.
8   Q.  So we can take that off the table?
9   A.  Yes, sir.
10  Q.  What are you specifically pursuing
11  damages -- let me back up.
12        For what injuries are you pursuing
13  damages in this lawsuit?
14  A.  Officially, it is sprained sacroiliac joint
15  on the right side, but it's caused a lot of low back
16  pain strictly on the right side.  And it's prevented me
17  from staying working on the rig and performing other
18  duties, as well.
19  Q.  So lower back pain is your complaint in this
20  lawsuit?
21  A.  Yes, sir.
22  Q.  Anything else that I need to be worried
23  about today or ever in this lawsuit?
24  A.  Not that I can think of.
25        MR. AVERY:  Object to form.

888-893-3767
www.lexitaslegal.com

Patricia Diana Ormond                                    Pages

1          MR. NORRIS:  That is an overbroad
2     question.
3     BY MR. NORRIS:
4          Q.  Any other injuries that you have, as we sit
5     here today, that you are pursuing damages for in the
6     lawsuit?
7          A.  No, sir.  Just the lower back pain.
8          Q.  When did you first hire a lawyer post
9     incident, February 20th, 2019?
10          A.  I honestly couldn't tell you.  I don't
11     remember.
12          Q.  Well, was it the next day?
13          A.  No, sir.
14          Q.  Was it a year later?
15          A.  It was sometime after I left the rig in
16     August --
17          Q.  Okay.
18          A.  -- of 2019.
19          Q.  That's helpful.  So from February 20th until
20     you report an injury -- we are going to look at that
21     incident report -- six months later in August of 2019,
22     you hired an attorney?
23          A.  Yes, sir.
24          Q.  Okay.
25          A.  Well, I didn't actually hire anyone for a

1     while.  I just started speaking to different attorneys
2     trying to see what -- how this whole process would even
3     work.
4          Q.  Let's be careful here --
5          MR. AVERY:  Yeah.
6     BY MR. NORRIS:
7          Q.  -- because I am not -- I am not allowed to
8     ask you what you talked about with an attorney that you
9     had retained.
10          A.  Yes, sir.
11          Q.  Fair?  You understand that?
12          A.  Yes.
13          Q.  I am entitled, I believe, to know when you
14     formally retained an attorney.
15          A.  I would have to go back in my e-mail and
16     find out for sure.
17          Q.  That was my next question.
18              How did you, in your mind, initially
19     retain an attorney?  Was it by e-mail?
20          A.  E-mail and phone calls, yes, sir.
21          Q.  When did you formally retain, either by
22     phone calls, e-mails, letters, contracts, whatever, the
23     Doyle firm?
24          A.  I don't remember the exact date.
25          Q.  That's something -- you can look at either

1     your e-mails or a signed letter or a signed contract
2     and tell me that date?
3          A.  Yes, sir.
4          Q.  Okay.  And would you be willing to do that?
5          A.  I guess.
6          Q.  That is, at a break, after you talk with
7     your lawyers?
8          A.  Yes, sir.
9          MR. AVERY:  That's fine.
10     BY MR. NORRIS:
11          Q.  Let's go back just for a moment to the
12     gentleman that -- I think it was all other -- it was
13     all males in the engine room that day?
14          A.  Yes, sir.
15          Q.  Okay.  That's another rule that sometimes
16     some lawyers will approach you on the front end, but I
17     like to see how you do it.  It is you have to give a
18     yes or a no and then explain so that he can type it
19     down.  He doesn't do good with --
20          A.  Nods?
21          Q.  -- nods and huh-uh, fair?
22          A.  Yes, sir.
23          Q.  Okay.  You mentioned -- I think it was Pedro
24     Hernandez?
25          A.  Yes, sir.

1          Q.  What did Pedro -- what was his role that
2     day?
3          A.  That day he pretty much -- it was him at
4     night and then his boss during the day.  They were the
5     two engine technicians that were there to help oversee
6     the engine rebuilds.  So he was the night duty guy, and
7     so he just helps us rebuild engines.
8          Q.  Okay.  Is he from -- was he a Diamond
9     Offshore employee?
10          A.  No, sir.  He was a third party hand.
11          Q.  So he was a contractor who was there to
12     service and/or overhaul the company -- I'm sorry -- the
13     engine along with Diamond employees, correct?
14          A.  Yes, sir.
15          Q.  Do you recall the contractor that he
16     actually worked for?
17          A.  I think it was Himtech, H-i-m-t-e-c-h.
18          Q.  You mentioned the different shifts.  Let's
19     explain that a little bit.  My understanding is you
20     were on the nightshift.  Is that right?
21          A.  Yes, sir.  The rig actually has four
22     different shifts, some that start at 12:00, some that
23     start at 6:00 both morning and night.  So if you work
24     the dayshift, it's 6:00 to 6:00.  If you work the
25     nightshift, it's 6:00 p.m. to 6:00 a.m.  Then if you

888-893-3767
www.lexitaslegal.com

Patricia Diana Ormond                                    Pages

[Page 29]

1   work towers, it's like noon to midnight or midnight to
2   noon.
3       Q.   Okay.
4       A.   And I believe I was on the nightshift,
5   because I was working as a third assistant engineer.
6   They wanted me on the nightshift just because it was
7   normally slower.
8       Q.   That's good.  I will follow up just a few
9   questions.
10           So as far as what your duties were in
11  February, March of 2019, you were working as a third
12  assistant engineer on the nightshift, correct?
13      A.   Yes, sir.
14      Q.   That means you would have -- you would come
15  on at 6:00 p.m.?
16      A.   Yes, sir.
17      Q.   And you would work all night until
18  6:00 a.m.?
19      A.   Yes, sir.
20      Q.   And operations on a drill shift are 24 hours
21  a day, seven days a week, right?
22      A.   Yes, sir.
23      Q.   And there are other shifts, other people,
24  who work from 6:00 in the morning, when you-all get
25  off, until 6:00 p.m. when you-all come back on?

[Page 30]

1       A.   Right.
2       Q.   And then there are other job functions and
3   duties that are being conducted on what we call towers,
4   which are what, 12:00 to 12:00?
5       A.   Yes, sir.
6       Q.   Either way, 12-hour shifts on working and
7   then you get 12 hours off?
8       A.   Correct.
9       Q.   Okay.  And how long was your hitch that
10  started on February 20th, 2019?
11      A.   We probably got to the rig sometime before
12  lunch on the helicopter.  Then I had until 6:00 p.m.
13  until my shift started.
14      Q.   That hitch was 28 days?
15      A.   Yes, sir.
16      Q.   So basically four weeks on, four weeks off?
17      A.   Yes, sir.
18      Q.   Was Mr. Letchworth on the rig when you
19  arrived on February 20th, 2019?
20      A.   Yes, sir, I believe he was already there.  I
21  don't remember his schedule exactly.
22      Q.   Was he on the same hitch schedule that you
23  were on during that time frame?
24      A.   I don't remember.  I was moving around a lot
25  just trying to get wherever they needed me to go

[Page 31]

1   schedulewise.
2       Q.   At the time of -- by February 20, 2019, you
3   would have been working for Diamond for about a year?
4       A.   Yes, sir.
5       Q.   And all those safety core assessments -- we
6   will look at them specifically, but you had been signed
7   off on by that point -- by that point being
8   February 20th, 2019 -- by Diamond?
9       A.   As an oiler, yes, sir, I believe I was.
10      Q.   Well, let's talk about that.
11           What is the difference between an oiler
12  and a third assistant engineer?
13      A.   United States Coast Guard license.
14      Q.   And did you have that?
15      A.   Yes, sir.
16      Q.   So you were -- an oiler doesn't need a Coast
17  Guard license, correct?
18      A.   I think they do, but it's technically a QMED
19  license.  It's qualified member of the engine
20  department.
21           And then the next step up is third
22  assistant engineer.  Next step is second, first, chief.
23           To get to that point, you have to have
24  a certain amount of sailing time.  You have to take a
25  license exam, all that fun stuff.

[Page 32]

1       Q.   So to move from oiler to third assistant
2   engineer, there are certain licensing requirements
3   based on sea time and other qualifications?
4       A.   Yes, sir.
5       Q.   That need to be obtained, right?
6       A.   Yes, sir.
7       Q.   And by February 20, 2019, had you obtained
8   all the necessary licensing and other obligations
9   necessary to be in a third assistant engineer position?
10      A.   Yes, sir.  I started Diamond with my third
11  assistant engineer's license.
12      Q.   So you had all of the required stuff to be a
13  third assistant engineer on the day you started at
14  Diamond, right?
15      A.   Yes, sir.
16      Q.   And you just weren't actually formally put
17  in that position until a little over a year later when
18  you go out to the RHINO on February 20th, 2019?
19      A.   Right.  It wasn't even -- I wouldn't say
20  formally.  It was more of our chief engineer had to go
21  in early, so everybody bumped up one.  Since I held
22  that license, they felt okay putting me in that
23  position for that time.
24      Q.   You received an e-mail, I believe, from
25  Diamond saying, hey, you are going to be in a third

Patricia Diana Ormond                                          Pages

[Page 33]

1  assistant engineer position?
2      A.  Yes, sir, I think it was an e-mail.
3      Q.  Was that a decision that you disagreed with?
4      A.  No, sir.  I was excited.
5      Q.  Was -- did you make more money?
6      A.  I think so.  I think I got paid as a third.
7      Q.  That's a good thing?
8      A.  Oh, yeah.
9      Q.  As an oiler, did you supervise anyone at
10 Diamond?
11      A.  I wouldn't say I was put in a supervisory
12 position, but there were certain jobs where unlicensed
13 people were under me and I just happened to be the most
14 senior one there.
15      Q.  Okay.  And same question as a third
16 assistant engineer:  Did you supervise anyone?
17      A.  Same setup.  It wasn't, like, me
18 specifically being told, hey, go supervise these
19 people.  It's just we were all on a job.  I just
20 happened to be the most senior one there.
21      Q.  When you moved from oiler to third assistant
22 engineer, you are doing essentially the same functions;
23 you are just acting with that licensing certification
24 behind you?
25      A.  Yes, sir.

[Page 34]

1      Q.  It's not like all of a sudden you went from
2 oiler supervising no one to third assistant engineer
3 supervising 20 people?
4      A.  Right.  The only thing that changed is the
5 engineer stand -- like, at all times an engineer has to
6 be present in the control room.  And as a third, you
7 can be that person that's there, but they didn't let me
8 start doing that by myself until almost the second week
9 in.
10      Q.  Of the hitch that we were talking about?
11      A.  Yes, sir.
12      Q.  Okay.  Well, let's be clear.
13          You stayed on after the alleged injury
14 on February 20th, 2019, for your entire hitch, correct?
15      A.  Yes, I did.
16      Q.  And at no time during that 27-, 28-day
17 period did you make a formal incident report to Diamond
18 about your injury, correct?
19      A.  No, I did not.
20      Q.  At no time during that 27, 28 days were you
21 not able to do your job?
22      A.  There was sometimes that I would have to
23 take more time doing my job or I would have to get more
24 help doing it because I was just in pain.
25      Q.  Did you report that pain to anyone?

[Page 35]

1      A.  Not officially.
2      Q.  Well, how about unofficially?
3      A.  I mean, I would mention it to people working
4 with me, like, I mean, it would be noticeable if I
5 couldn't pick up something that I normally used to be
6 able to pick up because it just hurt.  So I would have
7 to ask somebody to help me because I was hurting.
8      Q.  Who was that person?
9      A.  It could have been Nick.  It could have been
10 any of the guys in the engine department.  It just
11 happened to be whoever I was working with at the time.
12      Q.  By this point you are in a romantic
13 relationship with Mr. Letchworth?
14      A.  Kind of.
15      Q.  Okay.
16      A.  I don't know --
17      Q.  What does that mean?
18      A.  We were just talking at the time.  We were
19 getting to know each other more.
20      Q.  Were you-all in a sexual relationship during
21 this time?
22      A.  No, sir.
23      Q.  When did that change?
24      A.  I couldn't tell you exactly.
25      Q.  Well, if we are talking about February/March

[Page 36]

1 of 2019, you-all move in together in August of '19,
2 correct?
3      A.  Yes.
4      Q.  So --
5      A.  I mean, it happened quickly.  I will say
6 that.
7      Q.  Okay.
8      A.  It just -- I don't know.  It just kind of
9 happened over the next few months, I guess.
10      Q.  Sometime between February of '19 and August
11 of 2019 when you move in together, your relationship
12 moves from talking or getting to know each other into a
13 sexual, romantic relationship?
14      A.  Yes, sir.
15      Q.  Okay.  And did that occur on the rig or at
16 home?
17      A.  Mostly at home.
18      Q.  And so you used to live in Colorado when you
19 joined Diamond back in 2018, correct?
20      A.  Yes, sir.
21      Q.  Why did you move to Mississippi?
22      A.  The real reason, I wanted to move out of my
23 parents' house.  I wanted to be on my own, and I wanted
24 to be within driving distance of the heliport to go to
25 work, because I was tired of losing the travel time

888-893-3767
www.lexitaslegal.com

Patricia Diana Ormond                                        Pages

1   going to and from work every time.
2       Q.  Okay.  And you picked -- when did you make
3   that move?
4       A.  December of 2018.
5       Q.  So about two months before the alleged
6   incident on February 20th, 2019, you moved from
7   Colorado to Mississippi?
8       A.  Yes.
9       Q.  And what was that address again, the city?
10      A.  McComb, Mississippi.
11      Q.  Okay.  And you just happened to pick McComb,
12  Mississippi?
13      A.  I was stuck between Texas, Mississippi --
14  Texas, Louisiana, and Mississippi.  I wanted something
15  within a three- or four-hour drive, if not less, but I
16  didn't want to be on the coast.  And I wanted a gated
17  apartment complex.  When you put those things into
18  Google, that was what I found.
19      Q.  Were you talking at that point to
20  Mr. Letchworth?
21      A.  Yes, sir.
22      Q.  You-all had begun your nonromantic,
23  nonsexual, getting-to-know-each-other relationship by
24  the time you moved to Mississippi?
25      A.  Yes, sir.  We were friends.

1       Q.  And you-all had met on the rig?
2       A.  Yes, sir.
3       Q.  Now, I'm just going to be real honest with
4   you.  I don't enjoy asking these questions, but you
5   have sued my client for -- I think you call it loss of
6   intimacy.
7       A.  Yes, sir.
8       Q.  So I have to.  Was -- our records indicate
9   that Mr. Letchworth was married during this time frame.
10      Is that your understanding?
11      A.  Yes, it is.
12      Q.  Is Mr. Letchworth still married?
13      A.  No, he is not.
14      Q.  When did he become unmarried?
15      A.  October of 2019.
16      Q.  Okay.  I got off on a tangent as I do
17  sometimes.  Let's go back and talk with -- we were
18  talking about Mr. Pedro Hernandez, who was, we believe,
19  a Himtech contractor employee, correct?
20      A.  Yes, sir.
21      Q.  And we are back in the engine room on
22  February 20th, 2019, fair?
23      A.  Fair.
24      Q.  You also said that there was a gentleman
25  named Nicholas Ryan Vandergriff?

1       A.  Yes, sir.
2       Q.  Or something along those lines?
3       A.  I think it is Nicholas Ryan.
4       Q.  Okay.  For whom did Mr. Vandergriff work?
5       A.  Diamond.
6       Q.  What was his position?
7       A.  I can't even think of the word for it.  It's
8   one step under oiler.  Motorman.
9       Q.  So was Mr. Vandergriff one of those Diamond
10  employees that during certain operations or projects or
11  work that you were doing, he would have been supervised
12  by you because you were more senior to him?
13      A.  Yes, sir.
14      Q.  And especially when you are moved into the
15  new position of third assistant engineer,
16  Mr. Vandergriff was within your scope of responsibility
17  of supervising?
18      A.  Yes, sir.
19      Q.  So at the time of the incident on
20  February 20th, 2019, Mr. -- you were supervising
21  Mr. Vandergriff?
22      A.  Yes, sir.
23      Q.  Now, where was Mr. Vandergriff at the time
24  the water sprayed out of the pipe?
25      A.  He was on the other side of the cylinder

1   head from me.
2       Q.  About how far is that?
3       A.  It's maybe two or three feet.
4       Q.  I am sorry?
5       A.  Maybe two or three feet.
6       Q.  He was right there with you?
7       A.  Yes, sir.  Both him and Pedro were on the
8   other side.
9       Q.  So he and Mr. Hernandez were about two to
10  three feet away from you?
11      A.  Yes, sir.
12      Q.  Were they struck by the burning water that
13  allegedly came out of the pipe?
14      A.  I think -- I'm not 100 percent positive.  I
15  think Nick might have gotten sprayed a little bit, but
16  they both kind of moved a little bit faster than I did,
17  probably --
18      Q.  Okay.
19      A.  -- because they were already standing, so --
20  but they were both right there.
21      Q.  Who turned the water off?
22      A.  Blake Clodfelter.
23      Q.  Where was Mr. Clodfelter?
24      A.  Clodfelter.
25      Q.  Sorry.

Patricia Diana Ormond                                    Pages

[Page 41]

1    A.  He was on the lower level of the engine
2  room.
3    Q.  So about how far from where you,
4  Mr. Hernandez, and Mr. Vandergriff was standing was
5  Mr. Clodfelter?
6    A.  He was on the backside of the engine after
7  us, so he was maybe 20 feet from us.
8    Q.  Would he be able to observe what the three
9  of you were doing?
10    A.  Probably not, because we were on top of the
11  engine on the other side.
12    Q.  He was on the other side of the engine on
13  the bottom lower level?
14    A.  Yes, sir.
15    Q.  How big is this engine?
16    A.  It's about the size of a pickup truck, a big
17  pickup truck.
18    Q.  Like an F350?
19    A.  Yes, but it's hard to describe.  I used to
20  know all the statistics.  You have four or five steps
21  to get up to the catwalk, which is about halfway.  It's
22  probably 15 feet tall, and it's probably 30 feet long
23  and maybe 10 feet wide, something along those lines.
24    Q.  It's a large piece of equipment?
25    A.  Yes, sir.

[Page 42]

1    Q.  That requires, it sounds like, a lower
2  level, a catwalk.
3        Is there an upper level?
4    A.  No, sir.  The upper level of the engine room
5  just goes around the outskirts of those three engines
6  sitting next to each other.  And the catwalk goes just
7  around the edge of them.  It's open below.  You can see
8  the engines below.
9    Q.  But as you said, someone who is standing on
10  the other side of the engine from where you-all were
11  wouldn't be able to observe exactly what happened?
12    A.  No, sir.
13    Q.  So Mr. Clodfelter would not have -- I
14  probably messed up his name.
15    A.  Clod, like --
16    Q.  Clod, like --
17    A.  C-l-o-d.
18    Q.  -- like a clay clod, a dirt clod?
19    A.  Right, there you go.
20    Q.  Mr. Clodfelter would not have been able to
21  witness or observe the incident?
22    A.  No, sir.
23    Q.  Now, what was his position again?
24    A.  He was another third assistant engineer.  He
25  is the normal third for that time period.

[Page 43]

1    Q.  What was he doing then?
2    A.  He was doing something with the valves down
3  below.
4    Q.  Was -- but did the operation -- the
5  overhaul, require two third assistant engineers?
6    A.  I wouldn't say it required it.  I mean, not
7  what we were doing, no, sir.  The actual overhaul
8  requires a lot more than just two engineers, but us
9  taking the jewelry off the cylinder head did not.
10    Q.  So Diamond had two third assistant engineers
11  assigned to the shift from 6:00 p.m. to 6:00 a.m., the
12  nightshift?
13    A.  I think Blake was on the midnight to noon.
14    Q.  So he was working a tower shift?
15    A.  Yes, sir, I think so.
16    Q.  Okay.  Yeah, that's a good point.
17        At what time between 6:00 p.m. and
18  6:00 a.m., approximately, did the incident occur?
19    A.  So it happened after midnight, because when
20  Blake came on, we were sitting around having coffee,
21  and then we went out to work.  So it happened after
22  midnight.
23    Q.  Okay.  Were you able to continue to work
24  until 6:00 a.m. the next morning after the incident
25  occurred?

[Page 44]

1    A.  It took me a couple hours to, one, gain my
2  composure and; two, just, I guess, get back into the
3  swing of things and calm down from everything, because
4  the adrenaline kind of hit me pretty hard.  But I did
5  make it to the end of my shift, yes, sir.
6    Q.  You were able to continue the shift and
7  complete it with no problems?
8    A.  I wouldn't say with no problems, but yes,
9  sir.
10    Q.  Okay.  If I understand your testimony, it --
11  the water sprays out.  You run 15 to 20 feet and jump
12  up on the catwalk.  Is that correct?
13    A.  Yes, sir.
14    Q.  When exactly did the back injury occur?
15    A.  In the process of getting up and running --
16  like, getting up and turning to run the other
17  direction.
18    Q.  So you didn't hurt your back jumping up to
19  the catwalk, correct?
20    A.  No, sir.
21    Q.  You didn't hurt your back somehow falling
22  over that catwalk?
23    A.  No, sir.
24    Q.  The catwalk really had nothing -- the jump
25  and that reaction had nothing to do with your injury?

[11] (Pages 41 to 44)

Patricia Diana Ormond                                    Pages

[Page 45]

1    **A.** It was the escape route.
2    **Q.** So running from the water spraying out to
3  the catwalk didn't have anything to do with your
4  injury, either?
5    **A.** Not that I know of, but, again, with the
6  adrenaline, I really couldn't tell you.
7    **Q.** But your testimony, if I understand it,
8  is -- that's what I am trying to get so the jury can
9  understand exactly what your complaints are?
10    **A.** Okay.
11    **Q.** -- is that when the water sprayed out, it
12  was hot?
13    **A.** Yes, sir.
14    **Q.** And you turned quickly to run to get away
15  from it?
16    **A.** Yes, sir. I was essentially -- I mean, I
17  was seated when I was working, so I was seated. I had,
18  like -- I wouldn't say I was completely straddling the
19  cylinder head, but I had my feet on either side of the
20  cylinder head. And I was working between my feet.
21          When the water started spraying, I had
22  to get up out of that position and get away from it, so
23  in the process of doing so, is when I hurt my back.
24    **Q.** Okay. How were you seated?
25    **A.** Essentially -- I don't know if -- I can try

[Page 46]

1  to demonstrate.
2    **Q.** Sure.
3    **A.** I was essentially seated like this. I just
4  had my feet flat, and I leaned over working below next
5  to me, because I was seated on the exhaust manifold,
6  which is a little bit higher than the cylinder head
7  itself.
8    **Q.** So you were sitting on another part of the
9  equipment?
10    **A.** Yes, sir.
11    **Q.** Not a chair or stool or anything?
12    **A.** No, sir.
13    **Q.** And not on the ground?
14    **A.** No, sir.
15    **Q.** Okay. So you were a little bit elevated
16  from the equipment that you were working on?
17    **A.** Correct.
18    **Q.** And when you -- the water sprayed out,
19  that's when you had to turn quickly to run away from
20  it?
21    **A.** Correct, yes, sir.
22    **Q.** Okay. Did you turn left or right?
23    **A.** To my right.
24    **Q.** So you turned right and ran right?
25    **A.** Yes, sir.

[Page 47]

1    **Q.** Okay. Did the other guys, specifically
2  Mr. Hernandez and Mr. Vandergriff, run along with you?
3    **A.** They -- I honestly couldn't tell you where
4  they ended up. I just know they got away from it. I
5  want to say -- and I don't remember for sure, because
6  he was yelling at me to do something, but I was so
7  zoned out and freaked out.
8          I think Nick ran to his left, which
9  would also have been my right, towards the aft of the
10  engine, but he wouldn't have had anywhere else to go
11  except the end of the catwalk, because it just goes up
12  to the top of the engine and you are done.
13          I think Pedro went down the stairs to
14  the lower level of the engine to get away from it.
15  Again, I couldn't tell you that 100 percent sure.
16    **Q.** Did someone come and clean up the water?
17    **A.** I had to after the fact.
18    **Q.** How did you clean it up?
19    **A.** I had to clean the bilge streams and let it
20  drain to the bilge, but that happened a couple days
21  later.
22    **Q.** The water was --
23    **A.** It was contained in the bilge pan, bilge
24  drain pan under the engine.
25    **Q.** So is there a grated floor?

[Page 48]

1    **A.** No, sir. It's a Diamond plate floor, and
2  then it's like a barrier that goes all the way around
3  that's directly under the engine, kind of like a catch
4  pan. And there is drains within that that goes down to
5  the bilge system.
6    **Q.** So the water runs off of the surface of the
7  deck?
8    **A.** Yes, sir.
9    **Q.** Into the drain?
10    **A.** Yes, sir, in that catch pan.
11    **Q.** And then that drain leads to a catch pan
12  somewhere that has to be cleaned?
13    **A.** It leads -- well, the drains are what gets
14  clogged. So as long as those drains are clear, those
15  pipes lead directly to the bilge tank.
16    **Q.** Got it. That water is --
17    **A.** We process it.
18    **Q.** -- disposed of by all sorts of --
19    **A.** Yes, sir.
20    **Q.** No allegation that we committed any
21  environmental issues?
22    **A.** Oh, no.
23    **Q.** Just making sure. You have mentioned
24  several times that someone was yelling at you post
25  release of the water and running and jumping on the

[12]  (Pages 45 to 48)

Patricia Diana Ormond                                    Pages

[Page 49]

1  catwalk.  Who was that?
2      A.  I think it was Nick.  Nick, I want to say,
3  was telling me to get -- I believe there was cardboard
4  or something behind me.  It was like he wanted me to
5  put it over the top of it, and I just -- I was in a
6  haze.  I couldn't really put together what he was
7  trying to tell me to do and actually do it.  So I just
8  stood there.
9          Once the water got shut off, I didn't
10 even think about it.  I went straight to the control
11 room.
12     Q.  And by Nick, you mean Mr. Vandergriff?
13     A.  Yes, sir.
14     Q.  And to be clear, Mr. Vandergriff worked for
15 you at that time?
16     A.  Not directly.  He was just -- we were all
17 working on the job together.
18     Q.  Right, but we talked about earlier --
19     A.  Yes.
20     Q.  -- he would have been one of those you were
21 supervising at the time?
22     A.  Yes, sir.
23     Q.  So you -- the water gets shut off, and you
24 go directly to the control room?
25     A.  Yes, sir.

[Page 50]

1      Q.  Tell the jury, what's the control room, and
2  who is there?
3      A.  The control room is the engine control room,
4  and it is the mastermind brain behind the engine room
5  and all the systems that go to support it.
6          So it's a bunch of computer screens and
7  keyboards, and it also has, like, our break area.
8  There is a bathroom.  There is doors to the other
9  engine room and whatnot where we have our meetings and
10 breaks and whatnot.
11         The second engineer, Matt Lucius, was
12 there, but he at the time was the acting first -- first
13 engineer on nights.
14     Q.  Anyone else that you recall?
15     A.  No, sir.  He was the only one in there.
16     Q.  And is that typical?
17     A.  Yes, sir.
18     Q.  You said his name is Matt Lucius?
19     A.  Yes, sir.
20     Q.  How do you spell Lucius?
21     A.  L-u-c-i-u-s.
22     Q.  He was the second assistant engineer, but
23 actually acting as the first assistant engineer on that
24 occasion?
25     A.  Yes, sir.

[Page 51]

1      Q.  And did you tell Mr. Lucius at that time
2  about the incident?
3      A.  No, sir.
4      Q.  Would Mr. Lucius have been able to observe
5  the incident?
6      A.  No, sir.  The cameras weren't on us at the
7  time.
8      Q.  Okay.  So there are cameras in the engine
9  room?
10     A.  Yes, there are.
11     Q.  How do you know that they were not on?
12     A.  It was common practice for the engineers to
13 point them away from wherever we were working.
14     Q.  Who would have made that decision?
15     A.  It just normally stays like that.  Normally
16 the chief or the first or whatever engineer is on watch
17 normally likes to adjust the cameras.
18     Q.  How are the cameras adjusted?
19     A.  There is a control panel there on the main
20 control panel of the control room.  It's a lot of
21 controls.
22     Q.  So you don't know that those cameras weren't
23 on?
24     A.  No, sir.
25     Q.  Do you?

[Page 52]

1      A.  Not for sure, no.
2      Q.  Okay.  You just assume that or speculate
3  that?
4      A.  Yes, sir.
5      Q.  Correct?
6      A.  They stay on, but you can turn them.  And so
7  normally they stay turned away from wherever people are
8  working.
9      Q.  Well, did you turn them away from where you
10 were working?
11     A.  No, sir.
12     Q.  Did you see anyone else turn them away from
13 where you were working?
14     A.  No, sir.
15     Q.  Do you know -- did Mr. Lucius or anyone else
16 tell you they turned them away from where you were
17 working?
18     A.  No, sir.
19     Q.  You are just speculating that they were?
20     A.  Yes, sir.  It was just common practice at
21 the time.
22     Q.  Well, did you ever move the cameras?
23     A.  No, sir.
24     Q.  That wouldn't have been your responsibility?
25     A.  No, sir.

[13]  (Pages 49 to 52)

Patricia Diana Ormond                                      Pages

[Page 53]

1    Q.  That would have been the responsibility of a
2  second or first assistant engineer?
3    A.  I mean, anyone can move them, and we do use
4  them to check on things.  Like, I have moved them
5  before to check on a pump that's running or something
6  like that.  You can turn them in pump rooms or whatnot.
7        But I would never -- I mean, I would
8  just be like, oh, I have got to go move the cameras and
9  go up there and do it.  I wouldn't be moving them
10  unless I had a job to look at.
11    Q.  Okay.  But at the time of the incident,
12  sometime after midnight, I guess, now on
13  February 21st --
14    A.  Yes, sir.
15    Q.  -- you don't know whether those cameras were
16  on, correct?
17    A.  Well, they don't get shut off.
18    Q.  They never get shut off, right?
19    A.  Not that I know of.  I have never seen them
20  off.
21    Q.  So we know that they were on, correct?
22    A.  Yes, sir.
23    Q.  So then it just becomes a matter of whether
24  or not they were pointed in the right direction of
25  where you were performing the work, correct?

[Page 54]

1    A.  Right.
2    Q.  And you don't have any personal knowledge,
3  as you sit here today, of anyone moving those cameras
4  away from the area that you were working, correct?
5    A.  Correct.
6    Q.  So if I go back to Diamond and get those
7  videos -- or if I have done that already -- and they
8  were on and they were pointed at the area of work, we
9  would be able to see what happened?
10    A.  Yes, sir.
11    Q.  And we would see the things that you have
12  already described for us here today.
13    A.  Yes, sir.
14    Q.  So water comes out.  You turn, injure your
15  back, continue to run the 15 to 20 feet, jump up on the
16  catwalk, correct?
17    A.  Yes, sir.
18    Q.  When you -- describe for us how you jump up
19  on the sidewalk.
20    A.  It's -- I couldn't even tell you the
21  distance that it was anymore, but having long legs
22  helped me out this time.
23        But I essentially just reached for it,
24  grabbed onto the rail, stepped up to it, and then
25  climbed over the railing.  It's normally like a top

[Page 55]

1  rail and a middle rail.  That's it.  So I just climbed
2  over it to get out of the way.
3    Q.  So there is a -- you are on the bottom
4  floor, correct?
5    A.  I was on the exhaust manifold of the
6  engine --
7    Q.  Okay.
8    A.  -- where I was sitting.  So when I got up, I
9  stayed on that.  I ran down that.  Right before the
10  turbo and all the up piping for the turbo on the back
11  of the engine, which is huge, is where I turned and
12  reached up to the catwalk and got up to the catwalk and
13  then climbed over the railing.
14    Q.  The catwalk, the -- how far is it from the
15  floor or the level that you were on and the floor the
16  level of the catwalk?
17    A.  Probably 20 feet, maybe less.  Maybe -- I
18  don't know.
19    Q.  Okay.
20    A.  I am a bad judge of that.
21    Q.  Well, let me do it this way.
22        So --
23    A.  I couldn't stand there and reach the ceiling
24  of the floor above me, if that makes sense.
25    Q.  Okay.

[Page 56]

1    A.  Like, if I am standing on the lower engine
2  room, I can't just reach the next floor.  So it's at
3  least 10 feet, 12 feet, something like that.
4    Q.  But between where the floor you were on and
5  that next floor, there is the catwalk?
6    A.  No.  Okay.  So it's hard to describe it.
7        All right.  So there is a lower level
8  of the engine room where you have the three engines
9  sitting.  They are mounted there.
10    Q.  Right.
11    A.  And that decking is maybe two feet above the
12  actual floor.  So there is the grating, the diamond
13  plate decking across the whole thing.  Everything is
14  diamond plate except for where the engine sits
15  directly, okay?
16        Then there is a set of stairs that goes
17  up, and there is the catwalk.
18    Q.  And the set of stairs that you said earlier
19  is -- I think you said five steps?
20    A.  That is a different set.
21    Q.  Okay.
22    A.  So -- okay.  So it's like a two-story room,
23  except the second story is just the edge of the room as
24  a walkway.
25    Q.  That's the top floor where you can walk and

Patricia Diana Ormond                                    Pages

[Page 57]

1   observe?
2       A.   That's what I call the catwalk.
3       Q.   Okay.
4       A.   So I was -- and there is an engine side
5   catwalk.  That's the one that has the little five steps
6   and gets up to the engine where you can work on it.
7            So I was on top of the engine itself
8   above the main floor, but below the second floor, but
9   close enough to it that I could reach it from where I
10  was at.
11      Q.   From where you were at until -- from where
12  you were to the bar that you had to grab the rail to
13  climb over, how far was that?
14      A.   Just a few feet.
15      Q.   Okay.  So did you -- you had to pull
16  yourself up?
17      A.   Kind of, sort of, I guess.  I don't really
18  remember.
19      Q.   Okay.
20      A.   I mean, I definitely had to use my legs more
21  than anything.
22      Q.   You had to, with your arms and legs and your
23  whole body, pull yourself up and go over that rail?
24      A.   Yes, sir.
25      Q.   So then you are on the --

[Page 58]

1       A.   The upper level of the engine room.
2       Q.   -- the upper level of the engine room?
3       A.   Yes, sir.
4       Q.   Okay.
5       A.   I am sorry that was so confusing.
6       Q.   No, that's okay.  How far was it from where
7   you pulled yourself up and over to the control room?
8       A.   Probably from, say, this corner of the room
9   and the door would be the entrance to the control room.
10      Q.   So for the record, you walk 15 or 20 feet,
11  turn, walk another 10 feet, and you would be in the
12  control room?
13      A.   Close enough, yeah, something along those
14  lines.
15      Q.   And the only person in the control room at
16  that time was Matt Lucius, who was the second assistant
17  engineer, but acting as the first assistant engineer?
18      A.   Correct.
19      Q.   And, again, you didn't report the incident
20  at that time to Mr. Lucius?
21      A.   No, sir.
22      Q.   How far -- how long did you stay in the
23  control room after that?
24      A.   It was a few minutes at least.  I was at the
25  water fountain with paper towels dousing them in cold

[Page 59]

1   water putting them on my neck and chest.
2       Q.   Did anyone -- was anyone there witnessing
3   that?
4       A.   Just Matt.
5       Q.   Did you --
6       A.   The drinking fountain is -- it's just one
7   long, big room.  It's all in sight of everything except
8   the bathroom.
9       Q.   Okay.  Is it your -- well, your lawsuit says
10  that people from Diamond witnessed this incident --
11      A.   Yes, sir.
12      Q.   -- and your injuries.  You understand that?
13      A.   Yes, sir.
14      Q.   Who?
15      A.   Nick and Pedro.
16      Q.   Okay.  Is it your testimony that Matt Lucius
17  witnessed?
18      A.   He just witnessed me trying to take care of
19  my neck and chest.
20      Q.   Did you say anything to him at that time?
21      A.   No, sir.  I was irritated and pissed off at
22  myself for getting hurt.
23           He asked me if I was okay.
24           I just kind of ignored him, and then I
25  told him that I was going to the female change room to

[Page 60]

1   finish taking care of myself.
2       Q.   Okay.  But it's not your allegation in this
3   lawsuit that Mr. Lucius was one of those Diamond
4   employees who witnessed the incident or the injuries?
5       A.   No, sir.
6       Q.   Okay.  So then you have got four or five
7   more hours of your shift that evening, correct?
8       A.   Yes, sir.
9       Q.   What occurred during those four or five
10  hours?
11      A.   I spent at least an hour of that just in the
12  female changing room calming down, trying to compose
13  myself, ice packs with cold water, really.
14           And then around 3:00 is coffee break,
15  so I went back to the control room for that.  And I
16  just acted like nothing happened.
17           They knew -- when I got back, like,
18  nobody said anything.  They all just kind of looked at
19  me.  It was just kind of like an unspoken event that
20  happened, I guess, because nobody really wanted to talk
21  about it, I guess.  I didn't want to.  We just
22  continued work.
23      Q.   So you went back down after 3:00 or so,
24  after coffee break, and continued to participate in the
25  overhaul of the engine?

[15]  (Pages 57 to 60)

Patricia Diana Ormond                                    Pages

[Page 61]

1   A.  Yes, sir.
2   Q.  Any additional injuries occur that day?
3   A.  No, sir.
4   Q.  Or I guess that morning into the 6:00 a.m.?
5   A.  No, sir.
6   Q.  You were able to perform your job functions?
7   A.  Lightly, yes.
8   Q.  Okay.
9   A.  I tried to position myself into parts of the
10  job that didn't require much.
11  Q.  Let's go back a little bit in time to when
12  you -- you arrive at the rig, lunchtime, as you said,
13  of --
14  A.  Yeah, it's normally before lunch.
15  Q.  Before you begin doing the operation that
16  you allege caused your injuries, sometime after
17  midnight?
18  A.  Uh-huh.
19  Q.  Are you with me?
20  A.  Yes, sir.
21  Q.  Was there a safety meeting?
22  A.  We just had pretower, which everybody
23  attends before they start their shift.
24  Q.  Tell me what happened at that pretower
25  safety meeting.

[Page 62]

1   A.  I can't remember exactly, but normally a
2   typical pretower is somebody does -- somebody has to
3   present some sort of topic, safety topic.  Captain --
4   somebody chief maintenance -- somebody will get up and
5   say something else, explain what has been going on
6   throughout the day, what the plan of the night, I
7   guess, is, but that's rig wide, so it's everybody in
8   there.
9          And then after that, you go down and
10  relieve your counterpart, and then we have like a
11  little coffee meeting, I guess, down in the engine
12  room -- or control room.
13  Q.  Okay.
14  A.  And we just kind of talk about the plan for
15  the night.
16  Q.  And is there a JSA done?
17  A.  It depends on whatever work is about to be
18  done.
19  Q.  Based on -- so let me back up so the jury
20  understands.
21         The rig for everyone has a big safety
22  meeting before you start the shift at 6:00 p.m.,
23  correct?
24  A.  Anytime, 6:00, noon, whatever.
25  Q.  Anytime a shift is getting ready to start?

[Page 63]

1   Is that right?
2   A.  Yes, pretower.
3   Q.  At that meeting, a captain and other
4   senior-level folks explain what's going on with the rig
5   that day or that shift, what the jobs are going to be,
6   and address safety issues?
7   A.  Correct.
8   Q.  And do you recall attending that safety
9   meeting --
10  A.  Yes, sir.
11  Q.  -- on February 20th, 2019?
12  A.  Yes, sir.
13  Q.  All right.  Then you go to your sort of
14  individual areas where you are going to be working for
15  that day as an oiler -- or a third assistant engineer
16  in this case, correct?
17  A.  Right.
18  Q.  And additional, more specific safety meeting
19  occurs, correct?
20  A.  Yes, sir, more or less.
21  Q.  And do you recall attending that safety
22  meeting prior to the shift that you allege caused your
23  injury?
24  A.  Yes, sir.
25  Q.  Who runs that meeting?

[Page 64]

1   A.  It's not really even a formal meeting.  It's
2   just us going down and, like, I would relieve whoever
3   was on duty that I would have taken his spot of.  They
4   tell me what they do throughout the day; explain, like,
5   if they are in the middle of a job or what's going on.
6   And then we just sit around and have coffee and talk
7   about random stuff --
8   Q.  Okay.
9   A.  -- until work starts.
10  Q.  Random stuff, you mean small talk over --
11  A.  Yeah.
12  Q.  -- coffee, like typical --
13  A.  Nothing important.
14  Q.  Okay.
15  A.  Like a break time talk.
16  Q.  But I want to focus on the safety aspects
17  that get discussed at these meetings.
18  A.  Like, if you are about to go do a job, they
19  may or may not have a JSA for you to sign.  They may or
20  may not have permits that need to be filled out.
21         Normally, right after -- like, when you
22  come on at 6:00, either in the morning or at night, you
23  are in charge of rounds.  So you have to go -- there is
24  three rounds, a forward machinery round, an aft
25  machinery round, and the engine room round.  So your

Patricia Diana Ormond                                        Pages

[Page 65]

1  motorman, your oiler -- or normally you have two
2  oilers -- you have three people that do those rounds.
3          So after that coffee break or coffee
4  time, they will go off and do their rounds, and I
5  honestly can't remember if I was still doing the round.
6  I think I was that night, because we were shorthanded.
7      Q.  How do you know what operation is, in this
8  case, where the crew that you were relieving had left
9  off in the operation?
10      A.  That's -- when we go down to -- go down
11  there to relieve them, they tell us that directly.  So
12  it comes from them to us.
13      Q.  And do you recall in this -- on this date
14  that turnover process?
15      A.  Not really.  I know that we didn't really
16  start doing anything with the engine until after
17  midnight.  I don't remember what we did before that,
18  though.
19      Q.  Was there a permit in place for that
20  operation of the engine overhaul that you then become
21  involved with later in the evening?
22      A.  I am sure so, but the permits, they are only
23  good for 12 hours.  So if they started a permit at 6:00
24  in the morning when they first came on shift, that
25  permit only went until 6:00 p.m.  A new permit would

[Page 66]

1  have to be filled out.  So it all depends which shift
2  that permit fell on.
3          Normally when you start a job, it's
4  going to go for a long job.  That permit -- that piece
5  of equipment goes into, like -- I don't want to say a
6  permanent lockout/tagout, but it's like a prolonged
7  period so you don't have to keep doing a full set of
8  new permits, I guess.
9          You just -- I don't even know how to
10  describe it.  The permit system was in-depth.
11          But it -- it really depends on what
12  crew starts the work as what crew continuously is going
13  to have to do those permits going forward.
14      Q.  And did -- in this instance that we are
15  talking about, would that at least in part have been
16  your responsibility?
17      A.  I really don't remember.
18          Permits were very hit and miss.  I
19  could sit down -- and a lot of the times I did because
20  I had the neatest handwriting -- and write out all the
21  permits for the night and then just have the respective
22  people sign them.
23          But it would be me filling them all out
24  and then them just signing where they had to sign.  And
25  it would be for whatever jobs were going on for that

[Page 67]

1  entire night, because more often than not you had to
2  get the captain or the chief engineer to sign them.
3  And they are off at 6:00 p.m., so you want to catch
4  them before they go to bed or whatever.  So you have to
5  get those permits going pretty quick.
6          So I filled out a lot of permits, and I
7  really don't remember that night specifically.
8      Q.  So you don't remember filling out a permit
9  for the operation that -- that part of the engine
10  overhaul that you allege you were injured on?
11      A.  No, sir.
12      Q.  Okay.  If there is a permit, is there also a
13  JSA?
14      A.  There should be, yes.
15      Q.  Do you recall a JSA being done anytime prior
16  to midnight on February the 20th, 2019?
17      A.  I don't remember specifically, no, sir.
18      Q.  Would also you -- that have been part of
19  your responsibility to participate at least in the JSA
20  process?
21      A.  It's generally something that they just
22  print it out and you just sign it.  I wouldn't say it's
23  necessarily an in-depth meeting or a review of it,
24  because, again, with all those permits that need to be
25  signed and everything, if that's all the work that is

[Page 68]

1  going to be done, you are going to have a JSA for each
2  one of those.
3          So you just sign whatever job you are
4  typically on on a permit, even though you may not
5  actually be on that job for work.  I honestly don't
6  remember.
7      Q.  You don't recall being a part of the JSA
8  process for the operation that you allege you were
9  injured on?
10      A.  No, sir.  I don't even know if we had a JSA
11  for that night.
12      Q.  Do you know what a JSA is?
13      A.  Job safety analysis.
14      Q.  What is the purpose of a job safety
15  analysis?
16      A.  To go over the potential risk factors and
17  safety mitigations and everything that can be done to
18  make the job go easier.
19      Q.  To identify risks that could be involved
20  with doing a job, correct?
21      A.  Yes, sir.
22      Q.  And then find ways to mitigate that risk,
23  correct?
24      A.  Correct.
25      Q.  All of which is to prevent personal injuries

[17]  (Pages 65 to 68)

Patricia Diana Ormond                                    Pages

[Page 69]

1   and environmental spills and those types of things,
2   correct?
3       A.  Uh-huh.
4       Q.  And that's -- that process is -- you would
5   agree, is important?
6       A.  Absolutely.
7       Q.  And shouldn't be something that you just
8   sign?
9       A.  No, sir, but that was the common practice at
10  the time.
11      Q.  And were you trained on job safety analysis?
12      A.  Yes, sir.
13      Q.  By whom?
14      A.  I think it was just an online course that
15  you take or, like, a computer program course.
16      Q.  And the Diamond Offshore trains you on how
17  to do a proper JSA?
18      A.  I think so, yes, sir.
19      Q.  That was one of the those core competencies
20  that your senior folks had to sign off that you knew
21  how to do?
22      A.  Correct.
23      Q.  Who is in charge of the JSA process, then,
24  for an engine overhaul in a shift change like we are
25  talking about here?

[Page 70]

1       A.  I honestly don't know.
2       Q.  Is that not something that a third assistant
3   engineer would at least be involved with?
4       A.  Sometimes, yes, sir.
5       Q.  Let me switch gears to the permit process
6   that you mentioned.
7           What is the purpose of a permit?
8       A.  Keep track of all the work that's going on,
9   allow work.  That way contradictory jobs that might --
10  I don't even know the words I am trying to say -- that
11  might harm another job doesn't get started, like hot
12  work and stuff like that.  That way, everybody knows
13  what's going on across the rig.  The safety precautions
14  and everything get marked on it.
15          You have people that do the work, check
16  the work, double check the work, and then you get it
17  officially approved just as a checks and balances-type
18  setup.
19      Q.  And so that a relieving crew or a crew
20  that's working on something nearby, everyone knows
21  what's going on in that engine overhaul.  Is that fair?
22      A.  Kind of.
23      Q.  That's what the permit process is for?
24      A.  That's the way it should be.
25      Q.  Okay.

[Page 71]

1       A.  But, say, my name gets put down on a permit
2   for bunkering, but I don't touch the bunkering because
3   I am doing an engine overhaul.  But they needed my name
4   on a permit because they already used everybody else's.
5           So then, I mean, when you have more
6   jobs than people, you have to -- they just made the
7   permits appear and people are on them and they were
8   signed and it just got done.
9       Q.  We are going to look at quite a few of them
10  that you actually signed.
11      A.  Yes, sir.
12      Q.  And you recall signing a lot of permits?
13      A.  Yes, sir.
14      Q.  And many times you were the person in charge
15  of those permits?
16      A.  Yes, sir.
17      Q.  You wouldn't just sign something if it
18  wasn't true?
19      A.  Correct.
20      Q.  And you wouldn't just sign something that
21  was meant to mislead, would you?
22      A.  Not intentionally.
23      Q.  So these permits and that whole process is
24  important, agree?
25      A.  It is.

[Page 72]

1       Q.  It's something that Diamond and other
2   companies do to ensure the safety of its employees.  Is
3   that fair?
4       A.  Right, but I think they got to the point
5   where it became overcomplicated and became a hindrance
6   to the point where a lot of the steps that should have
7   been performed by those permits got skipped or got
8   sidestepped or just didn't even happen.
9       Q.  Did you -- do you, as you sit here today,
10  have any specific knowledge, recollection, memory, of
11  the permits that were in place at the time that you
12  allege you were injured?
13      A.  No, sir, I don't remember.
14      Q.  Do you have any complaints about those
15  permits being overly complicated and not followed?
16      A.  Yes, sir.
17      Q.  Okay.  Specifically related to your injury?
18      A.  Oh, I mean, I don't even know -- obviously
19  the permit system wasn't followed if I got hurt,
20  because we should have never been able to touch that
21  engine if it wasn't locked out properly.  And it would
22  have been locked out properly if the permits were done
23  correctly.
24      Q.  Did you read -- as you sit here today, do
25  you recall reading the permit that was in place at the

888-893-3767
www.lexitaslegal.com

Patricia Diana Ormond                                    Pages

[Page 73]

1  time you came on shift around 6:00 p.m. on
2  February 20th, 2019?
3       A.  No, sir.
4       Q.  That's the purpose of it, right, is so you
5  get to go read it and understand what exactly the
6  condition of the engine in this case was, right?
7       A.  It's not so much what was done, though.
8            Nobody would just pull up the stack of
9  permits and just read through everything of what every
10 job is going on.  We were just told whatever our relief
11 told us, and then we just waited until we were told
12 what to do for the next job.
13           But the permits generally just stayed
14 on the fridge.
15      Q.  But in this case, you don't have any
16 specific recollection of reading the permits?
17      A.  No, sir.
18      Q.  Do you have any specific recollection of
19 what your relief told you?
20      A.  No, sir.
21      Q.  Did you ask, hey, is this locked out, tagged
22 out, whatever the term is we are going to use?
23      A.  At that point I don't think we were even
24 starting on it.
25      Q.  Okay.

[Page 74]

1       A.  When I took my relief at 6:00, we didn't
2  start on it until after midnight.  I didn't have any
3  reason to talk to him about it, but I don't even
4  remember when we actually officially started that
5  engine, if they started it before us or if we were the
6  first crew on it.
7       Q.  So you don't have any idea whether they were
8  in the middle or the beginning or the end of the engine
9  overhaul?
10      A.  I know they weren't -- it had to be the
11 beginning, because we were the first ones to start
12 taking stuff off the engine.
13      Q.  How long does it take to overhaul one of
14 these huge engines?
15      A.  Weeks.
16      Q.  And you stayed on the rig for the next few
17 four weeks?
18      A.  Yes, sir.
19      Q.  So when did you-all finish the overhaul of
20 engine No. 5?
21      A.  Engine No. 5, I believe we just did one
22 cylinder, so it wasn't a full rebuild.  So it was maybe
23 a week and a half, if not less.
24           Then we went to engine room No. 2 and
25 started on them.  One of those -- I don't remember

[Page 75]

1  which one, but it was a full rebuild.  We had to do all
2  nine cylinders.
3       Q.  What is the process supposed to be, then,
4  for when you show up -- and you are relieving some crew
5  member, correct?
6       A.  Uh-huh.
7       Q.  Someone went home when you got there?
8       A.  Right.
9       Q.  On the same helicopter?
10      A.  Yes.  They drop us off.  They refuel, and
11 those guys load up and tear out.
12      Q.  Did you talk -- because they had been there
13 for four weeks?
14      A.  Right.
15      Q.  Did you do a hand-over meeting or discussion
16 or conversation with any of the crew members that you
17 were relieving?
18      A.  No, sir.
19      Q.  Didn't even talk to them?
20      A.  At that point normally it's the higher ups
21 that do official turnovers, but they actually have --
22 they write turnovers notes, too, that get sent prior to
23 a new crew coming out.
24           But I say us lower people, but the
25 people like me as an oiler and everything, I didn't

[Page 76]

1  talk to anybody.
2       Q.  Okay.  But now you are a third assistant
3  engineer, correct?
4       A.  Right.
5       Q.  And you knew that before you showed up on
6  the rig, correct?
7       A.  Right.
8       Q.  You got the e-mail that said, hey,
9  congratulations, you have been selected; you have the
10 right certifications and everything, correct?
11      A.  Right.
12      Q.  You had been to the Merchant Marine Academy,
13 right?
14      A.  Yes.
15      Q.  At that time you had been at sea for several
16 months on other ships?
17      A.  Yes, sir.
18      Q.  You had been commissioned as an officer of
19 the United States Navy, correct?
20      A.  Yes, sir.
21      Q.  You had received about a year of training on
22 the job and otherwise from Diamond, correct?
23      A.  Correct.
24      Q.  And you don't say, hey, what the heck is
25 going on with this operation engine overhaul that I am

[19]  (Pages 73 to 76)

Patricia Diana Ormond                                    Pages

[Page 77]

1    getting ready to start breaking down pipes off of?
2        A.  No, sir.
3        Q.  Why not?
4        A.  Because those guys are so ready to go home,
5    half the time they don't want to talk.  And we are
6    already exhausted coming to the rig, because we had to
7    be at the heliport by 4:00 a.m. that we are grumpy that
8    we have to be back at work.
9        Q.  Well, I get that.  But, also, you know
10   safety is key?
11       A.  Right.
12       Q.  Right?
13       A.  But normally when you first get to the rig,
14   there is a big safety briefing that the captain does
15   which gives you the rundown of where everything stands,
16   what's happened in the month that you have been gone.
17   So I normally would rely on that PowerPoint and the
18   captain than I would just small talk with the guys of
19   what's going on.
20       Q.  Did you get that PowerPoint briefing from
21   the captain in this shift?
22       A.  Yes, sir.
23       Q.  Okay.
24       A.  Well, when we -- not in the shift, but,
25   like, when we first land on the rig.

[Page 78]

1        Q.  The captain's job is, hey, here is what's
2    been going on on the rig.  You guys have been gone for
3    four weeks.  Here is where we are on the operations,
4    here is where we are overhauling our engines, here is
5    what is --
6        A.  It wouldn't even get as in-depth as that.
7    He would give the general overview of what's been going
8    on.  He probably wouldn't even have the details of
9    where we were at with the engines.  I don't remember.
10       Q.  Okay.  But at some point before you put that
11   tool on that pipe --
12       A.  Uh-huh.
13       Q.  -- and kick it to the left to expose
14   yourself and your coworkers to whatever is in there,
15   did you not ask what is the current condition status of
16   this engine overhaul project?
17       A.  No, sir, because we were told we could go
18   ahead and start.
19       Q.  Okay.  Who told you that?
20       A.  Matt Lucius.
21       Q.  And did you ask Mr. Lucius as the third
22   assistant engineer to the first assistant engineer,
23   hey, is this -- is there any hot water in here?
24       A.  No, sir.  I just assumed it was locked out
25   when he told us that we were good to go.

[Page 79]

1        Q.  And you said earlier in your testimony that
2    you put the tool on there.  Before you kicked it over
3    to the left, you looked at Mr. Hernandez --
4        A.  Pedro.
5        Q.  -- and Mr. Vandergriff, correct?
6        A.  Just Mr. Hernandez, yes, sir.
7        Q.  Mr. -- and you gave him the, hey, can I do
8    this look?
9        A.  Yes, sir.
10       Q.  Correct?
11       A.  Uh-huh.
12       Q.  He gave you, I think you said, the thumbs
13   up?
14       A.  Yes, sir.
15       Q.  Now, Mr. Hernandez doesn't even work for
16   Diamond, correct?
17       A.  No, he does not.
18       Q.  And Mr. Hernandez works for a third party
19   contractor, correct?
20       A.  Correct.
21       Q.  But he was standing right next to you,
22   right?
23       A.  Across from me, yes, sir.
24       Q.  And then you have someone that you are in
25   charge of, supervising, Mr. Vandergriff, standing, you

[Page 80]

1    told me, two or the three feet away from you, correct?
2        A.  Uh-huh.
3        Q.  That's right?
4        A.  Yes, sir.
5        Q.  And so you don't go talk to someone and make
6    sure that when you kick that pipe over to the left you
7    are not going to expose those two and yourself to some
8    type of dangerous situation?
9        A.  When I was told by my supervisor, as Matt,
10   the second engineer acting first, to go ahead and go
11   start work, I thought the precautions and everything
12   that had been taken -- all the appropriate steps had
13   been taken, because he told us we could go ahead and
14   start.  So I was trusting his word as my supervisor to
15   go ahead and start.
16       Q.  Did Mr. Lucius just arrive on the same crew
17   as you?
18       A.  Yes, sir.
19       Q.  And how would Mr. Lucius have known the
20   status of the pipe that you were moving to the left?
21       A.  Because the upper engineers do much more
22   thorough turnovers than the lower engineers, oilers,
23   QMEDs, whatever you want to call them, do.
24           He probably had more detailed
25   information.  He was told what was expected of him to

888-893-3767
www.lexitaslegal.com

Patricia Diana Ormond                                    Pages

[Page 81]

1  get done that night.  In turn, he told us what to do
2  that night.  That's just normally the way it goes.
3     Q.  Did you ask Mr. Lucius, hey, has this been
4  locked out, or do I need to take some other precaution?
5     A.  I did not.
6     Q.  You just assumed that when he said you-all
7  can get started, that meant everything is good to go?
8     A.  Yes, sir.
9     Q.  Any other information that you had at that
10 time that there wasn't a dangerous substance behind
11 that pipe?
12    A.  Not that I can think of.
13    Q.  Now, did you ask Mr. Lucius, hey, before I
14 get started, can I look at the permit?
15    A.  No, I did not.
16    Q.  Were they available to you?
17    A.  They were in the process of being filled
18 out.
19    Q.  And did you look at the JSA?
20    A.  I don't recall.
21    Q.  Did you ask Mr. Lucius if you could review
22 the JSA?
23    A.  I don't remember.
24    Q.  Did you talk to your guys or Mr. Vandergriff
25 and/or Mr. Hernandez about whether they had looked at

[Page 82]

1  the permits or the JSA?
2     A.  No, sir.
3     Q.  Was Mr. Vandergriff relief with you arriving
4  at the rig that same day?
5     A.  I don't think so.  I think he had been
6  there.  I think it was Matt, Blake, and I that showed
7  up at the same time.
8     Q.  What about Mr. Hernandez?
9     A.  I think he had been there.
10       MR. NORRIS:  Let's take a break, about
11 five minutes.
12       THE VIDEOGRAPHER:  Off the record at
13 10:49.
14       (Recess from 10:50 to 10:58 a.m.)
15       THE VIDEOGRAPHER:  Okay.  Back on the
16 record at 10:58.  This is the beginning of media 2.
17 BY MR. NORRIS:
18    Q.  Ms. Ormond, we were talking a lot the first
19 part of your deposition about you put a tool on the
20 pipe prior to using that tool to move the pipe to the
21 left to disengage it.
22    A.  Yes, sir.
23    Q.  Is that a fair characterization?
24    A.  Yes, sir.
25    Q.  What is that tool?

[Page 83]

1     A.  It is -- there is no name for it.  It is
2  specifically made -- I don't know if it's by the engine
3  tech company or whatever, but it's about this wide.
4  It's got a handle cut out of it, so you can hold it up
5  top.  It goes all the way down.  And it's got a curve
6  cut out of it.  That curve fits directly over this
7  pipe, because there is a notch in that pipe that it
8  sits in.
9        When you put in that notch, all you
10 need is -- it's got a little bend to it.  When you bump
11 it, it pushes it out just enough to be able to move the
12 pipe, because the thing is, is that pipe has an O ring
13 on each end that seals it into the rest of the
14 manifold.
15       So like I said, each cylinder has its
16 own section of that type, and then it goes into a piece
17 that is the actually a part of the engine block.  So
18 the next cylinder over has a piece that matches it, and
19 they all go in together.
20       So you can get it from either way, I
21 think -- I think, if I remember correctly, but that's
22 all it's there for, that one pipe.
23    Q.  And had you -- how did you know how to use
24 the tool?
25    A.  We have had to do it before.

[Page 84]

1     Q.  So this engine overhaul process,
2  specifically in using this tool to disengage this pipe,
3  was something you had done before?
4     A.  Not the complete overhaul, but taking that
5  pipe out, yes, sir.
6     Q.  How many times?
7     A.  A handful of times.
8     Q.  I am sorry?
9     A.  A handful of times.
10    Q.  By handful, you mean four or five?
11    A.  Yes, sir.
12    Q.  It wasn't something that you had never done
13 before?
14    A.  Correct.
15    Q.  And you knew how the tool worked?
16    A.  Yes, sir.
17    Q.  Now, when a hot liquid runs through a metal
18 pipe or steel --
19    A.  Uh-huh.
20    Q.  -- would you agree that oftentimes the pipe
21 itself absorbs some of that heat?
22    A.  Yes, it does.
23    Q.  Did you feel the pipe prior to breaking it
24 open?
25    A.  No, I did not.

[21]  (Pages 81 to 84)

888-893-3767
www.lexitaslegal.com

Patricia Diana Ormond                                    Pages

[Page 85]

1      Q.  Could you feel the pipe radiating the heat
2  from the water that was inside?
3      A.  No more than the rest of the engine being
4  hot.
5      Q.  Okay.  Was the whole engine hot?
6      A.  Yes, sir.
7      Q.  That didn't tell you something shouldn't be
8  opened?
9      A.  I knew that it was previously shut down, and
10  an engine that size retains a lot of heat for a long
11  time.  So generally, no matter when we work on it,
12  except for when we have it completely torn apart, it's
13  going to retain that heat pretty well.
14      Q.  And you understand this overhaul had been
15  started a week prior to you showing up at the rig?
16      A.  Something along those lines.  I really don't
17  know.  I know we had multiple engines to do.  I don't
18  know what they did before I got there.  I don't
19  remember if they did another engine in engine 1 or not.
20          I know I was present for No. 5 and
21  the -- one or two engines in engine No. 2.
22      Q.  Okay.  Do you -- is part of your claim in
23  this lawsuit that Diamond should have had more people
24  to help you that day?
25      A.  It would have been helpful, yes, sir.

[Page 86]

1      Q.  How would the addition of more people to
2  help you prevented your injury?
3      A.  We were already short staffed when -- so our
4  first engineer, the reason why Matt had to step up into
5  that position, is because he became the acting chief
6  engineer during the day.  That took one man off nights.
7          So we were already underhanded, and
8  maybe if we had that additional person, the permits
9  would have been done correctly.  The engine might have
10  been locked out the right way before we were told to
11  ever start working on it, because there would have just
12  more eyes in the project.  There would have been more
13  knowledge, I guess, available.
14      Q.  Anything else?
15      A.  Right.  I just -- it could have been --
16  anything could have been prevented, I think.
17      Q.  Right.  But you had the two --
18  Mr. Vandergriff and Mr. Hernandez there two to three
19  feet away from you at the time, correct?
20      A.  Right.
21      Q.  You didn't need any help opening the pipe,
22  correct?
23      A.  No, sir.
24      Q.  You didn't hurt your back lifting anything,
25  correct?

[Page 87]

1      A.  No, sir.
2      Q.  You didn't hurt your back pulling -- bumping
3  the pipe to the side, right?
4      A.  No, I did not.
5      Q.  I think you testified, if I understand you
6  today, that you didn't even look at the permits that
7  evening?
8      A.  Not that I recall.
9      Q.  You didn't look at the JSA?
10      A.  Not that I recall.
11      Q.  So Diamond could have had 40 extra people
12  doing all the permits in the world and all the JSAs in
13  the world, and you wouldn't have looked at them,
14  correct?
15      A.  I wouldn't have had to have looked at them.
16      Q.  Your testimony, if I understand it, is that
17  Mr. Lucius would not have told you to get started if
18  there been more people?
19      A.  I think -- I mean, if there were more
20  people, then maybe the permits would have gotten done
21  faster.  So by the time we were ready to start, it
22  would have actually been locked out.
23          I don't -- I can't predict the what-ifs
24  of what could have happened.  I just know that it did
25  happen and that we were short staffed, and normally

[Page 88]

1  when we aren't short staffed, things like this normally
2  don't happen.
3      Q.  Where specifically were you short staffed as
4  it related to that engine overhaul?
5      A.  So if we would have had Mike Papenberg down
6  in the engine room, either he would have been out there
7  helping us or Matt would have been there, because we
8  would have one extra person.  So one of them would have
9  still been in the control room, but we still would have
10  had -- we could have had an extra set of hands out in
11  the control room supervising, watching, making sure we
12  are doing everything correctly, making sure it actually
13  was locked out correctly before we even started.
14      Q.  Matt Papenberg?
15      A.  Michael Papenberg.
16      Q.  Mike Papenberg?
17      A.  Yes, sir.
18      Q.  Do you know how you spell Papenberg for the
19  court reporter?
20      A.  Yes, P-a-p-e-n-b-e-r-g.
21      Q.  Mr. Papenberg was the --
22      A.  He is normally the night first engineer.  He
23  was, as I was, temporarily promoted.  He was now the
24  day chief, because our chief engineer had to go in for
25  whatever personal reasons.  So he switched to the

[22]  (Pages 85 to 88)

Patricia Diana Ormond                          Pages

---

[Page 89]

1  dayshift, and that's why Matt got promoted to the night
2  first position so that they still had all their bases
3  covered to some extent.
4      Q.  That's why you got promoted --
5      A.  Correct.
6      Q.  -- from oiler to third assistant engineer,
7  correct?
8      A.  Correct.
9      Q.  Okay.  And so wasn't it part of your job to
10  make sure the permits were in place, make sure the JSA
11  was there, and to make sure that that pipe was properly
12  locked out before you opened it?
13      A.  It just depends on whoever signed the
14  permit, really, but then again, that's another flaw of
15  the permit system, is you can go and do all this work
16  and lock it out and the area supervisor is supposed to
17  go and check those lockouts, when normally one of the
18  most senior engineers has to be the area supervisor.
19  So they are supposed to be the ones to go and check
20  those lockouts before you ever start work on it.
21          Well, if Matt was supposed to be the
22  area supervisor, and he never -- he told us to go ahead
23  and start working on it before it was even locked out.
24          But that's how a lot of the times the
25  work schedule went.  Things got started before the

---

[Page 90]

1  paperwork got done, because more often than not,
2  paperwork took longer than the job itself.
3      Q.  Okay.  But did that happen, to your
4  knowledge, in this specific circumstance?
5      A.  Well, if Blake was still filling out the
6  permits, then yes.
7      Q.  Right.  That's an if, though.
8          Do you know that Blake was still
9  filling out the permits?
10      A.  Yes, because when he shut off the valves, he
11  was locking them out.  That's why he was down where he
12  was at, because he was in the process of closing the
13  fuel valves, the water valves, all of the valves right
14  there.
15      Q.  Now we are talking about Clodfelter?
16      A.  Yes, sir.
17      Q.  So it's your testimony that Blake Clodfelter
18  was the one who was actually locking out at the time
19  that you were breaking open the pipe?
20      A.  Yes, sir.
21      Q.  And that's why he was at the valve area of
22  the engine?
23      A.  Correct.
24      Q.  Okay.  Did you as the third assistant
25  engineer with all the proper certifications,

---

[Page 91]

1  commissioned officer in the Navy, supervisor to at
2  least Mr. Vandergriff, have any responsibility to make
3  sure that the pipe was locked out, the engine was
4  locked out prior to breaking open that pipe?
5      A.  That's not what I was told to do, so no,
6  sir, not that I know of.
7      Q.  Did you -- did Mr. Hernandez have any
8  injuries?
9      A.  Not that I know of.
10      Q.  Did you ask him?
11      A.  No, sir.
12      Q.  It sounds like you acted like the accident
13  isn't even going to happen, right?
14      A.  Yes, sir, because I didn't want to lose my
15  job over it.
16      Q.  I understand that's your position.
17          But you didn't ask Mr. Hernandez
18  whether he was injured in the same accident, right?
19      A.  Right.
20      Q.  What about Mr. Vandergriff?  Did you sit
21  down with him and make sure he wasn't injured?
22      A.  I think I did ask him if he was okay.
23      Q.  What did he say?
24      A.  He said he was fine.
25      Q.  Did you ask him if he had hurt his back?

---

[Page 92]

1      A.  No, sir.
2      Q.  Did you ask him if he had any burns?
3      A.  No, sir.
4      Q.  Was -- did you have responsibility for
5  Mr. Vandergriff's safety that day?
6      A.  To some extent, yes, but I think we all have
7  a responsibility to everyone's safety.  So he had some
8  to mine just, as well.
9      Q.  Well, it sounds like you were relying on
10  Mr. Vandergriff to give you the thumbs up or the thumbs
11  down, correct?
12      A.  Yes, sir.
13      Q.  And not Mr. Lucius?
14      A.  Correct.
15      Q.  Now let's -- let's shift gears a little bit.
16      A.  Okay.
17      Q.  Let's go back.
18          You are from Colorado originally?
19      A.  I am.
20      Q.  Where did you grow up?
21      A.  Littleton, Colorado.
22      Q.  And for the jury, I am -- Littleton is
23  outside of Denver?
24      A.  Yes, sir.  It's a southwest suburb of
25  Denver.

---

888-893-3767
www.lexitaslegal.com

Patricia Diana Ormond                                    Pages

[Page 93]

1    Q.  So you went to high school in Littleton?
2    A.  Technically it was Denver, but it was not
3  far from the house.
4    Q.  When did you graduate from high school?
5    A.  2013.
6    Q.  And then you head off to the Merchant Marine
7  Academy?
8    A.  Yes, sir.
9    Q.  And where is the Merchant Marine Academy?
10    A.  Long Island, New York, Kings Point.
11    Q.  What takes you from Denver, Colorado, what
12  is the most landlocked spot on earth, to the United
13  States Merchant Marine Academy?
14    A.  There is actually a story behind it.
15        My sister, she is two and a half years
16  older, my sister Diana.  She wanted to go to West Point
17  ever since she was in third grade, and her junior year
18  of high school, she got accepted to the Naval Academy
19  summer seminar program, where you get to go be a plebe
20  for a year -- or a plebe for a week.  She did that.
21        My dad drove out, picked her up with my
22  uncle.  They toured the Naval Academy, West Point and
23  Kings Point and Coast Guard, and the only one that ever
24  paid her any attention was Kings Point.  The rest were
25  too busy for her or anything.

[Page 94]

1        As she learned more about it, she
2  became more enthralled with it.
3        Then she met our mentors back in
4  Colorado, and they continued to convince her.
5        And then as I learned more about it, I
6  decided that's what I wanted to do.  I always knew I
7  wanted to do something in the military and something as
8  an engineer.
9        So I was a freshman at the time when
10  she started learning about it, so they started kind of
11  grooming me to be prepared for the nomination process,
12  the application process, and everything.
13        And then away I went.
14    Q.  Got you.  What was your specific degree in
15  from the United States Merchant Marine Academy?
16    A.  It's a bachelor of science in marine
17  engineering.
18    Q.  What does that mean exactly?
19    A.  So, essentially, from the academy, you can
20  either be a deck officer or an engineering officer.
21  There is no other tracks, and either way, you get a
22  bachelor's of science.
23        For engineering -- and no matter what,
24  you come out with a Coast Guard license to sail, either
25  as a third mate or a third engineer.  You cannot

[Page 95]

1  graduate unless you pass those license exams.
2        So the engineering degree is, I guess,
3  the educational background to support that license.  So
4  it's a lot of diesel classes, electrical, HVAC, sewage,
5  water, all of that fun stuff.
6    Q.  Everything to run the engineering and
7  mechanics of a ship?
8    A.  Yes, sir.
9    Q.  Okay.
10    A.  To troubleshoot, repair, maintain.
11    Q.  And did you have practical experience during
12  your four years at the Merchant Marine Academy?
13    A.  Yes, sir.  During your sophomore year you
14  spend four months out at sea, and during your junior
15  year you spend eight months out at sea as a cadet on
16  various commercial ships, military ships, training
17  ships.  It just depends on where they send you.
18    Q.  So by the time you graduated in May/June
19  of '17, you had spent 10 or 12 months actually on a
20  ship?
21    A.  Yes, sir.  You have to have at least
22  300 days to graduate.
23    Q.  Wow.  And I am sure you have endured many
24  trainings and processes of policies and procedures
25  during that time frame, correct?

[Page 96]

1    A.  Yes, sir.
2    Q.  So then you graduate in -- let's just call
3  it May/June of '17?
4    A.  June, yes, sir.
5    Q.  You also receive your commission, correct?
6    A.  Correct.
7    Q.  And could you explain what that means to the
8  jury?
9    A.  United States Merchant Marine Academy is one
10  of the five federal service academies.  Like Army,
11  Navy, Coast Guard, and Air Force, there is also
12  Merchant Marines.  It is the only one that is run by
13  the Department of Transportation, but it is still one
14  of the five federal service academies.  So you don't
15  pay to go there.  The taxpayers pay your tuition,
16  essentially.
17        So upon graduation you have to -- you
18  have a commitment to serve to pay back that money,
19  essentially.
20        From the academy, unlike the other
21  service academies, you can go eight years' reserves or
22  five years' active and you can choose any branch you
23  want to go.  You don't have to go -- if you go to the
24  military academy, you have to go Army, Navy, Navy, so
25  on and so forth.

888-893-3767
www.lexitaslegal.com

Patricia Diana Ormond                                    Pages

[Page 97]

1        The majority of us go Navy Reserves
2   just because they -- there is a specific branch in Navy
3   Reserves called the strategic SEAL officer force that
4   we provide the backbone support for the Navy Reserves
5   to maintain their ships.
6        The Navy has a full fleet of reserve
7   ships that stay in port, but are ready to be activated
8   at any given notice if we ever go to war or anything
9   like that. We are the people that they call back to
10  serve, because in our civilian career, we maintain that
11  Coast Guard license to sail. So it easily transfers
12  over to if you have to get on a Navy ship, it's the
13  same concept.
14        And then you have to do your years of
15  service.
16      Q.  Got you. So where are you in the years of
17  service as we sit here today?
18      A.  Four years in.
19      Q.  So you have four more years of reserve
20  officer?
21      A.  If I can make it that far, yes, sir.
22      Q.  Have you been -- have any chapter 13 or
23  other proceedings been started based on your physical
24  situation?
25      A.  I am up for a medical retention review with

[Page 98]

1   the Navy Reserves currently.
2      Q.  What does that mean?
3      A.  I am not entirely sure yet.
4      Q.  How did that come about?
5      A.  I honestly tried to avoid telling the Navy
6   about my back problem hoping that it would resolve
7   itself because I didn't want to lose my commission and
8   with COVID and everything it kind of allowed me to do
9   that, because we got waivers for our active duty time
10  and we only have to do two weeks a year.
11        So last year I was able to get a waiver
12  for that. You know, you didn't have to complete your
13  physical fitness test or anything. I was able to kind
14  of fly under the radar, but it got to the point where I
15  finally had to explain to them what had happened and
16  where I am at with everything.
17        And now I have to go through -- like,
18  they want copies of all my medical records and
19  everything to see where I am at with the diagnosis and
20  the treatment and the pain, I guess, to see if it's
21  worth keeping me in or not.
22      Q.  When is the last PT test that you did?
23      A.  Probably December of 2018.
24      Q.  You understand that as a -- you know, as a
25  reserve officer performing your eight years of service

[Page 99]

1   back to the Merchant Marine Academy time, you have to
2   continue to stay in physical shape, right?
3      A.  Yes, sir.
4      Q.  And one way the Army does that is they make
5   you do physical fitness tests?
6      A.  Yes, sir.
7      Q.  And you -- I forget the exact requirements,
8   but once or twice a year you have to show up and do
9   your PT test, correct?
10      A.  Correct.
11      Q.  And the last time that you had to do that
12  was -- you said?
13      A.  Sometime in 2018.
14      Q.  Okay. Prior to the injury that you allege
15  occurred on February 20th, 2019?
16      A.  Yes, sir.
17      Q.  Are you represented by counsel in the
18  medical retention process that is currently ongoing
19  with the Navy?
20      A.  No, sir. It hasn't escalated to that point
21  yet.
22      Q.  You haven't had a formal what I would call
23  chapter process begun?
24      A.  No, sir.
25      Q.  Do you have a waiver specifically for post

[Page 100]

1   February 2019 PT test?
2      A.  No, sir. I never did my medical exam. I
3   just kind of skipped out on it, which I know I am going
4   to get in trouble for probably down the road, but no, I
5   don't. I do not.
6        Like I said, I tried to avoid it as
7   long as I could, but now it's starting to catch up with
8   me. And, yeah, I might have to deal with that, too.
9      Q.  Okay. Your resume that you supplied in
10  getting the job at Diamond back in '18 indicates that
11  you performed 93 days of active duty as an operations
12  officer in the U.S. Navy Reserves.
13        What is that?
14      A.  So right after I graduated -- well, okay,
15  right before I graduated, I was the second in command
16  of the entire regiment. The seniors run the regiment,
17  and I was the regiment executive officer. So with how
18  I performed there, the command staff of the academy or
19  administration of the academy decided to bring me back
20  on active duty orders after I graduated as their
21  operations officer for 90 days, 93.
22        So I had three months of active duty
23  working at the academy under the commandant, as a part
24  of the commandant staff just helping as needed, really,
25  just kind of doing whatever they needed help with.

[25]  (Pages 97 to 100)

Patricia Diana Ormond                                    Pages

[Page 101]

1      Q.  So that's what you were doing when you
2  applied to Diamond for a position to go on offshore?
3      A.  Actually, after the 90 days were up, I moved
4  back to Colorado, and then I went out to California.
5  And I tried to work for one of the shipping unions just
6  out of their union hall in Long Beach.
7          The jobs weren't really there, and when
8  they were there, more senior people would get them.  So
9  I just had a few days of day work when a ship would
10  pull in and they just needed extra hands to do
11  maintenance or whatever.
12          I ended up moving north to Sacramento
13  with my aunt.  That's when I applied for Diamond, and
14  that's when I got the call that they wanted an
15  interview.
16          And they flew me to Houston.  They
17  brought me here to Houston.
18      Q.  And then the whole process began with
19  Diamond?
20      A.  Yeah.  I was on the rig within that month.
21      Q.  Okay.  About how much were you making as an
22  oiler working offshore for Diamond for about a year?
23      A.  About 70; maybe 80,000 a year.
24      Q.  And then as a third assistant engineer
25  beginning in the hitch where -- beginning on

[Page 102]

1  February 20th, 2019, going forward, how much were you
2  making?
3      A.  I honestly couldn't tell you the difference.
4      Q.  Some amount more.  You just don't recall as
5  you sit here today?
6      A.  Yes, sir.
7      Q.  Okay.  Let's go back.  I forgot I skipped
8  this.
9          Growing up, what types of things did
10  you do?
11      A.  A lot of sports.  I have been in martial
12  arts since I was four years old.  I had my first black
13  belt by the time I was 10, my second one by the time I
14  was 15.  Swimming, volleyball, basketball, martial
15  arts, cross country.  I was very active, very
16  outdoorsy.
17          I grew up around military vehicles.  My
18  dad collects them.  I have been working on them, just
19  like to be doing something hands on.
20      Q.  Everyone I know who lives in the Denver
21  area, they all snow ski, snowboard.
22          Did you grow up doing that?
23      A.  No.  I did it a few times, fell one too many
24  times, and got tired of it.
25      Q.  Me, too.

[Page 103]

1      A.  I never left the bunny hill.
2      Q.  Had you ever been injured snowboarding?
3      A.  No, sir.
4      Q.  Did you ever tell anyone that you were
5  injured snowboarding?
6      A.  I have never been snowboarding.  I have been
7  skiing.
8      Q.  Did you ever -- good point.
9          Did you ever get injured skiing?
10      A.  Just bumps and bruises.
11      Q.  No back injuries?
12      A.  No, sir.
13      Q.  Never told anyone that you injured your back
14  skiing?
15      A.  Not that I recall, no, sir.
16      Q.  From the time you graduated from high
17  school, go off to the Merchant Marine Academy -- it
18  sounds like even when you graduated -- your home of
19  record was in Colorado?
20      A.  Yes, sir.
21      Q.  When you joined Diamond, your home of
22  record -- you and I know that's a term of -- a military
23  term meaning where you always intend to go back to?
24      A.  Right.
25      Q.  It was always Colorado until you changed, I

[Page 104]

1  believe you told me in August 2019, and moved to
2  Mississippi?
3      A.  December, yes, December of 2018.
4      Q.  December of 2018?
5      A.  Yes, sir.
6          (Exhibit 1 marked.)
7      Q.  I am going to hand you what I have marked as
8  exhibit 1.  I tried to slide it.  Not good.
9          Mr. Ormond, this is a document with a
10  little funny number at the bottom right-hand corner
11  that says Diamond Ormond 965.
12          Do you see that?
13      A.  Yes, I do.
14      Q.  What is this?
15      A.  This is an isolation permit.
16      Q.  What does that mean?
17      A.  It's a lockout/tagout permit.
18      Q.  Is this the type of permit that we discussed
19  earlier in your deposition related to when certain
20  equipment prior to it being worked on is isolated
21  and/or at the end of it is deisolated?
22      A.  Correct.
23      Q.  This is the document we talked about, and I
24  asked you questions.  The purpose of it is to let
25  others know what is going on with the operation,

888-893-3767
www.lexitaslegal.com

Patricia Diana Ormond                                    Pages

[Page 105]

1 correct?
2      A.  Yes, sir.
3      Q.  Now, you see this document is dated, I
4 believe, at least next to your name beginning in the
5 middle section 21, February '19.
6          Do you see that?
7      A.  Yes.
8      Q.  This is the day after you allege that you
9 were injured, correct?
10      A.  Correct.
11      Q.  What -- and there, it looks like there are
12 10 separate signatures?
13      A.  Uh-huh.
14      Q.  And those are all your signatures?
15      A.  Yes, they are.
16      Q.  Now, did you, in fact, sign this document
17 10 times?
18      A.  Yes, I did.
19      Q.  Actually, I think you signed it more than
20 that.  You signed it down --
21      A.  At the bottom, as well, yes, sir.
22      Q.  At the bottom at least once where it says
23 approved CP1.  What does that mean?
24      A.  The approved CP is the approved competent
25 person.

[Page 106]

1      Q.  That was you, correct?
2      A.  Yes, sir.
3      Q.  At that time, although you listed oiler
4 probably by habit, you were actually serving as the
5 third assistant engineer?
6      A.  Right.  That handwriting where it says oiler
7 is not mine.  That's Mr. Lucius', but yes, I did sign
8 it.
9      Q.  Okay.  Why are you signing for the various
10 10 times in the isolation description section?
11      A.  Because apparently I was the one that went
12 and locked them back out.
13      Q.  What do you mean by apparently locked them
14 back out?
15      A.  Based off of this, the work was ongoing, so
16 they were not isolated when we started work that
17 morning, but this is the next shift that following
18 evening where I isolated them again.  So they must have
19 done a -- sanctioned test where they had permission
20 to deisolate something and then reisolate it again.
21      Q.  So something had occurred to make it
22 necessary for you to lock it back out, correct?
23      A.  Yes, sir.
24      Q.  And that something would have occurred while
25 you were not on shift in the 12 hours after you left at

[Page 107]

1 6:00 a.m. on 21 February 2019, correct?
2      A.  Correct.  Uh-huh.
3      Q.  That's a yes?
4      A.  Yes, sir.
5      Q.  And you are listing out 10 separate areas
6 that you are locking out in each of these 10 signed
7 blocks?
8      A.  It's not necessarily areas.  It's just
9 either a valve or a switch or something to do, I guess,
10 one specific valve at a time.  You have to list each
11 one individually and put a lock on each one
12 individually.
13      Q.  Okay.  And to be clear and fair, clear for
14 the record and fair to you, this permit, certificate,
15 is for a different engine than the engine No. 5,
16 correct?
17      A.  Correct.
18      Q.  If you see there at the top it says main
19 engine No. 2, where No. 2 is M/E.
20          Do you see that?
21      A.  Yes, sir.
22      Q.  So by the time you came back 12 hours after
23 your shift that we talked about all morning, your
24 roles -- your role and responsibility became the engine
25 overhaul of No. 2?

[Page 108]

1      A.  Correct.
2      Q.  That would be a different engine?
3      A.  Yes, sir.
4      Q.  Okay.  Was it near engine No. 5?
5      A.  No, sir.  It's in a completely different
6 engine room next to it.
7      Q.  You were able to perform all of these job
8 functions on this day, correct?
9      A.  Yes, sir.  It's just closing valves.
10      Q.  Well, did you do anything else that day
11 other than close these valves?
12      A.  I don't remember.
13      Q.  Safe to assume that you did?
14      A.  I would hope I did.  I was getting paid for
15 more than that.
16      Q.  Yeah.  Now, there are a series of permits if
17 you could -- if you want to flip through some of them.
18 I am not going to ask you specifically about each one
19 of them, just that these are the types of
20 isolation/deisolation permits and cold work permits and
21 hot work permits that we referenced earlier in your
22 testimony, correct?
23      A.  Correct.
24      Q.  These are the types of documents that when
25 we used the term permits before, we were referring to?

[27]  (Pages 105 to 108)

Patricia Diana Ormond                                    Pages

[Page 109]

1    A.  Yes, sir.
2    Q.  Okay.  The second page, Bates No. 841,
3  section 3 authorization, do you see that?
4    A.  Yes, I do.
5    Q.  It says PIC of work?
6        What is PIC of work?
7    A.  Person in charge.
8    Q.  So on the day of -- it looks like the shift
9  that -- the very shift after the shift we see you got
10  hurt, you were actually the person in charge of the
11  work that was described in this document, correct?
12    A.  Yes, sir.
13    Q.  And you signed that document?
14    A.  Yes, I did.
15    Q.  Nobody signed it for you?
16    A.  No, sir.
17    Q.  They might have written in the wrong
18  position for you, but you signed it?
19    A.  Yes, sir.
20    Q.  I mean, is there anything in these documents
21  that you see that's just not true?
22    A.  That bottom signature in section 4 under
23  completion is not mine.
24    Q.  Okay.  Who do you think signed for you?
25    A.  Matt Lucius.

[Page 110]

1    Q.  Why would he do that?
2    A.  Probably because he was closing out permits
3  so he was up at the clerk's office, and instead of
4  making me go up there to sign it for myself, he just
5  signed it.
6    Q.  Was that something that you would have
7  authorized at some point?
8    A.  Normally it just kind of happens.
9    Q.  Okay.  Do you dispute that he should have
10  done that?
11    A.  Yes.
12    Q.  He should have made you come up there and
13  actually sign it?
14    A.  Yes, sir.  That would have been the proper
15  way to do it.
16    Q.  Before looking at that signature today with
17  me, did you know that had occurred?
18    A.  I am sure it happened on multiple occasions.
19  It happened almost daily.  Whoever went up to close
20  permits generally would scribble somebody's name down
21  or do something along those lines.
22    Q.  Was that something that you did?
23    A.  Yes, sir, I have done it before.
24    Q.  Okay.  But as far as the authorization of
25  the work in section 3 --

[Page 111]

1    A.  That is --
2    Q.  -- you authorized the work as the person in
3  charge?
4    A.  Yes, sir, that is my signature.
5    Q.  What is a cold work permit?
6    A.  Cold work is anything -- pretty much
7  anything that needs a permit that doesn't involve a
8  major electrical source or welding or something like
9  that that would require, I believe, electrical, but it
10  requires a hot work permit.
11        So if you have a welding -- like, if
12  you have a welder that needs to do work like this hot
13  work permit on the next page --
14    Q.  That was my attempt to segue smoothly to the
15  next document.
16    A.  I picked it up.
17    Q.  We are looking at -- you are referencing
18  Diamond Ormond 869, right?
19    A.  Yes, sir.
20    Q.  That's a hot work permit.  So what are we
21  doing there?
22    A.  I believe the reason it's a hot work permit
23  is because they had to lock out the main breaker for
24  the engine, and it's a high voltage breaker.  The
25  electricians had to get involved and do their own

[Page 112]

1  permits, as well, to lock it out.  That's why there is
2  a high voltage testing/switching plan listed under
3  section 2 at the bottom of the -- that section.
4    Q.  And, again, you were the person in charge of
5  the work?
6    A.  Yes, sir.
7    Q.  And your signature there?
8    A.  Yes, sir.
9    Q.  And, again, I think this was the very next
10  shift?
11    A.  Next day.
12    Q.  Okay.  And is it your opinion in this
13  lawsuit or your claim that Diamond should have done a
14  hot work permit prior to you using the tool to remove
15  the pipe on February 20th, 2019?
16    A.  No, sir.  A hot work permit is not required
17  for that.
18    Q.  Was there -- what was required?  What
19  permit?
20    A.  It should have been a cold work permit along
21  with isolation -- isolation/desolation certificate.
22    Q.  Why is that?
23    A.  Because the water should have been isolated.
24  It should have been locked out.  We say isolated/locked
25  out interchangeably.

888-893-3767
www.lexitaslegal.com

Patricia Diana Ormond                                    Pages

[Page 113]

1          And in order to isolate something like
2   that and put a lock on it, you have to have a permit
3   that goes with it.  It's either a cold work or a hot
4   work permit.
5          Normally, most jobs fall under a cold
6   work permit, like I said, unless electricity or welders
7   or something like that is involved.
8      Q.  So hot work is not dealing with hot water?
9      A.  No, sir.
10     Q.  It's dealing with electricity or flammable
11  substances?
12     A.  Yes, sir.
13     Q.  That's all governed by OSHA and other types
14  of regulations?
15     A.  Yeah.  It's all something beyond me.
16     Q.  Where were you, anyway, on the RHINO on
17  February 20th and 21st of 2019, physically,
18  geographically in the world?
19     A.  Gulf of Mexico.
20     Q.  And that -- where did you get on the
21  helicopter to go to the rig?
22     A.  Galliano.
23     Q.  Louisiana?
24     A.  Yes, sir.
25     Q.  I think I can probably short circuit some of

[Page 114]

1   this with, you finished your hitch and left the rig 27,
2   28 days after February 20th, 2019, correct?
3      A.  Yes, sir.
4      Q.  And I think we talked about this.
5          At no time during that four-week period
6   did you report the injury?
7      A.  Correct.
8      Q.  You go home for a month?
9      A.  Uh-huh.
10     Q.  Correct?
11     A.  (Witness moves head up and down.)
12     Q.  And now we are into -- let's just call it
13  mid March to mid April?
14     A.  Yes, sir.
15     Q.  Did you report your injury to Diamond while
16  you were home?
17     A.  No, I did not.
18     Q.  Did you report your injury to anyone?
19     A.  I went to the chiropractor.
20     Q.  What chiropractor did you go to?
21     A.  It was Dr. Hinkley, I think is his name, in
22  McComb.  It wasn't -- I pretty much was laid up in bed
23  for the first two weeks that I was home, and then after
24  talking to my mom and whatnot about it, which is about
25  the pain, she recommended that I go see a chiropractor.

[Page 115]

1      Q.  Okay.  Did you tell that chiropractor -- I
2   am sorry.
3          What was the doctor's name again?
4      A.  Dr. Hinkley.
5      Q.  Did you tell Dr. Hinkley that you had hurt
6   your back while at work?
7      A.  I believe I did, but I don't recall
8   100 percent.
9      Q.  Because then you come back to the rig,
10  correct?
11     A.  Yes, sir.  I believe I saw him once, if not
12  twice, before I went back to work.
13     Q.  So in the -- while at home in the off time
14  prior to the hitch that you had the incident --
15     A.  Uh-huh.
16     Q.  -- you went to the chiropractor about twice?
17     A.  I think so.
18     Q.  Do you recall either time telling the
19  chiropractor Dr. Hinkley or any of the staff nurses
20  there that your injury that you were seeking attention
21  for was -- had occurred at work or was somehow work
22  related?
23     A.  Like I said, I think so, but I'm not
24  100 percent sure.
25     Q.  In either visit, you don't recall having

[Page 116]

1   that conversation?
2      A.  No, sir.
3      Q.  Okay.  Excuse me.  Then you go -- now we are
4   in the mid April?
5      A.  Uh-huh.
6      Q.  I guess sort of mid May?
7      A.  Yes, sir.
8      Q.  You go back to the BLACK RHINO, correct?
9      A.  Yes, I do.
10     Q.  You perform your duties as, again, a third
11  assistant engineer?
12     A.  No, sir, back to an oiler.
13     Q.  You go back to the oiler position?
14     A.  I was back to an oiler two weeks into that
15  hitch that I got hurt.  So I was only a third assistant
16  engineer for two weeks.
17     Q.  Okay.  Did you view that as a demotion?
18     A.  No, because I knew going into it, it was
19  temporary just while the chief engineer was off the
20  rig.
21     Q.  Understood, okay.  You go back out in mid
22  April to mid May as an oiler?
23     A.  Yes, sir.
24     Q.  Still in the Gulf of Mexico?
25     A.  Yes, sir.

Patricia Diana Ormond                                    Pages

---

[Page 117]

1    Q.  Still doing engine overhauls?
2    A.  No, sir.
3    Q.  What were you doing?
4    A.  I don't think so.  I think it was whatever
5  broke down, we fixed it.
6    Q.  Okay.  Again, during that hitch from April
7  to mid May 2019, did you report the incident or injury
8  to Diamond?
9    A.  Not officially.
10    Q.  Did you unofficially?
11    A.  I went to the medic a few times for, like,
12  Biofreeze and ibuprofen and stuff like that to see if
13  it would help with the pain.
14    Q.  You went to the medic --
15    A.  On --
16    Q.  Excuse me.
17       -- on the BLACK RHINO?
18    A.  Yes, sir.
19    Q.  You sought first aid?
20    A.  Yes, sir.
21    Q.  Over-the-counter pain medication?
22    A.  Correct.
23    Q.  And --
24    A.  Muscle -- Biofreeze.
25    Q.  Did you, during that time in seeking that

---

[Page 118]

1  medical attention from the Diamond medic, advise the
2  medic that you had been hurt at the prior hitch on the
3  rig?
4    A.  I don't remember.
5    Q.  Okay.
6    A.  I really honestly can't remember if we had
7  that conversation.
8       Him and I were pretty close friends.
9  We were both -- I don't know if he was from Colorado or
10  if he just lived there for a while.  We kind of had
11  that connection.  So that's why he was willing to help
12  me out with the Biofreeze and the ibuprofen and
13  whatnot -- I mean, besides the fact he is the medic.
14    Q.  That was kind of his job?
15    A.  Kind of.
16    Q.  What was his name?
17    A.  Todd Richmond.
18    Q.  Do you still keep in contact with
19  Mr. Richmond?
20    A.  No, sir.
21    Q.  So let me just be clear.
22       Did you tell Mr. Richmond during that
23  next hitch that you had hurt your back on the rig doing
24  work at Diamond?
25    A.  I don't remember.

---

[Page 119]

1    Q.  Okay.  Now we are in mid May.  You are back
2  in Mississippi, mid May of 2019 to mid June of 2019?
3    A.  Yes, sir.
4    Q.  Did you go back to the chiropractor?
5    A.  Yes, I did.
6    Q.  How many times?
7    A.  At least two or three.  I believe it was
8  closer to three, if not four.
9       And at one of the -- at one point he
10  seemed a little bit more concerned, so he performed
11  x-rays while I was there.  And then him and his wife
12  have a practice together.  They are both chiropractors,
13  so they are both Dr. Hinkleys, but it's Marlo and
14  Shane.  Shane was my primary caregiver, I guess.
15       So he had the x-rays done, and then
16  when he looked at them, he tried to tell me, let's see,
17  an atypical facet and arthritis developing in my back.
18    Q.  Can you say that a little slower?  I didn't
19  get that.
20    A.  So when he had the x-rays done, he started
21  looking at them.  He told me I had atypical facet and
22  arthritis developing in my back.
23    Q.  What part of your back?
24    A.  My lower back.
25    Q.  And did he explain that that was his opinion

---

[Page 120]

1  as to what was causing your pain?
2    A.  Yes, sir.
3       And his wife came in, and before he
4  even said anything in front of her, she agreed like
5  that's what she said, as well.
6       And to me that just sounded bizarre
7  that as someone so young I would have arthritis
8  developing.  So I immediately kind of -- not disregard
9  them, but I wanted to seek out another specialist.
10    Q.  Okay.
11    A.  And that's when I went to Dr. Byron Jeffcoat
12  in McComb.
13    Q.  What is his specialty?
14    A.  He is an orthopedic specialist.  I don't
15  remember his title exactly.
16       (Exhibit 2 marked.)
17    Q.  Let me hand you what I marked as exhibit 2.
18       This is a note from Dr. Jeffcoat dated
19  May 28, 2019.
20       Do you see that?
21    A.  Yes, I do.
22    Q.  Do you see it's a progress note for Patricia
23  Ormond describing you at that time?  Correct?
24    A.  Yes, sir.
25    Q.  Is this -- the timing consistent with the

---

888-893-3767
www.lexitaslegal.com

Patricia Diana Ormond                                    Pages

---

[Page 121]

1  first time you went to see Dr. Jeffcoat?
2       A.  Yes, sir, the first and only time.
3       Q.  Okay.  Did you tell Dr. Jeffcoat that you
4  were injured on February 20th or 21st, 2019, while
5  working offshore?
6       A.  I believe I explained to him kind of what I
7  did for work and that the injury was work related, but
8  I don't think I went into details of what happened.
9       Q.  So is it your testimony today that you told
10 Dr. Jeffcoat that your injury to your lower back was
11 from a work-related injury?
12      A.  Yes, sir, I believe so.
13      Q.  Okay.  Were you still working out during
14 this May time period that we are talking about?
15      A.  If I was, it was more so trying to stretch.
16 He gave me stretches and, like, minor exercises to do
17 to try to help relieve the pain.
18      Q.  When you go to the rig on -- while you are
19 on your hitch, there is a -- is there a fitness room?
20      A.  Yes, sir.
21      Q.  And would you do fitness while you were on
22 the rig?
23      A.  I would try.
24      Q.  And would you do fitness while on the rig
25 post February 20th, 2019?

---

[Page 122]

1       A.  It would be more so of trying to -- like,
2  exercises and stretches I was given.
3       Q.  So if people testify in this case that they
4  saw you in the rig fitness room working out, that
5  shouldn't be a surprise to you?
6       A.  No, sir.
7       Q.  Now --
8       A.  It was a pretty common to have an audience.
9       Q.  Okay.  If you go to the second page of this
10 document -- well, let me back up.
11          Prior to seeing Dr. Jeffcoat, had the
12 chiropractors given you any treatments?
13      A.  Just the manual adjustments that
14 chiropractors do, which freaked me out, by the way,
15 because I had never had that done before.
16          But that's -- he tried that, and there
17 was one point I think I went to him like Monday,
18 Wednesday, and Friday.  That Friday is when he was,
19 like, all right, let's try the x-rays and see what's
20 going on, because it just wasn't getting any better.
21      Q.  So Dr. Hinkley performed some type of
22 chiropractic maneuvers on your back?
23      A.  Manual traction and -- yes, sir.  He put me
24 in one of those -- it freaked me out -- traction
25 machines where it, like, puts your head in a

---

[Page 123]

1  contraption and pulls your waist and, like, tries to,
2  like, pulls you in two.
3          I don't recommend it, for the record,
4  but he tried.
5       Q.  Did that alleviate your pain?
6       A.  No, did it not.
7       Q.  Did it cause it to get worse?
8       A.  No, sir.  It just didn't help.
9       Q.  So you began to lose confidence on the
10 chiropractor route, which leads you to Dr. Jeffcoat,
11 which is the document we are looking at?
12      A.  Yes, sir.
13      Q.  This -- do you recall on the second page
14 telling Dr. Jeffcoat you were in a monogamous
15 relationship at that time?
16      A.  Yes, sir.
17      Q.  And that would have been with
18 Mr. Letchworth?
19      A.  Yes, sir.
20      Q.  Did Mr. -- did you take your x-rays to
21 Dr. Jeffcoat?
22      A.  No, sir, I don't think I did.  I don't know
23 that I had a copy of them yet.
24      Q.  Okay.  Well, you see about 3/4 of the way
25 down on the second page, it says:  Ancillary studies

---

[Page 124]

1  reviewed.  Normal LS spine x-ray.
2          Do you see that?
3       A.  I guess I did, yes, sir.
4       Q.  Did Dr. Jeffcoat tell you that your spine
5  x-rays were normal?
6       A.  Yes, sir.
7       Q.  That was different than what the
8  chiropractor had told you?
9       A.  Correct.
10      Q.  Did that cause you some concern?
11      A.  Absolutely.
12      Q.  Did you have a discussion with Dr. Jeffcoat
13 about that?
14      A.  Yes, I did.
15      Q.  And what did he tell you?
16      A.  He diagnosed me with a sprained SI joint,
17 but he -- I lost faith in him because he barely
18 examined me.  So then I sought another specialist.
19      Q.  Okay.  Who was that?
20      A.  That was at Southern Bone and Joint.  I
21 wanted to see Dr. David Lee right off the bat, but I
22 had to go through a nurse practitioner first, Kim
23 Semnick, and she ordered an MRI before she would let me
24 see Dr. Lee.
25      Q.  Okay.  Was that before you went back out in

---

[31]  (Pages 121 to 124)

Patricia Diana Ormond                                    Pages

[Page 125]

1 June to the rig, if you recall?
2    A.  No.  That would have been after.
3    Q.  Okay.  So you see Dr. Jeffcoat.  You then a
4 couple weeks later go back out to the rig?
5    A.  Yes, sir.  I don't remember the -- it was
6 pretty close I went back to work.
7    Q.  And then in June is when -- 2019 is when we
8 are talking about, correct?
9    A.  Yes, sir.
10    Q.  You were then there from mid June to
11 mid July?
12    A.  Yes, sir, I believe so.
13    Q.  And were you able to perform your duties
14 during that hitch?
15    A.  With struggles.
16    Q.  But you hadn't gone to see Southern Bone and
17 Joint yet?
18    A.  I don't remember.  I don't think so.  I
19 don't remember exactly when I got in with them, but I
20 know the MRI was done -- I don't remember when it was
21 done, but it was done right before I went back to work
22 in August.
23    Q.  Okay.
24    A.  So I know that I saw them and then she had
25 to schedule the MRI and it was two different

[Page 126]

1 appointments.  And I know the MRI took a minute to get
2 to.
3        (Exhibit 3 marked.)
4    Q.  Let me hand you what I have marked as
5 exhibit 3.  Ms. Ormond, I will give you a second to
6 look at this if you need it.
7        It appears to be -- it is an MRI
8 screening patient questionnaire that you filled out and
9 signed in late July 2019?
10    A.  Yes, sir.
11    Q.  Correct?
12    A.  Uh-huh.
13    Q.  And this was prior to getting to the MRI
14 that you mentioned just a minute ago?
15    A.  Yes, sir.  I believe I had to fill this out
16 the day of or right before.
17    Q.  I think that's right.  Shortly before taking
18 the MRI --
19    A.  Yes, sir.
20    Q.  -- going through the MRI, you filled this
21 out?
22    A.  Yes, sir.
23    Q.  Okay.  And you signed this as -- certifying
24 that it's true there at the bottom, right?
25    A.  Uh-huh.

[Page 127]

1    Q.  Did you tell anyone at Southern Bone and
2 Joint Specialists, at least as of July 30th, 2019, that
3 your back pain was related to a work-related injury?
4    A.  The first time I went to Southern Bone and
5 Joint, when I was going through, like, the -- I guess,
6 like, the new patient, like you sit at their desk and
7 they get all your information and everything.  She
8 asked me if it was work related.
9        And I said:  Yes.
10        She said:  Is it through workers' comp?
11        I said:  No.
12        She said:  Well, then, let's leave it
13 at that, and you will just -- your insurance will cover
14 what it can for now.  We will worry about the worker
15 stuff later, because I knew I didn't fall under
16 workers' comp being on the rig.
17        She didn't know how that was going to
18 work, and I just wanted to be seen.  So I just agreed I
19 would pay out of pocket if I had to.
20    Q.  Did you have an attorney by July 30th, 2019?
21    A.  No, sir.
22    Q.  Did you at the last break determine when you
23 retained an attorney?
24    A.  August 14th.
25        MR. AVERY:  I can't testify.  You have

[Page 128]

1 to.
2        MR. NORRIS:  I would love for him to.
3    A.  August 14th is when I hired the Doyle Law
4 Firm.  August 16th is when I officially had the
5 paperwork signed, I think.
6 BY MR. NORRIS:
7    Q.  Let's split the difference and call it --
8    A.  It was a weekend, so....
9    Q.  August 16th, 2019, is when you retained the
10 Doyle Law Firm?
11        MR. AVERY:  Object to form.
12    A.  It was --
13 BY MR. NORRIS:
14    Q.  Sometime between August 14th and
15 August 16th, 2019?
16    A.  Yes, sir.
17    Q.  Let me ask --
18        MR. AVERY:  Just so we clarify on the
19 record, I think she may be mistaken the year, just --
20    A.  2020.
21        MR. AVERY:  I'm not coaching her.  I
22 just want to get the document right.
23    A.  2020, yeah.  I wasn't thinking.  I am sorry.
24 BY MR. NORRIS:
25    Q.  Is it -- let's -- we will just start over.

[32]  (Pages 125 to 128)

Patricia Diana Ormond                                          Pages

[Page 129]

1        Your testimony is sometime between
2   August 14th and August 16th --
3       A.  Of 2020.
4       Q.  -- 2020 --
5       A.  Yes, sir.
6       Q.  -- you retained the Doyle Law Firm?
7       A.  Yes, sir.
8       Q.  Prior to August 14th or 16th, 2020, had you
9   retained any other attorneys or law firms related to
10  the injury that is now the subject of this lawsuit?
11      A.  Yes.
12      Q.  When did you retain whoever that attorney
13  was?
14      A.  Officially, I believe it was July of 2020.
15      Q.  And what -- who was that?
16      A.  The McNeal -- David McNeal.
17      Q.  Where is Mr. McNeal?
18      A.  I think he is based out of Houston.
19      Q.  Okay.  So sometime in July of 2020 you
20  retained plaintiff's lawyer McNeal --
21      A.  Yes, sir.
22      Q.  -- related to the injury that is the subject
23  of this lawsuit?
24      A.  Yes, sir.
25      Q.  Okay.  Prior to July of 2020 when you

[Page 130]

1   retained Mr. McNeal, had you retained any other
2   attorneys related to the injuries or injury that is the
3   subject of this current lawsuit?
4       A.  No, sir.
5       Q.  Okay.  So we can say the first time you
6   retained an attorney was July of 2020 related to this
7   injury?
8       A.  Yes, sir, if by retained you mean like
9   officially signing a contract.
10      Q.  Sure.
11      A.  Yes, sir.
12      Q.  Don't tell me what it is.  When is the first
13  time you began receiving advice from an attorney
14  related to the injury that is the subject of the
15  lawsuit?
16      A.  Probably October of 2019.
17      Q.  Okay.  Would that be a different lawyer
18  other than the Doyle Firm or the McNeal?
19      A.  No, sir.
20      Q.  How did you -- did you -- let me back up and
21  make sure I am steering clear of substance of your
22  conversations.
23          In October of '19, were you having --
24  in October of -- beginning of October '19, were you
25  having verbal conversations with an attorney related to

[Page 131]

1   the injury that is subject to the lawsuit?
2       A.  Verbal and written.
3       Q.  How were the communications in writing,
4   e-mails or --
5       A.  Started as Facebook messages and then
6   e-mails.
7       Q.  So it's July 30th.  You do the
8   self-evaluation that we are looking at here as
9   exhibit 3 related to the MRI.
10          Sometime either that day or the next
11  day you go through the MRI process?
12      A.  Yes, sir.
13      Q.  Okay.  If my math is correct, you then a
14  week or two later report back to the rig?
15      A.  Uh-huh.
16      Q.  Correct?
17      A.  Uh-huh.
18      Q.  Still in the Gulf of Mexico?
19      A.  Yes, sir.
20      Q.  And you file an incident report?
21      A.  Yes, I do.
22      Q.  Was -- that incident report was filed by you
23  with Diamond on August the 16th, 2019, correct?
24      A.  Yes, it was.
25      Q.  Let's call that about six months after the

[Page 132]

1   February 20th, 2019, date that you allege an injury had
2   occurred, right?
3       A.  Yes, sir.
4       Q.  And was that the first day of your hitch
5   back on August the 16th?
6       A.  No, sir.  I was out there less than a week,
7   I think.
8       Q.  So a few days into your hitch you make the
9   decision to finally report the incident to Diamond,
10  right?
11      A.  Yes, sir.
12      Q.  Why then?
13      A.  The pain became too unbearable that I
14  couldn't complete any part of my job, and I decided it
15  was time for me to go in.
16      Q.  Okay.  To whom did you report?
17      A.  First I told whoever was on watch that I
18  needed to go talk to the clerk.
19          I went to the clerk, and I asked if
20  there was room on the helicopter, the crew change
21  helicopter, going in that day.
22          And he kind of asked me why.
23          And I explained what was going on.
24          He said he would let me know.
25          And then when the medic -- that was

[33]  (Pages 129 to 132)

Patricia Diana Ormond                                     Pages

[Page 133]

1   around midnight or 1:00 in the morning.  When the medic
2   came on around 6:00, I told him what was going on.
3           That's when we wrote that report.
4           (Exhibit 4 marked.)
5       Q.  Who was the clerk, if you recall?
6       A.  I think it was Chris.  I don't remember his
7   last name.  I can picture his face, but I know that
8   doesn't help.
9       Q.  What was his position other than --
10      A.  He is the clerk.  That's his position, the
11  rig clerk.
12      Q.  Okay.
13      A.  He wasn't, like, in the official reporting
14  line of anything.  I was just seeing if there was room
15  to go home.
16      Q.  Okay.  And then sometime thereafter --
17  shortly thereafter, you refer to the safety department
18  representative, correct?
19      A.  Yes, sir.
20      Q.  That was Mr. Todd Richmond, correct?
21      A.  Yes, sir, he is also the medic.
22      Q.  Mr. Richmond was the individual we talked
23  about earlier that you were friends with?
24      A.  Yes, sir.
25      Q.  And he would give you over-the-counter

[Page 134]

1   stuff?
2       A.  Yes, sir.
3       Q.  What do you recall telling Mr. Richmond and
4   others when you made this report on August the 16th,
5   2019?
6       A.  That my back pain had become too severe.  I
7   just wasn't able to stick it out any longer, and I
8   needed to go home and get it looked at.
9       Q.  What was their response if you recall?
10      A.  They were understanding, because they knew
11  it had been bothering me for a while.  So they helped
12  me make it work, sent me home.
13      Q.  Who is they?
14      A.  I mean, the other engineers and the other
15  guys I worked with, they knew that my back was
16  bothering me.  I mean, I would come in from -- on
17  breaks and I would lay on the engine room, control room
18  floor trying to get some relief.
19      Q.  Had you gone to the medic when you arrived
20  the week before you actually made the report?
21      A.  I think I had, because the nurse
22  practitioner prescribed me some muscle relaxers.  I
23  think I told him about it, because I think we were
24  supposed to tell if you had any prescriptions.  I
25  couldn't even take them at work, because they made me

[Page 135]

1   drowsy and that sketched me out.
2       Q.  Let me hand you what I have marked as
3   exhibit 4 -- actually, before I ask you about that, did
4   you talk to the OIM, Mr. Blackden, about this report?
5       A.  Before I left, I believe I did, yes.
6       Q.  Before you left, you went and talked to OIM
7   or he came and talked to you?
8       A.  Yes, sir, I think I had to.
9       Q.  What was that discussion?
10      A.  I just kind of explained the pain that I was
11  in, and he just wanted to make sure I was going to be
12  okay.
13      Q.  Okay.  And he okay'd you getting on the next
14  helicopter back, correct?
15      A.  Yes, sir.  That's why he signed everything,
16  I believe.
17      Q.  Did you tell Mr. Blackden, the OIM, that you
18  had injured your back while at work and on duty back in
19  February 20th or 21st, 2019?
20      A.  No, sir, I did not.
21      Q.  Did you tell him that you had injured your
22  back while not at work?
23      A.  I don't think so, but I don't recall.
24      Q.  Did you tell anyone in -- on August 16th or
25  thereabouts that you had injured your back while not at

[Page 136]

1   work?
2       A.  I don't think so.
3       Q.  What about Mr. Richmond?  Did you tell him
4   that?
5       A.  No, sir.
6       Q.  Okay.  Let's take a look at your actual
7   statement on the first page, Diamond Ormond 1005.
8           First of all, that's your signature at
9   the bottom there?
10      A.  Yes, sir, it is.
11      Q.  Do you recall giving this statement?
12      A.  Yes, sir.
13      Q.  Did you write the words that are on the
14  blank lines?
15      A.  Yes, sir, with coaching from the medic.
16      Q.  Okay.  Is there anything in here that's not
17  true?
18      A.  The cause and origin were known to me, but I
19  didn't report it at the time, either.
20      Q.  So explain that to the jury.
21      A.  Again, I don't want to report the injury
22  and have to go through the investigation and the whole
23  process and become the talk of the ship again.  So when
24  I explained that to Todd, he understood and he told me
25  what -- told me how to write it.  So he told me to

888-893-3767
www.lexitaslegal.com

Patricia Diana Ormond                                    Pages

[Page 137]

1  write cause and origin, unknown.
2      Q.  Those were actually somebody else's words,
3  not yours?
4      A.  Yes, sir.
5      Q.  You understand that you swore they were
6  true?
7      A.  Yes, sir.
8      Q.  You are specifically focused on the first
9  sentence in this document, which says:  For a few
10 months now, I have been experiencing pain in my lower
11 right back, cause or origin unknown?
12         Correct?
13     A.  Correct.
14     Q.  Because at least according to your lawsuit
15 and what you testified today under oath, you knew for
16 many months, six months if we are to believe your
17 testimony, that the cause or origin was known, correct?
18     A.  Yes, sir, known to me.
19     Q.  But yet you didn't include that when you
20 made this report?
21     A.  No, sir.  Again, I was just afraid of losing
22 my job.
23     Q.  But you knew, didn't you, that if you
24 submitted a false statement, you could lose -- be
25 terminated, correct?

[Page 138]

1      A.  If they -- yes, sir.
2      Q.  But you wanted to pursue that over telling
3  the truth?
4      A.  I didn't want to lose my career.  I had been
5  the subject of an investigation before, and I just
6  didn't want to go through it again.
7      Q.  And so you knew that if you did make a
8  truthful report or a report that included that this
9  injury occurred at work, Diamond would have done an
10 investigation?
11     A.  Yes, sir.
12     Q.  That was Diamond's policy?
13     A.  Yes, it was.
14     Q.  And you knew that was a serious event for
15 Diamond, correct?
16     A.  They make it a serious event, yes, sir.
17     Q.  Because they want to do a diligent,
18 responsible investigation, correct?
19         MR. AVERY:  Object to form.
20     A.  Yes, sir.
21 BY MR. NORRIS:
22     Q.  You knew that, because you were trained on
23 how that process works, correct?
24     A.  Yes, sir.
25         MR. AVERY: Can we take a quick break?

[Page 139]

1         MR. NORRIS:  Sure.
2         THE VIDEOGRAPHER:  Off the record at
3  11:56.
4         (Recess from 11:56 a.m. to 12:04 p.m.)
5         THE VIDEOGRAPHER:  Okay.  Back on the
6  record at 12:04.  This is the beginning of media 3.
7         (Exhibit 5 marked.)
8  BY MR. NORRIS:
9      Q.  Ms. Ormond, I am going to hand you what I
10 have marked as exhibit 5.
11         This is a letter dated August 30th,
12 2019, from Diamond Offshore to you at your McComb,
13 Mississippi, address, correct?
14     A.  Yes, sir.
15     Q.  Do you recall receiving this letter from
16 Diamond?
17     A.  Yes, I do.
18     Q.  Do you know who Michelle Orgeron is, who
19 signed it at the bottom?
20     A.  I have never met her personally, but I have
21 spoken to her many times.
22     Q.  She is -- part of her responsibilities are
23 to communicate with employees about disability payments
24 and workers' comp, the equivalent of maintenance and
25 cure, those types things, correct?

[Page 140]

1      A.  Yes, sir.
2      Q.  At any point in your training and
3  experience, did you ever become familiar with the term
4  maintenance and cure?
5      A.  No, sir.
6      Q.  Your lawsuit is making a demand for
7  maintenance and cure.
8         Do you realize that?
9      A.  Yes, sir.
10     Q.  Maintenance and cure under the law is
11 payable to Jones Act seamen if they are injured while
12 at work.
13         Do you understand that?
14     A.  Right, yes, sir.
15     Q.  Okay.  Is it your claim that Diamond did not
16 pay you appropriate maintenance and cure in this case?
17         MR. AVERY:  Object to form.
18     A.  After receiving short-term disability and
19 long-term disability, no, sir.
20 BY MR. NORRIS:
21     Q.  So it's not in your claim that we should
22 have paid you maintenance and cure?
23     A.  Wait.  What?
24     Q.  I am trying to understand.  I have got your
25 lawsuit?

[35]  (Pages 137 to 140)

Patricia Diana Ormond                                    Pages

[Page 141]

1     A.  Can you rephrase that?
2     Q.  I have got your lawsuit, and it includes a
3  claim that Diamond should have paid you appropriate
4  maintenance and cure under the Jones Act.  Do you
5  understand that?
6     A.  Right, yes, sir.
7     Q.  And you understand you are making that claim
8  as a plaintiff?
9     A.  Yes.  Yes, sir, I am.
10    Q.  When should Diamond have begun paying you
11 maintenance and cure?
12    A.  After the long-term disability lawsuit --
13 like, after they let me go.
14    Q.  After you were terminated?
15    A.  Yes, sir.
16    Q.  Okay.  And --
17    A.  I mean, isn't that -- is that the point of
18 maintenance and cure --
19    Q.  Well, I can't answer that because I am not
20 your lawyer.
21    A.  I don't know.
22    Q.  We probably have differing answers from the
23 people in this room.
24            I understand this is sort of a legal
25 issue, but you are a commissioned officer.  And I just

[Page 142]

1  want to make sure I understand the claims you are
2  making in the lawsuit.
3     A.  Okay.
4     Q.  If you don't know, you don't know.  Tell me
5  that.
6     A.  I probably won't know, but okay.
7     Q.  Is it your claim and testimony here today
8  that Diamond should have begun paying you maintenance
9  and cure under the Jones Act when you were -- after you
10 were terminated?
11    A.  I don't know.  I don't know how the
12 Jones Act works.
13    Q.  Okay.  Did you ever tell anyone at Diamond,
14 Ms. Orgeron or anyone else with whom you communicated,
15 that Diamond should pay you maintenance and cure?
16    A.  Not that I recall.  I don't think I was
17 aware of it at the time.
18    Q.  You never, since your termination, at least
19 until the filing and proof of claim in our bankruptcy
20 process sent a letter or made a request of Diamond to
21 pay you maintenance and cure because you were injured
22 at work?
23    A.  Not that I recall.
24    Q.  Essentially, until the claims in the lawsuit
25 showed up, you agree you never made a claim for

[Page 143]

1  maintenance and cure with Diamond?
2     A.  I didn't know I could.
3     Q.  Fair enough.  But you didn't?
4     A.  No, sir.
5     Q.  Okay.  Let's look at the letter that's dated
6  30 August 2019.
7            Do you see that?
8     A.  Yes, I do.
9     Q.  You made the report to Diamond that we just
10 looked at as exhibit 4 on -- I think it was August
11 16th, 2019, correct?
12    A.  Yes, sir.
13    Q.  So about two weeks later, after you were
14 sent back to Mississippi, you received this letter that
15 we are looking at as exhibit 5, correct?
16    A.  Yes, sir.
17    Q.  And Ms. Orgeron says:  Dear Ms. Ormond,
18 hourly short-term disability gives you the opportunity
19 to receive disability benefits for a nonoccupational
20 accident or illness for up to 24 weeks after a 14-day
21 waiting period.
22            Do you see that?
23    A.  Yes, I do.
24    Q.  And you recall getting that, correct?
25    A.  Yes, sir.

[Page 144]

1     Q.  Basically, Ms. Orgeron is saying, look, you
2  can get this short-term disability -- and she goes on
3  to explain, I think, it's about 60 percent of what you
4  were making, but it only lasts for about six months?
5     A.  Correct.
6     Q.  And it is meant to compensate you at least
7  in part when you have a -- an injury or a disability
8  for something that occurs while you were not at work,
9  correct?
10    A.  Correct.
11    Q.  You knew and understood that from Diamond's
12 perspective, based on your incident report, Diamond
13 understood that your injury did not occur at work,
14 correct?
15    A.  Yes, sir.
16    Q.  No doubt in your mind that was Diamond's
17 understanding, right?
18    A.  Yes, sir.
19    Q.  But yet you then received about 60 percent
20 of your pay up to $2500 a week for six months based on
21 your statement that this was an injury that did not
22 occur on Diamond's rig, right?
23    A.  Yes, sir.
24    Q.  And you never during that six-month period
25 called Diamond, Ms. Orgeron, or anyone else and said,

                                [36]  (Pages 141 to 144)

Patricia Diana Ormond                                        Pages

[Page 145]

1  hey, look, stop sending me this money because this
2  isn't true, did you?
3       A.  No, I did not.
4       Q.  And it's only when the money runs out that
5  you hire a lawyer or begin talking to lawyers and it's
6  only when the money runs out that now you say in this
7  lawsuit that we should have paid you maintenance and
8  cure, correct?
9            MR. AVERY:  Object to form.
10      A.  I started talking to lawyers in October of
11  2019, long before this money ran out.
12  BY MR. NORRIS:
13      Q.  But you were still taking the money based on
14  the statements and representations that you had made
15  that you weren't hurt at work, correct?
16      A.  Yes, sir.
17      Q.  Did no one tell you, lawyers, or any wise --
18           MR. NORRIS:  You may want to object.
19  BY MR. NORRIS:
20      Q.  -- hey, look, you are entitled to
21  maintenance and cure if this happened at work for real?
22           MR. AVERY:  Don't answer to the extent
23  you are talking about legal advice.  You can answer
24  otherwise.
25      A.  Okay.  I was still under the impression that

[Page 146]

1  I was going to get better, so I still didn't want
2  Diamond to know that I got hurt at work.
3  BY MR. NORRIS:
4       Q.  But yet you are taking all this money every
5  two weeks knowing that you had made this representation
6  that, at least according to your testimony today under
7  oath, wasn't true?
8       A.  Correct.
9       Q.  And yet you never called Ms. Orgeron or
10  write her back or send her an e-mail or a letter that
11  says, hey, look, I wasn't -- this is wrong?
12      A.  I was trying to get the help I needed for my
13  back, and I didn't know how else to do it.
14      Q.  Well, Diamond has people, Ms. Orgeron and
15  others --
16      A.  But that would involved reporting to her.
17      Q.  It would have been reporting that you had
18  lied about it in the past?
19      A.  Yes, sir.
20      Q.  You didn't want to stop the money coming in?
21      A.  Can you survive without any money?  No, I
22  didn't.
23           But it wasn't -- that wasn't the
24  purpose of me lying about it.  I wanted -- I needed
25  treatment.  I needed help.

[Page 147]

1       Q.  And you were getting that help, right?
2       A.  Yeah, but how can you get help without
3  money?
4       Q.  What would you do --
5       A.  It wasn't about the money for me, sir.
6       Q.  Knowing what you know now, looking at the --
7  look, you went to the Merchant Marine Academy.  You are
8  a commissioned officer in the United States Navy.
9           You and I know together that's a big
10  deal, correct?
11      A.  Yes, sir.
12      Q.  Core values, integrity is one of them,
13  truthfulness, honesty, correct?
14      A.  Yes, it is.
15      Q.  So I appreciate the fact you got upset when
16  you were confronted with this incident statement?
17      A.  Yes, sir.
18      Q.  But as you sit here today, to have to look
19  in that camera and go through with me, a former
20  commissioned officer in the same military, what would
21  you do differently?
22      A.  Report it right away.
23      Q.  Which is what our policies require?
24      A.  Yes, sir.  I just -- the fear of losing my
25  job and losing my livelihood overtook that.

[Page 148]

1       Q.  And we all make mistakes, fair?
2       A.  Yes.
3           (Exhibit 6 marked.)
4       Q.  Let me hand you, Ms. Ormond, what I have
5  marked as exhibit 6 to your deposition.  These are
6  documents that are Bates labeled -- at least the
7  beginning is 211 Ormond at the bottom.  They go through
8  237 Ormond.
9           Do you see that?
10      A.  Yes, sir.
11      Q.  These are basically physical therapy notes,
12  correct?
13      A.  Yes, sir.
14      Q.  And you begin going to TRI or TRI Therapy
15  Physical and Occupational Therapy beginning in mid to
16  late August 2019, correct?
17      A.  Yes, sir, I believe so.  That's right.
18      Q.  I think you went a total --
19      A.  Or September.
20      Q.  -- of 17 times?
21      A.  Sounds about right.
22      Q.  Sounds about right?  So this was you trying
23  to get better?
24      A.  Yes, sir.
25      Q.  And this was you trying to get back to work?

[37]  (Pages 145 to 148)

Patricia Diana Ormond                                    Pages

[Page 149]

1    A.  Yes, sir.
2    Q.  And this was you getting the help that you
3  needed, correct?
4    A.  Trying to, yes, sir.
5    Q.  And did this physical therapy work?
6    A.  No, sir.
7    Q.  Not at all?
8    A.  No, sir.
9    Q.  Okay.  But on the very first visit, there
10 are a couple things that are -- I want to ask you about
11 here.
12        First, you see in the subjective,
13 that's what you reported, correct?
14   A.  Yes, sir.
15   Q.  And it says that the -- I am sorry.  I am
16 going to go back up.  You said that the injury
17 onset/change of status date.
18        Do you see that on the top right?
19   A.  Yes, sir.
20   Q.  March 26, 2018?
21   A.  Yes, sir.  That's what it says.
22   Q.  Now, that is the date of the very first
23 injury where you did make the report, correct?
24   A.  Yes, sir.
25   Q.  That was when you fell on your hip?

[Page 150]

1    A.  Yes, sir, oh, yes, in the bilge --
2    Q.  So when you -- that occurred about a year
3  prior to the incident that brings us here today in the
4  lawsuit, right?
5    A.  Right.
6    Q.  We have talked a little bit about that, but
7  basically, you did make an incident report on that one?
8    A.  I did.
9    Q.  You did tell Diamond that -- for that
10 injury, that it was work related, correct?
11   A.  Yes, sir.
12   Q.  And we have -- you became concerned about
13 your job, but you were never fired, correct?
14   A.  No, sir.
15   Q.  There was no negative employment history in
16 your records, correct?
17   A.  Not officially, not documented, no.
18   Q.  You weren't demoted?
19   A.  No.
20   Q.  Diamond continued to pay you?
21   A.  Yes, sir.
22   Q.  And Diamond continued to train you?
23   A.  They tried.
24   Q.  Diamond continued to invest in you?
25   A.  They tried to slow me down, but yes.

[Page 151]

1    Q.  And you ended up actually getting promoted
2  at least for those two weeks in February of 2019,
3  correct?
4    A.  Yes, sir.
5    Q.  Okay.  But when you go to physical therapy,
6  you told them that your injury occurred on March 26th,
7  2018, and not February 20th, 2019, right?
8    A.  Yes, sir.  I thought that's where it was
9  related to.
10   Q.  Okay.  But that's different than what your
11 lawsuit says?
12   A.  Because at the time I thought the impact of
13 me falling the -- in March of 2018 was -- to me, it
14 made more sense that I would have lingering pain from
15 that, but then I fell -- yeah, I was bruised up, but I
16 got better without any ongoing pain.  But, again, I
17 didn't know what to tell them to not make it come back
18 to that incident.
19   Q.  In February?
20   A.  Yes, sir.
21   Q.  So when you tell the therapist that this
22 actually started back in March of 2018, you were still
23 concerned that the misrepresentations that you had made
24 two weeks before this visit would come out?
25   A.  Yes, sir.

[Page 152]

1    Q.  Is that your testimony?
2    A.  Yes, sir.
3    Q.  So basically you are lying again?
4    A.  Unfortunately, yes, sir.
5    Q.  Because then in the subjective -- that's
6  where you already told me this information came from
7  you -- the second bullet there says history of present
8  condition/mechanism of injury.
9        Do you see that?
10   A.  Yes, sir, I do.
11   Q.  You told the therapist not that you were
12 sprayed with hot water and hurt your back turning, but
13 yet that you had fallen at work on a ship onto your
14 right hip, correct?
15   A.  Yes, sir.
16   Q.  That's consistent with what occurred back in
17 March of '18?
18   A.  Yes, sir.
19   Q.  Still running from that lie?
20   A.  Unfortunately.
21   Q.  Did it -- by this point, you had had the MRI
22 that the Southern Bone folks sent you to, correct?
23   A.  Correct.
24   Q.  You knew that that MRI was essentially
25 negative, correct?

[38]  (Pages 149 to 152)

Patricia Diana Ormond                                        Pages

[Page 153]

1    A.  Correct.
2    Q.  And you had been told that, correct?
3    A.  Yes, sir.
4    Q.  Did you ever correct, in the 17 times you
5  went to see the TRI Therapy folks, your description of
6  what caused your injury?
7    A.  I don't believe so.  There wasn't a whole
8  lot of conversation, I guess.  I would go in.  He would
9  do the drawing billing, and I would leave.  He would
10 leave me in the room for 20 minutes.  Then I would
11 leave.
12   Q.  I am sorry.  Did the TRI Therapy folks not
13 perform their duties appropriately, in your opinion?
14   A.  No, sir.  I come to find out a little while
15 ago that that gentleman was fired not too long after I
16 stopped going there.
17   Q.  Okay.  But you never corrected either the
18 onset date or what had happened to cause your injury in
19 your opinion as it related to the 17 times you went to
20 see the TRI Therapy folks?
21   A.  No, sir, because I wasn't sure how it was
22 going to come back on me.
23   Q.  You weren't sure how that was going to
24 affect the payments and getting -- continuing to be
25 able to get therapy and --

[Page 154]

1    A.  Potential return to work.
2    Q.  Still running from that misrepresentation?
3    A.  Yes, sir.
4        MR. AVERY:  What are you-all thinking
5  as far as lunch and how much longer you-all have?
6        MR. NORRIS:  I've lost track of time.
7        MR. AVERY:  It's, like, 12:20.  I
8  wanted to check in and see what you are thinking.
9        MR. NORRIS:  Can we go about another
10 20, 25 minutes, like 12:45, and then kind of take a
11 break and evaluate where we are?
12       MR. AVERY:  Sure, yeah, that works.
13 BY MR. NORRIS:
14   Q.  Understand, anytime you need a break, you
15 get --
16   A.  I am good.  I want to get it done.  My mom
17 is sitting at the airport.
18       MR. NORRIS:  Actually, why don't we
19 take about a five-minute break now?  Let me kind of get
20 my wits about me, and I will be able to better tell
21 you.
22       MR. AVERY:  That sounds good.
23       THE VIDEOGRAPHER:  Off the record at
24 12:22.
25       (Recess from 12:22 to 12:38 p.m.)

[Page 155]

1        THE VIDEOGRAPHER:  Okay.  Back on the
2  record at 12:37.
3  BY MR. NORRIS:
4    Q.  Ms. Ormond, when we left off, I think we
5  were finishing our discussion about the August 2019
6  time period --
7    A.  Yes, sir.
8    Q.  -- just to orientate you so we don't confuse
9  our time periods.
10       So from the time you received the --
11   A.  The letter?
12   Q.  Yes, August 30th, 2019, letter from
13 Diamond --
14   A.  Yes, sir.
15   Q.  -- you began receiving the 60 percent of
16 your base weekly salary, correct?
17   A.  I had to go through the whole process with
18 The Hartford, but yes, sir, shortly thereafter.
19   Q.  You understood that that's a
20 Hartford-administered program that Diamond has?
21   A.  Yes, sir.
22   Q.  And that's why you had to communicate with
23 Hartford?
24   A.  Yes, sir.
25   Q.  But from basically -- let's just call it

[Page 156]

1  September through February of 2020, that was really the
2  six-month period where you would receive that
3  short-term disability payments?
4    A.  Correct.
5    Q.  And then you mentioned earlier in October of
6  2019 is the first time you began having communications
7  with attorneys?
8    A.  Yes, sir.
9        (Exhibit 7 marked.)
10   Q.  I am going to hand you what I have marked as
11 exhibit 7, titled accidental injury questionnaire with
12 your name at the top.
13       Do you see that?
14   A.  Yes, I do.
15   Q.  This is a document, I believe, that is
16 signed basically under oath on the final page, page 4,
17 by you on the 18th of January 2020?
18   A.  Yes, sir.
19   Q.  So this is a document that you signed
20 directly with the Hartford as part of the disability
21 qualification process, correct?
22   A.  Correct, yes, sir.
23   Q.  This is about five months or so after you
24 began receiving the short-term disability payments from
25 Diamond through the Hartford, correct?

[39]  (Pages 153 to 156)

Patricia Diana Ormond                                          Pages

[Page 157]

1   A.  Yes, sir.
2   Q.  And you knew and understood when you signed
3   exhibit 7 that your short-term disability payments were
4   coming to an end, correct?
5   A.  Yes, sir.
6   Q.  And that now you were involved in the
7   process of -- I think they call it the long-term
8   disability payments?
9   A.  Correct.
10   Q.  You were getting qualified when you
11   submitted this document in January of 2020 for the
12   long-term/post short-term disability stuff?
13   A.  Yes, sir.
14   Q.  Okay.  Now, in the second section it says:
15   If your disability is a result of an injury or
16   accident, please answer the following questions.
17       Do you see that?
18   A.  Yes, I do.
19   Q.  Now you tell The Hartford something
20   different than what you told Southern Bone and the
21   TRI Therapy people that your injury actually occurred
22   in the spring of 2019, correct?
23   A.  Yes, sir.
24   Q.  Really, for the first time, you tell
25   The Hartford in section 2, paragraph 2, what were you

[Page 158]

1   doing at the time of the injury -- you say for the
2   first time engine overhauls, correct?
3   A.  Correct.
4   Q.  Essentially for the first time you tell
5   The Hartford that your injuries were caused by an
6   incident that occurred at work in February of 2019.
7   A.  Correct.
8   Q.  Of course, section 4, did you file a lawsuit
9   or a claim, you answer no, because you had not done
10   that yet?
11   A.  Correct.
12   Q.  In 4C you are asked are you represented by
13   an attorney, and you circled no?
14   A.  Correct.
15   Q.  It was your understanding at that point you
16   had not yet retained an attorney?
17   A.  Yes, sir.
18   Q.  But you had sought communications with
19   attorneys four months before this document?
20   A.  Yes, sir.
21   Q.  Okay.  And of course, at the bottom
22   work-related injuries or accidents, you said -- were
23   you working when the injury occurred, you said yes,
24   correct?
25   A.  Yes, sir.

[Page 159]

1   Q.  Again, first time you were telling
2   The Hartford or Diamond that.  Is that right?
3   A.  Yes, sir, I believe so.
4   Q.  Now, when you were going through this
5   Hartford process in -- I will call it January of
6   2020 -- you were also having phone conversations with
7   the Hartford?
8   A.  I am sure, yes.
9   Q.  And during these phone conversations, were
10   they asking you whether these injuries that you are
11   alleging form the basis of your disability occurred at
12   work?
13   A.  I don't remember exactly the conversation,
14   but I am sure they did mention it, yes, sir.
15   Q.  When did you make the decision to come
16   clean?
17       MR. AVERY:  Object to form.
18   BY MR. NORRIS:
19   Q.  You know what I mean, don't you?
20   A.  It wasn't so much to come clean.  It was
21   just to seek further help knowing that the injury was
22   not necessarily going to be healed on its own.
23   Q.  Okay.  Well, let me go back and ask you
24   this.
25       We have talked about that first

[Page 160]

1   incident back in March of 2018 --
2   A.  Yes, sir.
3   Q.  -- when you fell into the bilge pump?
4   A.  Bilge well, yes, bilge well.
5   Q.  Into the bilge hole?
6   A.  It's a bilge well.
7   Q.  Yeah, okay.  You know what I am talking
8   about.
9       Now, those injuries, you were bumped
10   and bruised, correct?
11   A.  Yes, sir.
12   Q.  And you fell on your right hip?
13   A.  Kind of/sort of.  It's hard to explain.
14       I literally actually fell into the
15   hole, but my left leg caught me.  So one leg went into
16   the hole.  One leg went onto the deck.  And I kind of
17   fell sideways, so it fell more on ribs.  It knocked the
18   wind out of me.  I had bruised ribs and a bruised calf
19   muscle from hitting my leg.
20   Q.  Did you have back pain from that incident
21   from March of 2018 all the way through February 20th of
22   2019?
23   A.  No, sir.
24   Q.  Those injuries resolved themselves?
25   A.  Yes, sir.

Patricia Diana Ormond                                    Pages

[Page 161]

1    Q.  Okay.  During these phone interviews,
2    discussions, communications with The Hartford, did you
3    advise anytime until January of 2020 that your work --
4    that your injuries that form the basis of your
5    disability were work related?
6    A.  I don't remember.
7    Q.  As you sit here today, have you had any
8    surgeries?
9    A.  No, sir.
10   Q.  Do you intend to have any surgeries?
11   A.  Not at this time.
12   Q.  What are you doing now as far as treatment
13   goes for your back injury?
14   A.  Some stretching and exercising, the
15   Williamson exercises that was provided to me by
16   Dr. Rodriguez.
17   Q.  Okay.  What is it that you can't do today
18   that you could do the day before the injury that you
19   allege occurred on February 20th, 2019?
20   A.  Running, for one -- are you talking about
21   just exercise and stuff or just anything?
22   Q.  Anything in your daily life, because you
23   understand the claims in your lawsuit relate to things
24   that you can't do because of your injury.
25   A.  Yes, sir.

[Page 162]

1    Q.  So those are the things I am asking you
2    broadly right now, and then we can get more specific as
3    you go.
4    A.  Pretty much anything that requires lifting
5    anything more than 20 pounds, running, exercising,
6    anything that was more impact related, lifting heavy
7    weights like working out wise.
8         Sometimes standing to cook or do dishes
9    or do laundry, even sitting here today just sitting for
10   this long period of time is causing pretty severe pain,
11   but it just varies day-to-day.
12        Sometimes walking hurts more than
13   others.  Sometimes standing hurts.  Sometimes sitting,
14   laying down hurts.  It just doesn't seem to go away.
15   Q.  Okay.  Are you able to work as you sit here
16   today?
17   A.  Define work.
18   Q.  Anything that you do to generate income?
19   A.  I tried to get a job.  I have tried to get
20   several jobs, really.  But I got a job as a car
21   salesman, but they let me go because they didn't think
22   that I would stay with the company if my back ever got
23   better.
24        I missed a lot of work because of my
25   back, but I was only there for two and a half months or

[Page 163]

1    two months, really.
2    Q.  What were these dates?
3    A.  That was November to January of 2020 --
4    November of '19 to January of 2020, right?
5    Q.  Well, you weren't terminated until
6    February 14th of 2020.
7    A.  Right.
8    Q.  Did you go work at MacGrubbs?
9    A.  Yes, sir, in November of 2019.
10   Q.  So prior to being terminated by Diamond, you
11   went to work for Mack Grubbs?
12   A.  Yes, sir.  I was trying to get some sort of
13   income.
14   Q.  Short-term disability, I don't think,
15   requires that you be totally unemployed.
16   A.  Right.
17   Q.  Did you sell any cars?
18   A.  I think I sold three.  I was pretty proud of
19   myself for that, actually.
20   Q.  Is it your testimony today that you were let
21   go by Mack Grubbs sometime when?
22   A.  I believe it was January.
23   Q.  Of 2020?
24   A.  Yes, sir, or going into February, one of the
25   two.  Yes, sir.

[Page 164]

1    Q.  And what have you done since working at Mack
2    Grubbs to gain useful employment?
3    A.  I have tried to be a remote assistant for my
4    aunt and uncle who own a logging company out in
5    California.  It hasn't really worked that well because
6    of the time difference and now he has got COVID and
7    it's just going downhill, unfortunately.
8         I have also picked up where I left off
9    where I was back in high school.  I was a research
10   assistant for my mentor.  She is an author, as well.
11   So once every few weeks, she will send me a copy of her
12   book, and I will just do some minor editorial-type work
13   for her.
14        What else?  I attempted to start my
15   own -- go ahead.
16   Q.  Well, have you been paid for that editing?
17   A.  Yes, sir.
18   Q.  That's all right.  Keep going.
19   A.  I have attempted to start a company making
20   candles, but it's pretty much failed.  So I can't say
21   that I made any money at that.
22        And other than that, I have applied for
23   numerous jobs, had quite a few interviews and haven't
24   had anything further.
25   Q.  Because you are a very educated person?

[41]  (Pages 161 to 164)

Patricia Diana Ormond                                Pages

[Page 165]

1    A.  Yes, sir.
2    Q.  And you went to a very good school?
3    A.  Yes, sir.
4    Q.  You got a bachelor of science degree in
5  marine engineering, correct?
6    A.  Yes, sir.
7    Q.  You don't necessarily have to be on a ship
8  all the time to do that job, right?
9    A.  No, sir.
10   Q.  You could also do other types of
11  administrative functions, correct?
12   A.  Correct.
13   Q.  Do you know -- well, and in a post or --
14  wherever we are in the pandemic, many jobs are now
15  remote?
16   A.  Yes, sir.
17   Q.  You wouldn't even have to move somewhere?
18   A.  Except for the fact that I live in the
19  middle of nowhere with terrible internet service --
20   Q.  Well --
21   A.  -- which is proving to be difficult.
22   Q.  Well, could you move somewhere?
23   A.  Not at this time, no, sir.
24   Q.  Why not?
25   A.  Finances and family.

[Page 166]

1    Q.  Do you have family in Mississippi, also?
2    A.  No.  Just my fiance and his family.
3    Q.  Your fiance's family lives there?
4    A.  Yes, sir.
5    Q.  In Mississippi?
6    A.  Yes, sir.
7    Q.  And your fiance is still gainfully employed?
8    A.  Yes, sir.
9    Q.  He is actually still gainfully employed, my
10  understanding, by Diamond Offshore?
11   A.  Yes, he is.
12   Q.  He goes -- I assume he is not offshore right
13  now, because you are getting married on Friday?
14   A.  Correct.
15   Q.  You mentioned a mentor a couple of times?
16   A.  Yes, sir.  Dr. Patricia Sargent.
17   Q.  Who is she?
18   A.  Her and her husband -- well, he just
19  recently passed away, but he was a graduate of the
20  Naval Academy, a retired fighter pilot.
21       He found out about the academy and
22  started getting involved in helping other students get
23  nominated and whatnot to the academy.
24       So between two of them, she helps with
25  the resumes and the essays and whatnot.  Then he helps

[Page 167]

1  with making sure you are in the right extracurricular
2  activities and preparing you for interviews and
3  whatnot.  They have mentored over 100 students since
4  the academy, but they mentored my sister first and then
5  they mentored me next.
6    Q.  Okay.  Is Debbie Letchworth your future --
7    A.  Mother-in-law.
8    Q.  -- mother-in-law?
9    A.  Yes, sir.
10   Q.  Do you still -- I guess is Dr. Sargent the
11  one for whom you do the editing?
12   A.  Yes, sir.
13   Q.  Anything else you can't do today that you
14  could do on the day before the injury that you allege
15  occurred on February 20th, 2019?
16   A.  Specifically, I mean, there is a lot of
17  things, but I can't think of anything specifically,
18  besides I have a tendency to lose focus a lot more.
19       I used to be able to pay a lot more
20  attention to detail and multitask better and do all
21  sorts of stuff, but I have just kind of lost that
22  ability, because I just kind of get distracted, like
23  even right now I am like -- I am distracted trying to
24  answer questions, because I am trying to be
25  comfortable.  It's a struggle.

[Page 168]

1    Q.  Are you on -- presently on any medications?
2    A.  Just Aleve, over-the-counter pain reliever
3  antiinflammatory-type stuff.
4    Q.  Ever since February 20, 2019, until today,
5  is that all you have taken?
6    A.  No, sir.  They have tried me on muscle
7  relaxers -- I can't think of the name of them, but they
8  put me on stronger antiinflammatory, but I only have to
9  take one a day.  I can't think of the name of it.
10   Q.  Is that by prescription?
11   A.  Yes, sir.  The nurse practitioner put me on
12  the muscle relaxers and Mobec, was the first one.
13       Dr. Rodriguez tried to put me on
14  another antiinflammatory, but I can't remember the name
15  of that one.
16   Q.  Fair enough.  Those just didn't have any
17  analgesic effect on you?
18   A.  No, sir.
19   Q.  What about have you taken any stronger
20  prescription medications like opiates or any opioids?
21   A.  No, sir.
22   Q.  And today, you seem very lucid and with it.
23  Are you on anything other than over-the-counter
24  medications?
25   A.  No, sir, besides coffee.

[42]  (Pages 165 to 168)

Patricia Diana Ormond                                     Pages

[Page 169]

1    Q.  Anything else affecting you today that would
2  impact your ability to answer my questions truthfully?
3    A.  No, sir.
4    Q.  Okay.  Anything else the jury needs to know
5  and understand about your injuries and the impact to
6  your life as you sit here today versus what you could
7  do back on February 19th, 2019?
8    A.  I don't really know how to answer that
9  broadly.
10          It's changed my way of life.
11  Everything -- every part of my day I have to question
12  what I can and cannot do because of the limitations
13  that I now have.
14          Can I do a lot of things?  Yes.  But do
15  a lot of things cause me pain?  Yes.
16          I do things I probably shouldn't be
17  doing, to be honest, but I have to do stuff to maintain
18  my home, to maintain my yard when I am the only one
19  there and I don't want rattlesnakes coming up to my
20  front porch and stuff like that.  But it takes me a lot
21  longer than it used to would have.
22          It's definitely slowed me down quite a
23  bit.  I am definitely not as active as I was, and that
24  is overall frustrating, but it adds to a lot of stress
25  on my part and not -- feeling like I am not able to

[Page 170]

1  provide.
2    Q.  So you still are able to do certain types of
3  work in the yard?
4    A.  Sometimes.
5    Q.  It just takes you a little longer?
6    A.  I have to work up to it, and I regret it
7  afterwards.  I will be laid up for a while after I do
8  it, but sometimes it just has to get done.
9    Q.  In your responses to our request for
10  disclosures, you indicated that the incident also was
11  not properly documented or investigated by rig
12  management.
13          Are you aware of that claim?
14    A.  I am now, yes, sir.
15    Q.  Well, I can let you look at the document.
16    A.  I read it before, I believe.
17    Q.  Okay.
18    A.  But it was a long document and a lot to
19  read.
20    Q.  Well, and your lawyers wrote it, to be fair?
21    A.  Yes.
22    Q.  But as we sit here today, I mean that's a
23  pretty bold claim considering that you didn't tell us
24  it happened at work for a long time.
25    A.  Yes, sir, I understand.

[Page 171]

1    Q.  Your whole point in misrepresenting that for
2  months and months and months and months was so that we
3  wouldn't do an investigation, correct?
4    A.  Yes, sir, because I was the target of an
5  investigation before and it was not fun.
6    Q.  So you actually misrepresented things to us
7  about the incident that you intended to prevent us from
8  doing an investigation, correct?
9    A.  Essentially, yes.
10    Q.  Are you still, after today, making that
11  claim that we were negligent or otherwise should have
12  done a more thorough investigation?
13        MR. AVERY:  Object to form.
14    A.  I don't know how to answer that.
15  BY MR. NORRIS:
16    Q.  Okay.  Do you understand the irony of that
17  claim --
18    A.  Yes, sir.
19    Q.  -- considering your testimony today?
20    A.  Yes, sir.
21    Q.  Okay.  So you have mentioned several times
22  in our discussions today about you have been
23  investigated before and it was not pleasant.
24        What is that related to?
25    A.  When I fell into the bilge well and I

[Page 172]

1  reported that incident, I became known as the deck
2  grating victim.  People that I have never met before in
3  my life would come up to me while I was eating food and
4  be like, hey, you are the deck grating victim, right?
5        I don't know these people.  It's
6  because in those pretewor or those safety meetings when
7  people got put on the rig, that incident got put on
8  that PowerPoint, and the safety rep or the captain,
9  without fail, would always say she or her.  And they
10  knew it was an oiler, and I was the only female oiler
11  on the rig.  So they automatically knew it was me.
12        So I would get teased, ridiculed,
13  looked at differently, messed with for it, and that
14  went companywide.  It wasn't just on our rig.
15    Q.  And you understand that when an injury
16  occurs on the rig, Diamond sends out --
17    A.  To try and prevent it from happening again.
18    Q.  Right.  I was almost there.
19        You understand that when an injury or
20  an incident is reported, such as what you reported back
21  in March of 2018, it sends out safety alerts for --
22  companywide?
23    A.  Right.
24    Q.  And the purpose of that is to ensure that
25  other people don't have the same or similar types of

888-893-3767
www.lexitaslegal.com

Patricia Diana Ormond                                    Pages

[Page 173]

1  injuries or incidents?
2      A.  Correct.
3      Q.  And those safety alerts, you have seen them
4  many times, right?
5      A.  Uh-huh.
6      Q.  That's --
7      A.  Yes, sir.
8      Q.  And they don't include your name and address
9  or Social Security number?
10     A.  No, but like I said, when you are the only
11  female in the engine room, people automatically know.
12  And it became an embarrassment.
13     Q.  So that -- the fact that Diamond did a
14  thorough investigation of the incident you reported
15  back in March of '18 actually served, in your opinion,
16  your testimony today, to cause -- to add to you not
17  wanting to make the incident report come 2019?
18     A.  Yes, sir.
19     Q.  Any other incidents or investigations that
20  similarly added into your fear of investigation?
21     A.  Just hearsay of other people's
22  investigations, but nothing directly associated with
23  me.
24     Q.  Okay.  This is sometimes -- not sometimes;
25  for me, all the time -- a difficult area to discuss,

[Page 174]

1  but you have made the claim both in your lawsuit and in
2  your disclosures that you still suffer intimacy issues?
3      A.  Yes, sir.
4      Q.  Okay.  Can you explain to me what that means
5  and the impact of that?
6      A.  The pain that I suffer from prevents me from
7  being able to make love, I guess, have sex, whatever,
8  do anything intimate with my fiance.  Sometimes it just
9  completely prevents it, and it sometimes causes -- not
10  anger between us, but it makes me feel bad.  And then I
11  just -- it messes up that part of our relationship
12  sometimes.
13     Q.  Okay.  And you say sometimes.  You are able
14  to engage in sexual activity on other occasions?
15     A.  Yes, sir.
16     Q.  So some --
17     A.  But still with pain.
18     Q.  Okay.  So you can -- you can have intimate
19  times with your fiance, but on occasion you are not
20  able to because of the back pain?
21     A.  Yes, sir.  It's not as often as we both
22  would like.
23     Q.  You get married on Friday?
24     A.  Yes, sir.
25     Q.  So it's not -- it's not to the level where

[Page 175]

1  you -- see, I am really bad at asking these questions.
2      A.  It's awkward questions.
3      Q.  You still care about each other enough and
4  have enough intimate times together that you want to
5  get married here in the next few days?
6      A.  I mean, a relationship is not just about
7  intimacy, so there is more to it.  I guess we will
8  leave that one up for debate, but....
9      Q.  Okay.  So prior to the injury, how many
10  times did you -- were you and your then, I guess,
11  boyfriend able to have sexual activities together in a
12  given week?
13     A.  I don't know how to put a number on it.
14     Q.  We can agree that postinjury it's -- there
15  are times where you can't because of the pain?
16     A.  Yes, sir.
17     Q.  Okay.  Have any of your doctors recommended
18  to you any type of surgery that you just simply refuse
19  to have?
20     A.  Most recently, Dr. Rodriguez -- well,
21  actually before that, Dr. David Lee from the Southern
22  Bone and Joint, he suggested that he could potentially
23  put like a nerve stimulator thing in my spine to
24  prevent the pain signals from traveling to my brain,
25  but to me that just felt like a Band-Aid that would

[Page 176]

1  mask the fact that there is pain there.  It was a
2  completely voluntary surgery.
3          I told him I didn't want it, because I
4  didn't want to not be in pain and overdo it and make it
5  worse, like tricking my mind essentially.
6          But Dr. Rodriguez, when I first started
7  seeing him, he wanted to do an injection, and then if
8  the injection didn't help because that was going to be
9  my -- that was my third injection into my SI joint.  He
10  said the next step would be surgery to fuse the joint,
11  which that would be his formal recommendation, but he
12  did not want to perform it on me because I am a young
13  female and I haven't had any kids and he couldn't
14  guarantee that it would take the pain away.
15         So he left it up to me, and we haven't
16  gone any further with the discussion just because he
17  couldn't guarantee that it would even help.
18     Q.  We will talk about Dr. Rodriguez in a moment
19  a little more.
20         But as you sit here today, are you
21  undergoing any treatment other than over-the-counter
22  medications?
23     A.  No, sir, not at this time.
24     Q.  You are not going to physical therapy
25  anymore?

                              [44]  (Pages 173 to 176)

Patricia Diana Ormond                                    Pages

[Page 177]

1    A.  No, sir.
2    Q.  Are you still getting injections?
3    A.  No, sir, not since the last one with
4  Dr. Rodriguez.
5    Q.  When was the last time you were in physical
6  therapy?
7    A.  That was before I started seeing
8  Dr. Rodriguez.
9    Q.  Was there -- we looked at exhibit 6 earlier,
10  which was the TRI when you went 17 times in September,
11  October of 2019.
12       Do you recall that?
13    A.  Yes, I do.
14    Q.  Have you gone back to TRI for additional
15  physical therapy after those time periods?
16    A.  I have gone back, but not in an official
17  capacity.  They have a program where you can pay so
18  much a month and you can just go in and, like, do heat
19  and ice or do the therapy or whatever it may be.  I did
20  that for a couple weeks, but it wasn't, like I said, in
21  any official -- it was kind of like a gym membership.
22  That was a few months ago -- I say a few months ago.
23  It was closer to the beginning of the year.
24    Q.  Of 2021?
25    A.  Yes, sir.

[Page 178]

1    Q.  Any other physical therapy or occupational
2  therapy sessions that you have had other than that sort
3  of informal?
4    A.  I believe it was after TRI Therapy, I went
5  to Dr. Dan Lynch.  David Lee referred me to him.  He
6  was a -- I don't even know how to say it -- a
7  musculoskeletal osteopathic specialist.  He is similar
8  to a chiropractor, but he doesn't do the snap, crackle,
9  and pop.  He does, like, slow manipulations and trying
10  to slowly work kinks and everything else back out.
11       I went to him a few times.  He did a
12  couple trigger point injections at the very end, and he
13  basically told me that if those didn't help, then he
14  didn't know what else to do for me.
15    Q.  Those did not help?
16    A.  No, sir, but I think that was all in 2020.
17    Q.  Okay.  Any other physical therapy in 2021?
18    A.  No, sir.  Just me on my own doing the
19  Williamson, whatever they are called, exercises at
20  home.
21    Q.  Okay.  And do you have exercise equipment at
22  home?
23    A.  We just got a Bowflex.  I don't use it,
24  though.
25    Q.  Got what?

[Page 179]

1    A.  We just got a Bowflex, but I don't use that.
2  I just use the bands for stretching, like resistance
3  band.
4       (Exhibit 8 marked.)
5    Q.  Let me hand you what I have marked as
6  exhibit 8.  This is a document Bates labeled Diamond
7  Ormond 140 at the beginning through 143.  It's a note
8  from Southern Bone and Joint Specialists and for you,
9  Ms. Ormond.  It's dated February 13th, 2020.
10       Do you see that?
11    A.  Yes, sir.
12    Q.  So that's the time frame where you -- just
13  to orientate you, we talked about six months of
14  short-term that ended in February of 2020 at or --
15  actually, this note was from the day before, correct?
16    A.  Yes, sir.
17    Q.  Now, by this time, you had already
18  corresponded with lawyers, right?
19    A.  Yes, sir.
20    Q.  And by -- if we see the evaluation there
21  under history of present illness, do you see that?
22    A.  Yes, sir.
23    Q.  Dr. Lee that you mentioned earlier starts in
24  the second sentence:  She has a very unusual history.
25       Do you see that?

[Page 180]

1    A.  Yes, sir.
2    Q.  Have you reviewed these notes at all?
3    A.  Not lately, but I have read through them.
4    Q.  How did you come to read through these
5  notes?
6    A.  I went about getting my own copy of medical
7  records well before I ever retained a lawyer, just
8  mostly because The Hartford was having a hard time
9  getting documents from Southern Bone and Joint so I
10  would get copies for them.
11    Q.  And you would review them yourself?
12    A.  Yes, sir.
13    Q.  Did you discuss Dr. Lee's here that she
14  has a very unusual history?
15    A.  No, sir.
16    Q.  That's just something I would have to ask
17  him about?
18    A.  Yes, sir.
19    Q.  And then he goes on and says she was working
20  on an engine when it began spraying hot material.
21       Do you see that?
22    A.  Yes, sir.
23    Q.  She had to rapidly move out of the way to
24  avoid being injured.
25       Correct?

[45]  (Pages 177 to 180)

Patricia Diana Ormond                                      Pages

[Page 181]

1    A.  Yes, sir.
2    Q.  Now, of course, that is a totally different
3  story than what you had originally told Southern Bone,
4  correct?
5    A.  Yes, sir.
6    Q.  Now, what if anything did you do after you
7  saw Dr. Lee in February of 2020 based on your visit
8  with him?
9    A.  I don't -- I think that's when I was still
10  seeing Dr. Lynch, maybe.  I don't remember the timeline
11  exactly when I stopped seeing one or the other, but
12  when he came to the conclusion that he could install
13  that stimulator, whatever, and that he was stumped on
14  what else it could be, I kind of gave up on him.
15    Q.  And then if you look on the last page of the
16  document, top right --
17    A.  Yes, sir.
18    Q.  -- it appears he looked at the imaging
19  available for review that included the new MRI scan
20  from Southern Bone and Joint from January 21st, 2020,
21  correct?
22    A.  Uh-huh.
23    Q.  He also, I think, looked at someone else,
24  but he said that film demonstrates basically an
25  unremarkable lumbar spine MRI.

[Page 182]

1        Do you see that?
2    A.  Yes, sir.
3    Q.  Did you have a discussion with Dr. Lee about
4  his observation that your MRI from January of 2020 was
5  unremarkable?
6    A.  Yes, sir.
7    Q.  And then he goes on and says there is a bone
8  scan from Wesley Merritt done about the same time
9  period?
10    A.  Uh-huh.
11    Q.  And that also was unremarkable?
12    A.  Yes, sir.
13    Q.  Okay.  Then he goes on.  There was a prior
14  pelvis and SI joint MRI scan, correct?
15    A.  Yes.
16    Q.  We talked a little about that one earlier?
17    A.  Yes, sir.
18    Q.  And it looks like that revealed no evidence
19  of sacrum fracture or sacroiliitis, correct?
20    A.  Uh-huh.
21    Q.  Did you have discussions with Dr. Lee about
22  these things?
23    A.  Yes, sir.
24    Q.  So I guess my question is:  As far as
25  January of 2020 and your visit with Dr. Lee, was there

[Page 183]

1  anything -- any evidence objectively demonstrating your
2  injury?
3    A.  There was no imagery available that marked
4  anything, but that was why I got so frustrated and so
5  distrustful about all these doctors, is because I was
6  in such severe pain and yet they couldn't find out what
7  was wrong with me.
8    Q.  And to this day -- to your knowledge,
9  because, look, let me back up.
10        You have reviewed a lot of your medical
11  records, correct?
12    A.  Yes, sir.
13    Q.  You have a vested interest in your medical
14  condition?
15    A.  I do.
16    Q.  You are an educated person?
17    A.  I hope so.
18    Q.  I have reviewed these same things, and I
19  don't see anywhere where there is any objective
20  evidence of your injuries.
21    A.  Correct.
22    Q.  So your -- is that wrong?
23    A.  No, sir.  That's why I continued searching,
24  because I was tired of being told that there was
25  nothing wrong with me even though I knew for a fact

[Page 184]

1  that something was if I was still in pain.
2        And after the same document you just
3  were reading, further down I still was seeing Dr. Lynch
4  during that time period.
5    Q.  Correct.  So -- do you continue to receive
6  Hartford long-term disability payments?
7    A.  Yes, sir.
8        (Exhibit 9 marked.)
9    Q.  All the way from May of 2020 until today?
10    A.  Yes, sir.
11    Q.  Now --
12    A.  Or February, February, yes, sir.
13    Q.  So from February 2020 until today you have
14  received long-term disability payments from
15  The Hartford?
16    A.  Yes, sir.
17    Q.  Is it your understanding, as we have talked
18  about for the last four hours, that those long-term
19  disability payments from The Hartford are based upon
20  your injuries being nonoccupational?
21    A.  But in the accident report that I filled out
22  for them where I did say it was occupationally related,
23  then they still provided the long-term disability.
24    Q.  Yeah.  My understanding -- my question is:
25  Have you had any discussions with them where you

[46]  (Pages 181 to 184)

Patricia Diana Ormond                                          Pages

[Page 185]

1  provided information that you are sending me this money
2  under long-term disability policy, but my injuries I
3  now allege are work related?
4      A.  I don't remember having that conversation.
5      Q.  And you will agree you have had many
6  conversations with The Hartford?
7      A.  Yes, sir.
8      Q.  Many conversations with The Hartford related
9  to its payment of long-term disability payments to you
10 over the past year and a half?
11     A.  Yes, sir.
12     Q.  In fact, I think Hartford even sent you to
13 the R3 Continuum.
14         Do you recall that assessment?
15     A.  They sent me to an independent review.  I
16 don't know if that's the same thing.
17     Q.  Right.
18     A.  Okay.
19     Q.  Where was that?
20     A.  It was in Hattiesburg -- I don't even
21 remember.  Forest General, maybe.
22     Q.  And did you tell the independent review
23 medical providers that your injury was caused by a
24 work-related injury?
25     A.  I believe I did, but I don't remember for

[Page 186]

1  sure.
2      Q.  Okay.  Let me hand you what I have marked as
3  exhibit 9.  This is a document Bates labeled Diamond
4  Ormond 280 through 282 -- 283.  I am sorry.  And it
5  is -- it's a letter to you from The Hartford dated
6  May 6, 2020, correct?
7      A.  Yes, sir.
8      Q.  And it basically says:  We are pleased to
9  inform you that we have approved your claim for
10 long-term disability benefits.
11         Do you see that?
12     A.  Yes, sir.
13     Q.  Do you recall getting this record?
14     A.  Yes, I do.
15     Q.  And it's a true and accurate depiction of
16 what you recall receiving?
17     A.  It looks like it, yes, sir.
18     Q.  Do you keep all these types of letters and
19 correspondence in a file?
20     A.  Yes, sir.
21     Q.  So you -- if I asked you to go do it, you
22 could go to that file and get your copies of it?
23     A.  Probably so.
24     Q.  When you have conversations with
25 The Hartford or Michelle Orgeron or anybody else

[Page 187]

1  related to these important documents, do you make notes
2  on the letter sometimes?
3      A.  No, sir.
4      Q.  Do you make notes anywhere else?
5      A.  No, sir.
6      Q.  So as to conversations that you had with
7  The Hartford related to either short-term or long-term
8  disability that were not included in e-mails or in
9  writing, you don't have any notes of those?
10     A.  I don't think so.  I don't recall writing
11 stuff down.
12         Normally our cell service is so bad I
13 am always outside on the phone.  I can't be inside on
14 the phone, because it won't pick up the call.
15     Q.  But you don't have a practice of writing on
16 the letter, hey, here is what we talked about or you
17 don't keep a journal or a log anywhere that is
18 separate?
19     A.  No, sir.
20     Q.  Okay.  Did you know that there were what we
21 call -- I don't call it anything, but what is called in
22 the bankruptcy world -- a proof of claim was filed on
23 your behalf?
24     A.  Yes, sir.
25     Q.  Did you review that prior to it being filed?

[Page 188]

1      A.  I believe I did.
2      Q.  Do you believe that everything in that proof
3  of claim that was filed on your behalf is true and
4  accurate under oath?
5      A.  As far as I know, yes, sir.
6      Q.  Why did you stop going to the Southern Bone
7  doctors in Mississippi and start seeing Dr. Rodriguez?
8      A.  I stopped going to Southern Bone and Joint
9  because they couldn't find out what was wrong with me.
10         I started going to Dr. Rodriguez
11 because that's where Mr. Doyle sent me.
12     Q.  Okay.  Who is Mr. Doyle, for the jury?
13     A.  My lawyer.
14     Q.  Okay.  So it's true that Mr. Doyle sent you
15 to Dr. Rodriguez?
16     A.  Yes, sir.
17         (Exhibit 10 marked.)
18     Q.  Do you know -- well, let me hand you what I
19 am marking now as exhibit 10.
20         Now, of course, Mr. -- Dr. Rodriguez is
21 located in Houston, Texas?
22     A.  Yes, sir.
23     Q.  How do you get from Mississippi to Houston,
24 Texas, to see Dr. Rodriguez?
25     A.  I drive.

[47]  (Pages 185 to 188)

Patricia Diana Ormond                                    Pages

[Page 189]

1    Q.  Do you drive by yourself?
2    A.  No, sir.
3    Q.  Who drives with you?
4    A.  My fiance.
5    Q.  That would be Mr. Letchworth?
6    A.  Yes, sir.
7    Q.  How many times have you seen Dr. Rodriguez?
8    A.  I think three times in person, I think.
9    Q.  You said three?  I just didn't hear you.
10   A.  I think, yeah.
11   Q.  Okay.  And each time you drive to Houston to
12   see Dr. Rodriguez, correct?
13   A.  Yes, sir.
14   Q.  And each time you drive with --
15   A.  My fiance, yes, sir.
16   Q.  I guess you can't see Dr. Rodriguez if
17   Mr. Letchworth is on hitch?
18   A.  No, sir.
19   Q.  Is -- let's do exhibit 10.  Exhibit 10 that
20   I have provided to you is a note from Dr. Rodriguez
21   related to a visit of September 4th, 2020.
22       Do you see that?
23   A.  Yes, sir.
24   Q.  And did -- do you recall this visit?
25   A.  Yes, sir.

[Page 190]

1    Q.  Have you seen this record before?
2    A.  Yes, I have.
3    Q.  Anything in this record that's not true and
4    accurate as to the conversations you had with
5    Dr. Rodriguez?
6    A.  They put the wrong date down.
7    Q.  Where?
8    A.  Second line of the history of present
9    illness where it says working on a drill ship on
10   2-20-20.  It should have been 2-20 of '19.
11   Q.  That's a good point.  Anything else that's
12   not accurate based on your conversations and
13   recollection?
14   A.  Not that I can see.
15   Q.  How long did you visit with Dr. Rodriguez on
16   February the -- I am sorry -- September 4th, 2020, this
17   first visit?
18   A.  It was about 30, 35 minutes, maybe.
19   Q.  Okay.  What did he do?
20   A.  He did a full -- I can't even think of the
21   word.
22   Q.  Examination?
23   A.  Yes.
24   Q.  Okay.
25   A.  He had me lay on my back and checked my legs

[Page 191]

1    and how they moved and what hurt and what didn't hurt.
2    He had me explain the pain, and then he did his exam
3    and everything.
4        And I had brought all of my scans with
5    me that Dr. Lee and everyone else has gotten, but he
6    didn't want to look at them until he actually examined
7    me, because he wanted -- the way he explained it is he
8    wanted to treat the patient, not the scans.
9    Q.  Okay.  And did you discuss the imaging
10   studies and x-rays with Dr. Rodriguez during this first
11   visit?
12   A.  Yes, sir.
13   Q.  And do you recall what his impressions were?
14   A.  He basically -- he said that just because
15   the images don't show anything doesn't mean there is
16   nothing wrong, which made me feel a little bit better,
17   because everyone was telling me that there wasn't
18   anything wrong; that obviously I was still in pain and
19   that a sprained SI joint wouldn't necessarily show up
20   on any imaging.
21       So he was frustrated with the other
22   doctors that they couldn't pinpoint that, he said --
23   but he also said it was commonly overlooked.
24   Q.  Okay.  So he agreed with the prior doctors
25   at least that the imaging studies and x-rays were

[Page 192]

1    unremarkable?
2    A.  Yes, sir.
3    Q.  He, however, has the opinion that you have a
4    severe right sacroiliac joint sprain, correct?
5    A.  Yes, sir.
6    Q.  And I think that's what you told me at the
7    very beginning of your deposition is now your
8    impression of what's wrong?
9    A.  Yes, sir.
10   Q.  How does -- how did Dr. Rodriguez tell you
11   he was going to treat your severe right sacroiliac
12   joint sprain?
13   A.  It's a mouthful, huh?
14   Q.  Yes.
15   A.  He wanted me to get another injection into
16   the joint.
17   Q.  Did you do that?
18   A.  Yes, sir.
19   Q.  And did that provide relief for the pain?
20   A.  Not on the drive home.  It was very
21   uncomfortable, but maybe for the first couple of days
22   after, it might have been improved it one number on the
23   pain scale, but after that, it went right back to where
24   it had been.
25   Q.  How far is that drive one way?

[48]  (Pages 189 to 192)

Patricia Diana Ormond                                    Pages

[Page 193]

1    A.  Depending on traffic, six to twelve hours.
2    Q.  Do you have to drive through Baton Rouge?
3    A.  Yes, sir.  That's why the --
4    Q.  That added two hours right there?
5    A.  Exactly.
6    Q.  So let's just say it's a seven-hour drive?
7    A.  Yes, sir.
8    Q.  That's 14 hours in the car both ways,
9    correct?
10   A.  Yes, sir.
11   Q.  On the way back, you said after receiving
12   the injection from Dr. Rodriguez, it was very, very
13   uncomfortable?
14   A.  Absolutely.
15   Q.  More uncomfortable than the seven-hour drive
16   over?
17   A.  Yes.
18   Q.  Okay.  Do you recall discussing with
19   Dr. Rodriguez his prognosis based on his diagnosis of
20   the severe right sacroiliac joint sprain?
21   A.  What is prognosis?
22   Q.  Prognosis being did he have discussion with
23   you about, hey, I am going to give you this shot, here
24   is what is going to happen over the next two days and
25   up to 20 years?

[Page 194]

1    A.  So he told me after the injection that it
2    could take up to two weeks to go into effect and it --
3    he didn't say how long it was supposed to last.
4        He said if it didn't help or if it kind
5    of helped, we could potentially do a third -- I guess
6    fourth one.  At the time it would be the fourth one.
7        But he said after that, then surgery
8    would be the next option.
9    Q.  So this was the first injection you had had
10   with Dr. Rodriguez?
11   A.  Yes, sir, but I had two previous ones.
12   Q.  And with whom was that?
13   A.  Southern Bone and Joint.
14   Q.  So Southern Bone had given you the same
15   exact treatment that Dr. Rodriguez gave to you?
16   A.  Yes, sir.
17   Q.  Those didn't work, either?
18   A.  No, sir.
19   Q.  But Dr. Rodriguez wanted to give you a third
20   and potentially a fourth?
21   A.  He insisted on it, because the first two
22   that I received were done in about two minutes.
23   Q.  Okay.
24   A.  Not under -- like, I wasn't put to sleep for
25   them or anything.  It was just in and out.  He was

[Page 195]

1    convinced they didn't take their time and actually
2    finding where the needle needed to go and giving the
3    proper injection at the proper site, I guess, in the
4    joint.
5        So I came back to Houston again, and
6    that's -- they put me to sleep for it.  And I don't
7    think it was a long process, but I was asleep for it.
8    Q.  Okay.  So let me make sure I understand.
9        Did you get the shot -- the third shot,
10   the first from Dr. Rodriguez, but the third total on
11   the same visit that we are looking at the record here
12   on September 4th, 2020?
13   A.  No, sir.  It wasn't until -- I don't even
14   remember.  I want to say it was early 2021, maybe.  It
15   should be in my records.  I honestly don't remember.
16   Q.  Okay.  So you come to Houston.  You see
17   Dr. Rodriguez for -- I think you said 30, 35 minutes,
18   correct?
19   A.  Yes, sir.
20   Q.  He did an examination, correct?
21   A.  Uh-huh.
22   Q.  He then looked at your films and x-rays and
23   MRIs, correct?
24   A.  Yes, sir.
25   Q.  And then did he give you a -- an injection

[Page 196]

1    on that date?
2    A.  No, sir.
3    Q.  You drive back to --
4    A.  Mississippi.
5    Q.  -- Mississippi?
6    A.  Yes, sir.
7    Q.  And then you come back sometime later.  Is
8    that right?
9    A.  Yes, sir.  I want to say -- and I really
10   honestly don't remember.  I think there was another
11   visit in between those two with Dr. Rodriguez before I
12   got the injection.
13       (Exhibit 11 marked.)
14   Q.  Let me hand you what I have marked as
15   exhibit 11.
16   A.  Maybe not.
17   Q.  This is another Dr. Rodriguez treatment
18   record dated November 2nd, 2020, of you.
19       Do you see that?
20   A.  Yes, sir.
21   Q.  It says it's a followup visit, correct?
22   A.  Yes, sir.
23   Q.  The patient informs that her pain has
24   improved since her last visit.
25       Do you see that?

888-893-3767
www.lexitaslegal.com

Patricia Diana Ormond                                    Pages

[Page 197]

1    A.  Yes, sir.
2    Q.  Do you recall having that discussion with
3  Dr. Rodriguez?
4    A.  Uh-huh.
5    Q.  That's a yes?  Sorry.
6    A.  Yes, sir.
7    Q.  It says approximately 40 percent better
8  after receiving the right SI joint injection.
9        Do you see that?
10    A.  Yes, sir.
11    Q.  So sometime between -- I have even forgotten
12  the date -- January the 4th --
13    A.  No.  September 4th.
14    Q.  September 4th, 2020, and November 2nd, 2020,
15  you had come back to Houston and seen Dr. Rodriguez for
16  the first shot with Dr. Rodriguez, third shot total?
17    A.  Yes, sir.
18    Q.  And that is when he put you under anesthesia
19  and gave you the shot?
20    A.  Yes, sir.
21    Q.  It looks like it worked?
22    A.  This followup visit was just a phone call.
23    Q.  Okay.  When you say this followup visit, you
24  are referring to the --
25    A.  The one on November 2nd.

[Page 198]

1    Q.  Exhibit 11?
2    A.  Yes, sir.
3    Q.  So September 4th, hey, I looked at all the
4  stuff; we are going to do a shot.  You come back
5  sometime thereafter.  He actually does the shot,
6  correct?
7    A.  Yes, sir.
8    Q.  You drive back.  It's very uncomfortable?
9    A.  Yes, sir.
10    Q.  Now, I thought you told me, well, it didn't
11  really work.  It was like 1 less on the pain skill?
12    A.  Yes.
13    Q.  Okay.
14    A.  But to me that is an improvement.
15    Q.  And then you have a conversation over the
16  phone with Dr. Rodriguez on November 2nd and he at
17  least writes down that it was better?
18    A.  Yes, sir.
19    Q.  Had it gotten better over time?
20    A.  A little bit.  Like I said, it does take a
21  couple weeks for it to go into effect, I guess, is what
22  they tell me.  It did get better for a little bit, but
23  then it quickly went back to what it had been.
24    Q.  And he notes on the second page of the
25  exhibit 11 that we are looking at that -- at the bottom

[Page 199]

1  assessment, some improvement with current treatments.
2        Do you see that?
3    A.  Yes, sir.
4    Q.  Continue the Williams exercises?
5    A.  Uh-huh.
6    Q.  And continue taking Tylenol for pain,
7  correct?
8    A.  Yes, sir.
9    Q.  Don't lift more than 20 pounds, right?
10    A.  Yes, sir.
11    Q.  Then he talks about consider the SI joint
12  fusion if pain interferes with ADL and work?
13    A.  Yes, sir.
14    Q.  So did Dr. Rodriguez tell you that you
15  should go back to work of some sort?
16    A.  He didn't say one way or the other, I don't
17  think.
18    Q.  He tells you to follow up in three months
19  there right above his signature?
20    A.  Yes, sir.
21    Q.  Did you do that?
22    A.  I have tried to call his office a few times,
23  and I have never managed to get an appointment or to
24  get through to him.
25        So I honestly just kind of got to the

[Page 200]

1  point where if his next thing was going to be fusion, I
2  didn't really care to follow up, anyway.
3    Q.  Did you get that fourth injection?
4    A.  No, sir.
5    Q.  So since the phone conversation -- well,
6  hold on.
7        THE VIDEOGRAPHER:  In about five
8  minutes, let's take a break.
9        MR. NORRIS:  Sure.
10  BY MR. NORRIS:
11    Q.  Since the phone conversation on November
12  the 2nd, exhibit 11, have you had other visits with
13  Dr. Rodriguez, including any telephone or telenet?
14    A.  No, sir.  I have tried, and like I said, I
15  haven't been successful in getting one.
16    Q.  Okay.  So you haven't seen Dr. -- let me
17  back up.
18        The phone conversation that occurred on
19  November 2nd, 2020, exhibit 11, how long were you on
20  the phone with Dr. Rodriguez?
21    A.  Just a few minutes.
22    Q.  Five?
23    A.  Five, ten minutes, yes, sir.
24    Q.  Since that phone conversation, have you
25  spoken with Dr. Rodriguez?

[50]  (Pages 197 to 200)

Patricia Diana Ormond                                            Pages

[Page 201]

1     A.  No, sir.  I have spoken with his nurse and
2   front desk receptionist, but not him.
3     Q.  And the purpose of those phone calls was to
4   try to get back in to see him?
5     A.  Just trying to have another virtual
6   conversation with him instead of having to drive all
7   the way here for a boring conversation.
8         (Exhibit 12 marked.)
9     Q.  Let me hand you exhibit 12.  This is another
10   note and patient statement, so -- dated January 4th,
11   2021.
12         Do you recall this visit?
13     A.  Kind of.  Now I am kind of confused what
14   order everything went in.
15     Q.  This is about two months after exhibit 11 in
16   November 2nd, so maybe this was another phone
17   conversation you had with Dr. Rodriguez?
18     A.  I really don't remember which one was the
19   phone conversation now.  I thought it was that first
20   one, but now I don't remember.  I have to go back
21   through my e-mail.
22     Q.  Fair enough.  Let's -- it appears that you
23   spoke with or saw Dr. Rodriguez on January the 4th,
24   2021?
25     A.  Okay.  This -- yes, sir.  This was

[Page 202]

1   definitely -- we came back for this one, because this
2   is when he gave me the prescription for the -- Celebrex
3   is the name brand of it.
4         So the one in November was a phone
5   followup; this one was in person, I believe.
6     Q.  Okay.
7     A.  I don't think he gave me that prescription
8   over the phone.
9     Q.  How long did you see Dr. Rodriguez on
10   January 4th, 2021, approximately?
11     A.  About 30 minutes again --
12     Q.  Now --
13     A.  -- I think.
14     Q.  -- if you look at the second page, do you
15   recall discussing with Dr. Rodriguez that your pain had
16   worsened since your last visit?
17     A.  Yes, sir.
18     Q.  Do you recall that day telling him or
19   discussing with him that the SI joint injection gave
20   her one month relief?
21     A.  That sounds about right, yes, sir.
22     Q.  And that the pain is recurring even despite
23   doing the Williams exercises?
24     A.  Yes, sir.
25     Q.  The last sentence of that paragraph says she

[Page 203]

1   is not working.
2         Do you see that?
3     A.  Yes, sir.
4     Q.  Walking, standing, and other ADL.  ADL
5   meaning active daily activities.  I don't know.  Do you
6   understand what that means?
7     A.  I don't know what that means, either.
8     Q.  It says:  Walking, standing, or other ADL,
9   including sex?
10     A.  Yes, sir.
11     Q.  Do you recall having a conversation with
12   Dr. Rodriguez about the intimacy issues?
13     A.  Yes, sir.
14     Q.  What do you recall telling him about the
15   intimacy issues?
16     A.  Pretty much the same thing we discussed
17   earlier about just not being able to perform as often
18   as I used to and just having more pain involved during.
19     Q.  I think you have already told me this, but
20   the prescription that he gave you --
21     A.  Yes, sir.
22     Q.  -- that I can't pronounce very well, did it
23   have any relief, provide any relief?
24     A.  No, sir, it did not.
25     Q.  We already talked about that.  Here is what

[Page 204]

1   I want to ask you about is --
2     A.  Oh, I am sorry.  I was confused on my
3   timeline.
4         The first injection he ordered, I did
5   still have in Hattiesburg, Mississippi, but he ordered
6   it, not Southern Bone and Joint.
7         This injection that he wrote the
8   prescription for is the one that I came back to Houston
9   for.
10     Q.  Did you come back after November 4th?
11     A.  Yes.
12     Q.  And --
13     A.  I want to say it was in February.
14     Q.  Of 2021?
15     A.  Yes.
16         MR. NORRIS:  Okay.  Let's take a
17   five-minute break so he can change the tape.
18         THE VIDEOGRAPHER:  Off the record at
19   1:36.
20         (Recess from 1:36 to 1:45 p.m.)
21         THE VIDEOGRAPHER:  Okay.  Back on the
22   record at 1:45.  This is the beginning of media 4.
23   BY MR. NORRIS:
24     Q.  Mrs. Ormond, let's go back to exhibit 12,
25   which you should have in front of you.

[51]  (Pages 201 to 204)

Patricia Diana Ormond                                        Pages

[Page 205]

1    A.  Yes, sir.
2    Q.  And just make sure we are still on the same
3  page.  I think when we left off before we had to change
4  the tape, you had realized that you did see
5  Dr. Rodriguez on November -- January the 4th, 2021,
6  correct?
7    A.  Yes, sir.
8    Q.  So what was the purpose of that visit as you
9  recall it?
10    A.  It was just another followup.  He was trying
11  to see how I was doing with those Williams exercises.
12  Just see how I was doing.
13    Q.  I think you said that was another 30-,
14  35-minute visit?
15    A.  Yes, sir.
16    Q.  And then he prescribed the -- the medication
17  that you said didn't work?
18    A.  Yes, sir.
19    Q.  But did he also do another MRI?
20    A.  No, sir.  So this order for the MRI is when
21  he was actually ordering another injection.
22    Q.  Understood.  So you are referring to the
23  last page of exhibit 12, which is a hand filled out
24  order for MRI.  And it was, in fact, an order for the
25  third -- the --

[Page 206]

1    A.  This would be --
2    Q.  -- the fourth?
3    A.  The third.
4    Q.  The third, okay?
5    A.  Yeah.
6    Q.  Because you had two with Southern Bone?
7    A.  Okay.  I had one with Southern Bone, another
8  one through Southern Bone that he ordered,
9  Dr. Rodriguez.
10    Q.  That's what you refer to as No. 2?
11    A.  I think so, yeah.  And then this would be
12  the No. 3 that I came to Houston and let Dr. Rodriguez
13  do.
14    Q.  And that was subsequent to January 4, 2021?
15    A.  Yes, sir.
16    Q.  And then have you had a fourth one?
17    A.  No, sir.
18    Q.  After the third that Dr. Rodriguez did?
19    A.  Right.
20    Q.  During which you I think said you were
21  sedated somehow?
22    A.  Yes, sir.
23    Q.  Did you obtain relief from that third
24  injection?
25    A.  That was the one that with the drive home

[Page 207]

1  that was miserable, because that was the one that was
2  here.  And then it probably got better for maybe a week
3  or two, and then, I mean, just like the other ones, it
4  didn't last long at all.
5    Q.  Okay.
6    A.  That's --
7    Q.  Do you have plans to get a fourth?
8    A.  I need to talk to him again and see if
9  that's even recommended at this point since the past
10  three have not done anything they were supposed to,
11  really.
12    Q.  And that's why subsequent to early January
13  of 2021 you have been continuing to call the nurse --
14    A.  Yes, sir.
15    Q.  -- to get on --
16    A.  There was another -- so the followup I
17  thought was a phone call, it was after this injection
18  that he did.  I followed up with him via phone.  I
19  don't know if that's in the records or not, but since
20  that phone call, I have not been in touch with him.
21         (Exhibit 13 marked.)
22    Q.  Since the injection where you were
23  sedated -- we are calling that No. 3?
24    A.  Yes, sir.
25    Q.  Have you been back physically to Houston to

[Page 208]

1  see Dr. Rodriguez?
2    A.  I don't think so, no, sir.
3    Q.  It sounds like there may have been a
4  followup?
5    A.  There is virtually, yes, sir.
6    Q.  And in these virtual visits, are you
7  actually on Zoom or something?
8    A.  No, sir.  This one was just a phone call.
9    Q.  Let me hand you what I have marked as
10  exhibit 13.  That is a billing note dated --
11    A.  October 11.
12    Q.  -- October the 11th?
13    A.  Not October, I'm sorry.  February 11th.
14    Q.  February 11th, 2021, correct?
15    A.  Yes, sir.
16    Q.  So subsequent to all the times you have done
17  visits and/or gotten injections with Dr. Rodriguez,
18  correct?
19    A.  Yes, sir.  This is for the injection.
20    Q.  Okay, fair enough.  Now, you didn't pay for
21  the injection, correct?
22    A.  No, I did not.
23    Q.  And the -- and this says that the injection
24  plus the sedation anesthesia was almost $23,000,
25  correct?

Patricia Diana Ormond                                    Pages

[Page 209]

1      **A.**  Yes, it does.
2      **Q.**  That's not something you paid?
3      **A.**  No, sir.
4      **Q.**  Actually, the document reflects that the
5  Doyle Trial Lawyers, your plaintiff's counsel in this
6  case --
7      **A.**  Yes, sir.
8      **Q.**  -- have been at least billed for that,
9  correct?
10     **A.**  Yes, sir.
11     **Q.**  Do you know whether the Doyle Trial Lawyers
12  have paid that $22,860 on your behalf?
13     **A.**  I have no idea.
14     **Q.**  Do you ever get any bills from
15  Dr. Rodriguez?
16     **A.**  No, sir.
17     **Q.**  Now, all the bills you got from all your
18  doctors before you saw Dr. Rodriguez that the Doyle
19  Trial Lawyers sent you to, had you been paying?
20     **A.**  Yes, sir.
21     **Q.**  So for the first time now your plaintiff's
22  lawyers are paying the bills of Dr. Rodriguez?
23     **A.**  Yes, sir.
24     **Q.**  Did you know that the Doyle Trial Lawyers
25  were at least being billed for the amounts that you

[Page 210]

1  were incurring with Dr. Rodriguez?
2      **A.**  Yes, sir.
3      **Q.**  Do you know how much Dr. Rodriguez charges?
4      **A.**  Not until I see these bills, no, sir.
5      **Q.**  Do you get a copy of bills like exhibit 13
6  for other services?
7      **A.**  I think the first time I saw them was when
8  it come out in the evidence-type stuff of all of this.
9      **Q.**  What we call discovery?
10     **A.**  Yeah, that.
11     **Q.**  Fair enough.  Did you pay -- you paid for
12  the first -- first injection was Southern Bone?
13     **A.**  First one was covered by my insurance.  The
14  second one I paid out-of-pocket, the one that -- the
15  first one that Dr. Rodriguez ordered that I still got
16  in Mississippi I paid out-of-pocket.
17     **Q.**  How much was that one, about, if you recall?
18     **A.**  11 or $1200, out of pocket.
19     **Q.**  So when you drive all the way to Houston,
20  Texas, apparently that went up about $17,000?
21     **A.**  Apparently so.
22     **Q.**  I guess Dr. Rodriguez is really good at
23  giving injections such that it costs -- I don't know
24  how many times -- hundreds of times more?
25            MR. AVERY:  Object to form.

[Page 211]

1      **A.**  Well, it was also anesthesia, but yes, sir.
2  BY MR. NORRIS:
3      **Q.**  The anesthesia is $4,360, correct?
4      **A.**  Yes, sir.
5      **Q.**  The injection is $18,500?
6      **A.**  Yes, sir.
7      **Q.**  Something you had paid less than $1500 for?
8      **A.**  I believe so.
9      **Q.**  Let's go back in time a little bit.
10            I think you told me in earlier
11  testimony that you purchased a house in August of '19?
12     **A.**  Yes, sir.
13     **Q.**  Now, as we have talked about a lot today,
14  the -- you allege the injury occurred on February 20th,
15  21st, 2019, correct?
16     **A.**  Yes, sir.
17     **Q.**  So six months before you bought the house,
18  right?
19     **A.**  Yes, sir.
20     **Q.**  Help me understand why you bought a house
21  while you were out on disability.
22     **A.**  Rent was more expensive than a house note.
23     **Q.**  How much is your house note, approximately?
24     **A.**  825 -- no.  Maybe I had it backwards.
25            The house note was barely more than the

[Page 212]

1  note.  To me, having my own house was more important
2  than paying somebody else's bills.
3      **Q.**  Okay.  Did you purchase that house in only
4  your name?
5      **A.**  Yes, sir.
6      **Q.**  Do you pay the $825 a month mortgage?
7      **A.**  Not anymore.
8      **Q.**  Does Mr. Letchworth contribute to that?
9      **A.**  Yes, sir.
10     **Q.**  Do you-all live together now?
11     **A.**  Yes, sir.
12     **Q.**  Does Mr. Letchworth have children?
13     **A.**  Yes, sir.
14     **Q.**  Because to my understanding you don't have
15  children?
16     **A.**  No, I do not.
17     **Q.**  How many children does Mr. Letchworth have?
18     **A.**  Five.
19     **Q.**  What are their age ranges?
20     **A.**  11 to 22 -- 23.
21     **Q.**  How many of them live in the home with you
22  and Mr. Letchworth?
23     **A.**  One on occasion.
24     **Q.**  Where do they live the other times?
25     **A.**  They are on their own.  The youngest one is

[53]  (Pages 209 to 212)

Patricia Diana Ormond                                   Pages

---

[Page 213]

1   with his ex-wife.  The rest are all grown and doing
2   their own thing.
3       Q.  So most of the time it's just you and
4   Mr. Letchworth in the home?
5       A.  Yes, sir.
6       Q.  You don't have any obligation legally, as we
7   sit here today, to pay child support for any of those
8   children?
9       A.  No, sir.
10      Q.  What I am trying to get to is what are your
11  monthly expenses for you personally.
12          Sounds like $825 for your mortgage,
13  correct?
14      A.  Yes.
15      Q.  That's paid by Mr. Letchworth, correct?
16      A.  Right now all the bills are paid by him.  I
17  don't have any income except the long-term disability,
18  which doesn't even cover enough to fill up a tank of
19  gas sometimes.
20      Q.  Okay.  And if you didn't cohabitate with
21  Mr. Letchworth, I guess your bills would be the $825 a
22  month for the mortgage?
23      A.  Yes, sir.
24      Q.  And what else?
25      A.  Light bill, water bill.

---

[Page 214]

1       Q.  What are your monthly utilities?  Let's just
2   make it easy-ish.
3       A.  Altogether including -- maybe 300, maybe
4   200.  It just depends.
5       Q.  Let's call it $300?
6       A.  Okay.
7       Q.  It will include cell phone, WiFi, cable,
8   heating, light, water, those types of things?
9       A.  Yes, sir.
10      Q.  Okay.  What about -- do you have a vehicle?
11      A.  Yes, sir.
12      Q.  What do you drive?
13      A.  A 2004 Chevy Silverado.
14      Q.  Do you own that car yourself?
15      A.  Yes, I do.
16      Q.  It's in your name?
17      A.  Well, it's mine and my parents, yes, sir.
18  It was may dad's truck.
19      Q.  I'm sorry?
20      A.  It was my dad's truck.
21      Q.  Got you.  How did you get to Houston for the
22  deposition?
23      A.  In Jeffrey's truck.
24      Q.  What type of truck does Jeffrey have?
25      A.  2007 Chevy Silverado.

---

[Page 215]

1       Q.  You-all like the Chevys?
2       A.  GM boy.
3       Q.  I am not worried about his truck at the
4   moment.
5           Your truck, is it paid off?
6       A.  Yes, sir.
7       Q.  Other than insurance and tags or
8   registration type, you don't have to pay for that?
9       A.  No, sir.
10      Q.  About what is your -- let's do it yearly --
11  car insurance?  Do you know?
12      A.  For my truck it's probably about right at
13  about $1,000.
14      Q.  A year?
15      A.  Yes, sir.
16      Q.  Okay.  What other monthly expenses do you
17  personally have that may be -- may be being paid for by
18  Mr. Letchworth at the moment, but they are in your
19  name, for instance?
20      A.  In my name, I have other vehicles that
21  belong to Jeffrey and I.  I have a loan that I got when
22  I was a midshipman at the academy, a career starter
23  loan.
24      Q.  How much is that?
25      A.  A month?

---

[Page 216]

1       Q.  Let's do total amount, then do monthly.
2       A.  Total amount left is 5,000.  A month is 618.
3       Q.  $618?
4       A.  Yes, sir.
5       Q.  Okay.  What about -- you said you and
6   Mr. Letchworth own other vehicles together?
7       A.  Yes, sir.
8       Q.  What are those other vehicles?
9       A.  Here is the list.  Remember he has five
10  kids.
11          Let's see.  He has a 2004 GMC Sierra --
12  I'm sorry -- 2002.  It's in my name.  A 2018 Mazda 3.
13  I guess that's it.  The rest are his --
14      Q.  Okay.
15      A.  -- or paid off.
16      Q.  Why are the '02 GMC truck and the '18
17  Mazda 3 in your name?
18      A.  Because he didn't have the credit at the
19  time to get them.
20      Q.  Are they only in your name?
21      A.  I believe they are registered in mine and
22  his, but the loan itself is just in mine.
23      Q.  Okay.  Those vehicles are not used by you?
24      A.  No, sir.
25      Q.  They are used by his --

---

[54]  (Pages 213 to 216)

Patricia Diana Ormond                              Pages

[Page 217]

1   **A.**  Kids.
2   **Q.**  -- children?
3   **A.**  Yes, sir.
4   **Q.**  Okay.
5   **A.**  I shouldn't say kids.  They are adults,
6   but....
7   **Q.**  Okay.  Any other monthly expenses that you
8   have in your name that you would be responsible for if
9   Mr. Letchworth was not around?
10   **A.**  A credit card bill.
11   **Q.**  Okay.
12   **A.**  Well, technically two.  One is 300 a month,
13   but the other one is 80.
14   **Q.**  Does Mr. Letchworth pay those?
15   **A.**  Yes, sir.
16   **Q.**  There is another -- let me back up.
17          We kind of did your room -- you know,
18   what it would take for your household.
19          What about food and those types things,
20   just household monthly goods?
21   **A.**  Probably four to 500 a month in groceries.
22   Gas is probably another four or 500.  We live in the
23   middle of nowhere.  Driving anywhere is about 20 miles
24   each way, but because those vehicles are in my name,
25   the insurance is also in my name.  So our whole

[Page 218]

1   insurance policy is for all of his kids' vehicles and
2   ours is in my name.
3          Same with the cell phone bills.
4   **Q.**  Okay.  I think you told me this, but the
5   house note, you obviously had bought that house two
6   years before you were going to be married.
7          Is the loan only in your name?
8   **A.**  Yes, sir.
9          MR. NORRIS:  That's all I have today.
10          THE WITNESS:  Okay.
11          MR. NORRIS:  Thank you for your time.
12          MR. AVERY:  I reserve for trial.
13          THE VIDEOGRAPHER:  Off the record at
14   1:59.
15
16
17
18
19
20
21
22
23
24
25

[Page 219]

1          CORRECTIONS AND SIGNATURE
2   PAGE  LINE  CHANGE       REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24          I, PATRICIA DIANA ORMOND, have read the foregoing
25   deposition and hereby affix my signature that same is

[Page 220]

1   true and correct, except as noted herein.
2
3          _____
4          PATRICIA DIANA ORMOND
5   THE STATE OF _____)
6   COUNTY OF _____)
7          Before me, _____, on this
8   day personally appeared PATRICIA DIANA ORMOND, known to
    me (or proved to me under oath through _____)
9   (description of identity card or other document) to be
    the person whose name is subscribed to the foregoing
10   instrument and acknowledged to me that they executed the
    same for the purposes and consideration therein
11   expressed.
12          Given under my hand and seal of office this
    _____ day of _____, _____.
13
14          _____
15          NOTARY PUBLIC IN AND FOR
    THE STATE OF _____
16
17
18
19
20
21
22
23
24
25

Patricia Diana Ormond                                          Pages

[Page 221]

1                    CAUSE NO. 2021-29362
2    PATRICIA ORMOND        : IN THE DISTRICT COURT OF
                            :
3        Plaintiff          :
                            :
4    VS.              : HARRIS COUNTY, TEXAS
                            :
5    DIAMOND OFFSHORE    :
     MANAGEMENT COMPANY,    :
6    DIAMOND OFFSHORE LIMITED,:
     AND DIAMOND OFFSHORE   :
7    COMPANY             :
                            :
8        Defendants      : 127TH JUDICIAL DISTRICT
9
10
11           REPORTER'S CERTIFICATION
12        DEPOSITION OF PATRICIA DIANA ORMOND
13              OCTOBER 13, 2021
14
15        I, Craig Michael Bechtel, Certified Shorthand
16   Reporter in and for the State of Texas, hereby certify
17   to the following:
18        That the witness, PATRICIA DIANA ORMOND, was duly
19   sworn by the officer and that the transcript of the oral
20   deposition is a true record of the testimony given by
21   the witness;
22        That the deposition transcript was submitted on
23   October 19th, 2021 to the witness or to the attorney
24   for the witness for examination, signature and return to
25   me by November 9th, 2021;

[Page 222]

1        That the amount of time used by each party at the
2    deposition is as follows:
3        Mr. Joshua Norris - 03:43
4        That pursuant to information given to the
5    deposition officer at the time said testimony was taken,
6    the following includes counsel for all parties of
7    record:
8      COUNSEL FOR PLAINTIFF:
       Mr. Jeff Avery
9      Doyle
       3401 Allen Parkway, Suite 100
10     Houston, Texas 77019
       713-571-1146
11     javery@doylelawfirm.com
12     COUNSEL FOR DEFENDANTS:
       Mr. Joshua A. Norris
13     Mr. Patrick J. Fackrell
       Jones Walker
14     811 Main Street, Suite 2900
       Houston, Texas 77002
15     713-437-1800
       jnorris@joneswalker.com
16     pfackrell@joneswalker.com
17        I further certify that I am neither counsel for,
18   related to, nor employed by any of the parties or
19   attorneys in the action in which this proceeding was
20   taken, and further that I am not financially or
21   otherwise interested in the outcome of the action.
22        Further certification requirements pursuant to
23   the Rule 203 of TRCP will be certified to after they
24   have occurred.
25

[Page 223]

1        Certified to by me this 19th day of
2    October, 2021.
3
4
5
6    _____
     Craig Michael Bechtel, Texas CSR 6462
7    Lexitas
     Firm Registration No. 95
8    13101 Northwest Freeway, Suite 210
     Houston, Texas 77040
9    888-893-3767
     Expiration:  10-31-21
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

[Page 224]

1    FURTHER CERTIFICATION UNDER RULE 203 TRCP
2
3        The original deposition/correction sheet was/was
4    not returned to the deposition officer on
5    November 9th, 2021;
6        If returned, the attached Changes and Signature
7    page contains any changes and the reasons therefor;
8        If returned, the original deposition was
9    delivered to _____, Custodial Attorney;
10       That $ _____is the deposition officer's
11   charges to the Defendants for preparing the original
12   deposition transcript and any copies of the exhibits;
13       That the deposition was delivered in accordance
14   with Rule 203.3, and that a copy of this certificate was
15   served on all parties shown herein on
16   _____ and filed with the Clerk.
17
18
19
20
21
22
23
24
25

[56]  (Pages 221 to 224)

Patricia Diana Ormond                    Pages

[Page 225]

1    Certified to by me this _____ day of
2    _____, _____.
3
4
5    _____
     Craig Michael Bechtel, Texas CSR 6462
6    Lexitas
     Firm Registration No. 95
7    13101 Northwest Freeway, Suite 210
     Houston, Texas 77040
8    888-893-3767
     Expiration:  10-31-23
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**A**

**a.m** 1:24 28:25
  29:18 43:11,18,24
  61:4 77:7 82:14
  107:1 139:4
**ability** 167:22
  169:2
**able** 34:21 35:6
  41:8 42:11,20
  43:23 44:6 51:4
  54:9 61:6 72:20
  83:11 98:11,13
  108:7 125:13
  134:7 153:25
  154:20 162:15
  167:19 169:25
  170:2 174:7,13,20
  175:11 203:17
**above-styled** 1:23
**abrasions** 20:1,23
**Absolutely** 69:6
  124:11 193:14
**absorbed** 24:3
**absorbs** 84:21
**academies** 96:10,14
  96:21
**academy** 76:12
  93:7,9,13,18,22
  94:15,19 95:12
  96:9,20,24 99:1
  100:18,19,23
  103:17 147:7
  166:20,21,23
  167:4 215:22
**accepted** 93:18
**accident** 91:12,18
  143:20 157:16
  184:21
**accidental** 156:11
**accidents** 158:22
**accurate** 186:15
  188:4 190:4,12
**achiness** 9:21
**acknowledged**
  220:9
**Act** 140:11 141:4

142:9,12
**acted** 12:16 60:16
  91:12
**acting** 33:23 50:12
  50:23 58:17 80:10
  86:5
**action** 222:19,21
**activated** 97:7
**active** 96:22 98:9
  100:11,20,22
  102:15 169:23
  203:5
**activities** 167:2
  175:11 203:5
**activity** 174:14
**actual** 24:6 43:7
  56:12 136:6
**add** 19:15 173:16
**added** 173:20 193:4
**addition** 86:1
**additional** 61:2
  63:18 86:8 177:14
**address** 6:15,24
  37:9 63:6 139:13
  173:8
**addresses** 7:5
**adds** 169:24
**adjust** 51:17
**adjusted** 51:18
**adjustments**
  122:13
**ADL** 199:12 203:4
  203:4,8
**administer** 2:13
**administration**
  100:19
**administrative**
  165:11
**adrenaline** 9:22
  44:4 45:6
**adults** 217:5
**advice** 130:13
  145:23
**advise** 118:1 161:3
**affect** 153:24
**affix** 219:25

**afraid** 11:5 137:21
**aft** 47:9 64:24
**age** 212:19
**ago** 126:14 153:15
  177:22,22
**agree** 11:13 14:20
  14:23 23:8 69:5
  71:24 84:20
  142:25 175:14
  185:5
**agreed** 2:6 120:4
  127:18 191:24
**ahead** 22:11 78:18
  80:10,13,15 89:22
  164:15
**aid** 117:19
**Air** 96:11
**airport** 154:17
**alerts** 172:21 173:3
**Aleve** 186:2
**allegation** 48:20
  60:2
**allege** 9:10 10:3
  24:6 61:16 63:22
  67:10 68:8 72:12
  99:14 105:8 132:1
  161:19 167:14
  185:3 211:14
**alleged** 18:11 20:24
  34:13 37:5
**allegedly** 40:13
**alleges** 8:18
**alleging** 159:11
**Allen** 2:2 5:3 222:9
**alleviate** 123:5
**allow** 70:9
**allowed** 26:7 98:8
**Altogether** 214:3
**amount** 31:24
  102:4 216:1,2
  222:1
**amounts** 209:25
**analgesic** 168:17
**analysis** 68:13,15
  69:11
**Ancillary** 123:25

**and/or** 2:9 28:12
  81:25 104:21
  208:17
**anesthesia** 197:18
  208:24 211:1,3
**anger** 174:10
**answer** 2:10 20:12
  20:14 141:19
  145:22,23 157:16
  158:9 167:24
  169:2,8 171:14
**answers** 141:22
**antiinflammatory**
  168:8,14
**antiinflammator...**
  168:3
**anybody** 9:5 76:1
  186:25
**anymore** 54:21
  176:25 212:7
**anytime** 62:24,25
  67:15 154:14
  161:3
**anyway** 113:16
  200:2
**apart** 7:5 85:12
**apartment** 7:4,9
  37:17
**apparent** 12:22
**apparently** 106:11
  106:13 210:20,21
**appear** 71:7
**Appearances** 3:3
**appeared** 220:7
**appears** 126:7
  181:18 201:22
**application** 94:12
**applied** 101:2,13
  164:22
**appointment**
  199:23
**appointments**
  126:1
**appreciate** 147:15
**approach** 27:16
**appropriate** 80:12

140:16 141:3
**appropriately**
  153:13
**approved** 70:17
  105:23,24,24
  186:9
**approximately**
  43:18 197:7
  202:10 211:23
**April** 114:13 116:4
  116:22 117:6
**area** 50:7 54:4,8
  89:16,18,22 90:21
  102:21 173:25
**areas** 63:14 107:5,8
**arms** 57:22
**Army** 16:19 96:10
  96:24 99:4
**arrive** 61:12 80:16
**arrived** 30:19
  134:19
**arriving** 82:3
**arthritis** 119:17,22
  120:7
**arts** 102:12,15
**asked** 9:20 59:23
  104:24 127:8
  132:19,22 158:12
  186:21
**asking** 38:4 159:10
  162:1 175:1
**asleep** 195:7
**aspects** 64:16
**assessment** 185:14
  199:1
**assessments** 13:21
  31:5
**assigned** 43:11
**assistant** 11:8,11
  29:5,12 31:12,22
  32:1,9,11,13 33:1
  33:16,21 34:2
  39:15 42:24 43:5
  43:10 50:22,23
  53:2 58:16,17
  63:15 70:2 76:2

78:22,22 89:6
90:24 101:24
106:5 116:11,15
164:3,10
**associated** 173:22
**assume** 52:2 108:13
166:12
**assumed** 78:24
81:6
**attached** 2:4 224:6
**attempt** 111:14
**attempted** 164:14
164:19
**attending** 63:8,21
**attends** 61:23
**attention** 93:24
115:20 118:1
167:20
**attorney** 25:22 26:8
26:14,19 127:20
127:23 129:12
130:6,13,25
158:13,16 221:23
224:9
**attorneys** 26:1
129:9 130:2 156:7
158:19 222:19
**atypical** 119:17,21
**audience** 122:8
**August** 6:25 7:1,7
7:11 25:16,21
36:1,10 104:1
125:22 127:24
128:3,4,9,14,15
129:2,2,8 131:23
132:5 134:4
135:24 139:11
143:6,10 148:16
155:5,12 211:11
**aunt** 101:13 164:4
**author** 164:10
**authorization**
109:3 110:24
**authorized** 2:13
110:7 111:2
**automatically**

172:11 173:11
**available** 81:16
86:13 181:19
183:3
**Avenue** 7:3
**Avery** 5:2 24:25
26:5 27:9 127:25
128:11,18,21
138:19,25 140:17
145:9,22 154:4,7
154:12,22 159:17
171:13 210:25
218:12 222:8
**avoid** 98:5 100:6
180:24
**aware** 142:17
170:13
**awkward** 175:2

**B**
**bachelor** 94:16
165:4
**bachelor's** 94:22
**back** 7:19 19:3
24:11,15,19 25:7
26:15 27:11 29:25
36:19 38:17,21
44:2,14,18,21
45:23 54:6,15
55:10 60:15,17,23
61:11 62:19 77:8
82:15 86:24 87:2
91:25 92:17 94:3
96:18 97:9 98:6
99:1 100:10,19
101:4 102:7
103:11,13,23
106:12,14,22
107:22 115:6,9,12
116:8,12,13,14,21
118:23 119:1,4,17
119:22,23,24
121:10 122:10,22
124:25 125:4,6,21
127:3 130:20
131:14 132:5

134:6,15 135:14
135:18,18,22,25
137:11 139:5
143:14 146:10,13
148:25 149:16
151:17,22 152:12
152:16 153:22
155:1 159:23
160:1,20 161:13
162:22,25 164:9
169:7 172:20
173:15 174:20
177:14,16 178:10
183:9 190:25
192:23 193:11
195:5 196:3,7
197:15 198:4,8,23
199:15 200:17
201:4,20 202:1
204:8,10,21,24
207:25 211:9
217:16
**backbone** 97:4
**background** 95:3
**backside** 41:6
**backwards** 211:24
**bad** 55:20 174:10
175:1 187:12
**balances-type**
70:17
**band** 179:3
**Band-Aid** 175:25
**bands** 179:2
**bankruptcy** 142:19
187:22
**bar** 57:12
**barely** 124:17
211:25
**barrier** 48:2
**base** 155:16
**based** 32:3 62:19
97:23 106:15
129:18 144:12,20
145:13 181:7
184:19 190:12
193:19

**bases** 89:2
**basically** 30:16
144:1 148:11
150:7 152:3
155:25 156:16
178:13 181:24
186:8 191:14
**basis** 12:4 159:11
161:4
**basketball** 102:14
**bat** 124:21
**Bates** 109:2 148:6
179:6 186:3
**bathroom** 50:8
59:8
**Baton** 193:2
**Beach** 101:6
**Bechtel** 1:25
221:15 223:6
225:5
**bed** 67:4 114:22
**began** 101:18 123:9
130:13 155:15
156:6,24 180:20
**beginning** 74:8,11
82:16 101:25,25
105:4 130:24
139:6 148:7,15
177:23 179:7
192:7 204:22
**begun** 37:22 99:23
141:10 142:8
**behalf** 187:23
188:3 209:12
**believe** 9:7 14:2
15:12 26:13 29:4
30:20 31:9 32:24
38:18 49:3 74:21
104:1 105:4 111:9
111:22 115:7,11
119:7 121:6,12
125:12 126:15
129:14 135:5,16
137:16 148:17
153:7 156:15
159:3 163:22

170:16 178:4
185:25 188:1,2
202:5 211:8
216:21
**belong** 215:21
**belt** 102:13
**bend** 83:10
**benefits** 143:19
186:10
**better** 122:20 146:1
148:23 151:16
154:20 162:23
167:20 191:16
197:7 198:17,19
198:22 207:2
**beyond** 113:15
**big** 23:10,11 41:15
41:16 59:7 62:21
77:14 147:9
**bilge** 47:19,20,23
47:23 48:5,15
150:1 160:3,4,4,5
160:6 171:25
**bill** 213:25,25
217:10
**billed** 209:8,25
**billing** 153:9
208:10
**bills** 209:14,17,22
210:4,5 212:2
213:16,21 218:3
**Biofreeze** 117:12
117:24 118:12
**bit** 8:16 19:21
28:19 40:15,16
46:6,15 61:11
92:15 119:10
150:6 169:23
191:16 198:20,22
211:9
**bizarre** 120:6
**black** 102:12 116:8
117:17
**Blackden** 135:4,17
**Blake** 10:25 40:22
43:13,20 82:6

90:5,8,17
**blank** 136:14
**block** 83:17
**blocks** 107:7
**body** 57:23
**boiling** 22:15
**bold** 170:23
**bone** 124:20 125:16
127:1,4 152:22
157:20 175:22
179:8 180:9 181:3
181:20 182:7
188:6,8 194:13,14
204:6 206:6,7,8
210:12
**book** 164:12
**boring** 201:7
**boss** 28:4
**bothering** 134:11
134:16
**bottom** 41:13 55:3
104:10 105:21,22
109:22 112:3
126:24 136:9
139:19 148:7
158:21 198:25
**bought** 7:8 211:17
211:20 218:5
**Bowflex** 178:23
179:1
**boy** 215:2
**boyfriend** 175:11
**brackets** 21:25
22:2,8
**brain** 50:4 175:24
**brake** 19:20
**branch** 96:22 97:2
**brand** 202:3
**break** 20:16 27:6
50:7 60:14,24
64:15 65:3 82:10
127:22 138:25
154:11,14,19
200:8 204:17
**breaker** 111:23,24
**breaking** 16:5 77:1

84:23 90:19 91:4
**breaks** 50:10
134:17
**briefing** 77:14,20
**bring** 100:19
**brings** 6:11 150:3
**broadly** 162:2
169:9
**Brockway** 5:12
**broke** 117:5
**brought** 101:17
191:4
**bruised** 151:15
160:10,18,18
**bruises** 103:10
**bullet** 152:7
**bump** 22:14 83:10
**bumped** 11:7 22:13
32:21 160:9
**bumping** 87:2
**bumps** 103:10
**bunch** 19:16,16
50:6
**bunkering** 71:2,2
**bunny** 103:1
**burn** 9:21 19:11
**burned** 19:5 23:25
**burning** 19:12
40:12
**burns** 19:9,21
20:24 24:6,7 92:2
**busy** 93:25
**Byron** 120:11

**C**

**C** 5:1
**C-l-o-d** 42:17
**cable** 214:7
**cadet** 95:15
**calf** 160:18
**California** 101:4
164:5
**call** 30:3 38:5 57:2
80:23 96:2 97:9
99:22 101:14
114:12 128:7

131:25 155:25
157:7 159:5
187:14,21,21
197:22 199:22
207:13,17,20
208:8 210:9 214:5
**called** 10:20 16:10
21:12 97:3 144:25
146:9 178:19
187:21
**calling** 207:23
**calls** 26:20,22 201:3
**calm** 44:3
**calming** 60:12
**camera** 147:19
**cameras** 51:6,8,17
51:18,22 52:22
53:8,15 54:3
**candles** 164:20
**capable** 11:11
14:14
**capacity** 177:17
**captain** 13:4 14:6
14:10 62:3 63:3
67:2 77:14,18,21
172:8
**captain's** 78:1
**car** 162:20 193:8
214:14 215:11
**card** 217:10 220:8
**cardboard** 49:3
**care** 59:18 60:1
175:3 200:2
**career** 97:10 138:4
215:22
**careful** 26:4
**caregiver** 119:14
**cars** 163:17
**case** 24:5 63:16
65:8 73:6,15
122:3 140:16
209:6
**catch** 48:3,10,11
67:3 100:7
**catwalk** 21:18
22:22 23:5 41:21

42:2,6 44:12,19
44:22,24 45:3
47:11 49:1 54:16
55:12,12,14,16
56:5,17 57:2,5
**caught** 160:15
**cause** 1:1,23 123:7
124:10 136:18
137:1,11,17
153:18 169:15
173:16 221:1
**caused** 21:5,10
24:15 61:16 63:22
153:6 158:5
185:23
**causes** 174:9
**causing** 120:1
162:10
**ceiling** 55:23
**Celebrex** 202:2
**cell** 187:12 214:7
218:3
**certain** 31:24 32:2
33:12 39:10
104:19 170:2
**certificate** 3:7
107:14 112:21
224:14
**certification** 33:23
221:11 222:22
224:1
**certifications** 76:10
90:25
**certified** 221:15
222:23 223:1
225:1
**certify** 221:16
222:17
**certifying** 126:23
**chair** 46:11
**change** 35:23 59:25
69:24 132:20
204:17 205:3
219:2
**changed** 34:4
103:25 169:10

**changes** 3:6 224:6,7
**changing** 60:12
**chapter** 97:22
99:23
**characterization**
82:23
**charge** 64:23 69:23
71:14 79:25 109:7
109:10 111:3
112:4
**charges** 210:3
224:11
**check** 53:4,5 70:15
70:16 89:17,19
154:8
**checked** 190:25
**checks** 70:17
**chemically** 19:14
**chemicals** 19:15
**chest** 22:18 59:1,19
**Chevy** 214:13,25
**Chevys** 215:1
**chief** 12:12,16 13:3
13:6 14:6,10,13
31:22 32:20 51:16
62:4 67:2 86:5
88:24,24 116:19
**child** 213:7
**children** 212:12,15
212:17 213:8
217:2
**chiropractic**
122:22
**chiropractor**
114:19,20,25
115:1,16,19 119:4
123:10 124:8
178:8
**chiropractors**
119:12 122:12,14
**choose** 15:19 96:22
**chose** 12:2
**Chris** 133:6
**Christmas** 8:4,5
**circled** 158:13
**circuit** 113:25

Patricia Diana Ormond                                         Pages

circumstance 90:4
city 37:9
Civil 2:3
civilian 97:10
claim 8:22 85:22
    112:13 140:15,21
    141:3,7 142:7,19
    142:25 158:9
    170:13,23 171:11
    171:17 174:1
    186:9 187:22
    188:3
claims 19:4 142:1
    142:24 161:23
clarify 128:18
classes 95:4
clay 42:18
clean 47:16,18,19
    159:16,20
cleaned 48:12
cleaner 19:20
clear 34:12 48:14
    49:14 107:13,13
    118:21 130:21
clerk 132:18,19
    133:5,10,11
    224:16
clerk's 110:3
client 38:5
climb 57:13
climbed 22:22
    54:25 55:1,13
clod 42:15,16,18,18
Clodfelter 10:25
    40:22,23,24 41:5
    42:13,20 90:15,17
clogged 48:14
close 57:9 58:13
    108:11 110:19
    118:8 125:6
closer 119:8 177:23
closing 90:12 108:9
    110:2
clothes 24:3
clothing 23:19
coaching 128:21

136:15
coast 31:13,16
    37:16 93:23 94:24
    96:11 97:11
Code 16:10
coffee 43:20 60:14
    60:24 62:11 64:6
    64:12 65:3,3
    168:25
cohabitate 213:20
cold 58:25 60:13
    108:20 111:5,6
    112:20 113:3,5
collects 102:18
Colorado 36:18
    37:7 92:18,21
    93:11 94:4 101:4
    103:19,25 118:9
come 20:17 21:25
    29:14,25 47:16
    64:22 94:24 98:4
    110:12 115:9
    134:16 151:17,24
    153:14,22 159:15
    159:20 172:3
    173:17 180:4
    195:16 196:7
    197:15 198:4
    204:10 210:8
comes 54:14 65:12
comfortable 167:25
coming 75:23 77:6
    146:20 157:4
    169:19
command 100:15
    100:18
commandant
    100:23,24
commercial 95:16
commission 96:5
    98:7
commissioned 15:6
    15:11 76:18 91:1
    141:25 147:8,20
commitment 96:18
committed 48:20

common 51:12
    52:20 69:9 122:8
commonly 191:23
communicate
    139:23 155:22
communicated
    142:14
communications
    131:3 156:6
    158:18 161:2
comp 127:10,16
    139:24
companies 72:2
company 1:5,7
    28:12 83:3 162:22
    164:4,19 221:5,7
companywide
    172:14,22
compensate 144:6
competencies 12:24
    12:24 13:2,9,25
    14:5 69:19
competency 13:21
    14:8
competent 105:24
complaint 24:19
complaints 45:9
    72:14
complete 44:7 84:4
    98:12 132:14
completed 13:2
    22:9
completely 45:18
    85:12 108:5 174:9
    176:2
completing 10:24
completion 109:23
complex 37:17
complicated 72:15
compose 60:12
composure 44:2
computer 50:6
    69:15

18:2 119:10
    150:12 151:23
conclusion 20:18
    181:12
condition 73:6
    78:15 183:14
condition/mecha...
    152:8
conducted 30:3
conducting 21:4
confidence 123:9
confirmation 22:10
confronted 147:16
confuse 155:8
confused 201:13
    204:2
confusing 58:5
congratulations
    8:12 76:9
connection 118:11
consequences
    15:23 16:6
consider 199:11
consideration
    220:10
considering 170:23
    171:19
consistent 120:25
    152:16
contact 118:18
contained 47:23
contains 224:7
continue 43:23
    44:6 54:15 99:2
    184:5 199:4,6
continued 60:22,24
    94:4 150:20,22,24
    183:23
continuing 153:24
    207:13
continuously 66:12
Continuum 185:13
contract 27:1 130:9
contractor 28:11
    28:15 38:19 79:19
contracts 26:22

contradictory 70:9
contraption 123:1
contribute 212:8
control 34:6 49:10
    49:24 50:1,3,3
    51:19,20,20 58:7
    58:9,12,15,23
    60:15 62:12 88:9
    88:11 134:17
controls 51:21
conversation 17:24
    18:2 75:16 116:1
    118:7 153:8
    159:13 185:4
    198:15 200:5,11
    200:18,24 201:6,7
    201:17,19 203:11
conversations
    13:23 130:22,25
    159:6,9 185:6,8
    186:24 187:6
    190:4,12
convince 94:4
convinced 195:1
cook 162:8
copies 98:18 180:10
    186:22 224:12
copy 123:23 164:11
    180:6 210:5
    224:14
core 31:5 69:19
    147:12
corner 58:8 104:10
Corps 16:19
correct 8:19 9:25
    11:15,19,22,25
    15:17,21 17:5,12
    17:17 18:16,20
    19:6 28:13 29:12
    30:8 31:17 34:14
    34:18 36:2,19
    38:19 44:12,19
    46:17,21 52:5
    53:16,21,25 54:4
    54:5,16 55:4
    58:18 60:7 62:23

63:7,16,19 68:20
68:23,24 69:2,22
71:19 75:5 76:3,6
76:10,19,22,23
79:5,10,16,19,20
80:1 84:14 86:19
86:22,25 87:14
89:5,7,8 90:23
92:11,14 95:25
96:5,6 99:9,10
104:22 105:1,9,10
106:1,22 107:1,2
107:16,17 108:1,8
108:22,23 109:11
114:2,7,10 115:10
116:8 117:22
120:23 124:9
125:8 126:11
131:13,16,23
133:18,20 135:14
137:12,13,17,25
138:15,18,23
139:13,25 143:11
143:15,24 144:5,9
144:10,14 145:8
145:15 146:8
147:10,13 148:12
148:16 149:3,13
149:23 150:10,13
150:16 151:3
152:14,22,23,25
153:1,2,4 155:16
156:4,21,22,25
157:4,9,22 158:2
158:3,7,11,14,24
160:10 165:5,11
165:12 166:14
171:3,8 173:2
179:15 180:25
181:4,21 182:14
182:19 183:11,21
184:5 186:6
189:12 192:4
193:9 195:18,20
195:23 196:21
198:6 199:7 205:6

208:14,18,21,25
209:9 211:3,15
213:13,15 220:1
**corrected** 153:17
**CORRECTIONS**
219:1
**correctly** 72:23
83:21 86:9 88:12
88:13
**corresponded**
179:18
**correspondence**
186:19
**costs** 210:23
**counsel** 2:7 5:2,6
16:20 99:17 209:5
222:6,8,12,17
**counterpart** 62:10
**country** 102:15
**COUNTY** 1:4
220:6 221:4
**couple** 13:12 44:1
47:20 125:4
149:10 166:15
177:20 178:12
192:21 198:21
**course** 69:14,15
158:8,21 181:2
188:20
**court** 1:2 88:19
221:2
**courthouse** 8:15
**cover** 127:13
213:18
**covered** 89:3
210:13
**COVID** 98:8 164:6
**coworkers** 78:14
**CP** 105:24
**CP1** 105:23
**crackle** 178:8
**Craig** 1:24 221:15
223:6 225:5
**cream** 9:21
**credit** 216:18
217:10

**Creek** 6:14,16
**crew** 65:8 66:12,12
70:19,19 74:6
75:4,16,23 80:16
132:20
**cross** 102:15
**CSR** 1:25 223:6
225:5
**cure** 139:25 140:4,7
140:10,16,22
141:4,11,18 142:9
142:15,21 143:1
145:8,21
**current** 78:15
130:3 199:1
**currently** 6:13 7:21
98:1 99:18
**Curt** 12:19
**curve** 83:5,6
**Custodial** 224:9
**cut** 83:4,6
**cylinder** 21:13,20
21:24 22:17 39:25
43:9 45:19,20
46:6 74:22 83:15
83:18
**cylinders** 75:2

**D**
**dad** 93:21 102:18
**dad's** 214:18,20
**daily** 110:19 161:22
203:5
**damages** 24:6,11
24:13 25:5
**Dan** 178:5
**dangerous** 80:8
81:10
**date** 8:21 26:24
27:2 65:13 132:1
149:17,22 153:18
190:6 196:1
197:12
**dated** 105:3 120:18
139:11 143:5
179:9 186:5

196:18 201:10
208:10
**dates** 163:2
**David** 124:21
129:16 175:21
178:5
**Davis** 5:11
**day** 9:10,10,15 11:4
21:7 23:14 25:12
27:13 28:2,3,4
29:21 32:13 61:2
62:6 63:5,15 64:4
82:4 85:24 86:6
88:24 92:5 101:9
105:8 108:8,10
109:8 112:11
126:16 131:10,11
132:4,21 161:18
167:14 168:9
169:11 179:15
183:8 202:18
220:7,12 223:1
225:1
**day-to-day** 162:11
**days** 8:10 29:21
30:14 34:20 47:20
95:22 100:11,21
101:3,9 114:2
132:8 175:5
192:21 193:24
**dayshift** 28:24 89:1
**deal** 100:8 147:10
**dealing** 113:8,10
**Dear** 143:17
**debate** 175:8
**Debbie** 167:6
**December** 37:4
98:23 104:3,3,4
**decided** 94:6
100:19 132:14
**decision** 33:3 51:14
132:9 159:15
**deck** 48:7 94:20
160:16 172:1,4
**decking** 56:11,13
**Defendants** 1:8,22

5:6 221:8 222:12
224:11
**Define** 162:17
**definitely** 57:20
169:22,23 202:1
**degree** 94:14 95:2
165:4
**deisolate** 106:20
**deisolated** 104:21
**delivered** 224:9,13
**demand** 140:6
**demonstrate** 46:1
**demonstrates**
181:24
**demonstrating**
183:1
**demoted** 150:18
**demotion** 116:17
**Denver** 92:23,25
93:2,11 102:20
**department** 31:20
35:10 96:13
133:17
**Depending** 193:1
**depends** 15:25
62:17 66:1,11
89:13 95:17 214:4
**depiction** 186:15
**deposition** 1:11,20
2:11 20:5,10
82:19 104:19
148:5 192:7
214:22 219:25
221:12,20,22
222:2,5 224:4,8
224:10,12,13
**deposition/correc...**
224:3
**describe** 23:16
41:19 54:18 56:6
66:10
**described** 54:12
109:11
**describing** 120:23
**description** 3:10
106:10 153:5

220:8
**desk** 127:6 201:2
**despite** 202:22
**detail** 167:20
**detailed** 80:24
**details** 13:14 78:8
 121:8
**determine** 127:22
**developing** 119:17
 119:22 120:8
**diagnosed** 124:16
**diagnosis** 98:19
 193:19
**diamond** 1:5,6,6
 7:16 9:8 11:4,14
 11:19,22,25 12:3
 13:16 14:24 17:4
 17:11 18:10 28:8
 28:13 31:3,8
 32:10,14,25 33:10
 34:17 36:19 39:5
 39:9 43:10 48:1
 54:6 56:12,14
 59:10 60:3 69:16
 72:1 76:22 79:16
 85:23 87:11
 100:10 101:2,13
 101:19,22 103:21
 104:11 111:18
 112:13 114:15
 117:8 118:1,24
 131:23 132:9
 136:7 138:9,15
 139:12,16 140:15
 141:3,10 142:8,13
 142:15,20 143:1,9
 144:12,25 146:2
 146:14 150:9,20
 150:22,24 155:13
 155:20 156:25
 159:2 163:10
 166:10 172:16
 173:13 179:6
 186:3 221:5,6,6
**Diamond's** 13:21
 138:12 144:11,16

144:22
**Diana** 1:12,20 3:4
 6:4,9 93:16
 219:24 220:3,7
 221:12,18
**diesel** 95:4
**difference** 31:11
 102:3 128:7 164:6
**different** 21:19
 26:1 28:18,22
 56:20 107:15
 108:2,5 124:7
 125:25 130:17
 151:10 157:20
 181:2
**differently** 12:10
 147:21 172:13
**differing** 141:22
**difficult** 165:21
 173:25
**diligent** 138:17
**directed** 21:11
**direction** 44:17
 53:24
**directly** 14:16 48:3
 48:15 49:16,24
 56:15 65:11 83:6
 156:20 173:22
**dirt** 42:18
**disability** 139:23
 140:18,19 141:12
 143:18,19 144:2,7
 156:3,20,24 157:3
 157:8,12,15
 159:11 161:5
 163:14 184:6,14
 184:19,23 185:2,9
 186:10 187:8
 211:21 213:17
**disagreed** 33:3
**disclose** 12:3
**disclosures** 170:10
 174:2
**discovery** 24:5
 210:9
**discuss** 173:25

180:13 191:9
**discussed** 64:17
 104:18 203:16
**discussing** 193:18
 202:15,19
**discussion** 75:15
 124:12 135:9
 155:5 176:16
 182:3 193:22
 197:2
**discussions** 161:2
 171:22 182:21
 184:25
**disengage** 82:21
 84:2
**dishes** 162:8
**disposed** 48:18
**dispute** 110:9
**disregard** 120:8
**distance** 36:24
 54:21
**distracted** 167:22
 167:23
**DISTRICT** 1:2,8
 221:2,8
**distrustful** 183:5
**doctor** 19:8
**doctor's** 115:3
**doctors** 175:17
 183:5 188:7
 191:22,24 209:18
**document** 104:9,23
 105:3,16 109:11
 109:13 111:15
 122:10 123:11
 128:22 137:9
 156:15,19 157:11
 158:19 170:15,18
 179:6 181:16
 184:2 186:3 209:4
 220:8
**documented**
 150:17 170:11
**documents** 108:24
 109:20 148:6
 180:9 187:1

**doing** 12:15 14:13
 20:10 21:10 33:22
 34:8,23,24 39:11
 41:9 43:1,2,7
 45:23 61:15 65:5
 65:16 66:7 68:20
 71:3 87:12 88:12
 100:25 101:1
 102:19,22 111:21
 117:1,3 118:23
 158:1 161:12
 169:17 171:8
 178:18 202:23
 205:11,12 213:1
**door** 58:9
**doors** 50:8
**double** 70:16
**doubt** 144:16
**dousing** 58:25
**downhill** 164:7
**Doyle** 2:2 5:3 26:23
 128:3,10 129:6
 130:18 188:11,12
 188:14 209:5,11
 209:18,24 222:9
**Dr** 114:21 115:4,5
 115:19 119:13
 120:11,18 121:1,3
 121:10 122:11,21
 123:10,14,21
 124:4,12,21,24
 125:3 161:16
 166:16 167:10
 168:13 175:20,21
 176:6,18 177:4,8
 178:5 179:23
 180:13 181:7,10
 182:3,21,25 184:3
 188:7,10,15,20,24
 189:7,12,16,20
 190:5,15 191:5,10
 192:10 193:12,19
 194:10,15,19
 195:10,17 196:11
 196:17 197:3,15
 197:16 198:16

199:14 200:13,16
 200:20,25 201:17
 201:23 202:9,15
 203:12 205:5
 206:9,12,18 208:1
 208:17 209:15,18
 209:22 210:1,3,15
 210:22
**drain** 47:20,24 48:9
 48:11
**drains** 48:4,13,14
**drawing** 153:9
**drill** 29:20 190:9
**drink** 20:17
**drinking** 59:6
**drive** 37:15 188:25
 189:1,11,14
 192:20,25 193:2,6
 193:15 196:3
 198:8 201:6
 206:25 210:19
 214:12
**drives** 189:3
**driving** 36:24
 217:23
**drop** 75:10
**drove** 93:21
**drowsy** 135:1
**duly** 1:22 6:5
 221:18
**duties** 24:18 29:10
 30:3 116:10
 125:13 153:13
**duty** 28:6 64:3 98:9
 100:11,20,22
 135:18

**E**

**E** 5:1,1
**e-mail** 26:15,19,20
 32:24 33:2 76:8
 146:10 201:21
**e-mails** 9:5 26:22
 27:1 131:4,6
 187:8
**earlier** 49:18 56:18

Patricia Diana Ormond                                      Pages

79:1 104:19
108:21 133:23
156:5 177:9
179:23 182:16
203:17 211:10
**early** 32:21 195:14
207:12
**earplugs** 23:20
**earth** 93:12
**easier** 68:18
**easily** 97:11
**easy-ish** 214:2
**eating** 172:3
**edge** 42:7 56:23
**editing** 164:16
167:11
**editorial-type**
164:12
**educated** 164:25
183:16
**educational** 95:3
**effect** 168:17 194:2
198:21
**eight** 95:15 96:21
98:25
**either** 8:1 14:7
26:21,25 30:6
45:4,19 64:22
83:20 88:6 94:20
94:21,24 107:9
113:3 115:18,25
131:10 136:19
153:17 187:7
194:17 203:7
**electrical** 95:4
111:8,9
**electrician** 9:25
18:16
**electricians** 111:25
**electricity** 113:6,10
**elevated** 46:15
**else's** 71:4 137:2
212:2
**embarrassment**
173:12
**Emma** 5:12

**employed** 166:7,9
222:18
**employee** 28:9
38:19
**employees** 15:17
28:13 39:10 60:4
72:2 139:23
**employment**
150:15 164:2
**ended** 47:4 101:12
151:1 179:14
**endured** 95:23
**engage** 174:14
**engaged** 7:22 8:3
13:20
**engine** 10:2,17,18
11:1 21:4,14,17
21:24 22:21 23:11
27:13 28:5,6,13
31:19 35:10 38:21
41:1,6,11,12,15
42:4,10 47:10,12
47:14,24 48:3
50:3,4,9 51:8 55:6
55:11 56:1,8,14
57:4,6,7 58:1,2
60:25 62:11 64:25
65:16,20 67:9
69:24 70:21 71:3
72:21 73:6 74:5,8
74:12,20,21,24
76:25 78:16 83:2
83:17 84:1 85:3,5
85:10,19,19,21
86:9 88:4,6 90:22
91:3 107:15,15,19
107:24 108:2,4,6
111:24 117:1
134:17 158:2
173:11 180:20
**engineer** 11:8,12
12:12,16 13:3,6
14:8,12 21:12
29:5,12 31:12,22
32:2,9,13,20 33:1
33:16,22 34:2,5,5

39:15 42:24 50:11
50:13,22,23 51:16
53:2 58:17,17
63:15 67:2 70:3
76:3 78:22,22
80:10 86:4,6
88:22,24 89:6
90:25 94:8,25
101:24 106:5
116:11,16,19
**engineer's** 32:11
**engineering** 94:17
94:20,23 95:2,6
165:5
**engineers** 12:13
19:2 43:5,8,10
51:12 80:21,22
89:18 134:14
**engines** 28:7 42:5,8
56:8 74:14 78:4,9
85:17,21
**enjoy** 38:4
**ensure** 16:11 72:2
172:24
**enthralled** 94:2
**entire** 16:9 34:14
67:1 100:16
**entirely** 98:3
**entitled** 26:13
145:20
**entrance** 58:9
**environment** 18:5
**environmental**
48:21 69:1
**equipment** 41:24
46:9,16 66:5
104:20 178:21
**equivalent** 139:24
**escalated** 99:20
**escape** 45:1
**especially** 17:1
39:14
**essays** 166:25
**essentially** 33:22
45:16,25 46:3
54:23 94:19 96:16

96:19 142:24
152:24 158:4
171:9 176:5
**evaluate** 154:11
**evaluation** 179:20
**evening** 21:15 60:7
65:21 87:7 106:18
**event** 60:19 138:14
138:16
**everybody** 32:21
61:22 62:7 70:12
71:4
**everyone's** 92:7
**evidence** 182:18
183:1,20
**evidence-type**
210:8
**ex-wife** 213:1
**exact** 7:25 19:13
26:24 99:7 194:15
**exactly** 7:14 21:9
30:21 35:24 42:11
44:14 45:9 62:1
73:5 94:18 120:15
125:19 159:13
181:11 193:5
**exam** 31:25 100:2
191:2
**examination** 3:5
6:6 190:22 195:20
221:24
**examined** 124:18
191:6
**exams** 95:1
**excited** 33:4
**Excuse** 116:3
117:16
**executed** 220:9
**executive** 100:17
**exercise** 161:21
178:21
**exercises** 121:16
122:2 161:15
178:19 199:4
202:23 205:11
**exercising** 161:14

162:5
**exhaust** 21:16 46:5
55:5
**exhausted** 77:6
**exhibit** 3:11,13,15
3:17,19,21,23 4:1
4:3,5,7,9,11 104:6
104:8 120:16,17
126:3,5 131:9
133:4 135:3 139:7
139:10 143:10,15
148:3,5 156:9,11
157:3 177:9 179:4
179:6 184:8 186:3
188:17,19 189:19
189:19 196:13,15
198:1,25 200:12
200:19 201:8,9,15
204:24 205:23
207:21 208:10
210:5
**exhibits** 3:9 224:12
**expected** 80:25
**expenses** 213:11
215:16 217:7
**expensive** 211:22
**experience** 16:5
95:11 140:3
**experienced** 18:16
**experiencing**
137:10
**Expiration** 223:9
225:8
**explain** 21:9 27:18
28:19 62:5 63:4
64:4 96:7 98:15
119:25 136:20
144:3 160:13
174:4 191:2
**explained** 121:6
132:23 135:10
136:24 191:7
**explaining** 19:19
**expose** 78:13 80:7
**expressed** 220:10
**extent** 89:3 92:6

145:22
**extra** 87:11 88:8,10
  101:10
**extracurricular**
  167:1
**eyes** 86:12

**F**

**F350** 41:18
**face** 133:7
**face-to-face** 16:2
**Facebook** 131:5
**facet** 119:17,21
**Fackrell** 5:7 222:13
**fact** 8:21 11:18
  47:17 105:16
  118:13 147:15
  165:18 173:13
  176:1 183:25
  185:12 205:24
**factors** 68:16
**fail** 172:9
**failed** 164:20
**fair** 16:17 20:14
  26:11 27:21 38:22
  38:23 70:21 72:3
  82:23 107:13,14
  143:3 148:1
  168:16 170:20
  201:22 208:20
  210:11
**faith** 124:17
**fall** 113:5 127:15
**fallen** 152:13
**falling** 44:21
  151:13
**false** 137:24
**familiar** 140:3
**family** 165:25
  166:1,2,3
**far** 7:5 23:4 29:10
  40:2 41:3 55:14
  57:13 58:6,22
  93:3 97:21 110:24
  154:5 161:12
  182:24 188:5

192:25
**fast** 13:8
**faster** 40:16 87:21
**fear** 147:24 173:20
**February** 8:19,24
  10:3 11:15 12:2,9
  18:11 25:9,19
  29:11 30:10,19
  31:2,8 32:7,18
  34:14 36:10 37:6
  38:22 39:20 53:13
  63:11 67:16 73:2
  99:15 100:1 102:1
  105:5 107:1
  112:15 113:17
  114:2 121:4,25
  132:1 135:19
  151:2,7,19 156:1
  158:6 160:21
  161:19 163:6,24
  167:15 168:4
  169:7 179:9,14
  181:7 184:12,12
  184:13 190:16
  204:13 208:13,14
  211:14
**February/March**
  35:25
**federal** 96:10,14
**feel** 13:9 84:23 85:1
  174:10 191:16
**feeling** 169:25
**feet** 23:8 40:3,5,10
  41:7,22,22,23
  44:11 45:19,20
  46:4 54:15 55:17
  56:3,3,11 57:14
  58:10,11 80:1
  86:19
**fell** 66:2 102:23
  149:25 151:15
  160:3,12,14,17,17
  171:25
**felt** 11:9 32:22
  175:25
**female** 59:25 60:12

172:10 173:11
  176:13
**fiance** 6:20 166:2,7
  174:8,19 189:4,15
**fiance's** 166:3
**fighter** 166:20
**file** 131:20 158:8
  186:19,22
**filed** 8:18 24:5
  131:22 187:22,25
  188:3 224:16
**filing** 142:19
**fill** 126:15 213:18
**filled** 64:20 66:1
  67:6 81:17 126:8
  126:20 184:21
  205:23
**filling** 66:23 67:8
  90:5,9
**film** 184:24
**films** 195:22
**final** 156:16
**finally** 98:15 132:9
**Finances** 165:25
**financially** 222:20
**find** 26:16 68:22
  153:14 183:6
  188:9
**finding** 195:2
**fine** 27:9 91:24
**finish** 20:3,11,14
  60:1 74:19
**finished** 114:1
**finishing** 155:5
**fire** 20:13 23:18
**fired** 12:7 150:13
  153:15
**firm** 26:23 128:4,10
  129:6 130:18
  223:7 225:6
**firms** 129:9
**first** 6:5 7:13 8:25
  11:8,14 12:8
  13:13,13,19 14:3
  14:8,11,17 21:7
  25:8 31:22 50:12

50:12,23 51:16
  53:2 58:17 65:24
  74:6,11 77:13,25
  78:22 80:10 82:18
  86:4 88:22 89:2
  102:12 114:23
  117:19 121:1,2
  124:22 127:4
  130:5,12 132:4,17
  136:7,8 137:8
  149:9,12,22 156:6
  157:24 158:2,4
  159:1,25 167:4
  168:12 176:6
  190:17 191:10
  192:21 194:9,21
  195:10 197:16
  201:19 204:4
  209:21 210:7,12
  210:12,13,15
**fitness** 98:13 99:5
  121:19,21,24
  122:4
**fits** 83:6
**five** 41:20 56:19
  57:5 60:6,9 82:11
  84:10 96:10,14,22
  156:23 200:7,22
  200:23 212:18
  216:9
**five-minute** 154:19
  204:17
**fixed** 117:5
**flame** 23:17
**flammable** 113:10
**flat** 46:4
**flaw** 89:14
**fleet** 97:6
**flew** 101:16
**flip** 108:17
**floor** 47:25 48:1
  55:4,15,15,24
  56:2,4,5,12,25
  57:8,8 134:18
**fly** 98:14
**focus** 64:16 167:18

**focused** 137:8
**folks** 63:4 69:20
  152:22 153:5,12
  153:20
**follow** 14:25 15:13
  15:17,20 16:4,12
  17:2 18:7 29:8
  199:18 200:2
**followed** 13:20
  72:15,19 207:18
**following** 16:21
  106:17 157:16
  221:17 222:6
**follows** 6:5 222:2
**followup** 196:21
  197:22,23 202:5
  205:10 207:16
  208:4
**food** 172:3 217:19
**force** 96:11 97:3
**foregoing** 219:24
  220:9
**Forest** 185:21
**forget** 10:16 99:7
**forgot** 20:21 102:7
**forgotten** 197:11
**form** 2:9 24:25
  128:11 138:19
  140:17 145:9
  159:11,17 161:4
  171:13 210:25
**formal** 34:17 64:1
  99:22 176:11
**formally** 26:14,21
  32:16,20
**former** 147:19
**forth** 96:25
**forward** 64:24
  66:13 102:1
**found** 37:18 166:21
**fountain** 58:25 59:6
**four** 28:21 30:16,16
  41:20 60:6,9
  74:17 75:13 78:3
  84:10 95:12,14
  97:18,19 102:12

119:8 158:19
184:18 217:21,22
**four-hour** 37:15
**four-week** 114:5
**fourth** 194:6,6,20
200:3 206:2,16
207:7
**FR** 23:18
**fracture** 182:19
**frame** 7:25 9:1
30:23 38:9 95:25
179:12
**freaked** 47:7
122:14,24
**Freeway** 223:8
225:7
**freshman** 94:9
**Friday** 8:9 122:18
122:18 166:13
174:23
**fridge** 73:14
**friends** 37:25 118:8
133:23
**front** 27:16 120:4
169:20 201:2
204:25
**froze** 22:23
**frustrated** 183:4
191:21
**frustrating** 169:24
**fuel** 90:13
**full** 66:7 74:22 75:1
97:6 190:20
**fun** 31:25 95:5
171:5
**functions** 30:2
33:22 61:6 108:8
165:11
**funny** 104:10
**further** 159:21
164:24 176:16
184:3 222:17,20
222:22 224:1
**fuse** 176:10
**fusion** 199:12 200:1
**future** 167:6

**G**

**gain** 44:1 164:2
**gainfully** 166:7,9
**Galliano** 113:22
**gas** 213:19 217:22
**gated** 37:16
**gears** 8:16 70:5
92:15
**general** 12:24 78:7
185:21
**generally** 67:21
73:13 85:11
110:20
**generate** 162:18
**gentleman** 27:12
38:24 153:15
**gentlemen** 21:17
**geographically**
113:18
**getting** 8:14 35:19
36:12 44:15,16
59:22 62:25 77:1
100:10 108:14
122:20 126:13
135:13 143:24
147:1 149:2 151:1
153:24 157:10
166:13,22 177:2
180:6,9 186:13
200:15
**getting-to-know-...**
37:23
**give** 27:17 78:7
92:10 126:5
133:25 193:23
194:19 195:25
**given** 20:5 97:8
122:2,12 175:12
194:14 220:11
221:20 222:4
**gives** 77:15 143:18
**giving** 136:11 195:2
210:23
**glasses** 23:20
**gloves** 23:19,20
**GM** 215:2

**GMC** 216:11,16
**go** 11:9 16:14 18:8
18:23 19:3,8 20:7
22:10 26:15 27:11
30:25 32:18,20
33:18 36:24 38:17
42:19 47:10 49:24
50:5 53:8,9 54:6
57:23 61:11 62:9
63:13 64:18,23
65:4,10,10 66:4
67:4 68:16,18
73:5 77:4 78:17
78:25 80:5,10,10
80:13,15 81:7
83:19 88:24 89:15
89:17,19,22 92:17
93:16,19 96:15,21
96:23,23,23,24
97:1,8 98:17
101:2 102:7
103:17,23 110:4
113:21 114:8,20
114:25 116:3,8,13
116:21 119:4
121:18 122:9
124:22 125:4
131:11 132:15,18
133:15 134:8
136:22 138:6
141:13 147:19
148:7 149:16
151:5 153:8 154:9
155:17 159:23
162:3,14,21 163:8
163:21 164:15
177:18 186:21,22
194:2 195:2
198:21 199:15
201:20 204:24
211:9
**goes** 19:21 42:5,6
47:11 48:2,4
56:16 66:5 81:2
83:5,16 113:3
144:2 161:13

166:12 180:19
182:7,13
**going** 13:14 15:20
15:22 21:13 25:20
32:25 37:1 38:3
59:25 62:5 63:4,5
63:14 64:2,5 66:4
66:12,13,25 67:5
68:1,1 70:8,13,21
71:9 73:10,22
76:25 77:19 78:2
78:7 80:7 85:13
91:13 100:3 102:1
104:7,25 108:18
116:18 122:20
126:20 127:5,17
132:21,23 133:2
135:11 139:9
146:1 148:14
149:16 153:16,22
153:23 156:10
159:4,22 163:24
164:7,18 176:8,24
188:6,8,10 192:11
193:23,24 198:4
200:1 218:6
**good** 16:8 27:19
29:8 33:7 43:16
65:23 78:25 81:7
103:8 104:8
154:16,22 165:2
190:11 210:22
**goods** 217:20
**Google** 37:18
**gotten** 40:15 87:20
191:5 198:19
208:17
**governed** 113:13
**grab** 57:12
**grabbed** 54:24
**grade** 93:17
**graduate** 93:4 95:1
95:22 96:2 166:19
**graduated** 95:18
100:14,15,20
103:16,18

**graduation** 96:17
**grated** 47:25
**grating** 56:12 172:2
172:4
**great** 6:18 20:10
**grew** 102:17
**groceries** 217:21
**grooming** 94:11
**ground** 46:13
**group** 14:9
**grow** 92:20 102:22
**Growing** 102:9
**grown** 213:1
**Grubbs** 163:11,21
164:2
**grumpy** 77:7
**guarantee** 176:14
176:17
**Guard** 31:13,17
93:23 94:24 96:11
97:11
**guess** 9:22 16:2
19:10 27:5 36:9
44:2 53:12 57:17
60:20,21 61:4
62:7,11 66:8
86:13 95:2 98:20
107:9 116:6
119:14 124:3
127:5 153:8
167:10 174:7
175:7,10 182:24
189:16 194:5
195:3 198:21
210:22 213:21
216:13
**Gulf** 113:19 116:24
131:18
**guy** 28:6
**guys** 35:10 47:1
75:11 77:4,18
78:2 81:24 134:15
**gym** 177:21

**H**

**H-i-m-t-e-c-h** 28:17

Patricia Diana Ormond                                                      Pages

**habit** 106:4
**half** 74:23 77:5
  93:15 162:25
  185:10
**halfway** 41:21
**hall** 101:6
**hand** 22:9 28:10
  104:7 120:17
  126:4 135:2 139:9
  148:4 156:10
  179:5 186:2
  188:18 196:14
  201:9 205:23
  208:9 220:11
**hand-over** 75:15
**handed** 21:21 22:7
**handful** 84:7,9,10
**handle** 83:4
**hands** 88:10 101:10
  102:19
**handwriting** 66:20
  106:6
**happen** 11:10 72:8
  87:25 88:2 90:3
  91:13 193:24
**happened** 10:11
  33:13,20 35:11
  36:5,9 37:11
  42:11 43:19,21
  47:20 54:9 60:16
  60:20 61:24 77:16
  87:24 98:15
  110:18,19 121:8
  145:21 153:18
  170:24
**happening** 11:2
  172:17
**happens** 110:8
**hard** 41:19 44:4
  56:6 160:13 180:8
**hardhat** 23:20
**harm** 70:11
**HARRIS** 1:4 221:4
**Hartford** 155:18,23
  156:20,25 157:19
  157:25 158:5

159:2,5,7 161:2
  180:8 184:6,15,19
  185:6,8,12 186:5
  186:25 187:7
**Hartford-admini...**
  155:20
**Hattiesburg** 8:15
  185:20 204:5
**haze** 49:6
**head** 18:19 21:13
  21:20 22:17 40:1
  43:9 45:19,20
  46:6 93:6 114:11
  122:25
**healed** 159:22
**hear** 189:9
**hearsay** 173:21
**heat** 84:21 85:1,10
  85:13 177:18
**heating** 214:8
**heavy** 162:6
**heck** 76:24
**held** 32:21
**helicopter** 30:12
  75:9 113:21
  132:20,21 135:14
**heliport** 36:24 77:7
**help** 16:20 28:5
  34:24 35:7 85:24
  86:2,21 100:25
  117:13 118:11
  121:17 123:8
  133:8 146:12,25
  147:1,2 149:2
  159:21 176:8,17
  178:13,15 194:4
  211:20
**helped** 54:22
  134:11 194:5
**helpful** 25:19 85:25
**helping** 10:18 88:7
  100:24 166:22
**helps** 28:7 166:24
  166:25
**hereto** 2:4,7
**Hernandez** 10:17

27:24 38:18 40:9
  41:4 47:2 79:3,6
  79:15,18 81:25
  82:8 86:18 91:7
  91:17 92:10
**hey** 18:4,23 32:25
  33:18 73:21 76:8
  76:24 78:1,23
  79:7 81:3,13
  145:1,20 146:11
  172:4 187:16
  193:23 198:3
**high** 19:13 21:22
  93:1,4,18 103:16
  111:24 112:2
  164:9
**higher** 46:6 75:20
**hill** 103:1
**Himtech** 28:17
  38:19
**hindrance** 72:5
**Hinkley** 114:21
  115:4,5,19 122:21
**Hinkleys** 119:13
**hip** 149:25 152:14
  160:12
**hire** 25:8,25 145:5
**hired** 25:22 128:3
**history** 150:15
  152:7 179:21,24
  180:14 190:8
**hit** 22:5 44:4 66:18
**hitch** 8:25 11:14
  13:13 30:9,14,22
  34:10,14 101:25
  114:1 115:14
  116:15 117:6
  118:2,23 121:19
  125:14 132:4,8
  189:17
**hitting** 9:20 160:19
**hold** 13:7 83:4
  200:6
**hole** 160:5,15,16
**home** 36:16,17 75:7
  77:4 103:18,21

114:8,16,23
  115:13 133:15
  134:8,12 169:18
  178:20,22 192:20
  206:25 212:21
  213:4
**honest** 38:3 169:17
**honestly** 25:10 47:3
  65:5 68:5 70:1
  98:5 102:3 118:6
  195:15 196:10
  199:25
**honesty** 147:13
**hope** 108:14 183:17
**hoping** 98:6
**hot** 9:20 21:3 22:15
  45:12 70:11 78:23
  84:17 85:4,5
  108:21 111:10,12
  111:20,22 112:14
  112:16 113:3,8,8
  152:12 180:20
**hour** 7:6 60:11
**hourly** 143:18
**hours** 29:20 30:7
  44:1 60:7,10
  65:23 106:25
  107:22 184:18
  193:1,4,8
**house** 7:8 36:23
  93:3 211:11,17,20
  211:22,23,25
  212:1,3 218:5,5
**household** 217:18
  217:20
**Houston** 2:2 5:4,8
  101:16,17 129:18
  188:21,23 189:11
  195:5,16 197:15
  204:8 206:12
  207:25 210:19
  214:21 222:10,14
  223:8 225:7
**huge** 55:11 74:14
**huh** 192:13
**huh-uh** 27:21

**hundreds** 210:24
**hurt** 35:6 44:18,21
  45:23 59:22 72:19
  86:24 87:2 91:25
  109:10 115:5
  116:15 118:2,23
  145:15 146:2
  152:12 191:1,1
**hurting** 35:7
**hurts** 162:12,13,14
**husband** 166:18
**HVAC** 95:4

**I**

**ibuprofen** 117:12
  118:12
**ice** 60:13 177:19
**idea** 23:1 74:7
  209:13
**identify** 68:19
**identity** 220:8
**ignored** 59:24
**illness** 143:20
  179:21 190:9
**illnesses** 11:22
**imagery** 183:3
**images** 191:15
**imaging** 181:18
  191:9,20,25
**immediately** 11:19
  17:16 120:8
**impact** 23:19
  151:12 162:6
  169:2,5 174:5
**important** 14:21,25
  15:13,16 17:1,15
  18:23 64:13 69:5
  71:24 187:1 212:1
**impression** 145:25
  192:8
**impressions** 191:13
**improved** 192:22
  196:24
**improvement**
  198:14 199:1
**in-depth** 66:10

**initially** 26:18
**incident** 11:3,10,19
    12:4,8 13:13,19
    14:4,18 17:8,20
    17:25 18:8,11,24
    25:9,21 34:17
    37:6 39:19 42:21
    43:18,24 51:2,5
    53:11 58:19 59:10
    60:4 115:14 117:7
    131:20,22 132:9
    144:12 147:16
    150:3,7 151:18
    158:6 160:1,20
    170:10 171:7
    172:1,7,20 173:14
    173:17
**incidents** 17:16
    173:1,19
**include** 137:19
    173:8 214:7
**included** 138:8
    181:19 187:8
**includes** 141:2
    222:6
**including** 200:13
    203:9 214:3
**income** 162:18
    163:13 213:17
**incurring** 210:1
**independent**
    185:15,22
**INDEX** 3:1
**indicate** 38:8
**indicated** 170:10
**indicates** 100:10
**individual** 14:8
    63:14 133:22
**individually** 107:11
    107:12
**inform** 186:9
**informal** 178:3
**information** 80:25
    81:9 127:7 152:6
    185:1 222:4
**informs** 196:23

**initially** 26:18
**injection** 176:7,8,9
    192:15 193:12
    194:1,9 195:3,25
    196:12 197:8
    200:3 202:19
    204:4,7 205:21
    206:24 207:17,22
    208:19,21,23
    210:12 211:5
**injections** 177:2
    178:12 208:17
    210:23
**injure** 54:14
**injured** 8:19,22
    10:3 11:13 67:10
    68:9 72:12 91:18
    91:21 103:2,5,9
    103:13 105:9
    121:4 135:18,21
    135:25 140:11
    142:21 180:24
**injuries** 11:22
    24:12 25:4 59:12
    60:4 61:2,16
    68:25 91:8 103:11
    130:2 158:5,22
    159:10 160:9,24
    161:4 169:5 173:1
    183:20 184:20
    185:2
**injury** 9:3,6,9,15
    10:6,9,13 21:5,10
    25:20 34:13,18
    44:14,25 45:4
    63:23 72:17 86:2
    99:14 114:6,15,18
    115:20 117:7
    121:7,10,11 127:3
    129:10,22 130:2,7
    130:14 131:1
    132:1 136:21
    138:9 144:7,13,21
    149:16,23 150:10
    151:6 152:8 153:6
    153:18 156:11

157:15,21 158:1
    158:23 159:21
    161:13,18,24
    167:14 172:15,19
    175:9 183:2
    185:23,24 211:14
**inside** 85:2 187:13
**insisted** 194:21
**install** 181:12
**instance** 1:21 66:14
    215:19
**instrument** 220:9
**insurance** 127:13
    210:13 215:7,11
    217:25 218:1
**integrity** 147:12
**intend** 103:23
    161:10
**intended** 171:7
**intentionally** 71:22
**interaction** 16:2
**interchangeably**
    112:25
**interest** 183:13
**interested** 222:21
**interferes** 199:12
**internet** 165:19
**interview** 101:15
**interviews** 161:1
    164:23 167:2
**intimacy** 38:6
    174:2 175:7
    203:12,15
**intimate** 174:8,18
    175:4
**invest** 150:24
**investigated** 170:11
    171:23
**investigation**
    136:22 138:5,10
    138:18 171:3,5,8
    171:12 173:14,20
**investigations**
    173:19,22
**involve** 111:7
**involved** 65:21

68:19 70:3 111:25
    113:7 146:16
    157:6 166:22
    203:18
**irony** 171:16
**irritated** 59:21
**irritation** 19:11
**Island** 93:10
**isolate** 113:1
**isolated** 104:20
    106:16,18 112:23
**isolated/locked**
    112:24
**isolation** 104:15
    106:10 112:21
**isolation/deisolat...**
    108:20 112:21
**issue** 141:25
**issues** 48:21 63:6
    174:2 203:12,15

_____
                J
**J** 5:7 222:13
**JAG** 16:19
**jail** 16:14
**January** 156:17
    157:11 159:5
    161:3 163:3,4,22
    181:20 182:4,25
    197:12 201:10,23
    202:10 205:5
    206:14 207:12
**javery@doylela...**
    5:5 222:11
**Jeff** 5:2 222:8
**Jeffcoat** 120:11,18
    121:1,3,10 122:11
    123:10,14,21
    124:4,12 125:3
**Jeffrey** 6:22 9:11
    214:24 215:21
**Jeffrey's** 214:23
**jewelry** 21:12 43:9
**jnorris@joneswa...**
    5:9 222:15
**job** 11:5,11 12:6,17

16:19 21:22 30:2
    33:19 34:21,23
    49:17 53:10 61:6
    61:10 64:5,18
    66:3,4 68:3,5,13
    68:14,18,20 69:11
    70:11 73:10,12
    76:22 78:1 89:9
    90:2 91:15 100:10
    108:7 118:14
    132:14 137:22
    147:25 150:13
    162:19,20 165:8
**jobs** 33:12 63:5
    66:25 70:9 71:6
    101:7 113:5
    162:20 164:23
    165:14
**joined** 36:19
    103:21
**joint** 24:14 124:16
    124:20 125:17
    127:2,5 175:22
    176:9,10 179:8
    180:9 181:20
    182:14 188:8
    191:19 192:4,12
    192:16 193:20
    194:13 195:4
    197:8 199:11
    202:19 204:6
**Jones** 5:7 140:11
    141:4 142:9,12
    222:13
**Joshua** 5:6 222:3
    222:12
**journal** 187:17
**JSA** 62:16 64:19
    67:13,15,19 68:1
    68:7,10,12 69:17
    69:23 81:19,22
    82:1 87:9 89:10
**JSAs** 87:12
**judge** 55:20
**JUDICIAL** 1:8
    221:8

**July** 125:11 126:9
  127:2,20 129:14
  129:19,25 130:6
  131:7
**jump** 44:11,24
  54:15,18
**jumped** 22:20,21
**jumping** 44:18
  48:25
**June** 96:4 119:2
  125:1,7,10
**junior** 93:17 95:14
**jury** 19:25 20:23
  21:9 45:8 50:1
  62:19 92:22 96:8
  136:20 169:4
  188:12
**Justice** 16:11

**K**

**keep** 66:7 70:8
  118:18 164:18
  186:18 187:17
**keeping** 98:21
**key** 77:10
**keyboards** 50:7
**kick** 78:13 80:6
**kicked** 79:2
**kids** 176:13 216:10
  217:1,5
**kids'** 218:1
**Kim** 124:22
**kind** 8:1 19:20,22
  35:14 36:8 40:16
  44:4 48:3 57:17
  59:24 60:18,19
  62:14 70:22 94:10
  98:8,13 100:3,25
  110:8 118:10,14
  118:15 120:8
  121:6 132:22
  135:10 154:10,19
  160:13,16 167:21
  167:22 177:21
  181:14 194:4
  199:25 201:13,13

217:17
**Kings** 93:10,23,24
**kinks** 178:10
**knew** 11:21 14:12
  60:17 69:20 76:5
  84:15 85:9 94:6
  116:18 127:15
  134:10,15 137:15
  137:23 138:7,14
  138:22 144:11
  152:24 157:2
  172:10,11 183:25
**knocked** 160:17
**know** 8:24 10:21
  11:1 12:14 16:6
  20:17 21:3 26:13
  35:16,19 36:8,12
  41:20 45:5,25
  47:4 51:11,22
  52:15 53:15,19,21
  55:18 65:7,15
  66:9 68:10,12
  70:1,10 72:18
  74:10 77:9 83:2
  83:23 85:17,17,18
  85:20 87:24 88:18
  90:8 91:6,9 98:12
  98:24 100:3
  102:20 103:22
  104:25 110:17
  118:9 123:22
  125:20,24 126:1
  127:17 132:24
  133:7 139:18
  141:21 142:4,4,6
  142:11,11 143:2
  146:2,13 147:6,9
  151:17 159:19
  160:7 165:13
  169:4,8 171:14
  172:5 173:11
  175:13 178:6,14
  185:16 187:20
  188:5,18 203:5,7
  207:19 209:11,24
  210:3,23 215:11

217:17
**knowing** 146:5
  147:6 159:21
**knowledge** 54:2
  72:10 86:13 90:4
  183:8
**known** 80:19
  136:18 137:17,18
  172:1 220:7
**knows** 10:8,10
  70:12,20

**L**

**L-u-c-i-u-s** 50:21
**labeled** 148:6 179:6
  186:3
**laid** 114:22 170:7
**land** 77:25
**landlocked** 93:12
**Lane** 7:3
**large** 41:24
**lasted** 19:23
**lasts** 144:4
**late** 126:9 148:16
**lately** 180:3
**laundry** 162:9
**law** 128:3,10 129:6
  129:9 140:10
**laws** 16:10
**lawsuit** 6:10 8:18
  12:5 19:5 24:4,13
  24:20,23 25:6
  59:9 60:3 85:23
  112:13 129:10,23
  130:3,15 131:1
  137:14 140:6,25
  141:2,12 142:2,24
  145:7 150:4
  151:11 158:8
  161:23 174:1
**lawyer** 25:8 129:20
  130:17 141:20
  145:5 180:7
  188:13
**lawyers** 27:7,16
  145:5,10,17

170:20 179:18
  209:5,11,19,22,24
**lay** 134:17 190:25
**laying** 162:14
**lead** 48:15
**leads** 48:11,13
  123:10
**leaned** 46:4
**learned** 12:13 94:1
  94:5
**learning** 94:10
**leave** 19:11 127:12
  153:9,10,11 175:8
**led** 12:21
**Lee** 124:21,24
  175:21 178:5
  179:23 181:7
  182:3,21,25 191:5
**Lee's** 180:13
**left** 17:23 25:15
  46:22 47:8 65:8
  78:13 79:3 80:6
  80:20 82:21 103:1
  106:25 114:1
  135:5,6 155:4
  160:15 164:8
  176:15 205:3
  216:2
**leg** 160:15,15,16,19
**legal** 141:24 145:23
**legally** 213:6
**legs** 22:18 54:21
  57:20,22 190:25
**length** 21:23
**let's** 19:3 26:4
  27:11 28:18 31:10
  34:12 38:17 61:11
  82:10 92:15,15,17
  96:2 102:7 114:12
  119:16 122:19
  127:12 128:7,25
  131:25 136:6
  143:5 155:25
  189:19 193:6
  200:8 201:22
  204:16,24 211:9

214:1,5 215:10
  216:1,11
**Letchworth** 6:22
  6:23 7:10,13,16
  7:21 8:2 9:12,18
  9:24 17:7,10,19
  18:10 30:18 35:13
  37:20 38:9,12
  123:18 167:6
  189:5,17 212:8,12
  212:17,22 213:4
  213:15,21 215:18
  216:6 217:9,14
**letter** 3:20 4:4 27:1
  139:11,15 142:20
  143:5,14 146:10
  155:11,12 186:5
  187:2,16
**letters** 26:22
  186:18
**level** 11:1 41:1,13
  42:2,3,4 47:14
  55:15,16 56:7
  58:1,2 174:25
**Lexitas** 223:7 225:6
**license** 31:13,17,19
  31:25 32:11,22
  94:24 95:1,3
  97:11
**licensing** 32:2,8
  33:23
**lie** 152:19
**lied** 146:18
**lieutenant** 15:10,12
**life** 161:22 169:6,10
  172:3
**lift** 199:9
**lifting** 86:24 162:4
  162:6
**light** 213:25 214:8
**Lightly** 61:7
**likes** 51:17
**likewise** 17:10
**limitations** 169:12
**LIMITED** 1:6
  221:6

Patricia Diana Ormond                                                                                    Pages

**line** 133:14 190:8
219:2
**lines** 20:22 21:20
39:2 41:23 58:14
85:16 110:21
136:14
**lingering** 151:14
**liquid** 19:6 84:17
**list** 107:10 216:9
**listed** 106:3 112:2
**listing** 107:5
**literally** 160:14
**little** 8:16 19:21
21:19 22:14 23:13
28:19 32:17 40:15
40:16 46:6,15
57:5 61:11 62:11
83:10 92:15
104:10 119:10,18
150:6 153:14
170:5 176:19
182:16 191:16
198:20,22 211:9
**Littleton** 92:21,22
93:1
**live** 6:18 36:18
165:18 212:10,21
212:24 217:22
**lived** 6:23 118:10
**livelihood** 147:25
**lives** 102:20 166:3
**load** 75:11
**loan** 215:21,23
216:22 218:7
**located** 188:21
**lock** 89:16 106:22
107:11 111:23
112:1 113:2
**locked** 21:6 72:21
72:22 73:21 78:24
81:4 86:10 87:22
88:13 89:12,23
91:3,4 106:12,13
112:24
**locking** 90:11,18
107:6

**lockout/tagout** 66:6
104:17
**lockouts** 89:17,20
**log** 187:17
**logging** 164:4
**logical** 20:18
**long** 6:23 17:4
18:10 30:9 41:22
48:14 54:21 58:22
59:7 66:4 74:13
85:10 93:10 100:7
101:6 145:11
153:15 162:10
170:18,24 190:15
194:3 195:7
200:19 202:9
207:4
**long-term** 140:19
141:12 157:7
184:6,14,18,23
185:2,9 186:10
187:7 213:17
**long-term/post**
157:12
**longer** 19:24 90:2
134:7 154:5
169:21 170:5
**look** 25:20 26:25
31:6 53:10 71:9
79:8 81:14,19
87:6,9 126:6
136:6 143:5 144:1
145:1,20 146:11
147:7,18 170:15
181:15 183:9
191:6 202:14
**looked** 22:10 60:18
79:3 81:25 87:13
87:15 119:16
134:8 143:10
172:13 177:9
181:18,23 195:22
198:3
**looking** 110:16
111:17 119:21
123:11 131:8

143:15 147:6
195:11 198:25
**looks** 105:11 109:8
182:18 186:17
197:21
**lose** 91:14 98:7
123:9 137:24
138:4 167:18
**losing** 11:5 36:25
137:21 147:24,25
**loss** 38:5
**lost** 124:17 154:6
167:21
**lot** 13:14 16:1,5
18:18 19:24 24:3
24:15 30:24 43:8
51:20 66:19 67:6
71:12 72:6 82:18
85:10 89:24 95:4
102:11 153:8
162:24 167:16,18
167:19 169:14,15
169:20,24 170:18
183:10 211:13
**Louisiana** 37:14
113:23
**love** 128:2 174:7
**low** 24:15
**lower** 11:1 24:19
25:7 41:1,13 42:1
47:14 56:1,7
75:24 80:22
119:24 121:10
137:10
**LS** 124:1
**lucid** 168:22
**Lucius** 50:11,18,20
51:1,4 52:15
58:16,20 59:16
60:3 78:20,21
80:16,19 81:3,13
81:21 87:17 92:13
109:25
**Lucius'** 106:7
**lumbar** 181:25
**lunch** 30:12 61:14

154:5
**lunchtime** 61:12
**lying** 146:24 152:3
**Lynch** 178:5
181:10 184:3

—————————

**M**

**M/E** 107:19
**MacGrubbs** 163:8
**machinery** 64:24
64:25
**machines** 122:25
**Mack** 163:11,21
164:1
**Madsen** 12:19,20
12:21 13:24 14:15
**main** 5:8 51:19
57:8 107:18
111:23 222:14
**maintain** 95:10
97:5,10 169:17,18
**maintenance** 62:4
101:11 139:24
140:4,7,10,16,22
141:4,11,18 142:8
142:15,21 143:1
145:7,21
**major** 111:8
**majority** 97:1
**making** 48:23
88:11,12 101:21
102:2 110:4 140:6
141:7 142:2 144:4
164:19 167:1
171:10
**males** 27:13
**man** 86:6
**managed** 199:23
**management** 1:5
170:12 221:5
**maneuvers** 122:22
**manifold** 21:17,22
21:23 46:5 55:5
83:14
**manipulations**
178:9

**manual** 122:13,23
**March** 29:11
114:13 149:20
151:6,13,22
152:17 160:1,21
172:21 173:15
**marine** 76:12 93:6
93:9,13 94:15,16
95:12 96:9 99:1
103:17 147:7
165:5
**Marines** 96:12
**marked** 70:14
104:6,7 120:16,17
126:3,4 133:4
135:2 139:7,10
148:3,5 156:9,10
179:4,5 183:3
184:8 186:2
188:17 196:13,14
201:8 207:21
208:9
**marking** 188:19
**marks** 19:11,25
20:23
**Marlo** 119:13
**married** 7:22 8:7
8:14 38:9,12
166:13 174:23
175:5 218:6
**martial** 102:11,14
**mask** 176:1
**mastermind** 50:4
**matches** 83:18
**mate** 94:25
**material** 180:20
**math** 131:13
**Matt** 50:11,18
58:16 59:4,16
78:20 80:9 82:6
86:4 88:7,14 89:1
89:21 109:25
**matter** 53:23 85:11
94:23
**May/June** 95:18
96:3

**Mazda** 216:12,17
**McComb** 7:4 37:10
  37:11 114:22
  120:12 139:12
**McNeal** 129:16,16
  129:17,20 130:1
  130:18
**mean** 10:10 16:4
  19:12 22:16 35:3
  35:4,17 36:5 43:6
  45:16 49:12 53:3
  53:7 57:20 64:10
  71:5 72:18 84:10
  87:19 94:18 98:2
  104:16 105:23
  106:13 109:20
  118:13 130:8
  134:14,16 141:17
  159:19 167:16
  170:22 175:6
  191:15 207:3
**meaning** 103:23
  203:5
**means** 2:1 29:14
  96:7 174:4 203:6
  203:7
**meant** 71:21 81:7
  144:6
**mechanics** 95:7
**media** 82:16 139:6
  204:22
**medic** 117:11,14
  118:1,2,13 132:25
  133:1,21 134:19
  136:15
**medical** 3:14,16,22
  4:2,6,8,10,12
  97:25 98:18 99:18
  100:2 118:1 180:6
  183:10,13 185:23
**medication** 117:21
  205:16
**medications** 168:1
  168:20,24 176:22
**meet** 7:13,16
**meeting** 61:21,25

62:11,22 63:3,9
  63:18,22,25 64:1
  67:23 75:15
**meetings** 50:9
  64:17 172:6
**member** 31:19 75:5
**members** 75:16
**membership**
  177:21
**memory** 72:10
**mention** 35:3
  159:14
**mentioned** 27:23
  28:18 48:23 70:6
  126:14 156:5
  166:15 171:21
  179:23
**mentor** 164:10
  166:15
**mentored** 167:3,4,5
**mentors** 94:3
**Merchant** 76:12
  93:6,9,13 94:15
  95:12 96:9,12
  99:1 103:17 147:7
**Merritt** 182:8
**messages** 131:5
**messed** 42:14
  172:13
**messes** 174:11
**met** 38:1 94:3
  139:20 172:2
**metal** 84:17
**Mexico** 113:19
  116:24 131:18
**Michael** 1:24 88:15
  221:15 223:6
  225:5
**Michelle** 139:18
  186:25
**mid** 114:13,13
  116:4,6,21,22
  117:7 119:1,2,2
  125:10,11 148:15
**middle** 55:1 64:5
  74:8 105:5 165:19

217:23
**midnight** 29:1,1
  43:13,19,22 53:12
  61:17 65:17 67:16
  74:2 133:1
**midshipman**
  215:22
**Mike** 5:11 88:5,16
**miles** 217:23
**military** 15:2,4,20
  16:1,2,10,12 94:7
  95:16 96:24
  102:17 103:22
  147:20
**mind** 26:18 144:16
  176:5
**mine** 92:8 106:7
  109:23 214:17
  216:21,22
**minor** 121:16
  164:12
**minute** 126:1,14
**minutes** 58:24
  82:11 153:10
  154:10 190:18
  194:22 195:17
  200:8,21,23
  202:11
**miserable** 207:1
**mislead** 71:21
**misrepresentation**
  154:2
**misrepresentations**
  151:23
**misrepresented**
  171:6
**misrepresenting**
  171:1
**missed** 162:24
**Mississippi** 6:14,17
  7:4 8:15 36:21
  37:7,10,12,13,14
  37:24 104:2 119:2
  139:13 143:14
  166:1,5 188:7,23
  196:4,5 204:5

210:16
**mistaken** 128:19
**mistakes** 148:1
**mitigate** 68:22
**mitigations** 68:17
**Mobec** 168:12
**mom** 114:24
  154:16
**moment** 27:11
  176:18 215:4,18
**Monday** 122:17
**money** 33:5 96:18
  145:1,4,6,11,13
  146:4,20,21 147:3
  147:5 164:21
  185:1
**monogamous**
  123:14
**month** 77:16
  101:20 114:8
  177:18 202:20
  212:6 213:22
  215:25 216:2
  217:12,21
**monthly** 213:11
  214:1 215:16
  216:1 217:7,20
**months** 11:15
  13:12,20 17:6
  25:21 36:9 37:5
  76:16 95:14,15,19
  100:22 131:25
  137:10,16,16
  144:4,20 156:23
  158:19 162:25
  163:1 171:2,2,2,2
  177:22,22 179:13
  199:18 201:15
  211:17
**morning** 28:23
  29:24 43:24 61:4
  64:22 65:24
  106:17 107:23
  133:1
**mortgage** 212:6
  213:12,22

**mother-in-law**
  167:7,8
**motorman** 39:8
  65:1
**mounted** 56:9
**mouthful** 192:13
**move** 7:7 32:1 36:1
  36:11,21,22 37:3
  52:22 53:3,8
  82:20 83:11
  165:17,22 180:23
**moved** 9:8 33:21
  37:6,24 39:14
  40:16 53:4 101:3
  104:1 191:1
**moves** 18:19 36:12
  114:11
**moving** 13:8 30:24
  53:9 54:3 80:20
  101:12
**MRI** 124:23 125:20
  125:25 126:1,7,13
  126:18,20 131:9
  131:11 152:21,24
  181:19,25 182:4
  182:14 205:19,20
  205:24
**MRIs** 195:23
**multiple** 85:17
  110:18
**multitask** 167:20
**muscle** 117:24
  134:22 160:19
  168:6,12
**musculoskeletal**
  178:7

**N**

**N** 5:1
**name** 6:8,21 10:16
  10:21 42:14 50:18
  71:1,3 83:1 105:4
  110:20 114:21
  115:3 118:16
  133:7 156:12
  168:7,9,14 173:8

202:3 212:4
214:16 215:19,20
216:12,17,20
217:8,24,25 218:2
218:7 220:9
**named** 38:25
**Naval** 93:18,22
166:20
**Navy** 15:7,12 76:19
91:1 96:11,24,24
97:1,2,4,6,12 98:1
98:5 99:19 100:12
147:8
**near** 108:4
**nearby** 70:20
**neatest** 66:20
**necessarily** 67:23
107:8 159:22
165:7 191:19
**necessary** 32:8,9
106:22
**neck** 22:18 59:1,19
**need** 18:8 20:16,19
24:22 31:16 32:5
64:20 67:24 81:4
83:10 86:21 126:6
154:14 207:8
**needed** 13:7,24
30:25 71:3 100:24
100:25 101:10
132:18 134:8
146:12,24,25
149:3 195:2
**needle** 195:2
**needs** 111:7,12
169:4
**negative** 150:15
152:25
**negligent** 171:11
**neither** 222:17
**nerve** 175:23
**never** 10:21 18:1,22
53:7,18,19 72:20
84:12 89:22 100:2
103:1,6,13 122:15
139:20 142:18,25

144:24 146:9
150:13 153:17
172:2 199:23
**new** 21:14 39:15
65:25 66:8 75:23
93:10 127:6
181:19
**Nicholas** 10:19
38:25 39:3
**Nick** 10:19,20
21:18 35:9 40:15
47:8 49:2,2,12
59:15
**night** 8:25 28:4,6
28:23 29:17 62:6
62:15 64:22 65:6
66:21 67:1,7
68:11 81:1,2
88:22 89:1
**nights** 50:13 86:6
**nightshift** 28:20,25
29:4,6,12 43:12
**nine** 75:2
**nods** 27:20,21
**nominated** 166:23
**nomination** 94:11
**nonoccupational**
143:19 184:20
**nonromantic** 37:22
**nonsexual** 37:23
**noon** 29:1,2 43:13
62:24
**normal** 42:25 124:1
124:5
**normally** 20:7 29:7
35:5 51:15,15,17
52:7 54:25 61:14
62:1 64:21 65:1
66:3 75:20 77:13
77:17 81:2 87:25
88:1,22 89:17
110:8 113:5
187:12
**Norris** 3:5 5:6 6:7
25:1,3 26:6 27:10
82:10,17 128:2,6

128:13,24 138:21
139:1,8 140:20
145:12,18,19
146:3 154:6,9,13
154:18 155:3
159:18 171:15
200:9,10 204:16
204:23 211:2
218:9,11 222:3,12
**north** 101:12
**Northwest** 223:8
225:7
**notary** 2:12 220:14
**notch** 22:4 83:7,9
**note** 120:18,22
179:7,15 180:13
189:20 201:10
208:10 211:22,23
211:25 212:1
218:5
**noted** 220:1
**notes** 9:2 75:22
148:11 180:2,5
187:1,4,9 198:24
**notice** 97:8
**noticeable** 35:4
**notify** 12:3
**November** 163:3,4
163:9 196:18
197:14,25 198:16
200:11,19 201:16
202:4 204:10
205:5 221:25
224:5
**number** 104:10
173:9 175:13
192:22
**numbered** 1:23
**numerous** 164:23
**nurse** 124:22
134:21 168:11
201:1 207:13
**nurses** 115:19

─────────
**O**
─────────
**O** 83:12

**oath** 137:15 146:7
156:16 188:4
220:8
**oaths** 2:13
**object** 24:25 128:11
138:19 140:17
145:9,18 159:17
171:13 210:25
**objections** 2:8
**objective** 183:19
**objectively** 183:1
**obligation** 213:6
**obligations** 18:6
32:8
**observation** 182:4
**observe** 41:8 42:11
42:21 51:4 57:1
**obtain** 206:23
**obtained** 32:5,7
**obviously** 72:18
191:18 218:5
**occasion** 11:14,18
50:24 174:19
212:23
**occasions** 110:18
174:14
**occupational**
148:15 178:1
**occupationally**
184:22
**occur** 36:15 43:18
44:14 61:2 144:13
144:22
**occurred** 9:9,10
43:25 60:9 99:15
106:21,24 110:17
115:21 132:2
138:9 150:2 151:6
152:16 157:21
158:6,23 159:11
161:19 167:15
200:18 211:14
222:24
**occurs** 63:19 144:8
172:16
**October** 1:13,23

6:2 38:15 130:16
130:23,24,24
145:10 156:5
177:11 208:11,12
208:13 221:13,23
223:2
**of/sort** 160:13
**office** 110:3 199:22
220:11
**officer** 2:13 15:6,11
76:18 91:1 94:20
94:20 97:3,20
98:25 100:12,17
100:21 141:25
147:8,20 221:19
222:5 224:4
**officer's** 224:10
**offices** 2:1
**official** 75:21
133:13 177:16,21
**officially** 24:14
35:1 70:17 74:4
117:9 128:4
129:14 130:9
150:17
**offshore** 1:5,6,6
7:17 17:1 18:5,18
28:9 69:16 101:2
101:22 121:5
139:12 166:10,12
221:5,6,6
**oftentimes** 84:20
**oh** 8:10 33:8 48:22
53:8 72:18 150:1
204:2
**oil** 21:19
**oiler** 31:9,11,16
32:1 33:9,21 34:2
39:8 63:15 65:1
75:25 89:6 101:22
106:3,6 116:12,13
116:14,22 172:10
172:10
**oilers** 65:2 80:22
**OIM** 135:4,6,17
**okay** 6:1 8:16,17

Patricia Diana Ormond                                    Pages

11:3 12:7 14:15
14:20 18:3 19:1
20:20 21:7,11
23:12 24:2,4
25:17,24 27:4,15
27:23 28:8 29:3
30:9 32:22 33:15
34:12 35:15 36:7
36:15 37:2,11
38:16 39:4 40:18
43:16,23 44:10
45:10,24 46:15,22
47:1 51:8 52:2
53:11 55:7,19,25
56:6,15,21,22
57:3,15,19 58:4,6
59:9,16,23 60:2,6
61:8 62:13 64:8
64:14 67:12 70:25
72:17 73:25 76:2
77:23 78:10,19
82:15 85:5,22
89:9 90:3,24
91:22 92:16 95:9
99:14 100:9,14
101:21 102:7
106:9 107:13
108:4 109:2,24
110:9,24 112:12
115:1 116:3,17,21
117:6 118:5 119:1
120:10 121:3,13
122:9 123:24
124:19,25 125:3
125:23 126:23
129:19,25 130:5
130:17 131:13
132:16 133:12,16
135:12,13 136:6
136:16 139:5
140:15 141:16
142:3,6,13 143:5
145:25 149:9
151:5,10 153:17
155:1 157:14
158:21 159:23

160:7 161:1,17
162:15 167:6
169:4 170:17
171:16,21 173:24
174:4,13,18 175:9
175:17 178:17,21
182:13 185:18
186:2 187:20
188:12,14 189:11
190:19,24 191:9
191:24 193:18
194:23 195:8,16
197:23 198:13
200:16 201:25
202:6 204:16,21
206:4,7 207:5
208:20 212:3
213:20 214:6,10
215:16 216:5,14
216:23 217:4,7,11
218:4,10
**okay'd** 135:13
**old** 102:12
**older** 93:16
**once** 22:9 49:9 99:8
105:22 115:11
164:11
**ones** 15:21 74:11
89:19 194:11
207:3
**ongoing** 99:18
106:15 151:16
**online** 69:14
**onset** 153:18
**onset/change**
149:17
**open** 42:7 84:24
90:19 91:4
**opened** 85:8 89:12
**opening** 86:21
**operation** 21:4 43:4
61:15 65:7,9,20
67:9 68:8 76:25
104:25
**operations** 29:20
39:10 78:3 100:11

100:21
**opiates** 168:20
**opinion** 12:21
14:16 21:10
112:12 119:25
153:13,19 173:15
192:3
**opioids** 168:20
**opportunity** 143:18
**option** 194:8
**oral** 1:11,20 221:19
**order** 113:1 201:14
205:20,24,24
**ordered** 124:23
204:4,5 206:8
210:15
**ordering** 205:21
**orders** 100:20
**Orgeron** 139:18
142:14 143:17
144:1,25 146:9,14
186:25
**orientate** 155:8
179:13
**origin** 136:18 137:1
137:11,17
**original** 2:10 13:12
224:3,8,11
**originally** 92:18
181:3
**Ormond** 1:2,12,21
3:4 6:4,9 82:18
104:9,11 111:18
120:23 126:5
136:7 139:9
143:17 148:4,7,8
155:4 179:7,9
186:4 204:24
219:24 220:3,7
221:2,12,18
**orthopedic** 120:14
**OSHA** 113:13
**osteopathic** 178:7
**out-of-pocket**
210:14,16
**outcome** 222:21

**outdoorsy** 102:16
**outside** 92:23
187:13
**outskirts** 42:5
**over-the-counter**
117:21 133:25
168:2,23 176:21
**overall** 169:24
**overbroad** 25:1
**overcomplicated**
72:5
**overdo** 176:4
**overhaul** 28:12
43:5,7 60:25
65:20 67:10 69:24
70:21 71:3 74:9
74:13,19 76:25
78:16 84:1,4
85:14 88:4 107:25
**overhauling** 78:4
**overhauls** 117:1
158:2
**overlooked** 191:23
**overly** 72:15
**oversee** 28:5
**overtook** 147:25
**overview** 78:7

――――――――
**P**
**P** 5:1,1
**P-a-p-e-n-b-e-r-g**
88:20
**p.m** 1:24 28:25
29:15,25 30:12
43:11,17 62:22
65:25 67:3 73:1
139:4 154:25
204:20
**packs** 60:13
**page** 3:10 109:2
111:13 122:9
123:13,25 136:7
156:16,16 181:15
198:24 202:14
205:3,23 219:2
224:7

**paid** 33:6 93:24
108:14 140:22
141:3 145:7
164:16 209:2,12
210:11,14,16
211:7 213:15,16
215:5,17 216:15
**pain** 9:22 24:16,19
25:7 34:24,25
98:20 114:25
117:13,21 120:1
121:17 123:5
127:3 132:13
134:6 135:10
137:10 151:14,16
160:20 162:10
168:2 169:15
174:6,17,20
175:15,24 176:1,4
176:14 183:6
184:1 191:2,18
192:19,23 196:23
198:11 199:6,12
202:15,22 203:18
**pan** 47:23,24 48:4
48:10,11
**pandemic** 165:14
**panel** 51:19,20
**Papenberg** 88:5,14
88:15,16,18,21
**paper** 58:25
**paperwork** 90:1,2
128:5
**paragraph** 157:25
202:25
**parents** 214:17
**parents'** 36:23
**Park** 7:3
**Parkway** 2:2 5:3
222:9
**part** 19:5 46:8
66:15 67:9,18
68:7 82:19 83:17
85:22 89:9 100:23
119:23 132:14
139:22 144:7

Patricia Diana Ormond                                    Pages

156:20 169:11,25
174:11
**participate** 60:24
67:19
**parties** 2:7 222:6
222:18 224:15
**parts** 21:19 61:9
**party** 28:10 79:18
222:1
**pass** 95:1
**passed** 166:19
**patient** 126:8 127:6
191:8 196:23
201:10
**Patricia** 1:2,12,20
3:4 6:4,9 18:5,23
120:22 166:16
219:24 220:3,7
221:2,12,18
**Patrick** 5:7 222:13
**pay** 96:15,15,18
127:19 140:16
142:15,21 144:20
150:20 167:19
177:17 208:20
210:11 212:6
213:7 215:8
217:14
**payable** 140:11
**paying** 141:10
142:8 209:19,22
212:2
**payment** 185:9
**payments** 139:23
153:24 156:3,24
157:3,8 184:6,14
184:19 185:9
**Pedro** 10:16 21:17
21:21 27:23 28:1
38:18 40:7 47:13
59:15 79:4
**pelvis** 182:14
**people** 16:5,16,20
29:23 33:13,19
34:3 35:3 52:7
59:10 65:2 66:22

70:15 71:6,7
75:24,25 85:23
86:1 87:11,18,20
97:9 101:8 122:3
141:23 146:14
157:21 172:2,5,7
172:25 173:11
**people's** 173:21
**percent** 40:14
47:15 115:8,24
144:3,19 155:15
197:7
**perform** 11:6 61:6
108:7 116:10
125:13 153:13
176:12 203:17
**performed** 72:7
100:11,18 119:10
122:21
**performing** 11:11
24:17 53:25 98:25
**period** 34:17 42:25
66:7 114:5 121:14
143:21 144:24
155:6 156:2
162:10 182:9
184:4
**periods** 155:9
177:15
**permanent** 66:6
**permission** 106:19
**permit** 65:19,23,25
65:25 66:2,4,10
67:8,12 68:4 70:5
70:7,23 71:1,4
72:19,25 81:14
89:14,15 104:15
104:17,18 107:14
111:5,7,10,13,20
111:22 112:14,16
112:19,20 113:2,4
113:6
**permits** 3:12 64:20
65:22 66:8,13,18
66:21 67:5,6,24
71:7,12,15,23

72:7,11,15,22
73:9,13,16 82:1
86:8 87:6,12,20
89:10 90:6,9
108:16,20,20,21
108:25 110:2,20
112:1
**person** 34:7 35:8
58:15 71:14 86:8
88:8 105:25 109:7
109:10 111:2
112:4 164:25
183:16 189:8
202:5 220:9
**personal** 54:2
68:25 88:25
**personally** 15:13
139:20 213:11
215:17 220:7
**perspective** 144:12
**pfackrell@jones...**
5:10 222:16
**phone** 26:20,22
159:6,9 161:1
187:13,14 197:22
198:16 200:5,11
200:18,20,24
201:3,16,19 202:4
202:8 207:17,18
207:20 208:8
214:7 218:3
**physical** 97:23
98:13 99:2,5
148:11,15 149:5
151:5 176:24
177:5,15 178:1,17
**physically** 113:17
207:25
**PIC** 109:5,6
**pick** 35:5,6 37:11
187:14
**picked** 37:2 93:21
111:16 164:8
**pickup** 41:16,17
**picture** 133:7
**piece** 41:24 66:4

83:16,18
**pilot** 166:20
**pinpoint** 191:22
**pipe** 21:22 22:2,5
22:14 39:24 40:13
78:11 80:6,20
81:11 82:20,20
83:7,7,12,12,22
84:2,5,18,20,23
85:1 86:21 87:3
89:11 90:19 91:3
91:4 112:15
**pipes** 48:15 77:1
**piping** 55:10
**pissed** 59:21
**place** 14:24 16:11
22:8 65:19 72:11
72:25 89:10
**plaintiff** 1:3 5:2
6:10 141:8 221:3
222:8
**plaintiff's** 129:20
209:5,21
**plan** 62:6,14 112:2
**plans** 8:7 207:7
**plate** 48:1 56:13,14
**pleasant** 171:23
**please** 157:16
**pleased** 186:8
**plebe** 93:19,20
**plus** 208:24
**pocket** 127:19
210:18
**point** 8:8 9:19
20:16 31:7,7,23
35:12 37:19 43:16
51:13 72:4,6
73:23 75:20 78:10
93:10,16,22,23,24
98:14 99:20 103:8
110:7 119:9
122:17 140:2
141:17 152:21
158:15 171:1
178:12 190:11
200:1 207:9

**pointed** 53:24 54:8
**policies** 14:23
15:14 16:12,22
17:2,5,11,14
95:24 147:23
**policy** 138:12 185:2
218:1
**pop** 178:9
**porch** 169:20
**port** 97:7
**position** 11:6 12:22
12:25 32:9,17,23
33:1,12 39:6,15
42:23 45:22 61:9
86:5 89:2 91:16
101:2 109:18
116:13 133:9,10
**positive** 40:14
**post** 25:8 48:24
99:25 121:25
165:13
**postinjury** 175:14
**potential** 68:16
154:1
**potentially** 175:22
194:5,20
**pounds** 162:5 199:9
**PowerPoint** 77:17
77:20 172:8
**PPE** 23:14
**practical** 95:11
**practice** 51:12
52:20 69:9 119:12
187:15
**practitioner** 124:22
134:22 168:11
**precaution** 81:4
**precautions** 70:13
80:11
**predict** 87:23
**prepared** 94:11
**preparing** 167:2
224:11
**prescribed** 134:22
205:16
**prescription**

168:10,20 202:2,7
203:20 204:8
prescriptions
134:24
present 5:11 34:6
62:3 85:20 152:7
179:21 190:8
presently 168:1
pretower 61:22,24
62:2 63:2 172:6
pretty 22:23 28:3
44:4 67:5 85:13
111:6 114:22
118:8 122:8 125:6
162:4,10 163:18
164:20 170:23
203:16
prevent 68:25
171:7 172:17
175:24
prevented 24:16
86:2,16
prevents 174:6,9
previous 194:11
previously 85:9
primary 119:14
print 67:22
prior 7:1,10 12:9
21:4 63:22 67:15
75:22 82:20 84:23
85:15 91:4 99:14
104:20 112:14
115:14 118:2
122:11 126:13
129:8,25 150:3
163:10 175:9
182:13 187:25
191:24
probably 9:11 23:6
30:11 40:17 41:10
41:22,22 42:14
55:17 58:8 78:8
80:24 98:23 100:4
106:4 110:2
113:25 130:16
141:22 142:6

169:16 186:23
207:2 215:12
217:21,22
problem 98:6
problems 44:7,8
Procedure 2:3
procedures 14:24
15:17 17:11,15
95:24
proceeding 222:19
proceedings 97:23
process 26:2 44:15
45:23 48:17 65:14
67:20 68:8 69:4
69:23 70:5,23
71:23 75:3 81:17
84:1 90:12 94:11
94:12 99:18,23
101:18 131:11
136:23 138:23
142:20 155:17
156:21 157:7
159:5 195:7
processes 95:24
produced 1:21
prognosis 193:19
193:21,22
program 69:15
93:19 155:20
177:17
programs 13:15
progress 120:22
project 78:16 86:12
projects 39:10
prolonged 66:6
promoted 88:23
89:1,4 151:1
pronounce 203:22
proof 142:19
187:22 188:2
proper 23:14 69:17
90:25 110:14
195:3,3
properly 72:21,22
89:11 170:11
protect 12:6

proud 163:18
prove 11:6
proved 220:8
provide 97:4 170:1
192:19 203:23
provided 161:15
184:23 185:1
189:20
providers 185:23
proving 165:21
provisions 2:4
PT 98:22 99:9
100:1
public 2:12 220:14
pull 57:15,23 73:8
101:10
pulled 58:7
pulling 87:2
pulls 123:1,2
pump 53:5,6 160:3
purchase 212:3
purchased 211:11
purpose 68:14 70:7
73:4 104:24
146:24 172:24
201:3 205:8
purposes 220:10
pursuant 2:3 222:4
222:22
pursue 138:2
pursuing 24:5,10
24:12 25:5
push 22:2
pushes 83:11
put 11:7 19:17 22:9
32:16 33:11 37:17
49:5,6 71:1 78:10
79:2 82:19 83:9
107:11 113:2
122:23 168:8,11
168:13 172:7,7
175:13,23 190:6
194:24 195:6
197:18
puts 122:25
putting 32:22 59:1

**Q**

QMED 31:18
QMEDs 80:23
qualification
156:21
qualifications 32:3
qualified 31:19
157:10
question 2:9 20:11
20:13,21 25:2
26:17 33:15
169:11 182:24
184:24
questionnaire 3:24
126:8 156:11
questions 20:18
29:9 38:4 104:24
157:16 167:24
169:2 175:1,2
quick 67:5 138:25
quickly 36:5 45:14
46:19 198:23
quite 13:9 71:9
164:23 169:22

**R**

R 5:1
R3 185:13
radar 98:14
radiating 85:1
rail 54:24 55:1,1
57:12,23
railing 22:22,22
54:25 55:13
ran 22:20 23:4
46:24 47:8 55:9
145:11
random 64:7,10
ranges 212:19
rank 15:9,12
rapidly 180:23
rattlesnakes 169:19
reach 55:23 56:2
57:9
reached 54:23
55:12

reaction 14:3,17
44:25
read 72:24 73:5,9
170:16,19 180:3,4
219:24
reading 72:25
73:16 184:3
ready 12:17 13:10
62:25 77:1,4
87:21 97:7
real 36:22 38:3
145:21
realize 140:8
realized 205:4
really 7:25 17:15
44:24 45:6 49:6
57:17 60:13,20
64:1 65:15,15
66:11,17 67:7
85:16 89:14
100:24 101:7
118:6 156:1
157:24 162:20
163:1 164:5 169:8
175:1 196:9
198:11 200:2
201:18 207:11
210:22
reason 15:1 36:22
74:3 86:4 111:22
219:2
reasons 88:25
224:7
rebuild 10:18 28:7
74:22 75:1
rebuilding 21:14
rebuilds 28:6
recall 7:25 14:19
28:15 50:14 63:8
63:21 65:13 67:15
68:7 71:12 72:25
81:20 87:8,10
102:4 103:15
115:7,18,25
123:13 125:1
133:5 134:3,9

Patricia Diana Ormond

Pages

135:23 136:11
139:15 142:16,23
143:24 177:12
185:14 186:13,16
187:10 189:24
191:13 193:18
197:2 201:12
202:15,18 203:11
203:14 205:9
210:17
**receive** 96:5 143:19
156:2 184:5
**received** 18:6 32:24
76:21 143:14
144:19 155:10
184:14 194:22
**receiving** 130:13
139:15 140:18
155:15 156:24
186:16 193:11
197:8
**receptionist** 201:2
**Recess** 82:14 139:4
154:25 204:20
**recollection** 72:10
73:16,18 190:13
**recommend** 123:3
**recommendation**
176:11
**recommended**
114:25 175:17
207:9
**record** 2:4 6:2
58:10 82:12,16
103:19,22 107:14
123:3 128:19
139:2,6 154:23
155:2 186:13
190:1,3 195:11
196:18 204:18,22
218:13 221:20
222:7
**records** 3:14,16,22
4:2,6,8,10,12 38:8
98:18 150:16
180:7 183:11

195:15 207:19
**recurring** 202:22
**refer** 133:17 206:10
**referenced** 108:21
**referencing** 111:17
**referred** 178:5
**referring** 108:25
197:24 205:22
**reflects** 209:4
**refuel** 75:10
**refuse** 175:18
**regiment** 100:16,16
100:17
**registered** 216:21
**registration** 215:8
223:7 225:6
**regret** 170:6
**regulations** 18:7
20:8 113:14
**reisolate** 106:20
**relate** 161:23
**related** 14:17 72:17
88:4 104:19
115:22 121:7
127:3,8 129:9,22
130:2,6,14,25
131:9 150:10
151:9 153:19
161:5 162:6
171:24 184:22
185:3,8 187:1,7
189:21 222:18
**relationship** 7:24
35:13,20 36:11,13
37:23 123:15
174:11 175:6
**relaxers** 134:22
168:7,12
**release** 48:25
**relief** 73:10,19 74:1
82:3 134:18
192:19 202:20
203:23,23 206:23
**relieve** 62:10 64:2
65:11 121:17
**reliever** 168:2

**relieving** 65:8
70:19 75:4,17
**rely** 77:17
**relying** 92:9
**remember** 7:14
10:20 19:13 25:11
26:24 30:21,24
47:5 57:18 62:1
65:5,17 66:17
67:7,8,17 68:6
72:13 74:4,25
78:9 81:23 83:21
85:19 108:12
118:4,6,25 120:15
125:5,18,19,20
133:6 159:13
161:6 168:14
181:10 185:4,21
185:25 195:14,15
196:10 201:18,20
216:9
**remote** 164:3
165:15
**remove** 112:14
**Rent** 211:22
**rep** 172:8
**repair** 95:10
**rephrase** 141:1
**report** 3:18 11:3,21
13:19 17:7,16,20
17:22,25 18:8,23
25:20,21 34:17,25
58:19 114:6,15,18
117:7 131:14,20
131:22 132:9,16
133:3 134:4,20
135:4 136:19,21
137:20 138:8,8
143:9 144:12
147:22 149:23
150:7 173:17
184:21
**reported** 1:25
11:19 12:8 149:13
172:1,20,20
173:14

**reporter** 88:19
221:16
**Reporter's** 3:7
221:11
**reporting** 14:3,17
133:13 146:16,17
**representation**
146:5
**representations**
145:14
**representative**
133:18
**represented** 99:17
158:12
**reprimanded** 12:8
**request** 142:20
170:9
**require** 43:5 61:10
111:9 147:23
**required** 11:21
23:17 32:12 43:6
112:16,18
**requirement** 11:24
**requirements** 32:2
99:7 222:22
**requires** 42:1 43:8
111:10 162:4
163:15
**research** 164:9
**reserve** 97:6,19
98:25 218:12
**reserved** 2:8
**reserves** 15:8 96:21
97:1,3,4 98:1
100:12
**reservist** 16:3
**reside** 6:13 7:2,10
**resistance** 179:2
**resistant** 23:18,19
**resolve** 98:6
**resolved** 160:24
**respective** 2:7
66:21
**response** 134:9
**responses** 170:9
**responsibilities**

139:22
**responsibility**
39:16 52:24 53:1
66:16 67:19 91:2
92:4,7 107:24
**responsible** 138:18
217:8
**responsiveness**
2:10
**rest** 83:13 85:3
93:24 213:1
216:13
**result** 157:15
**resume** 100:9
**resumes** 166:25
**retain** 26:19,21
85:13 129:12
**retained** 26:9,14
127:23 128:9
129:6,9,20 130:1
130:1,6,8 158:16
180:7
**retains** 85:10
**retardant** 23:17
**retention** 97:25
99:18
**retired** 166:20
**return** 154:1
221:24
**returned** 224:4,6,8
**revealed** 182:18
**review** 67:23 81:21
97:25 180:11
181:19 185:15,22
187:25
**reviewed** 124:1
180:2 183:10,18
**RHINO** 32:18
113:16 116:8
117:17
**ribs** 160:17,18
**Richmond** 118:17
118:19,22 133:20
133:22 134:3
136:3
**Rick** 10:21

ridiculed 172:12
rig 7:17 9:16 13:13
    24:17 25:15 28:21
    30:11,18 36:15
    38:1 61:12 62:7
    62:21 63:4 70:13
    74:16 76:6 77:6
    77:13,25 78:2
    82:4 85:15 101:20
    113:21 114:1
    115:9 116:20
    118:3,23 121:18
    121:22,24 122:4
    125:1,4 127:16
    131:14 133:11
    144:22 170:11
    172:7,11,14,16
right 10:10 15:2
    17:2 18:14,18
    24:15,16 28:20
    29:21 30:1 32:5
    32:14,19 34:4
    40:6,20 42:19
    46:22,23,24,24
    47:9 49:18 53:18
    53:24 54:1 55:9
    56:7,10 63:1,13
    63:17 64:21 72:4
    73:4,6 75:8,14
    76:4,7,10,11,13
    77:11,12 79:21,22
    80:3 86:10,15,17
    86:20 87:3 90:7
    90:13 91:13,18,19
    99:2 100:14,15
    103:24 106:6
    111:18 122:19
    124:21 125:21
    126:16,17,24
    128:22 132:2,10
    137:11 140:14
    141:6 144:17,22
    147:1,22 148:17
    148:21,22 149:18
    150:4,5 151:7
    152:14 159:2

160:12 162:2
163:4,7,16 164:18
165:8 166:12
167:1,23 172:4,18
172:23 173:4
179:18 181:16
185:17 192:4,11
192:23 193:4,20
196:8 197:8 199:9
199:19 202:21
206:19 211:18
213:16 215:12
right-hand 104:10
ring 83:12
risk 68:16,22
risks 68:19
road 6:16 100:4
Rodriguez 161:16
    168:13 175:20
    176:6,18 177:4,8
    188:7,10,15,20,24
    189:7,12,16,20
    190:5,15 191:10
    192:10 193:12,19
    194:10,15,19
    195:10,17 196:11
    196:17 197:3,15
    197:16 198:16
    199:14 200:13,20
    200:25 201:17,23
    202:9,15 203:12
    205:5 206:9,12,18
    208:1,17 209:15
    209:18,22 210:1,3
    210:15,22
role 28:1 107:24
roles 107:24
romantic 35:12
    36:13
room 10:2 11:1
    27:13 34:6 38:21
    41:2 42:4 49:11
    49:24 50:1,3,3,4,9
    51:9,20 56:2,8,22
    56:23 58:1,2,7,8,9
    58:12,15,23 59:7

59:25 60:12,15
62:12,12 64:25
74:24 88:6,9,11
108:6 121:19
122:4 132:20
133:14 134:17,17
141:23 153:10
173:11 217:17
rooms 53:6
Rouge 193:2
round 64:24,25,25
    65:5
rounds 64:23,24
    65:2,4
route 45:1 123:10
rule 27:15 222:23
    224:1,14
rules 2:3 14:20
    15:13,17,20 16:4
    16:6,12,21 17:2,5
    18:7 20:7
run 44:11,16 45:14
    46:19 47:2 54:15
    95:6 96:12 100:16
rundown 77:15
running 44:15 45:2
    48:25 53:5 152:19
    154:2 161:20
    162:5
runs 21:23 48:6
    63:25 84:17 145:4
    145:6
Ryan 10:20,20
    38:25 39:3

---

## S

S 5:1
Sacramento 101:12
sacroiliac 24:14
    192:4,11 193:20
sacroiliitis 182:19
sacrum 182:19
Safe 108:13
safety 12:24 17:11
    17:14 19:16 23:20
    31:5 61:21,25

62:3,21 63:6,8,18
63:21 64:16 68:13
68:14,17 69:11
70:13 72:2 77:10
77:14 92:5,7
133:17 172:6,8,21
173:3
sail 94:24 97:11
sailing 31:24
salary 155:16
salesman 162:21
sanctioned 106:19
Sargent 166:16
    167:10
saw 115:11 122:4
    125:24 181:7
    201:23 209:18
    210:7
saying 14:12 32:25
    144:1
says 59:9 104:11
    105:22 106:6
    107:18 109:5
    123:25 137:9
    143:17 146:11
    149:15,21 151:11
    152:7 157:14
    180:19 182:7
    186:8 190:9
    196:21 197:7
    202:25 203:8
    208:23
scale 192:23
scan 181:19 182:8
    182:14
scans 191:4,8
scars 19:25 20:23
schedule 30:21,22
    89:25 125:25
schedulewise 31:1
school 93:1,4,18
    103:17 164:9
    165:2
science 94:16,22
    165:4
scope 39:16

screening 126:8
screens 50:6
scribble 110:20
sea 32:3 76:15
    95:14,15
seal 97:3 220:11
seals 83:13
seamen 140:11
searching 183:23
seated 45:17,17,24
    46:3,5
second 14:7,11
    21:12 31:22 34:8
    50:11,22 53:2
    56:23 57:8 58:16
    80:10 100:15
    102:13 109:2
    122:9 123:13,25
    126:5 152:7
    157:14 179:24
    190:8 198:24
    202:14 210:14
section 21:24 83:16
    105:5 106:10
    109:3,22 110:25
    112:3,3 157:14,25
    158:8
Security 173:9
sedated 206:21
    207:23
sedation 208:24
see 11:2 26:2 27:17
    42:7 52:12 54:9
    54:11 98:19,20
    104:12 105:3,6
    107:18,20 109:3,9
    109:21 114:25
    117:12 119:16
    120:20,22 121:1
    122:19 123:24
    124:2,21,24 125:3
    125:16 143:7,22
    148:9 149:12,18
    152:9 153:5,20
    154:8 156:13
    157:17 175:1

179:10,20,21,25
180:21 182:1
183:19 186:11
188:24 189:12,16
189:22 190:14
195:16 196:19,25
197:9 199:2 201:4
202:9 203:2 205:4
205:11,12 207:8
208:1 210:4
216:11
**seeing** 122:11
133:14 176:7
177:7 181:10,11
184:3 188:7
**seek** 120:9 159:21
**seeking** 115:20
117:25
**seen** 53:19 127:18
173:3 189:7 190:1
197:15 200:16
**segue** 111:14
**selected** 76:9
**self-evaluation**
131:8
**sell** 163:17
**seminar** 93:19
**Semnick** 124:23
**send** 9:5 95:17
146:10 164:11
**sending** 145:1
185:1
**sends** 172:16,21
**senior** 12:13 33:14
33:20 39:12 69:20
89:18 101:8
**senior-level** 63:4
**seniors** 100:16
**sensation** 19:22,23
**sense** 55:24 151:14
**sent** 75:22 134:12
142:20 143:14
152:22 185:12,15
188:11,14 209:19
**sentence** 137:9
179:24 202:25

**separate** 11:14
105:12 107:5
187:18
**September** 148:19
156:1 177:10
189:21 190:16
195:12 197:13,14
198:3
**series** 108:16
**serious** 138:14,16
**seriously** 23:25
**serve** 96:18 97:10
**served** 173:15
224:15
**serves** 12:4
**service** 28:12 96:10
96:14,21 97:15,17
98:25 165:19
187:12
**services** 210:6
**serving** 106:4
**sessions** 178:2
**set** 9:23 16:10 22:7
56:16,18,20 66:7
88:10
**setup** 33:17 70:18
**seven** 29:21
**seven-hour** 193:6
193:15
**severe** 134:6
162:10 183:6
192:4,11 193:20
**sewage** 95:4
**sex** 174:7 203:9
**sexual** 35:20 36:13
174:14 175:11
**Shane** 119:14,14
**shape** 99:2
**sheet** 224:3
**shift** 8:16 12:23
21:7 29:20 30:13
43:11,14 44:5,6
60:7 61:23 62:22
62:25 63:5,22
65:24 66:1 69:24
73:1 77:21,24

92:15 106:17,25
107:23 109:8,9,9
112:10
**shifts** 28:18,22
29:23 30:6
**ship** 95:7,20 97:12
101:9 136:23
152:13 165:7
190:9
**shipping** 101:5
**ships** 76:16 95:16
95:16,17 97:5,7
**shock** 22:24
**shoes** 23:21
**short** 86:3 87:25
88:1,3 113:25
**short-term** 140:18
143:18 144:2
156:3,24 157:3,12
163:14 179:14
187:7
**Shorthand** 221:15
**shorthanded** 65:6
**shortly** 126:17
133:17 155:18
**shot** 193:23 195:9,9
197:16,16,19
198:4,5
**show** 19:25 20:23
75:4 99:8 191:15
191:19
**showed** 76:5 82:6
142:25
**showing** 85:15
**shown** 224:15
**shut** 22:23 23:3
49:9,23 53:17,18
85:9 90:10
**SI** 124:16 176:9
182:14 191:19
197:8 199:11
202:19
**side** 22:3,5 24:15
24:16 39:25 40:8
41:11,12 42:10
45:19 57:4 87:3

**sides** 22:1
**sidestepped** 72:8
**sidewalk** 54:19
**sideways** 160:17
**Sierra** 216:11
**sight** 59:7
**sign** 64:19 66:22,24
67:2,22 68:3 69:8
69:20 71:17,20
105:16 106:7
110:4,13
**signals** 175:24
**signature** 3:6
109:22 110:16
111:4 112:7 136:8
199:19 219:1,25
221:24 224:6
**signatures** 105:12
105:14
**signed** 2:11 13:3,5
13:9 14:6,7,9,9,12
27:1,1 31:6 67:25
71:8,10 89:13
105:19,20 107:6
109:13,15,18,24
110:5 126:9,23
128:5 135:15
139:19 156:16,19
157:2
**signing** 66:24 71:12
106:9 130:9
**Silver** 6:14,16
**Silverado** 214:13
214:25
**similar** 172:25
178:7
**similarly** 173:20
**simply** 175:18
**sir** 6:12 7:12,18,23
8:6,11,20,23 9:4
9:13,17 10:1,4,7
10:12,14 11:16,20
11:23 13:17 14:1
14:22 15:1,8,18
15:23 16:15,23,25
17:3,6,9,13 18:15

18:17,21 19:7,10
20:2,9,15 21:2,6,8
23:9,11,15,23
24:1,7,9,21 25:7
25:13,23 26:10,20
27:3,8,14,22,25
28:10,14,21 29:13
29:16,19,22 30:5
30:15,17,20 31:4
31:9,15 32:4,6,10
32:15 33:2,4,25
34:11 35:22 36:14
36:20 37:21,25
38:2,7,20 39:1,13
39:18,22 40:7,11
41:14,25 42:4,12
42:22 43:7,15
44:5,9,13,20,23
45:13,16 46:10,12
46:14,21,25 48:1
48:8,10,19 49:13
49:22,25 50:15,17
50:19,25 51:3,6
51:24 52:4,11,14
52:18,20,23,25
53:14,22 54:10,13
54:17 57:24 58:3
58:21 59:11,13,21
60:5,8 61:1,3,5,20
63:10,12,20,24
67:11,17 68:10,21
69:9,12,18 70:4
71:11,13,16 72:13
72:16 73:3,17,20
74:18 75:18 76:17
76:20 77:2,22
78:17,24 79:6,9
79:14,23 80:4,18
81:8 82:2,22,24
84:5,11,16 85:6
85:25 86:23 87:1
88:17 90:16,20
91:6,11,14 92:1,3
92:12,24 93:8
95:8,13,21 96:1,4
97:21 99:3,6,16

99:20,24 100:2
102:6 103:3,12,15
103:20 104:5
105:2,21 106:2,23
107:4,21 108:3,5
108:9 109:1,12,16
109:19 110:14,23
111:4,19 112:6,8
112:16 113:9,12
113:24 114:3,14
115:11 116:2,7,12
116:23,25 117:2
117:18,20 118:20
119:3 120:2,24
121:2,12,20 122:6
122:23 123:8,12
123:16,19,22
124:3,6 125:5,9
125:12 126:10,15
126:19,22 127:21
128:16 129:5,7,21
129:24 130:4,8,11
130:19 131:12,19
132:3,6,11 133:19
133:21,24 134:2
135:8,15,20 136:5
136:10,12,15
137:4,7,18,21
138:1,11,16,20,24
139:14 140:1,5,9
140:14,19 141:6,9
141:15 143:4,12
143:16,25 144:15
144:18,23 145:16
146:19 147:5,11
147:17,24 148:10
148:13,17,24
149:1,4,6,8,14,19
149:21,24 150:1
150:11,14,21
151:4,8,20,25
152:2,4,10,15,18
153:3,14,21 154:3
155:7,14,18,21,24
156:8,18,22 157:1
157:5,13,23

158:17,20,25
159:3,14 160:2,11
160:23,25 161:9
161:25 163:9,12
163:24,25 164:17
165:1,3,6,9,16,23
166:4,6,8,16
167:9,12 168:6,11
168:18,21,25
169:3 170:14,25
171:4,18,20 173:7
173:18 174:3,15
174:21,24 175:16
176:23 177:1,3,25
178:16,18 179:11
179:16,19,22
180:1,12,15,18,22
181:1,5,17 182:2
182:6,12,17,23
183:12,23 184:7
184:10,12,16
185:7,11 186:7,12
186:17,20 187:3,5
187:19,24 188:5
188:16,22 189:2,6
189:13,15,18,23
189:25 191:12
192:2,5,9,18
193:3,7,10 194:11
194:16,18 195:13
195:19,24 196:2,6
196:9,20,22 197:1
197:6,10,17,20
198:2,7,9,18
199:3,8,10,13,20
200:4,14,23 201:1
201:25 202:17,21
202:24 203:3,10
203:13,21,24
205:1,7,15,18,20
206:15,17,22
207:14,24 208:2,5
208:8,15,19 209:3
209:7,10,16,20,23
210:2,4 211:1,4,6
211:12,16,19

212:5,9,11,13
213:5,9,23 214:9
214:11,17 215:6,9
215:15 216:4,7,24
217:3,15 218:8
**sister** 93:15,16
167:4
**sit** 25:4 54:3 64:6
66:19 72:9,24
91:20 97:17 102:5
127:6 147:18
161:7 162:15
169:6 170:22
176:20 213:7
**site** 195:3
**sits** 22:4 56:14 83:8
**sitting** 21:16 42:6
43:20 46:8 55:8
56:9 154:17 162:9
162:9,13
**situation** 80:8
97:24
**six** 17:6 25:21
131:25 137:16
144:4,20 179:13
193:1 211:17
**six-month** 144:24
156:2
**size** 41:16 85:10
**sketched** 135:1
**ski** 102:21
**skiing** 103:7,9,14
**skill** 198:11
**skin** 19:12,18,20
**skipped** 72:7 100:3
102:7
**sleep** 194:24 195:6
**slide** 104:8
**slow** 13:7,24 150:25
178:9
**slowed** 169:22
**slower** 29:7 119:18
**slowly** 178:10
**small** 64:10 77:18
**smoothly** 111:14
**snap** 178:8

**snow** 102:21
**snowboard** 102:21
**snowboarding**
103:2,5,6
**Social** 173:9
**sold** 163:18
**somebody** 35:7
62:2,2,4,4 137:2
212:2
**somebody's** 110:20
**sophomore** 95:13
**sorry** 9:14 10:9
20:3,4 28:12 40:4
40:25 58:5 84:8
115:2 128:23
149:15 153:12
186:4 190:16
197:5 204:2
208:13 214:19
216:12
**sort** 57:17 62:3
63:13 116:6
141:24 163:12
178:2 199:15
**sorts** 48:18 167:21
**sought** 117:19
124:18 158:18
**sounded** 120:6
**sounds** 42:1 91:12
92:9 103:14
148:21,22 154:22
202:21 208:3
213:12
**source** 111:8
**Southern** 124:20
125:16 127:1,4
152:22 157:20
175:21 179:8
180:9 181:3,20
188:6,8 194:13,14
204:6 206:6,7,8
210:12
**southwest** 92:24
**speaking** 26:1
**specialist** 120:9,14
124:18 178:7

**Specialists** 127:2
179:8
**specialty** 120:13
**specific** 6:15 13:1
63:18 72:10 73:16
73:18 90:4 94:14
97:2 107:10 162:2
**specifically** 9:9
12:12,20 24:10
31:6 33:18 47:1
67:7,17 72:17
83:2 84:2 88:3
99:25 108:18
137:8 167:16,17
**speculate** 52:2
**speculating** 52:19
**spell** 50:20 88:18
**spend** 95:14,15
**spent** 60:11 95:19
**spills** 69:1
**spine** 124:1,4
175:23 181:25
**split** 128:7
**spoke** 9:12 201:23
**spoken** 139:21
200:25 201:1
**sports** 102:11
**spot** 64:3 93:12
**sprain** 192:4,12
193:20
**sprained** 24:14
124:16 191:19
**sprayed** 22:16,17
39:24 40:15 45:11
46:18 152:12
**spraying** 22:15
45:2,21 180:20
**sprays** 44:11
**spring** 157:22
**stack** 73:8
**staff** 100:18,24
115:19
**staffed** 86:3 87:25
88:1,3
**stairs** 47:13 56:16
56:18

stand 34:5 55:23
standing 10:23
    21:18 40:19 41:4
    42:9 56:1 79:21
    79:25 162:8,13
    203:4,8
stands 23:18 77:15
start 20:12 21:11
    21:13 28:22,23
    34:8 61:23 62:22
    62:25 65:16 66:3
    74:2,11 77:1
    78:18 80:11,14,15
    86:11 87:21 89:20
    89:23 128:25
    164:14,19 188:7
started 8:1 9:22,23
    12:14 22:15 26:1
    30:10,13 32:10,13
    45:21 65:23 70:11
    74:4,5,25 81:7,14
    85:15 87:17 88:13
    89:25 94:10,10
    97:23 106:16
    119:20 131:5
    145:10 151:22
    166:22 176:6
    177:7 188:10
starter 215:22
starting 21:14
    73:24 100:7
starts 64:9 66:12
    179:23
state 1:25 6:8 220:5
    220:15 221:16
stated 2:4
statement 136:7,11
    137:24 144:21
    147:16 201:10
statements 145:14
States 15:7 31:13
    76:19 93:13 94:15
    96:9 147:8
statistics 41:20
status 78:15 80:20
    149:17

stay 52:6,7 58:22
    97:7 99:2 162:22
stayed 34:13 55:9
    73:13 74:16
staying 24:17
stays 51:15
steel 84:18
steel-toed 23:20
steering 130:21
stenographic 2:1
step 31:21,22 39:8
    86:4 176:10
stepped 54:24
steps 41:20 56:19
    57:5 72:6 80:12
stick 134:7
stimulator 175:23
    181:13
STIPULATED 2:6
Stipulations 3:2
stood 23:2 49:8
stool 46:11
stop 145:1 146:20
    188:6
stopped 153:16
    181:11 188:8
story 56:23 93:14
    181:3
straddling 22:17
    45:18
straight 49:10
strategic 97:3
streams 47:19
street 5:8 6:15
    222:14
stress 169:24
stretch 121:15
stretches 121:16
    122:2
stretching 161:14
    179:2
strictly 24:16
stronger 168:8,19
struck 40:12
struggle 167:25
struggles 125:15

stuck 37:13
students 166:22
    167:3
studies 123:25
    191:10,25
stuff 19:16,17
    31:25 32:12 64:7
    64:10 70:12 74:12
    95:5 117:12
    127:15 134:1
    157:12 161:21
    167:21 168:3
    169:17,20 187:11
    198:4 210:8
stumped 181:13
Stumptown 6:16
subject 129:10,22
    130:3,14 131:1
    138:5
subjective 149:12
    152:5
submitted 137:24
    157:11 221:22
subordinates 15:16
    16:11,21
subscribed 220:9
subsequent 206:14
    207:12 208:16
substance 81:10
    130:21
substances 113:11
suburb 92:24
successful 200:15
sudden 34:1
sued 38:5
suffer 174:2,6
suggested 175:22
Suite 2:2 5:3,8
    222:9,14 223:8
    225:7
summer 93:19
supervise 33:9,16
    33:18
supervised 39:11
supervising 34:2,3
    39:17,20 49:21

79:25 88:11
supervisor 80:9,14
    89:16,18,22 91:1
supervisory 33:11
supplied 100:9
support 50:5 95:3
    97:4 213:7
supposed 75:3
    89:16,19,21
    134:24 194:3
    207:10
sure 13:24 16:21
    18:4 26:16 46:2
    47:5,15 48:23
    52:1 65:22 80:6
    88:11,12 89:10,10
    89:11 91:3,21
    95:23 98:3 110:18
    115:24 130:10,21
    135:11 139:1
    142:1 153:21,23
    154:12 159:8,14
    167:1 186:1 195:8
    200:9 205:2
surface 48:6
surgeries 161:8,10
surgery 175:18
    176:2,10 194:7
surprise 122:5
survive 146:21
Swimming 102:14
swing 44:3
switch 70:5 107:9
switched 88:25
swore 137:5
sworn 1:22 6:5
    221:19
system 48:5 66:10
    72:19 89:15
systems 50:5

———————
T
table 23:7,10 24:8
tagged 73:21
tags 215:7
take 20:18 21:22

22:1,3,5 24:8
    31:24 34:23 59:18
    69:15 74:13 81:4
    82:10 123:20
    134:25 136:6
    138:25 154:10,19
    168:9 176:14
    194:2 195:1
    198:20 200:8
    204:16 217:18
taken 1:22 64:3
    80:12,13 168:5,19
    222:5,20
takes 22:14 93:11
    169:20 170:5
talk 9:8 13:14 27:6
    31:10 38:17 60:20
    62:14 64:6,10,15
    74:3 75:12,19
    76:1 77:5,18 80:5
    81:24 132:18
    135:4 136:23
    176:18 207:8
talked 26:8 49:18
    104:23 107:23
    114:4 133:22
    135:6,7 150:6
    159:25 179:13
    182:16 184:17
    187:16 203:25
    211:13
talking 34:10 35:18
    35:25 36:12 37:19
    38:18 66:15 69:25
    82:18 90:15
    114:24 121:14
    125:8 145:5,10,23
    160:7 161:20
talks 199:11
tall 41:22
tangent 38:16
tank 48:15 213:18
tape 204:17 205:4
target 171:4
tasks 14:13
taxpayers 96:15

Patricia Diana Ormond                                    Pages

tear 75:11
teased 172:12
tech 10:17 83:3
technically 31:18
  93:2 217:12
technicians 28:5
telenet 200:13
telephone 200:13
tell 9:18 17:7,19,22
  18:4 25:10 27:2
  35:24 45:6 47:3
  47:15 49:7 50:1
  51:1 52:16 54:20
  61:24 64:4 65:11
  85:7 102:3 103:4
  115:1,5 118:22
  119:16 121:3
  124:4,15 127:1
  130:12 134:24
  135:17,21,24
  136:3 142:4,13
  145:17 150:9
  151:17,21 154:20
  157:19,24 158:4
  170:23 185:22
  192:10 198:22
  199:14
telling 23:2 49:3
  98:5 115:18
  123:14 134:3
  138:2 159:1
  191:17 202:18
  203:14
tells 199:18
temp 21:22
temperature 19:13
  19:14,23
temporarily 11:7
  88:23
temporary 116:19
ten 200:23
tendency 167:18
term 73:22 103:22
  103:23 108:25
  140:3
terminated 18:8

137:25 141:14
  142:10 163:5,10
termination 142:18
terrible 165:19
test 98:13,22 99:9
  100:1 106:19
testified 6:5 87:5
  137:15
testify 122:3 127:25
testimony 13:18
  18:22 44:10 45:7
  59:16 79:1 87:16
  90:17 108:22
  121:9 129:1
  137:17 142:7
  146:6 152:1
  163:20 171:19
  173:16 211:11
  221:20 222:5
testing/switching
  112:2
tests 99:5
Texas 1:4,25 2:2,3
  5:4,8 37:13,14
  188:21,24 210:20
  221:4,16 222:10
  222:14 223:6,8
  225:5,7
Thank 6:18 8:13
  218:11
therapist 151:21
  152:11
therapy 148:11,14
  148:15 149:5
  151:5 153:5,12,20
  153:25 157:21
  176:24 177:6,15
  177:19 178:1,2,4
  178:17
thereabouts 135:25
therefor 224:7
thereon 2:12
thing 16:8 20:13
  33:7 34:4 56:13
  83:12 175:23
  185:16 200:1

203:16 213:2
things 37:17 44:3
  53:4 54:11 69:1
  88:1 89:25 102:9
  139:25 149:10
  161:23 162:1
  167:17 169:14,15
  169:16 171:6
  182:22 183:18
  214:8 217:19
think 7:3 10:16,19
  11:10 14:7,13
  24:3,24 27:12,23
  28:17 31:18 33:2
  33:6,6 38:5 39:3,7
  40:14,15 43:13,15
  47:8,13 49:2,10
  56:19 65:6 69:14
  69:18 72:4 73:23
  79:12 81:12 82:5
  82:5,6,9 83:21,21
  86:16 87:5,19
  91:22 92:6 105:19
  109:24 112:9
  113:25 114:4,21
  115:17,23 117:4,4
  121:8 122:17
  123:22 125:18
  126:17 128:5,19
  129:18 132:7
  133:6 134:21,23
  134:23 135:8,23
  136:2 142:16
  143:10 144:3
  148:18 155:4
  157:7 162:21
  163:14,18 167:17
  168:7,9 178:16
  181:9,23 185:12
  187:10 189:8,8,10
  190:20 192:6
  195:7,17 196:10
  199:17 202:7,13
  203:19 205:3,13
  206:11,20 208:2
  210:7 211:10

218:4
thinking 128:23
  154:4,8
third 11:8,11 14:7
  14:11 28:10 29:5
  29:11 31:12,21
  32:1,9,10,13,25
  33:6,15,21 34:2,6
  39:15 42:24,25
  43:5,10 63:15
  70:2 76:2 78:21
  79:18 89:6 90:24
  93:17 94:25,25
  101:24 106:5
  116:10,15 176:9
  194:5,19 195:9,10
  197:16 205:25
  206:3,4,18,23
thorough 80:22
  171:12 173:14
thought 21:6 80:11
  151:8,12 198:10
  201:19 207:17
three 8:10 40:3,5
  40:10 41:8 42:5
  56:8 64:24 65:2
  80:1 86:18 100:22
  119:7,8 163:18
  189:8,9 199:18
  207:10
three- 37:15
thumbs 22:12
  79:12 92:10,10
time 2:8 7:25 9:1,2
  9:6,24 10:2 17:5
  18:11 20:19 22:15
  30:23 31:2,24
  32:3,23 34:16,20
  34:23 35:11,18,21
  36:25 37:1,24
  38:9 39:19,23
  42:25 43:17 49:15
  49:21 50:12 51:1
  51:7 52:21 53:11
  54:22 58:16,20
  59:20 61:11 64:15

65:4 69:10 72:11
  73:1 76:15 77:5
  81:10 82:7 85:11
  86:19 87:21 90:18
  94:9 95:18,25
  98:9 99:1,11
  102:13,13 103:16
  106:3 107:10,22
  114:5 115:13,18
  117:25 120:23
  121:1,2,14 123:15
  127:4 130:5,13
  132:15 136:19
  142:17 151:12
  154:6 155:6,9,10
  156:6 157:24
  158:1,2,4 159:1
  161:11 162:10
  164:6 165:8,23
  170:24 173:25
  176:23 177:5,15
  179:12,17 180:8
  182:8 184:4
  189:11,14 194:6
  195:1 198:19
  209:21 210:7
  211:9 213:3
  216:19 218:11
  222:1,5
timeline 181:10
  204:3
times 34:5 48:24
  66:19 71:14 84:6
  84:7,9 89:24
  102:23,24 105:17
  106:10 117:11
  119:6 139:21
  148:20 153:4,19
  166:15 171:21
  173:4 174:19
  175:4,10,15
  177:10 178:11
  189:7,8 199:22
  208:16 210:24,24
  212:24
timing 120:25

Patricia Diana Ormond

Pages

**tired** 36:25 102:24
183:24
**title** 120:15
**titled** 156:11
**today** 6:1,11 24:23
25:5 54:3,12 72:9
72:24 87:6 97:17
102:5 110:16
121:9 137:15
142:7 146:6
147:18 150:3
161:7,17 162:9,16
163:20 167:13
168:4,22 169:1,6
170:22 171:10,19
171:22 173:16
176:20 184:9,13
211:13 213:7
218:9
**Todd** 118:17
133:20 136:24
**told** 10:8,10 13:6
18:22 33:18 59:25
73:10,11,11,19
78:17,19,25 80:1
80:9,13,25 81:1
86:10 87:17 89:22
91:5 103:13 104:1
119:21 121:9
124:8 132:17
133:2 134:23
136:24,25,25
151:6 152:6,11
153:2 157:20
176:3 178:13
181:3 183:24
192:6 194:1
198:10 203:19
211:10 218:4
**tool** 21:21 22:4,7,10
78:11 79:2 82:19
82:20,25 83:24
84:2,15 112:14
**top** 21:12 41:10
47:12 49:5 54:25
56:25 57:7 83:5

107:18 149:18
156:12 181:16
**topic** 62:3,3
**torn** 85:12
**total** 148:18 195:10
197:16 216:1,2
**totally** 163:15
181:2
**touch** 71:2 72:20
207:20
**toured** 93:22
**towels** 58:25
**tower** 43:14
**towers** 29:1 30:3
**track** 70:8 154:6
**tracks** 94:21
**traction** 122:23,24
**traffic** 193:1
**train** 150:22
**trained** 11:24 14:25
17:4,10 69:11
138:22
**training** 13:15,15
13:21 18:6 76:21
95:16 140:2
**trainings** 95:24
**trains** 69:16
**transcript** 2:11
221:19,22 224:12
**transfers** 97:11
**Transportation**
96:13
**travel** 36:25
**traveling** 175:24
**TRCP** 222:23
224:1
**treat** 191:8 192:11
**treated** 12:10 19:14
**treating** 12:14
**treatment** 98:20
146:25 161:12
176:21 194:15
196:17
**treatments** 122:12
199:1
**TRI** 148:14,14

153:5,12,20
157:21 177:10,14
178:4
**trial** 2:8 209:5,11
209:19,24 218:12
**tricking** 176:5
**tried** 61:9 98:5
100:6 101:5 104:8
119:16 122:16
123:4 150:23,25
162:19,19 164:3
168:6,13 199:22
200:14
**tries** 123:1
**trigger** 178:12
**trouble** 100:4
**troubleshoot** 95:10
**truck** 41:16,17
214:18,20,23,24
215:3,5,12 216:16
**true** 71:18 109:21
126:24 136:17
137:6 145:2 146:7
186:15 188:3,14
190:3 220:1
221:20
**trusting** 80:14
**truth** 138:3
**truthful** 138:8
**truthfully** 169:2
**truthfulness** 147:13
**try** 20:12 45:25
121:17,23 122:19
172:17 201:4
**trying** 12:6 13:8
26:2 30:25 45:8
49:7 59:18 60:12
70:10 121:15
122:1 134:18
140:24 146:12
148:22,25 149:4
163:12 167:23,24
178:9 201:5
205:10 213:10
**tuition** 96:15
**turbo** 55:10,10

**turn** 46:19,22 52:6
52:9,12 53:6
54:14 58:11 81:1
**turned** 40:21 45:14
46:24 52:7,16
55:11
**turning** 44:16
152:12
**turnover** 65:14
**turnovers** 75:21,22
80:22
**twelve** 193:1
**twice** 99:8 115:12
115:16
**twisted** 22:20
**two** 7:5 11:8 21:17
28:5 37:5 40:3,5,9
43:5,8,10 44:2
56:11 65:1 80:1,7
85:21 86:17,18
93:15 98:10
114:23 116:14,16
119:7 123:2
125:25 131:14
143:13 146:5
151:2,24 162:25
163:1,25 166:24
193:4,24 194:2,11
194:21,22 196:11
201:15 206:6
207:3 217:12
218:5
**two-story** 56:22
**Tylenol** 199:6
**type** 14:3 19:6
27:18 80:8 83:16
104:18 122:21
175:18 214:24
215:8
**types** 69:1 102:9
108:19,24 113:13
139:25 165:10
170:2 172:25
186:18 214:8
217:19
**typical** 50:16 62:2

64:12
**typically** 68:4

___

## U

**U.S** 15:12 100:12
**Uh-huh** 61:18 69:3
75:6 78:12 79:11
80:2 84:19 105:13
107:2 114:9
115:15 116:5
126:12,25 131:15
131:17 173:5
181:22 182:10,20
195:21 197:4
199:5
**unbearable** 132:13
**uncle** 93:22 164:4
**uncomfortable**
192:21 193:13,15
198:8
**undergoing** 176:21
**underhanded** 86:7
**understand** 13:18
16:9,16,18,24
19:4 24:4 26:11
44:10 45:7,9
59:12 73:5 85:14
87:5,16 91:16
98:24 137:5
140:13,24 141:5,7
141:24 142:1
154:14 161:23
169:5 170:25
171:16 172:15,19
195:8 203:6
211:20
**understanding**
15:7 23:24 28:19
38:10 134:10
144:17 158:15
166:10 184:17,24
212:14
**understands** 62:20
**understood** 116:21
136:24 144:11,13
155:19 157:2

Patricia Diana Ormond

Pages

205:22
**unemployed**
163:15
**unfortunately**
152:4,20 164:7
**Uniform** 16:10
**union** 101:6
**unions** 101:5
**United** 15:7 31:13
76:19 93:12 94:15
96:9 147:8
**unknown** 137:1,11
**unlicensed** 33:12
**unmarried** 38:14
**unofficially** 35:2
117:10
**unremarkable**
181:25 182:5,11
192:1
**unspoken** 60:19
**unusual** 179:24
180:14
**upper** 42:3,4 58:1,2
80:21
**ups** 75:20
**upset** 147:15
**use** 53:3 57:20
73:22 83:23
178:23 179:1,2
**useful** 164:2
**USMJ** 16:10
**utilities** 214:1

———————

**V**

**values** 147:12
**valve** 90:21 107:9
107:10
**valves** 43:2 90:10
90:13,13,13 108:9
108:11
**Vandergriff** 10:22
38:25 39:4,9,16
39:21,23 41:4
47:2 49:12,14
79:5,25 81:24
82:3 86:18 91:2

91:20
**Vandergriff's** 92:5
**varies** 162:11
**various** 95:16
106:9
**vehicle** 214:10
**vehicles** 102:17
215:20 216:6,8,23
217:24 218:1
**verbal** 130:25
131:2
**versus** 169:6
**vested** 183:13
**victim** 172:2,4
**Videographer** 5:11
6:1 82:12,15
139:2,5 154:23
155:1 200:7
204:18,21 218:13
**videos** 54:7
**videotape** 2:1
**VIDEOTAPED**
1:11,20
**view** 116:17
**virtual** 201:5 208:6
**virtually** 208:5
**visit** 115:25 149:9
151:24 181:7
182:25 189:21,24
190:15,17 191:11
195:11 196:11,21
196:24 197:22,23
201:12 202:16
205:8,14
**visits** 200:12 208:6
208:17
**volleyball** 102:14
**voltage** 111:24
112:2
**voluntary** 176:2
**VS** 1:4 221:4

———————

**W**

**waist** 123:1
**wait** 13:6 140:23
**waited** 73:11

**waiting** 143:21
**waiver** 98:11 99:25
**waivers** 98:9
**walk** 56:25 58:10
58:11
**Walker** 5:7 222:13
**walking** 162:12
203:4,8
**walkway** 56:24
**want** 19:17 37:16
47:5 49:2 60:21
64:16 66:5 67:3
77:5 80:23 91:14
96:23 98:7,18
108:17 128:22
136:21 138:4,6,17
142:1 145:18
146:1,20 149:10
154:16 169:19
175:4 176:3,4,12
191:6 195:14
196:9 204:1,13
**wanted** 11:6 29:6
36:22,23,23 37:14
37:16 49:4 60:20
93:16 94:6,7
101:14 120:9
124:21 127:18
135:11 138:2
146:24 154:8
176:7 191:7,8
192:15 194:19
**wanting** 173:17
**war** 97:8
**was/was** 224:3
**wasn't** 10:11 11:9
12:17 22:8 32:19
33:17 71:18 72:19
72:21 74:22 81:10
84:12 89:9 91:21
114:22 122:20
128:23 133:13
134:7 146:7,11,23
146:23 147:5
153:7,21 159:20
172:14 177:20

191:17 194:24
195:13
**watch** 51:16 132:17
**watching** 88:11
**water** 9:20 19:13
19:14 21:3,22
22:15,23 23:3
39:24 40:12,21
44:11 45:2,11,21
46:18 47:16,22
48:6,16,25 49:9
49:23 54:14 58:25
59:1 60:13 78:23
85:2 90:13 95:5
112:23 113:8
152:12 213:25
214:8
**way** 22:16,18 30:6
48:2 55:2,21 70:9
70:12,24 81:2
83:5,20 86:10
94:21 99:4 110:15
122:14 123:24
160:21 169:10
180:23 184:9
191:7 192:25
193:11 199:16
201:7 210:19
217:24
**ways** 68:22 193:8
**wear** 9:22 19:16
23:17
**Wednesday** 6:2
122:18
**week** 29:21 34:8
74:23 85:15 93:20
131:14 132:6
134:20 144:20
175:12 207:2
**weekend** 128:8
**weekly** 155:16
**weeks** 11:8 13:19
30:16,16 74:15,17
75:13 78:3 98:10
114:23 116:14,16
125:4 143:13,20

146:5 151:2,24
164:11 177:20
194:2 198:21
**weights** 162:7
**welder** 111:12
**welders** 113:6
**welding** 111:8,11
**went** 10:21 13:5
34:1 43:21 47:13
49:10 60:15,23
65:25 74:24 75:7
89:25 93:1 94:13
101:4 106:11
110:19 114:19
115:12,16 117:11
117:14 120:11
121:1,8 122:17
124:25 125:6,21
127:4 132:19
135:6 147:7
148:18 153:5,19
160:15,16 163:11
165:2 172:14
177:10 178:4,11
180:6 192:23
198:23 201:14
210:20
**weren't** 23:25
32:16 51:6,22
74:10 101:7
145:15 150:18
153:23 163:5
**Wesley** 182:8
**West** 93:16,22
**what-ifs** 87:23
**whatnot** 21:20 50:9
50:10 53:6 114:24
118:13 166:23,25
167:3
**wide** 41:23 62:7
83:3
**wife** 119:11 120:3
**WiFi** 214:7
**Williams** 199:4
202:23 205:11
**Williamson** 161:15

178:19
**willing** 27:4 118:11
**wind** 160:18
**wise** 145:17 162:7
**witness** 1:21 2:12
  10:5,11,13 18:19
  42:21 114:11
  218:10 221:18,21
  221:23,24
**witnessed** 59:10,17
  59:18 60:4
**witnessing** 59:2
**wits** 154:20
**word** 39:7 80:14
  190:21
**words** 70:10 136:13
  137:2
**work** 8:19 10:24
  12:23 23:19,19
  26:3 28:23,24
  29:1,17,24 36:25
  37:1 39:4,11
  43:21,23 53:25
  54:8 57:6 60:22
  62:17 64:9 66:12
  67:25 68:5 70:8,9
  70:12,15,16,16
  77:8 79:15 80:11
  85:11 89:15,20,25
  101:5,9 106:15,16
  108:20,21 109:5,6
  109:11 110:25
  111:2,5,6,10,12
  111:13,20,22
  112:5,14,16,20
  113:3,4,6,8 115:6
  115:12,21,21
  118:24 121:7,7
  125:6,21 127:8,18
  134:12,25 135:18
  135:22 136:1
  138:9 140:12
  142:22 144:8,13
  145:15,21 146:2
  148:25 149:5
  150:10 152:13

154:1 158:6
159:12 161:3,5
162:15,17,24
163:8,11 164:12
170:3,6,24 178:10
185:3 194:17
198:11 199:12,15
205:17
**work-related**
  121:11 127:3
  158:22 185:24
**worked** 28:16
  49:14 84:15
  104:20 134:15
  164:5 197:21
**worker** 127:14
**workers'** 127:10,16
  139:24
**working** 21:19
  24:17 29:5,11
  30:6 31:3 35:3,11
  43:14 45:17,20
  46:4,16 49:17
  51:13 52:8,10,13
  52:17 54:4 63:14
  70:20 86:11 89:23
  100:23 101:22
  102:18 121:5,13
  122:4 158:23
  162:7 164:1
  180:19 190:9
  203:1
**works** 79:18 138:23
  142:12 154:12
**world** 87:12,13
  113:18 187:22
**worried** 24:22
  215:3
**worry** 127:14
**worse** 123:7 176:5
**worsened** 202:16
**worth** 98:21
**wouldn't** 11:10
  32:19 33:11 42:11
  43:6 44:8 45:18
  47:10 52:24 53:9

67:22 71:17,20
78:6,8 87:13,15
165:17 171:3
191:19
**Wow** 95:23
**write** 66:20 75:22
  136:13,25 137:1
  146:10
**writes** 198:17
**writing** 131:3 187:9
  187:10,15
**written** 109:17
  131:2
**wrong** 109:17
  146:11 183:7,22
  183:25 188:9
  190:6 191:16,18
  192:8
**wrote** 133:3 170:20
  204:7

**X**
**x-ray** 124:1
**x-rays** 119:11,15,20
  122:19 123:20
  124:5 191:10,25
  195:22

**Y**
**yard** 169:18 170:3
**yeah** 26:5 33:8
  43:16 58:13 61:14
  64:11 100:8
  101:20 108:16
  113:15 128:23
  147:2 151:15
  154:12 160:7
  184:24 189:10
  206:5,11 210:10
**year** 8:4 11:16,17
  12:9 25:14 31:3
  32:17 76:21 93:17
  93:20 95:13,15
  98:10,11 99:8
  101:22,23 128:19
  150:2 177:23

185:10 215:14
**yearly** 215:10
**years** 16:20 18:13
  18:14 93:15 95:12
  97:14,16,18,19
  98:25 102:12
  193:25 218:6
**years'** 96:21,22
**yelling** 22:25 47:6
  48:24
**York** 93:10
**you-all** 17:24 29:24
  29:25 35:20 36:1
  37:22 38:1 42:10
  74:19 81:6 154:4
  154:5 212:10
  215:1
**young** 120:7 176:12
**youngest** 212:25

**Z**
**zoned** 47:7
**Zoom** 208:7

**0**
**02** 216:16
**03:43** 222:3

**1**
**1** 3:11 85:19 104:6
  104:8 198:11
**1,000** 215:13
**1:00** 133:1
**1:36** 204:19,20
**1:45** 204:20,22
**1:59** 218:14
**10** 4:5 41:23 56:3
  58:11 95:19
  102:13 105:12,17
  106:10 107:5,6
  188:17,19 189:19
  189:19
**10-31-21** 223:9
**10-31-23** 225:8
**10:49** 82:13
**10:50** 82:14

**10:58** 82:14,16
**100** 2:2 5:3 40:14
  47:15 115:8,24
  167:3 222:9
**1005** 136:7
**104** 3:11
**11** 4:7 196:13,15
  198:1,25 200:12
  200:19 201:15
  208:11 210:18
  212:20
**11:56** 139:3,4
**11th** 208:12,13,14
**12** 4:9 30:7 56:3
  65:23 95:19
  106:25 107:22
  201:8,9 204:24
  205:23
**12-hour** 30:6
**12:00** 28:22 30:4,4
**12:04** 139:4,6
**12:20** 154:7
**12:22** 154:24,25
**12:37** 155:2
**12:38** 154:25
**12:45** 154:10
**120** 3:13
**1200** 210:18
**126** 3:15
**127TH** 1:8 221:8
**13** 1:13,23 4:11
  97:22 207:21
  208:10 210:5
  221:13
**13101** 223:8 225:7
**1328** 7:3
**133** 3:17
**139** 3:19
**13th** 6:2 179:9
**14** 193:8
**14-day** 143:20
**140** 179:7
**143** 179:7
**148** 3:21
**14th** 127:24 128:3
  128:14 129:2,8

Patricia Diana Ormond                                        Pages

163:6
**15** 41:22 44:11
54:15 58:10
102:14
**1500** 211:7
**156** 3:23
**16th** 128:4,9,15
129:2,8 131:23
132:5 134:4
135:24 143:11
**17** 95:19 96:3
148:20 153:4,19
177:10
**17,000** 210:20
**179** 4:1
**18** 100:10 152:17
173:15 216:16
**18,500** 211:5
**184** 4:3
**188** 4:5
**18th** 156:17
**19** 36:1,10 105:5
130:23,24 163:4
190:10 211:11
**196** 4:7
**19th** 169:7 221:23
223:1

**2**

**2** 3:2,13 74:24
82:16 85:21
107:19,19,25
112:3 120:16,17
157:25,25 206:10
**2-20** 190:10
**2-20-20** 190:10
**2:00** 1:24
**20** 23:8 31:2 32:7
34:3 41:7 44:11
54:15 55:17 58:10
153:10 154:10
162:5 168:4
193:25 199:9
217:23
**200** 214:4
**2002** 216:12

**2004** 214:13 216:11
**2007** 214:25
**201** 4:9
**2013** 93:5
**2018** 7:15 36:19
37:4 98:23 99:13
104:3,4 149:20
151:7,13,22 160:1
160:21 172:21
216:12
**2019** 6:25 7:1,7,11
8:19,24 10:3
11:15 12:3,9
18:12 25:9,18,21
29:11 30:10,19
31:2,8 32:7,18
34:14 36:1,11
37:6 38:15,22
39:20 63:11 67:16
73:2 99:15 100:1
102:1 104:1 107:1
112:15 113:17
114:2 117:7 119:2
119:2 120:19
121:4,25 125:7
126:9 127:2,20
128:9,15 130:16
131:23 132:1
134:5 135:19
139:12 143:6,11
145:11 148:16
151:2,7 155:5,12
156:6 157:22
158:6 160:22
161:19 163:9
167:15 168:4
169:7 173:17
177:11 211:15
**2020** 8:5 128:20,23
129:3,4,8,14,19
129:25 130:6
156:1,17 157:11
159:6 161:3 163:3
163:4,6,23 178:16
179:9,14 181:7,20
182:4,25 184:9,13

186:6 189:21
190:16 195:12
196:18 197:14,14
200:19
**2021** 1:13,23 6:2
177:24 178:17
195:14 201:11,24
202:10 204:14
205:5 206:14
207:13 208:14
221:13,23,25
223:2 224:5
**2021-29362** 1:1
221:1
**203** 222:23 224:1
**203.3** 224:14
**207** 4:11
**20th** 8:19,24 10:3
12:2,9 18:11 25:9
25:19 30:10,19
31:8 32:18 34:14
37:6 38:22 39:20
63:11 67:16 73:2
99:15 102:1
112:15 113:17
114:2 121:4,25
132:1 135:19
151:7 160:21
161:19 167:15
211:14
**21** 105:5 107:1
**210** 223:8 225:7
**211** 148:7
**215** 7:4
**219** 3:6
**21st** 53:13 113:17
121:4 135:19
181:20 211:15
**22** 212:20
**22,860** 209:12
**221** 3:7
**23** 212:20
**23,000** 208:24
**237** 148:8
**24** 29:20 143:20
**25** 154:10

**2500** 144:20
**26** 149:20
**26th** 151:6
**27** 34:20 114:1
**27-** 34:16
**28** 30:14 34:20
114:2 120:19
**28-day** 34:16
**280** 186:4
**282** 186:4
**283** 186:4
**2900** 5:8 222:14
**2nd** 196:18 197:14
197:25 198:16
200:12,19 201:16

**3**

**3** 3:15 109:3 110:25
126:3,5 131:9
139:6 206:12
207:23 216:12,17
**3/4** 123:24
**3:00** 60:14,23
**30** 41:22 143:6
190:18 195:17
202:11
**30-** 205:13
**300** 95:22 214:3,5
217:12
**30th** 127:2,20 131:7
139:11 155:12
**3401** 2:2 5:3 222:9
**35** 190:18 195:17
**35-minute** 205:14

**4**

**4** 3:17 109:22 133:4
135:3 143:10
156:16 158:8
204:22 206:14
**4,360** 211:3
**4:00** 77:7
**40** 87:11 197:7
**4C** 158:12
**4th** 189:21 190:16
195:12 197:12,13

197:14 198:3
201:10,23 202:10
204:10 205:5

**5**

**5** 3:3,19 74:20,21
85:20 107:15
108:4 139:7,10
143:15
**5,000** 216:2
**500** 217:21,22
**524** 6:16

**6**

**6** 3:5,21 148:3,5
177:9 186:6
**6:00** 28:23,24,24,25
28:25 29:15,18,24
29:25 30:12 43:11
43:11,17,18,24
61:4 62:22,24
64:22 65:23,25
67:3 73:1 74:1
107:1 133:2
**60** 144:3,19 155:15
**618** 216:2,3
**6462** 223:6 225:5

**7**

**7** 3:23 156:9,11
157:3
**70** 101:23
**713-437-1800** 5:9
222:15
**713-571-1146** 5:4
222:10
**77002** 5:8 222:14
**77019** 5:4 222:10
**77040** 223:8 225:7

**8**

**8** 4:1 179:4,6
**80** 217:13
**80,000** 101:23
**811** 5:8 222:14
**825** 211:24 212:6
213:12,21

Patricia Diana Ormond

Pages

[Page 254]

**841** 109:2
**869** 111:18
**888-893-3767** 223:9
  225:8

---

**9**

**9** 4:3 184:8 186:3
**9:36** 1:24 6:3
**90** 100:21 101:3
**93** 100:11,21
**95** 223:7 225:6
**965** 104:11
**9th** 221:25 224:5

**Exhibit 2**

**Deposition transcript of Nicholas Brian Vandergriff
taken on January 25, 2022**

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

## [Page 1]

Cause No. 2021-29362

PATRICIA ORMOND,                    * IN THE DISTRICT COURT OF
                                    *
        Plaintiff,                  *
                                    *
V.                                  * HARRIS COUNTY, TEXAS
                                    *
DIAMOND OFFSHORE                    *
MANAGEMENT COMPANY;                 *
DIAMOND OFFSHORE LIMITED; and       *
DIAMOND OFFSHORE COMPANY            *
                                    *
        Defendants.                 * 127th JUDICIAL DISTRICT

_____

VIDEOTAPED/ORAL DEPOSITION OF

NICHOLAS BRIAN VANDERGRIFF

January 25, 2022

(via Zoom)

_____

        VIDEOTAPED/ORAL DEPOSITION of NICHOLAS BRIAN
VANDERGRIFF, produced as a witness at the instance of
the Plaintiff, and duly sworn, was taken in the
above-styled and numbered cause on the 25th day of
January, 2022, from 8:33 a.m. to 9:34 a.m., before Lydia
L. Fleming, CSR in and for the State of Texas, reported
by machine shorthand, in Zoom Cloud Meetings, pursuant
to the Texas Rules of Civil Procedure.

## [Page 2]

A P P E A R A N C E S

FOR THE PLAINTIFF:
DOYLE DENNIS LLP
By: Mr. Michael Patrick Doyle
The Clocktower Building
3401 Allen Parkway
Suite 100
Houston, Texas  77016
713.571.1146
713.571.1148 Fax
mdoyle@doylelawfirm.com

FOR THE DEFENDANTS:
JONES WALKER LLP
By: Mr. Patrick J. Fackrell
811 Main Street
Suite 2900
Houston, Texas  77002
713.437.1800
713.437.1810 Fax
pfackrell@joneswalker.com

ALSO PRESENT:

Patricia Ormond
Harold Mullins, Videographer

## [Page 3]

T A B L E   O F   C O N T E N T S

APPEARANCES  ...............................  2

STIPULATIONS  ..............................  1

NICHOLAS BRIAN VANDERGRIFF
   Examination by Mr. Doyle .................  5
CHANGES AND SIGNATURE PAGE ...................  47
REPORTER'S CERTIFICATE PAGE ..................  49

EXHIBIT

Ormond 2

## [Page 4]

THE VIDEOGRAPHER:  Okay.  This begins the videotaped deposition of Nick Vandergriff taken on January the 25th, 2022.  We're on the record.  The time is now 8:33 a.m., Central time.

Would counsel please introduce yourselves for the record?

MR. DOYLE:  Yeah.  Mike Doyle here for Ms. Ormond.

MR. FACKRELL:  And Pat Fackrell with Jones Walker for Diamond Offshore.

THE REPORTER:  Mr. Vandergriff, would you raise your right hand?

(At this time, the witness was placed under oath by the Court Reporter.)

THE REPORTER:  And for the record, the witness is in Houston, Texas -- you can put your hand down -- and the court reporter is in Marshall, Texas this week.

MR. FACKRELL:  Lydia, the witness is actually in Chattanooga, Tennessee.

THE REPORTER:  And the court reporter is in Marshall, Texas this week.  And would counsel like a paper or electronic copy of this deposition?

MR. DOYLE:  This is Mike Doyle, electronic .ptx only, please.

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

[Page 5]

1    MR. FACKRELL:  Electronic as well for
2  Diamond Offshore.
3    THE REPORTER:  Okay.  Mr. Doyle.
4    MS. DOYLE:  Okay.  Thank you, ma'am.
5
6    NICHOLAS BRIAN VANDERGRIFF
7  was called as a witness for the Plaintiff and, after
8  having been duly sworn to tell the truth, testified as
9  follows:
10    EXAMINATION
11  BY MR. DOYLE:
12    Q.  Tell us your name, sir.
13    A.  Nicholas Brian Vandergriff.
14    Q.  We're taking your deposition remotely while
15  you're up in Chattanooga, Tennessee?
16    A.  Yes.
17    Q.  Are you currently working in the offshore
18  industry?
19    A.  Yes.
20    Q.  Where?
21    A.  In Dekar, Senegal in Africa.
22    Q.  For?
23    A.  Diamond Offshore.
24    Q.  And you had a chance to and have a lawyer from
25  Diamond Offshore present with you in the room we're

[Page 6]

1  taking your deposition remotely from?
2    A.  Correct.
3    Q.  If for some reason, whether the fact that it's
4  remote or any other reason you don't understand one of
5  my questions or you need me to repeat it, will you
6  please tell me?
7    A.  Yes.
8    Q.  And although we're remote -- you're up in
9  Chattanooga -- you understand our judge and jury are
10  counting on you to be as truthful, same oath, as if you
11  were before them in a courtroom?
12    A.  Yes.
13    Q.  Have you had a chance to look at any documents,
14  papers, materials, texts to get ready to testify as best
15  you can today about Ms. Ormond and her legal case?
16    A.  Yes.
17    Q.  What?
18    A.  I have the exhibits that you had sent
19  Mr. Fackrell, and I looked over those this morning.  If
20  there's any one you would like to talk about, we can
21  talk about that.
22    Q.  What other documents besides the exhibits that
23  were marked in potential use of your deposition date did
24  you have a chance to review to get ready to testify?
25    A.  Ms. Ormond's -- I'm sorry.  I forget the name.

[Page 7]

1  I'm drawing a blank but the deposition.
2    Q.  So her testimony she's already given in this
3  case?
4    A.  Correct.
5    Q.  What else?
6    A.  That's it.
7    Q.  Were you actually raised up in the
8  Chattanooga-Hamilton County area?
9    A.  Yeah, yes, Ringgold, Georgia.  But that's close
10  enough.
11    Q.  Right across the border?
12    A.  Yes, sir.
13    Q.  You've worked in the offshore industry for
14  about how long?
15    A.  Offshore gas and oil for eight years -- about
16  eight years.
17    Q.  For whom in the last eight years, if anybody,
18  besides Diamond?
19    A.  Just Diamond in like oil and gas.
20    Q.  How did you get involved in working in the
21  offshore oil and gas industry?
22    A.  I used to work on merchant vessels and just saw
23  an opportunity to have a better life as far as money and
24  time off with oil and gas.  So I applied with Diamond
25  and got a job.

[Page 8]

1    Q.  How long had you worked in merchant marine, in
2  other words, non-oil-and-gas work, before you started
3  with Diamond?
4    A.  From 2005 to '14 when I started.
5    Q.  How did you get into that work?
6    A.  Well, it was actually I was going to join the
7  Navy, and my dad took me to a school to check it out
8  instead of joining the Navy.  So I just started from
9  there.
10    Q.  That school was?
11    A.  Piney Point, Paul Hall Seamanship School.
12    Q.  And when you sailed as a merchant mariner, did
13  you have a particular level that you rose to in the
14  merchant marine?
15    A.  I had made my way all the way to bosun in the
16  deck department side.
17    Q.  And generally as a bosun you would be doing
18  what in the merchant marine on a --
19    A.  So that would be --
20    Q.  -- vessel?
21    A.  -- just overseeing the -- mainly painting and
22  stuff like that, but overseeing -- the chief mate would
23  be above me and tell me what needs to be done.  And then
24  I would have an AB, an ordinary seaman.
25    Q.  While working in the last eight years for

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

[Page 9]

1   Diamond, what work have you done, what vessels?
2       A.   So the only vessels I've done -- or the only
3   vessel I have done is the Black Rhino -- the Ocean Black
4   Rhino.
5       Q.   You worked with Ms. Ormond on that vessel?
6       A.   Correct.
7       Q.   How was Ms. Ormond to work with?
8       A.   She was -- well, I had a good relationship with
9   her.
10      Q.   How was her work attitude as you saw it on the
11  vessel working for Diamond Offshore?
12      A.   She did anything she was asked.
13      Q.   Do you work in a particular department on the
14  Black Rhino?
15      A.   I work in the engineering department now.
16      Q.   And you've been working on the Black Rhino
17  engineering department for about how long?
18      A.   2019, so going on three years.  Two and a half
19  years maybe.
20      Q.   You worked there February, 2019 with
21  Ms. Ormond?
22      A.   Correct.
23      Q.   What was her role working with you in the
24  engine room February, 2019 on Diamond's vessel, Black
25  Rhino?

[Page 10]

1       A.   She was a third engineer at the time.
2       Q.   And your position February, 2019 on the Black
3   Rhino was what?
4       A.   Motorman.
5       Q.   Which in terms of kind of the chain of command,
6   where did that put you as compared to Ms. Ormond?
7       A.   At the very bottom for me and then sublevel
8   supervisory for her.
9       Q.   And then the next one up the chain of command
10  would be?
11      A.   From her?
12      Q.   The next one up the level from Ms. Ormond would
13  be who?
14      A.   So that would be the second engineer.
15      Q.   Named?
16      A.   I don't know if we had one at that time because
17  the second was still in his first.
18      Q.   There was a first engineer above that second
19  engineer level?
20      A.   On -- yes, yes.  On the tower we were working,
21  we had a first engineer with us.
22      Q.   Named?
23      A.   Matt Lucius.
24      Q.   And when you talk about tower, you're talking
25  more or less about a work shift?

[Page 11]

1       A.   Correct.
2       Q.   And you had a particular tower or work shift on
3   the Black Rhino that you worked with Mr. Lucius and
4   Ms. Ormond?
5       A.   Correct.
6       Q.   What was that work shift?
7       A.   It was 6:00 to 6:00 nights, so 1800 to 06.
8       Q.   And was it just you-all three generally working
9   that shift or tower from 6:00 p.m. until 6:00 a.m.?
10      A.   Just on that -- that particular tower, I
11  believe so, yes.
12      Q.   And generally what would be the work that you
13  under the direction of Mr. Lucius would be doing with
14  Ms. Ormond on that night shift on the vessel?
15      A.   Ranges from multiple things.
16      Q.   Such as?
17      A.   Housekeeping.  At the time, we were doing the
18  overhaul.  So we would be doing the overhaul, PMs.
19      Q.   And PMs means?
20      A.   PMs, preventative maintenance.
21      Q.   And when you say you were doing primarily
22  overhauls, what are you talking about?
23      A.   Overhauling an engine.  Once they reach a
24  certain hour, there's basically a PM as well, preventive
25  maintenance on the engine to overhaul whatever needs to

[Page 12]

1   be done as far as the hours that had accumulated.
2       Q.   And during that process, there's something
3   called lockout/tagout and sanction-to-work?
4       A.   Sanction-to-test.
5       Q.   During that process, there's something called
6   lockout/tagout process and sanction-to-test?
7       A.   Correct.
8       Q.   What is lockout/tagout process and
9   sanction-to-test as you would describe it to someone?
10      A.   It's a communications tool as far as, okay, now
11  we have locked out -- isolated a piece of equipment, and
12  then we verified that it's locked out.  Now we're going
13  to try it to make sure that this machinery doesn't run.
14      Q.   What's the purpose of lockout/tagout and the
15  sanction-to-test documentation?
16           MR. FACKRELL:  Object, form.
17      A.   So it is for communication of what we're
18  working on and also to lock something out so it doesn't
19  run while you're working on it.
20      Q.   (BY MR. DOYLE)  Why would that be a potential
21  problem?
22           MR. FACKRELL:  Object, form.
23      A.   Injury -- potential injury.
24      Q.   (BY MR. DOYLE)  How so?
25           MR. FACKRELL:  Object, form.

[3]  (Pages 9 to 12)

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

[Page 13]

1     A. Multiple -- I mean, multiple things can happen
2 on multiple equipment, right. So if machinery is
3 running, you could get caught up in machinery or
4 anything like that.
5     Q. In addition to the machinery actually running,
6 how is lockout/tagout used if you're doing work on
7 lines -- pressure lines, heated lines, oil and gas
8 lines? How is it used when you have fluids?
9     A. Very similar. You've got valves that you need
10 to close to ensure that the fluids are -- are not
11 running to where you're going -- or what you're working
12 on.
13     Q. Why would that be important?
14        MR. FACKRELL: Object, form.
15     A. It would be important for, you know, potential
16 injury or various -- just various different things.
17     Q. (BY MR. DOYLE) Well, how can locking out,
18 documenting lockout, sanction-to-test, protect against
19 the risk of fluids in the equipment?
20        MR. FACKRELL: Object, form.
21     A. Can you repeat?
22        MR. DOYLE: Sure.
23     Q. (BY MR. DOYLE) How can this lockout/tagout
24 process, including documentation in writing, protect
25 against the risk to the vessel and personnel from fluids

[Page 14]

1 on equipment you're fixing to work on?
2        MR. FACKRELL: Same objection.
3     A. It can ensure that -- you know, that the
4 equipment that you're not working on is isolated.
5     Q. (BY MR. DOYLE) How?
6        MR. FACKRELL: Object, form.
7     A. Meaning that the steps in place by Diamond's
8 policy and procedures -- it lists that multiple,
9 different layers of -- we're going to isolate this and
10 verify it in isolation and then go to work.
11     Q. (BY MR. DOYLE) Did you as a motorman have any
12 particular role in the lockout/tagout or
13 sanction-to-test documentation in February, 2019 on the
14 Black Rhino?
15     A. Not to my knowledge.
16     Q. In the engine room night tower, who was the
17 engineer responsible for ensuring the lockout/tagout
18 documentation and process was consistently followed?
19        MR. FACKRELL: Object, form.
20     A. That would be Ms. Ormond.
21     Q. (BY MR. DOYLE) Who else?
22        MR. FACKRELL: Object, form.
23     A. Matt Lucius.
24     Q. (BY MR. DOYLE) You mentioned Ms. Ormond first.
25 Was she generally the person who was actually in

[Page 15]

1 practice responsible for lockout/tagout documentation?
2     A. It could be a multiple amount of people, but on
3 that night, she was PIC and in charge.
4     Q. You said "that night." What night are you
5 referring to?
6     A. I assume the night we're talking about, the
7 reason why we're giving a deposition.
8     Q. What happened that night that you remember?
9     A. HT water inlet pipe got open, and there was
10 water.
11     Q. Well, water doing what?
12     A. Coming out of the cylinder head.
13     Q. What kind of water?
14     A. HT water, high-temp water.
15     Q. "High-temp" meaning above what temperature are
16 we talking?
17     A. I'm not a hundred percent certain, 130,
18 something like that. I'm not sure, though.
19     Q. Potentially dangerous if you get it on you?
20        MR. FACKRELL: Object, form.
21     A. Yes.
22     Q. (BY MR. DOYLE) Tell us what happened in this
23 incident involving a release of high temperature water
24 involving Ms. Ormond that we're here on.
25     A. So there's a jacket water inlet pipe that

[Page 16]

1 connects head to head. And the pipe got pulled out by
2 Ms. Ormond, and water sprayed up. And the engine was
3 isolated and --
4     Q. What else happened to Ms. Ormond?
5     A. She got some water to the chest and face.
6     Q. And when she started getting water on her chest
7 and face in this incident you recall, what did she do?
8     A. She actually froze. And I had jumped up on the
9 catwalk and looked down, and I still saw her. So I
10 started yelling at her to get her to move, and at that
11 time, she had moved.
12     Q. How so? How did she move? What did you see
13 actually happened after she got hit with this water and
14 you yelled at her?
15     A. At that --
16        MR. FACKRELL: Object, form.
17     A. Okay. At that point, she got up, went a few
18 steps back and got up on the catwalk.
19     Q. (BY MR. DOYLE) And when you saw her in this
20 action, was she moving fast after getting struck by hot
21 water?
22     A. Honestly I don't recall like how fast she was
23 moving. But, like I said, the initial process, it was
24 almost like she had froze, and it wasn't until I started
25 yelling at her that she moved.

[4] (Pages 13 to 16)

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

[Page 17]

1    Q.   And when you say you honestly don't remember
2  how fast she was moving after she got struck by this
3  released high temperature water, is that your best
4  statement under oath, you just have no clue how fast she
5  moved?
6    A.   I have no --
7        MR. FACKRELL:  Object, form.
8    A.   I have no clue how fast she was moving.
9    Q.   (BY MR. DOYLE)  Okay.  So what stands out is,
10  she gets struck by this high temperature water that's
11  absolutely positively capable of causing injury.  Any
12  doubt about that?
13        MR. FACKRELL:  Object, form.
14    A.   No.
15    Q.   (BY MR. DOYLE)  And as she's struck by this hot
16  water coming out of the high temperature pipe, the first
17  thing you recall was seeing her what appeared to be
18  frozen at least for some period of time?
19    A.   Yes.
20    Q.   Now, when you say "frozen," are we talking she
21  sat there for five minutes with this high temperature
22  water sitting on her or something a lot less?
23    A.   I'm not -- I'm not sure of the timeline.
24    Q.   Very short time period that she sat there --
25    A.   I'm not --

[Page 18]

1    Q.   -- before getting out?
2    A.   I'm not sure of the time line.
3    Q.   So when you say you remember her frozen as the
4  high temperature is hitting her, is it also absolutely,
5  positively no recollection for how long you're saying she
6  was frozen with this high water temperature hitting her?
7        MR. FACKRELL:  Object, form.
8    A.   I'm not sure how long she was frozen.
9    Q.   (BY MR. DOYLE)  No recollection?
10    A.   No recollection.
11    Q.   And then as I've already -- or you've already
12  told us, zero recollection of how fast she was moving
13  after she started moving, getting struck by the high
14  water -- high temperature?
15    A.   That is correct.
16    Q.   Then you eventually saw her some period of
17  time -- don't know how long -- after getting struck by
18  the high water temperature release sitting up on a
19  catwalk?
20    A.   Yes.  She did get up on the catwalk.
21    Q.   And from where she was hit by the high
22  temperature release till the catwalk, how did she get
23  there?
24    A.   She had climbed up there.
25    Q.   And I think I already know the answer to this.

[Page 19]

1  How fast or how abruptly she was climbing up there, you
2  have zero recollection?
3    A.   Zero recollection.
4    Q.   And then she gets up eventually to the catwalk.
5  How was she on the catwalk?  In other words, how was she
6  positioned?
7    A.   Standing up.
8    Q.   Did she say anything?
9    A.   Not to my knowledge, no, no recollection.  I
10  don't know.
11    Q.   Well, what I'm getting is, did you hear her
12  yelling or at least some indication of surprise or pain
13  or anything at all, or is that all a black hole?
14    A.   I don't recall, yeah.  There was so much that
15  happened.  It was --
16    Q.   Just zero recollection?
17    A.   Zero recollection.
18    Q.   Did you go over to her to help her out?
19    A.   Yes.
20    Q.   Who else was present in the engine room while
21  all of this was going on, this incident that you recall?
22    A.   A third-party hand, Pedro Chavez.
23    Q.   And when you say "third-party hand," he was
24  working for a company besides Diamond Offshore?
25    A.   Correct.

[Page 20]

1    Q.   Do you remember what company Mr. Chavez was
2  working for?
3    A.   HHI.
4    Q.   Able to tell us what that stands for?
5    A.   I don't know.
6    Q.   What was Mr. Chavez doing as a third-party
7  contractor while this was going on?
8    A.   He was there to work on the overhauls.
9    Q.   I apologize.  It was kind of a little garbled.
10  He was there to work on what, sir?
11    A.   The overhauls, the services on the engine.
12    Q.   Was he working on the same task as you and
13  Ms. Ormond, or was he doing something different?
14    A.   Different.
15    Q.   What task was he working on that was different
16  from the one you and Ms. Ormond were working on?
17    A.   Not a hundred percent, but I believe it was the
18  fuel rails.
19    Q.   About how far was the project that you were
20  working on when this incident happened was Mr. Chavez?
21    A.   Maybe five feet.
22    Q.   Did Mr. Chavez tend to Ms. Ormond after you saw
23  this incident?
24    A.   I don't recall.
25    Q.   Did you see where he was after Ms. Ormond made

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

[Page 21]

1    it up to the catwalk?
2        A.  No.
3        Q.  And where Ms. Ormond started to where she ended
4    up on the catwalk, about how far a distance are we
5    talking?
6        A.  Maybe five feet of height.  And I'm not sure of
7    the distance of where she started.
8        Q.  Can you estimate at all?
9        A.  No.
10       Q.  So it's five feet higher.  And was she actually
11   standing on what when the high temperature water struck
12   her in her face and chest?  Am I saying that right?
13           MR. FACKRELL:  Object, form.
14       A.  Yes.
15       Q.  (BY MR. DOYLE)  How -- what was she actually
16   standing on when this high temperature water struck her
17   in the face and chest?
18       A.  She was standing on the cylinder head.
19       Q.  And the cylinder head is about how large?
20       A.  Let's call it three feet by five feet maybe.
21       Q.  And as she's standing on it and the high
22   temperature water struck her in the face and chest, how
23   was she positioned?  In other words, was she standing
24   up?  Was she sitting down?  Was she crouching?  What was
25   her position?

[Page 22]

1        A.  I'm not sure.
2        Q.  Do you have any recollection at all?
3        A.  I -- I feel like she may have been sitting when
4    she was prying the thing open, but under oath I can't
5    give you a hundred percent answer.
6        Q.  What you're saying is, just to do what she was
7    trying to do, undoing the piping, generally that would
8    require you to be seated or crouching.  Am I saying that
9    correctly?
10       A.  You don't have to, but it's way more
11   comfortable.
12       Q.  But because a lot of this -- to be fair, I
13   think you're saying -- is it -- is it best to say it's
14   foggy or just unclear in your recollection?  What would
15   be your best words to use?
16       A.  Can you repeat?
17       Q.  Sure.  This particular incident, parts of it
18   seem to be very clear.  Am I saying that correctly?
19       A.  Yes.  The incident in itself, yes.
20       Q.  And is there a particular reason why at least
21   parts of what happened to Ms. Ormond that night are
22   clear in your mind?
23           MR. FACKRELL:  Object, form.
24       A.  I would say that, I mean, the memory of -- of
25   seeing it happen, but other than that, everything

[Page 23]

1    happened so fast.  And, you know, the initial "Oh,
2    crap!" factor would take a lot of the outside things
3    away.
4        Q.  (BY MR. DOYLE)  And when you say "outside
5    things," that's like the distances, how fast she moved,
6    that kind of stuff?  Those would be the outside things
7    you've told us, no recollection?
8        A.  Correct.  So, I mean, at that point in time,
9    you know, my -- my biggest concern is her safety, right,
10   getting -- getting up on the catwalk and seeing this
11   water spraying and seeing her there.  And that was my
12   concern of getting her out of the way.
13       Q.  How come?
14       A.  Because she was getting hit with HT water.
15       Q.  Which you knew could do what to her?
16       A.  It could --
17           MR. FACKRELL:  Object, form.
18       A.  It could potentially burn her.
19       Q.  (BY MR. DOYLE)  Did you tend to her as she was
20   up on the walk at least five feet up from where she
21   started?
22       A.  I asked her how she was, if she was okay.
23       Q.  What did she tell you?
24       A.  At that point, she didn't really say anything.
25       Q.  You've heard the saying somebody "appeared to

[Page 24]

1    be in shock"?
2        A.  Yes.
3        Q.  Is that what Ms. Ormond appeared to be?
4        A.  Yes.
5        Q.  Where was Mr. Lucius, the second -- or I'm
6    sorry -- the first engineer that tower, when this all
7    happened?
8        A.  In the ECR.
9        Q.  Which is stands for what?
10       A.  The engine control room.
11       Q.  Distance approximately from where this cylinder
12   block was you-all were working on was how far?
13       A.  Not sure.
14       Q.  Best estimate?
15       A.  30 feet.
16       Q.  Noise:  Was there operating equipment?  Were
17   you-all wearing hearing protection?  What was it
18   sounding like when this all happened?
19       A.  Yes.  We had hearing protection on, and there
20   was probably two engines running.
21       Q.  Which meant loud?
22       A.  Loud.
23       Q.  This particular task, working on the cylinder
24   block, how did you two get assigned it?
25       A.  We had got assigned by Matt Lucius.

[6]  (Pages 21 to 24)

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

[Page 25]

1    Q.  When that tower?
2    A.  I'm not sure of what -- what time, but before
3  we started the task.
4    Q.  So sometime after you-all started work at
5  6:00 p.m.?
6    A.  Yes.
7    Q.  And generally what was the task that you and
8  Ms. Ormond were assigned to do by Mr. Lucius?
9    A.  It would be to prepare the head to be removed.
10    Q.  Do you remember generally what was the purpose
11  of removing the head on the cylinder?
12    A.  I believe it was for -- we had a leak -- an HT
13  leak in a cylinder.  So we had to pull the head to check
14  the O-ring.
15    Q.  This assignment, was it just you-all two or was
16  anybody else assigned to assist in that work?
17    A.  I don't recall.
18    Q.  And this assignment, was it given with any
19  documentation such as a lockout/tagout form?
20    A.  Yes.  We had a permit and lockout/tagout form.
21    Q.  Who gave you the permit, lockout/tagout form?
22    A.  No one gave me the lockout/tagout form.
23    Q.  Who gave you and Ms. Ormond a lockout/tagout
24  form?
25    A.  No one gave me a lockout/tagout form.

[Page 26]

1    Q.  When you say no one gave you, did you have some
2  responsibility to ensure before you got involved in the
3  work that there was a lockout/tagout documentation for
4  that cylinder in a high temperature line?
5    A.  I believe everybody that worked there had that
6  responsibility.
7    Q.  Including you?
8    A.  Correct.
9    Q.  So what, if anything, do you recall about how
10  you fulfilled that responsibility to ensure there was a
11  lockout/tagout documentation before that work started?
12    A.  Can you repeat?
13    Q.  Yes, sir.  You've told us everyone, including
14  you, had a responsibility.  How did you actually make
15  sure there was lockout/tagout documentation before the
16  work started in which you saw this incident involving
17  Ms. Ormond?
18    A.  I don't recall.
19    Q.  What were you supposed to do?
20    A.  Visually --
21        MR. FACKRELL:  Object, form.
22    A.  Visually check the valve.
23    Q.  (BY MR. DOYLE)  When you say "visually check
24  the valve," what are you talking about?
25    A.  Including my eyes to ensure that it was locked

[Page 27]

1  out.
2    Q.  And what were you looking to see to ensure it
3  was properly locked out/tagged out?
4    A.  It would be do you see the tag and is it locked
5  out, or is it -- the valve closed.
6    Q.  Do you recall whether there was a lockout tag
7  before the work started?
8    A.  No.
9    Q.  Mr. Lucius, when he assigned this task, did he
10  have some responsibility to ensure there was a
11  lockout/tagout documentation before the work got
12  started?
13    A.  If he was the area supervisor, yes.
14    Q.  Was he?
15    A.  I'm not sure.
16    Q.  Well, if it wasn't Mr. Lucius that night tower,
17  who would it be?
18    A.  It could have been Blake Clodfelter.
19    Q.  Now, what's the area supervisor supposed to do
20  under Diamond Offshore's own rules to ensure there's
21  proper lockout/tagout documentation in place before work
22  starts on equipment?
23        MR. FACKRELL:  Object, form.
24    A.  To visually inspect the area to make sure that
25  it is safe to work.

[Page 28]

1    Q.  (BY MR. DOYLE)  Did Mr. Lucius or any other
2  person -- area supervisor actually do that before you
3  and Ms. Ormond started the work?
4    A.  I don't recall.
5    Q.  Should they have -- or he have?
6        MR. FACKRELL:  Object, form.
7    A.  Yes.
8    Q.  (BY MR. DOYLE)  Because?
9        MR. FACKRELL:  Object, form.
10    A.  Because they are the area supervisor to ensure
11  the area is safe.
12    Q.  (BY MR. DOYLE)  Starting work on equipment
13  before all documentation is completed, is that ever
14  supposed to happen on a Diamond Offshore engine room
15  work?
16        MR. FACKRELL:  Object, form.
17    A.  No.
18    Q.  (BY MR. DOYLE)  Has it?
19        MR. FACKRELL:  Object, form.
20    A.  In this incident, yes.
21    Q.  (BY MR. DOYLE)  Mr. Lucius, do you recall how
22  he gave this assignment and what he said about when to
23  start it talking to you and Ms. Ormond?
24    A.  I don't recall.
25    Q.  Do you recall Mr. Lucius during his time as a

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

[Page 29]

1  supervisor ever instructing you and Ms. Ormond to get
2  started on the equipment before we finish completely the
3  lockout/tagout documentation?
4      A.  No.
5          MR. FACKRELL:  Object, form.
6      Q.  (BY MR. DOYLE)  I apologize, sir, and you're
7  doing fine.  You're doing nothing wrong.  Neither is
8  Mr. Fackrell.  But I think it got kind of caught up.  So
9  if you can just pause a little bit so that we don't have
10 you both talking, it will work really well for our court
11 reporter and our video, and only because of that, I'm
12 going to ask you the question again.
13         Do you recall Mr. Lucius, supervisor in
14 the engine room, telling you or Ms. Ormond to start work
15 on equipment before the lockout/tagout process
16 documentation is fully completed?
17         MR. FACKRELL:  Same objection.
18     A.  No.
19     Q.  (BY MR. DOYLE)  So what you're telling us is,
20 from the entire time you worked with Mr. Lucius,
21 absolutely, positively no recollection of him ordering
22 anyone to start work on equipment before the
23 lockout/tagout process is fully completed?
24         MR. FACKRELL:  Same objection.
25     A.  No.

[Page 30]

1      Q.  (BY MR. DOYLE)  Now, you are aware from your
2  training that the lockout/tagout documentation actually
3  follows very specific rules, aren't you?
4      A.  Yes.
5      Q.  And you could actually, at least if it's done
6  properly, go back and trace lockout/tagout times and
7  connect it to a particular sanction-to-test, can't you?
8      A.  Yes.
9      Q.  And if it's all done properly, it all ought to
10 line up right, wouldn't it?
11         MR. FACKRELL:  Object, form.
12     A.  Yes.
13     Q.  (BY MR. DOYLE)  So, for example, if you have a
14 sanction-to-test document, that's generated for what
15 purpose?
16         MR. FACKRELL:  Same objection.
17     A.  To deisolate a piece of equipment that you're
18 working on to test for leaks or whatever it may be.
19     Q.  (BY MR. DOYLE)  And in the chain of how the
20 documentation is created, the sanction-to-test is
21 created, generated, signed off on before or after
22 lockout/tagout?
23     A.  After.
24     Q.  Always?
25     A.  Yes.

[Page 31]

1          MR. FACKRELL:  Object, form.
2      Q.  (BY MR. DOYLE)  And if the lockout/tagout and
3  sanction-to-test process is properly followed, are there
4  always supposed to be lockout/tagout connected to every
5  single sanction-to-test by documentation number?
6          MR. FACKRELL:  Same objection.
7      A.  I believe so.
8      Q.  (BY MR. DOYLE)  You actually got some training
9  in this lockout/tagout/sanction-to-test process, haven't
10 you?
11     A.  Yes.
12     Q.  Describe it, please.
13     A.  It is a computer-based course program, I guess
14 you could say, that has tests throughout, testing your
15 knowledge going through.
16     Q.  How often do you go through this course on the
17 lockout/tagout/sanction-to-test documentation safety
18 process?
19     A.  Annually.
20         MR. FACKRELL:  Can we get a five-minute
21 break -- restroom break?
22         MR. DOYLE:  Yeah, of course.
23         MR. FACKRELL:  Okay.
24         MS. DOYLE:  One last question, if you
25 don't mind.

[Page 32]

1          MR. FACKRELL:  Sure.  Sure.
2      Q.  (BY MR. DOYLE)  Which means you've taken that
3  course, learned how to do this about how many times?
4      A.  I would say roughly eight -- seven or eight.
5          MR. DOYLE:  Perfect.  Let's take a break,
6  sir.
7          MR. FACKRELL:  All right.
8          THE VIDEOGRAPHER:  We are off the record.
9  The time is 9:07 a.m.
10         (BRIEF RECESS)
11         THE VIDEOGRAPHER:  We are back on the
12 record.  The time is 9:13 a.m.
13     Q.  (BY MR. DOYLE)  This incident February, 2019
14 that you've shared with us, was there an injury or
15 incident report?
16     A.  No.
17     Q.  Should there have been?
18     A.  Not if there wasn't an injury, no.
19     Q.  Near miss, was that something that you believe
20 needed to be documented?
21     A.  Yes, yes, if it were reported.
22     Q.  When you say if it was recorded, what do you
23 mean?
24     A.  Reported, if it was reported.
25     Q.  So I'm going to ask you that again.  Should

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

[Page 33]

1  this incident have been reported?
2      A.  I mean, kind of subjective, I guess.  It wasn't
3  reported because Ms. Ormond didn't want to report it,
4  and I went with her wishes of not reporting it.
5      Q.  Did she tell you why she didn't want to report
6  it?
7      A.  No.
8      Q.  Did you have a reason to understand from the
9  way it worked at Diamond Offshore why she wouldn't want
10  to report it?
11      MR. FACKRELL:  Object, form.
12      A.  No.
13      Q.  (BY MR. DOYLE)  Well, what might happen if an
14  incident like this gets reported that you were aware of,
15  having worked for Diamond Offshore?
16      MR. FACKRELL:  Object, form.
17      A.  It would be investigated.
18      Q.  (BY MR. DOYLE)  And potentially what?
19      MR. FACKRELL:  Object, form.
20      A.  I'm not sure.
21      Q.  (BY MR. DOYLE)  All right.  Potentially cause
22  someone to get into trouble?
23      MR. FACKRELL:  Same objection.
24      A.  It might.  I'm not sure.  I don't know how
25  Diamond would handle it.

[Page 34]

1      Q.  (BY MR. DOYLE)  As far as Mr. Lucius, did he
2  become aware of what happened?
3      MR. FACKRELL:  Same objection.
4      A.  I can assume.
5      Q.  (BY MR. DOYLE)  Well, did you talk with
6  Mr. Lucius that night about what had happened to your
7  coworker, Ms. Ormond?
8      A.  No.
9      Q.  Did you get some indication from either things
10  he said or how he acted that he had learned about the
11  incident?
12      A.  No.  But, I mean, I do know that they were with
13  each other in the engine control room, the ECR.  So --
14  and, like I said, I can assume, but I can't --
15      Q.  (BY MR. DOYLE)  Well, when you say they were
16  together, right after the incident she went up to the
17  engine control room where Mr. Lucius was?
18      A.  Correct.
19      Q.  And she was at least initially in shock.
20  You've already shared that with us?
21      A.  Possibly, yes.
22      Q.  And then you saw her go up to the engine
23  room -- control room?
24      A.  Correct.
25      Q.  Right away?

[Page 35]

1      A.  Short period, yeah.
2      Q.  And was she in the control room right after
3  this incident with the supervisor on duty for a period
4  of time?
5      A.  Yes.
6      Q.  Best estimate how long right after this
7  incident she goes up to the engine control room to talk
8  with Mr. Lucius, the supervisor?
9      A.  I'm -- I'm not sure.  So I had walked in and
10  actually walked out.
11      Q.  Why?
12      A.  Just kind of, you know, my own personal shock
13  of what just happened and, not really understanding,
14  being new in the engine room, just kind of went out and
15  cleared my mind as well.
16      Q.  So you're saying after watching this happen to
17  Ms. Ormond you felt in shock, too?
18      A.  In shock that it happened, yes, or -- yes, but
19  I wouldn't say like physical like shock.  Like you see
20  something happen and, you know --
21      Q.  And I guess when you're saying you're in shock
22  you weren't like a wound you were about to bleed out,
23  but you were shocked by this incident?
24      A.  Yes.
25      Q.  And you actually walked into the engine control

[Page 36]

1  room and then literally turned around and walked right
2  out when you saw Ms. Ormond talking with Mr. Lucius?
3      A.  I'm not sure of the timeline, but, yes, I
4  wasn't in there long.
5      Q.  Any doubt that right after this incident you
6  saw Ms. Ormond go right up to her supervisor and talk
7  with him in the control room?
8      A.  I wouldn't say directly up to him, but, yes, I
9  mean, that's how it happened.
10      Q.  Well, when you say you wouldn't say directly --
11      A.  Well, I mean it's not -- I don't believe that
12  she approached him.  She was kind of getting paper
13  towels and stuff on her face.
14      Q.  And when you walked in and then turned right
15  around, because you've shared with us you felt you were
16  in shock, did you see them talking?
17      A.  Yes.  They were over there saying something.
18      Q.  Couldn't hear a word?
19      A.  No.
20      Q.  She was wet from the high temperature water
21  spraying her, wasn't she?
22      A.  I believe so.  She would have to be.
23      Q.  Well, you saw her with paper towels?
24      A.  To cool her face off.
25      Q.  And did you see her with paper towels as she's

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

[Page 37]

1  talking to her supervisor, Matt Lucius?
2      A.  Yes.
3      Q.  Any doubt in your mind that Matt Lucius saw his
4  employee, Ms. Ormond, with paper towels obviously wet
5  from something in the control room?
6          MR. FACKRELL:  Object, form.
7      A.  I can't assume what Matt Lucius thought or did.
8      Q.  (BY MR. DOYLE)  Well, here's what I'm getting
9  at:  You saw him looking right at her as she's got paper
10  towels with this high temperature water being dried off.
11  Any doubt that picture happened as you saw it with your
12  own eyes?
13      A.  No.
14      Q.  Best estimate, if you can, how long Ms. Ormond
15  spent face to face after this incident in the engine
16  control room with Mr. Lucius?
17      A.  As I said, I don't know as I didn't stay in
18  there.
19      Q.  Did Ms. Ormond ever go back to work that
20  evening, that tower?
21      A.  I believe so.
22      Q.  Doing what?
23      A.  Not sure.
24      Q.  At some point in time after this incident, did
25  Ms. Ormond share with you that her back was hurting?

[Page 38]

1      A.  No, not from -- not from that night.
2      Q.  Well, when you say "not from that night," any
3  doubt at some point after this incident Ms. Ormond
4  shared her back was hurting?
5      A.  After this incident, yes.
6      Q.  About how long after this -- is it fair to call
7  it a shocking incident?
8          MR. FACKRELL:  Object, form.
9      A.  I'm not sure how long it was.
10      Q.  (BY MR. DOYLE)  Do you have any recollection
11  whether it was within a day, a week, two weeks, a month
12  at all, the period of time after this incident, that you
13  recall Ms. Ormond saying "My back is hurting"?
14      A.  So it would be -- it would have to be months,
15  or at least a month.
16      Q.  When you say "at least a month," why do you say
17  that?
18      A.  Well, just due to the work environment and the
19  schedule that we have.  So I was on a three-on/three-off
20  schedule.  She was on a 28 and 28.  And so it would be a
21  period of time where I didn't see her.
22      Q.  What you're saying is, at some point shortly
23  after this incident you were off the rig?
24      A.  Correct.
25      Q.  And then you came back on?

[Page 39]

1      A.  Correct.
2      Q.  So at some point, you weren't even around her
3  to see how she was doing right after the incident.  Is
4  that a fair statement?
5      A.  Yes.
6      Q.  And then when you came back at some point,
7  that's when you recall Ms. Ormond saying "My back is
8  hurting"?
9          MR. FACKRELL:  Object, form.
10      A.  Yes.  I could -- I could see her back was
11  hurting at some point.
12      Q.  (BY MR. DOYLE)  When you say you "could see her
13  back was hurting," what do you recall actually seeing?
14      A.  I could see her in physical pain.
15      Q.  Was it reflected kind of in her face, so to
16  speak?
17      A.  Yes.
18      Q.  Did you believe she was exaggerating or making
19  up pain?
20      A.  Never once.
21      Q.  Because?
22      A.  She's tough.
23          MR. FACKRELL:  Object, form.
24      A.  She's tough.
25      Q.  (BY MR. DOYLE)  Now, up until this incident

[Page 40]

1  with the hot water spraying her moving at some speed,
2  had you ever seen her have any physical difficulties or
3  show pain at all?
4      A.  Not that I can recall.
5      Q.  Up until this point, if we're talking about
6  the picture of how she was physically as a coworker, a
7  woman out there, what's the picture you can share with
8  her all the way up until this incident watching her?
9      A.  She was good at what she did.
10      Q.  Physically fit and able to do her job?
11      A.  Yes.
12      Q.  And then after this incident, you recall coming
13  back and she was different?
14      A.  I mean, honestly I can't -- I feel like we're
15  kind of splitting hairs here, but there is a point where
16  she wasn't physically okay.  I'm not sure at what point
17  that was.
18      Q.  Are you able this point -- and I guess if we
19  need to we can split hairs if you want to or need to.
20  At what point is your best recollection of the length of
21  time from this incident until you noticed things had
22  changed?
23      A.  I can't recall.
24      Q.  Is that basically a black hole?  You just have
25  zero recollection of how long or short that -- the

[10]  (Pages 37 to 40)

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

[Page 41]

1  incident and you saw things change?
2      A.  No, sir.  I mean, I could probably make a
3  guess.  But I'm under oath, and I only want to speak
4  what I know to be true.
5      Q.  Fair enough.  So unless you're absolutely
6  guessing, you don't feel you're able to give us a fully
7  truthful, sworn answer to how long or how short this
8  incident and you noticed her different?
9      A.  That's correct.
10         MR. FACKRELL:  Object, form.
11      A.  I can't recall of the timeline.
12      Q.  (BY MR. DOYLE)  Did you ever at any point get
13  asked by the area supervisor, Mr. Lucius, anything at
14  all about what had happened in this incident that you
15  were watching occur to Ms. Ormond?
16      A.  I don't recall.  I don't believe so.
17      Q.  You hesitated a little.  Is there a reason?
18      A.  No, because I was just thinking like it was
19  just kind of unspoken.  Nobody really talked about it.
20      Q.  When you say "it was unspoken," what do you
21  mean?
22      A.  So for me I'm big on I don't put anybody's
23  business out there.  So just the trust of Patricia that
24  me and her had, I just didn't speak of it.
25      Q.  So something that you had saw happen -- saw

[Page 42]

1  happened to her, but didn't speak to it after?
2         MR. FACKRELL:  Object, form.
3      A.  Yes.
4      Q.  (BY MR. DOYLE)  But it's not like it -- that
5  the fact that you didn't speak about it erased what you
6  saw happen to her?
7         MR. FACKRELL:  Same objection.
8      A.  No.  Nothing erased.
9      Q.  (BY MR. DOYLE)  Did Ms. Ormond when she -- from
10  your eyes was physically having pain and problems with
11  her back, did she in any way tell you how it had
12  happened at any possible situation besides this incident
13  you had seen but didn't talk about?
14         MR. FACKRELL:  Same objection.
15      A.  Not that I recall.
16      Q.  (BY MR. DOYLE)  And here's what I'm getting at:
17  You had seen this incident with your own eyes.  You had
18  seen what had happened to her.  You had seen her talking
19  to her supervisor, Mr. Lucius.  After that it was
20  something you knew about but nobody talked about?
21      A.  Yes.
22      Q.  But it wasn't like she ever came and said,
23  "Hey, you know, I was doing something off duty" or "had
24  an accident" or "had a car wreck?"  She never came in
25  and said, "Hey, I'm hurting" because of something

[Page 43]

1  besides this accident?  That never happened.  Am I
2  saying that correctly?
3      A.  Yes.
4      Q.  When was the first time you can recollect ever
5  being asked by Diamond employees about this incident?
6      A.  Not till November.
7      Q.  November of 2021?
8      A.  Yes.
9      Q.  You spoke to what Diamond employee?
10      A.  I had a phone call with Thomas Grote and Cort
11  Maddux, I believe.
12      Q.  And did you ever write out or give a reported
13  statement of any kind about this incident that you knew
14  about but was unspoken after the day?
15      A.  No.
16      Q.  Ever asked to?
17      A.  No.
18      Q.  From the day of the incident until November,
19  2021, did anybody from Diamond make the slightest effort
20  to ask you what had really happened to Ms. Ormond the
21  night in February, 2019 that you shared with us?
22         MR. FACKRELL:  Object, form.
23      A.  Just in November.
24      Q.  (BY MR. DOYLE)  So all the way from you seeing
25  her talking with Mr. Lucius, her supervisor, until

[Page 44]

1  November, 2021, zero effort by anyone at Diamond
2  Offshore to ask you anything about what you had seen
3  happen to your coworker?
4         MR. FACKRELL:  Same objection.
5      A.  No, sir.  But, I mean, I don't -- they didn't
6  know about it.  It wasn't reported.  So --
7      Q.  (BY MR. DOYLE)  Well, when you say they don't
8  know about it, have you been shown any legal papers
9  showing notice was provided years ago about this
10  incident?
11         MR. FACKRELL:  Same objections.
12      A.  No.
13      Q.  (BY MR. DOYLE)  What you can share is, as long
14  back as Diamond knew -- had received a report from
15  Ms. Ormond about what really happened, there had been
16  zero effort to even ask you a single question about
17  whether it was true or not.  Is that a fair statement?
18      A.  Yes.  I never was asked.
19      Q.  This incident, what you saw happening to
20  Ms. Ormond, what you did share with us, is it a hundred
21  percent accurate in your recollection?
22      A.  Yes.
23      Q.  If you had been asked, say, 2020 what really
24  happened to Ms. Ormond that you saw with your own eyes,
25  would you have told Diamond Offshore?

WWW.MILLER-REPORTING.COM - 713-581-7799/877-721-6416
Email: Depositions@Miller-Reporting.Com

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

[Page 45]

1    MR. FACKRELL:  Same objection.
2    **A.**  Yes.
3    **Q.**  (BY MR. DOYLE)  Because?
4        MR. FACKRELL:  Form objection.
5    **A.**  I believe in honesty and if -- if there's an
6    incident reported, then it would come out.
7    **Q.**  (BY MR. DOYLE)  Can you --
8        MR. DOYLE:  I tell you what.  I need to
9    take like a four-minute break.  I think I may be done.
10   But if it's okay with you, can we go off the record for
11   five minutes?  And I may be done.
12       MR. FACKRELL:  That's great.  That's
13   great.
14       MR. DOYLE:  Thanks.
15       THE VIDEOGRAPHER:  Okay.  We are off the
16   record.  The time is 9:29 a.m.
17       (BRIEF RECESS)
18       THE VIDEOGRAPHER:  We are back on the
19   record at 9:34 a.m.
20       MR. DOYLE:  Mr. Vandergriff, I appreciate
21   your patience today.  And I have no further questions at
22   this time.
23       MR. FACKRELL:  And we'll reserve our
24   questions for trial.  We'll read and sign.
25       THE VIDEOGRAPHER:  This concludes the

[Page 46]

1    video deposition, and we are off the record.  The time
2    is 9:34 a.m.
3        (Whereupon the deposition concluded at
4        9:34 a.m., Tuesday, January 25, 2022.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

[Page 47]

1        CHANGES AND SIGNATURE
2    WITNESS NAME: NICHOLAS BRIAN VANDERGRIFF
3    DATE OF DEPOSITION: January 25, 2022
4    PAGE   LINE   CHANGE      REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

[Page 48]

1        I, NICHOLAS BRIAN VANDERGRIFF, have read
2    the foregoing deposition and hereby affix my signature
3    that same is true and correct, except as noted above.
4
5        _____
6        NICHOLAS BRIAN VANDERGRIFF
7
8    THE STATE OF TEXAS )
9    COUNTY OF TRAVIS   )
10       Before me, _____, on
11   this day personally appeared NICHOLAS BRIAN VANDERGRIFF,
12   known to me (or proved to me under oath or through
13   _____) (description of identity or other
14   document) to be the person whose name is subscribed to
15   the foregoing instrument and acknowledged to me that
16   he/she executed the same for the purposes and
17   consideration therein expressed.
18       Given under my hand and seal of office
19   this _____ day of _____, ____.
20
21       _____
22       NOTARY PUBLIC IN AND FOR
23       THE STATE OF _____
24       MY COMMISSION EXP.:_____
25

[12]  (Pages 45 to 48)

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

[Page 49]

Cause No. 2021-29362
1
2  PATRICIA ORMOND,          * IN THE DISTRICT COURT OF
3                Plaintiff,   *
4       V.                    * HARRIS COUNTY, TEXAS
5                             *
   DIAMOND OFFSHORE           *
6  MANAGEMENT COMPANY;        *
   DIAMOND OFFSHORE LIMITED; and *
7  DIAMOND OFFSHORE COMPANY   *
8                             *
            Defendants.   * 127TH JUDICIAL DISTRICT
9
   * * * * * * * * * * * * * * * * * * *
10
           REPORTER'S CERTIFICATION
11
        VIDEOTAPED/ORAL DEPOSITION OF
12         NICHOLAS BRIAN VANDERGRIFF
13            JANUARY 25, 2022
                (via Zoom)
14
   * * * * * * * * * * * * * * * * * * *
15
16     I, LYDIA L. EDWARDS, CERTIFIED SHORTHAND
17  REPORTER in and for the State of Texas, hereby certify
18  to the following:
19     That the witness, NICHOLAS BRIAN VANDERGRIFF,
20  was duly sworn by me and that this deposition transcript
21  is a true record of the testimony given by said witness;
22     That the original deposition transcript was
23  submitted on February 4, 2022 to the Witness or to the
24  attorney for the witness for examination, signature and
25  return to me by February 24, 2022;

[Page 50]

1      That the amount of time used by each party at
2  the deposition is as follows:
3       Michael Patrick Doyle  - 0 hours, 50 minutes
        Patrick J. Fackrell    - 0 hours, 0 minutes
4
5      That pursuant to information given to the
6  deposition officer and made part of the record at the
7  time said testimony was taken, the following includes
8  all parties of record:
9  MICHAEL PATRICK DOYLE and PATRICK M. DENNIS, Attorney
    for PLAINTIFF
10 JOSHUA A.  NORRIS, T. PATRICK BAYNHAM and PATRICK J.
    FACKRELL, Attorney for DEFENDANTS
11
12     That I am neither counsel for, related to, nor
13  employed by any of the parties or attorneys in the
14  action in which this proceeding was taken and, further,
15  that I am not financially or otherwise interested in the
16  outcome of the action;
17     Further certification requirements pursuant to
18  Rule 203 of TRCP will be certified to after they have
19  occurred.
20     CERTIFIED TO BY ME this 4th day of February,
21  2022.
                _____
22              LYDIA L. EDWARDS, CSR 2567
                Certified Shorthand Reporter,State of Texas
23              Expiration Date:  12-31-18
                Firm Registration No. 62
24              MILLER-REPORTING.COM
                1225 North Loop West, Suite 327
25              Houston, Texas 77008

[Page 51]

1  FURTHER CERTIFICATION BY THE COURT REPORTING FIRM
2           UNDER RULE 203 TRCP
3       The original deposition was/was not returned
4  to the deposition officer on _____;
5       If returned, the attached Changes and
6  Signature Pages contain any changes and the reasons
7  therefor;
8       If returned, the original deposition
9  transcript was delivered to Michael Patrick Doyle,
10 Custodial Attorney;
11      That $_____ is the deposition officer's
12 charges to Plaintiff for preparing the original
13 deposition transcript and any copies of exhibits;
14      That the deposition was delivered in
15 accordance with Rule 203.3 and that a copy of this
16 certificate was served on all parties shown herein on
17 and filed with the Clerk.
18
19      CERTIFIED TO BY ME on this _____ day of
20 _____, 2022.
21
22              _____
                MILLER-REPORTING.COM
23              Firm Registration No. 62
                1225 North Loop West, Suite 327
24              Houston, Texas  77008
                (713) 581-7799
25              (800) 339-3966

[13]  (Pages 49 to 51)

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

**A**

**a.m** 1:22,22 4:4
  11:9 32:9,12
  45:16,19 46:2,4
**AB** 8:24
**able** 20:4 40:10,18
  41:6
**above-styled** 1:21
**abruptly** 19:1
**absolutely** 17:11
  18:4 29:21 41:5
**accident** 42:24 43:1
**accumulated** 12:1
**accurate** 44:21
**acknowledged**
  48:15
**acted** 34:10
**action** 16:20 50:14
  50:16
**addition** 13:5
**affix** 48:2
**Africa** 5:21
**ago** 44:9
**Allen** 2:4
**amount** 15:2 50:1
**Annually** 31:19
**answer** 18:25 22:5
  41:7
**anybody** 7:17
  25:16 43:19
**anybody's** 41:22
**apologize** 20:9 29:6
**APPEARANCES**
  3:2
**appeared** 17:17
  23:25 24:3 48:11
**applied** 7:24
**appreciate** 45:20
**approached** 36:12
**approximately**
  24:11
**area** 7:8 27:13,19
  27:24 28:2,10,11
  41:13
**asked** 9:12 23:22
  41:13 43:5,16

44:18,23
**assigned** 24:24,25
  25:8,16 27:9
**assignment** 25:15
  25:18 28:22
**assist** 25:16
**assume** 15:6 34:4
  34:14 37:7
**attached** 51:5
**attitude** 9:10
**attorney** 49:24 50:9
  50:10 51:10
**attorneys** 50:13
**aware** 30:1 33:14
  34:2

**B**

**B** 3:1
**back** 16:18 30:6
  32:11 37:19,25
  38:4,13,25 39:6,7
  39:10,13 40:13
  42:11 44:14 45:18
**basically** 11:24
  40:24
**BAYNHAM** 50:10
**begins** 4:1
**believe** 11:11 20:17
  25:12 26:5 31:7
  32:19 36:11,22
  37:21 39:18 41:16
  43:11 45:5
**best** 6:14 17:3
  22:13,15 24:14
  35:6 37:14 40:20
**better** 7:23
**big** 41:22
**biggest** 23:9
**bit** 29:9
**black** 9:3,3,14,16
  9:24 10:2 11:3
  14:14 19:13 40:24
**Blake** 27:18
**blank** 7:1
**bleed** 35:22
**block** 24:12,24

**border** 7:11
**bosun** 8:15,17
**bottom** 10:7
**break** 31:21,21
  32:5 45:9
**Brian** 1:12,18 3:5
  5:6,13 47:2 48:1,6
  48:11 49:12,19
**BRIEF** 32:10 45:17
**Building** 2:4
**burn** 23:18
**business** 41:23

**C**

**C** 2:1 3:1
**call** 21:20 38:6
  43:10
**called** 5:7 12:3,5
**capable** 17:11
**car** 42:24
**case** 6:15 7:3
**catwalk** 16:9,18
  18:19,20,22 19:4
  19:5 21:1,4 23:10
**caught** 13:3 29:8
**cause** 1:1,21 33:21
  49:1
**causing** 17:11
**Central** 4:4
**certain** 11:24 15:17
**certificate** 3:8
  51:16
**certification** 49:10
  50:17 51:1
**certified** 49:16
  50:18,20,22 51:19
**certify** 49:17
**chain** 10:5,9 30:19
**chance** 5:24 6:13
  6:24
**change** 41:1 47:4
**changed** 40:22
**changes** 3:7 47:1
  51:5,6
**charge** 15:3
**charges** 51:12

**Chattanooga** 4:20
  5:15 6:9
**Chattanooga-Ha...**
  7:8
**Chavez** 19:22 20:1
  20:6,20,22
**check** 8:7 25:13
  26:22,23
**chest** 16:5,6 21:12
  21:17,22
**chief** 8:22
**Civil** 1:25
**clear** 22:18,22
**cleared** 35:15
**Clerk** 51:17
**climbed** 18:24
**climbing** 19:1
**Clocktower** 2:4
**Clodfelter** 27:18
**close** 7:9 13:10
**closed** 27:5
**Cloud** 1:24
**clue** 17:4,8
**come** 23:13 45:6
**comfortable** 22:11
**coming** 15:12 17:16
  40:12
**command** 10:5,9
**COMMISSION**
  48:24
**communication**
  12:17
**communications**
  12:10
**company** 1:6,7
  19:24 20:1 49:6,7
**compared** 10:6
**completed** 28:13
  29:16,23
**completely** 29:2
**computer-based**
  31:13
**concern** 23:9,12
**concluded** 46:3
**concludes** 45:25
**connect** 30:7

**connected** 31:4
**connects** 16:1
**consideration**
  48:17
**consistently** 14:18
**contain** 51:6
**contractor** 20:7
**control** 24:10 34:13
  34:17,23 35:2,7
  35:25 36:7 37:5
  37:16
**cool** 36:24
**copies** 51:13
**copy** 4:23 51:15
**correct** 6:2 7:4 9:6
  9:22 11:1,5 12:7
  18:15 19:25 23:8
  26:8 34:18,24
  38:24 39:1 41:9
  48:3
**correctly** 22:9,18
  43:2
**Cort** 43:10
**counsel** 4:5,22
  50:12
**counting** 6:10
**County** 1:4 7:8
  48:9 49:4
**course** 31:13,16,22
  32:3
**court** 1:2 4:14,17
  4:21 29:10 49:2
  51:1
**courtroom** 6:11
**coworker** 34:7 40:6
  44:3
**crap** 23:2
**created** 30:20,21
**crouching** 21:24
  22:8
**CSR** 1:23 50:22
**currently** 5:17
**Custodial** 51:10
**cylinder** 15:12
  21:18,19 24:11,23
  25:11,13 26:4

NICHOLAS BRIAN VANDERGRIFF - January 25, 2022

**D**

dad 8:7
dangerous 15:19
date 6:23 47:3
  50:23
day 1:21 38:11
  43:14,18 48:11,19
  50:20 51:19
deck 8:16
Defendants 1:8 2:9
  49:8 50:10
deisolate 30:17
Dekar 5:21
delivered 51:9,14
DENNIS 2:3 50:9
department 8:16
  9:13,15,17
deposition 1:11,18
  4:2,23 5:14 6:1,23
  7:1 15:7 46:1,3
  47:3 48:2 49:11
  49:20,22 50:2,6
  51:3,4,8,11,13,14
describe 12:9 31:12
description 48:13
Diamond 1:5,6,7
  4:10 5:2,23,25
  7:18,19,24 8:3 9:1
  9:11 19:24 27:20
  28:14 33:9,15,25
  43:5,9,19 44:1,14
  44:25 49:5,6,7
Diamond's 9:24
  14:7
different 13:16
  14:9 20:13,14,15
  40:13 41:8
difficulties 40:2
direction 11:13
directly 36:8,10
distance 21:4,7
  24:11
distances 23:5
DISTRICT 1:2,8
  49:2,8
document 30:14

48:14
documentation
  12:15 13:24 14:13
  14:18 15:1 25:19
  26:3,11,15 27:11
  27:21 28:13 29:3
  29:16 30:2,20
  31:5,17
documented 32:20
documenting 13:18
documents 6:13,22
doing 8:17 11:13,17
  11:18,21 13:6
  15:11 20:6,13
  29:7,7 37:22 39:3
  42:23
doubt 17:12 36:5
  37:3,11 38:3
Doyle 2:3,3 3:6 4:7
  4:7,24,24 5:3,4,11
  12:20,24 13:17,22
  13:23 14:5,11,21
  14:24 15:22 16:19
  17:9,15 18:9
  21:15 23:4,19
  26:23 28:1,8,12
  28:18,21 29:6,19
  30:1,13,19 31:2,8
  31:22,24 32:2,5
  32:13 33:13,18,21
  34:1,5,15 37:8
  38:10 39:12,25
  41:12 42:4,9,16
  43:24 44:7,13
  45:3,7,8,14,20
  50:3,9 51:9
drawing 7:1
dried 37:10
due 38:18
duly 1:20 5:8 49:20
duty 35:3 42:23

**E**

E 2:1,1 3:1,1
ECR 24:8 34:13
EDWARDS 49:16

50:22
effort 43:19 44:1,16
eight 7:15,16,17
  8:25 32:4,4
either 34:9
electronic 4:23,24
  5:1
employed 50:13
employee 37:4 43:9
employees 43:5
ended 21:3
engine 9:24 11:23
  11:25 14:16 16:2
  19:20 20:11 24:10
  28:14 29:14 34:13
  34:17,22 35:7,14
  35:25 37:15
engineer 10:1,14,18
  10:19,21 14:17
  24:6
engineering 9:15
  9:17
engines 24:20
ensure 13:10 14:3
  26:2,10,25 27:2
  27:10,20 28:10
ensuring 14:17
entire 29:20
environment 38:18
equipment 12:11
  13:2,19 14:1,4
  24:16 27:22 28:12
  29:2,15,22 30:17
erased 42:5,8
estimate 21:8 24:14
  35:6 37:14
evening 37:20
eventually 18:16
  19:4
everybody 26:5
exaggerating 39:18
examination 3:6
  5:10 49:24
example 30:13
executed 48:16
exhibits 6:18,22

51:13
EXP 48:24
Expiration 50:23
expressed 48:17
eyes 26:25 37:12
  42:10,17 44:24

**F**

F 3:1
face 16:5,7 21:12
  21:17,22 36:13,24
  37:15,15 39:15
Fackrell 2:10 4:9,9
  4:19 5:1 6:19
  12:16,22,25 13:14
  13:20 14:2,6,19
  14:22 15:20 16:16
  17:7,13 18:7
  21:13 22:23 23:17
  26:21 27:23 28:6
  28:9,16,19 29:5,8
  29:17,24 30:11,16
  31:1,6,20,23 32:1
  32:7 33:11,16,19
  33:23 34:3 37:6
  38:8 39:9,23
  41:10 42:2,7,14
  43:22 44:4,11
  45:1,4,12,23 50:3
  50:10
fact 6:3 42:5
factor 23:2
fair 22:12 38:6 39:4
  41:5 44:17
far 7:23 12:1,10
  20:19 21:4 24:12
  34:1
fast 16:20,22 17:2,4
  17:8 18:12 19:1
  23:1,5
Fax 2:6,13
February 9:20,24
  10:2 14:13 32:13
  43:21 49:23,25
  50:20
feel 22:3 40:14 41:6

feet 20:21 21:6,10
  21:20,20 23:20
  24:15
felt 35:17 36:15
filed 51:17
financially 50:15
fine 29:7
finish 29:2
Firm 50:23 51:1,23
first 10:17,18,21
  14:24 17:16 24:6
  43:4
fit 40:10
five 17:21 20:21
  21:6,10,20 23:20
  45:11
five-minute 31:20
fixing 14:1
Fleming 1:23
fluids 13:8,10,19,25
foggy 22:14
followed 14:18 31:3
following 49:18
  50:7
follows 5:9 30:3
  50:2
foregoing 48:2,15
forget 6:25
form 12:16,22,25
  13:14,20 14:6,19
  14:22 15:20 16:16
  17:7,13 18:7
  21:13 22:23 23:17
  25:19,20,21,22,24
  25:25 26:21 27:23
  28:6,9,16,19 29:5
  30:11 31:1 33:11
  33:16,19 37:6
  38:8 39:9,23
  41:10 42:2 43:22
  45:4
four-minute 45:9
froze 16:8,24
frozen 17:18,20
  18:3,6,8
fuel 20:18

NICHOLAS BRIAN VANDERGRIFF - January 25, 2022

[Page 54]

fulfilled 26:10
fully 29:16,23 41:6
further 45:21 50:14
   50:17 51:1

**G**
garbled 20:9
gas 7:15,19,21,24
   13:7
generally 8:17 11:8
   11:12 14:25 22:7
   25:7,10
generated 30:14,21
Georgia 7:9
getting 16:6,20
   18:1,13,17 19:11
   23:10,10,12,14
   36:12 37:8 42:16
give 22:5 41:6
   43:12
given 7:2 25:18
   48:18 49:21 50:5
giving 15:7
go 14:10 19:18 30:6
   31:16 34:22 36:6
   37:19 45:10
goes 35:7
going 8:6 9:18
   12:12 13:11 14:9
   19:21 20:7 29:12
   31:15 32:25
good 9:8 40:9
great 45:12,13
Grote 43:10
guess 31:13 33:2
   35:21 40:18 41:3
guessing 41:6

**H**
hairs 40:15,19
half 9:18
Hall 8:11
hand 4:12,16 19:22
   19:23 48:18
handle 33:25
happen 13:1 22:25

28:14 33:13 35:16
   35:20 41:25 42:6
   44:3
happened 15:8,22
   16:4,13 19:15
   20:20 22:21 23:1
   24:7,18 34:2,6
   35:13,18 36:9
   37:11 41:14 42:1
   42:12,18 43:1,20
   44:15,24
happening 44:19
Harold 2:17
HARRIS 1:4 49:4
he/she 48:16
head 15:12 16:1,1
   21:18,19 25:9,11
   25:13
hear 19:11 36:18
heard 23:25
hearing 24:17,19
heated 13:7
height 21:6
help 19:18
hesitated 41:17
Hey 42:23,25
HHI 20:3
high 15:23 17:3,10
   17:16,21 18:4,6
   18:13,14,18,21
   21:11,16,21 26:4
   36:20 37:10
high-temp 15:14,15
higher 21:10
hit 16:13 18:21
   23:14
hitting 18:4,6
hole 19:13 40:24
honestly 16:22 17:1
   40:14
honesty 45:5
hot 16:20 17:15
   40:1
hour 11:24
hours 12:1 50:3,3
Housekeeping

11:17
Houston 2:5,12
   4:16 50:25 51:24
HT 15:9,14 23:14
   25:12
hundred 15:17
   20:17 22:5 44:20
hurting 37:25 38:4
   38:13 39:8,11,13
   42:25

**I**
identity 48:13
important 13:13,15
incident 15:23 16:7
   19:21 20:20,23
   22:17,19 26:16
   28:20 32:13,15
   33:1,14 34:11,16
   35:3,7,23 36:5
   37:15,24 38:3,5,7
   38:12,23 39:3,25
   40:5,8,12,21 41:1
   41:8,14 42:12,17
   43:5,13,18 44:10
   44:19 45:6
includes 50:7
including 13:24
   26:7,13,25
indication 19:12
   34:9
industry 5:18 7:13
   7:21
information 50:5
initial 16:23 23:1
initially 34:19
injury 12:23,23
   13:16 17:11 32:14
   32:18
inlet 15:9,25
inspect 27:24
instance 1:19
instructing 29:1
instrument 48:15
interested 50:15
introduce 4:5

investigated 33:17
involved 7:20 26:2
involving 15:23,24
   26:16
isolate 14:9
isolated 12:11 14:4
   16:3
isolation 14:10

**J**
J 2:10 50:3,10
jacket 15:25
January 1:13,22
   4:3 46:4 47:3
   49:13
job 7:25 40:10
join 8:6
joining 8:8
Jones 2:10 4:9
JOSHUA 50:10
judge 6:9
JUDICIAL 1:8
   49:8
jumped 16:8
jury 6:9

**K**
kind 10:5 15:13
   20:9 23:6 29:8
   33:2 35:12,14
   36:12 39:15 40:15
   41:19 43:13
knew 23:15 42:20
   43:13 44:14
know 10:16 13:15
   14:3 18:17,25
   19:10 20:5 23:1,9
   33:24 34:12 35:12
   35:20 37:17 41:4
   42:23 44:6,8
knowledge 14:15
   19:9 31:15
known 48:12

**L**
L 1:23 3:1 49:16

50:22
large 21:19
lawyer 5:24
layers 14:9
leak 25:12,13
leaks 30:18
learned 32:3 34:10
legal 6:15 44:8
length 40:20
Let's 21:20 32:5
level 8:13 10:12,19
life 7:23
LIMITED 1:6 49:6
line 18:2 26:4 30:10
   47:4
lines 13:7,7,7,8
lists 14:8
literally 36:1
little 20:9 29:9
   41:17
LLP 2:3,10
lock 12:18
locked 12:11,12
   26:25 27:3,4
locking 13:17
lockout 13:18 27:6
lockout/tagout 12:3
   12:6,8,14 13:6,23
   14:12,17 15:1
   25:19,20,21,22,23
   25:25 26:3,11,15
   27:11,21 29:3,15
   29:23 30:2,6,22
   31:2,4
lockout/tagout/sa...
   31:9,17
long 7:14 8:1 9:17
   18:5,8,17 35:6
   36:4 37:14 38:6,9
   40:25 41:7 44:13
look 6:13
looked 6:19 16:9
looking 27:2 37:9
Loop 50:24 51:23
lot 17:22 22:12 23:2
loud 24:21,22

Lucius 10:23 11:3
11:13 14:23 24:5
24:25 25:8 27:9
27:16 28:1,21,25
29:13,20 34:1,6
34:17 35:8 36:2
37:1,3,7,16 41:13
42:19 43:25
Lydia 1:22 4:19
49:16 50:22

**M**

M 50:9
ma'am 5:4
machine 1:24
machinery 12:13
13:2,3,5
Maddux 43:11
Main 2:11
maintenance 11:20
11:25
making 39:18
MANAGEMENT
1:6 49:6
marine 8:1,14,18
mariner 8:12
marked 6:23
Marshall 4:17,22
mate 8:22
materials 6:14
Matt 10:23 14:23
24:25 37:1,3,7
mdoyle@doylela...
2:7
mean 13:1 22:24
23:8 32:23 33:2
34:12 36:9,11
40:14 41:2,21
44:5
meaning 14:7
15:15
means 11:19 32:2
meant 24:21
Meetings 1:24
memory 22:24
mentioned 14:24

merchant 7:22 8:1
8:12,14,18
Michael 2:3 50:3,9
51:9
Mike 4:7,24
MILLER-REPO...
50:24 51:22
mind 22:22 31:25
35:15 37:3
minutes 17:21
45:11 50:3,3
money 7:23
month 38:11,15,16
months 38:14
morning 6:19
motorman 10:4
14:11
move 16:10,12
moved 16:11,25
17:5 23:5
moving 16:20,23
17:2,8 18:12,13
40:1
Mullins 2:17
multiple 11:15 13:1
13:1,2 14:8 15:2

**N**

N 2:1 3:1,1
name 5:12 6:25
47:2 48:14
Named 10:15,22
Navy 8:7,8
Near 32:19
need 6:5 13:9 40:19
40:19 45:8
needed 32:20
needs 8:23 11:25
neither 29:7 50:12
never 39:20 42:24
43:1 44:18
new 35:14
Nicholas 1:12,18
3:5 5:6,13 47:2
48:1,6,11 49:12
49:19

Nick 4:2
night 11:14 14:16
15:3,4,4,6,8 22:21
27:16 34:6 38:1,2
43:21
nights 11:7
Noise 24:16
non-oil-and-gas 8:2
NORRIS 50:10
North 50:24 51:23
NOTARY 48:22
noted 48:3
notice 44:9
noticed 40:21 41:8
November 43:6,7
43:18,23 44:1
number 31:5
numbered 1:21

**O**

O 3:1,1
O-ring 25:14
oath 4:14 6:10 17:4
22:4 41:3 48:12
Object 12:16,22,25
13:14,20 14:6,19
14:22 15:20 16:16
17:7,13 18:7
21:13 22:23 23:17
26:21 27:23 28:6
28:9,16,19 29:5
30:11 31:1 33:11
33:16,19 37:6
38:8 39:9,23
41:10 42:2 43:22
objection 14:2
29:17,24 30:16
31:6 33:23 34:3
42:7,14 44:4 45:1
45:4
objections 44:11
obviously 37:4
occur 41:15
occurred 50:19
Ocean 9:3
office 48:18

officer 50:6 51:4
officer's 51:11
offshore 1:5,6,7
4:10 5:2,17,23,25
7:13,15,21 9:11
19:24 28:14 33:9
33:15 44:2,25
45:5,6,9
Offshore's 27:20
Oh 23:1
oil 7:15,19,21,24
13:7
okay 4:1 5:3,4
12:10 16:17 17:9
23:22 31:23 40:16
45:10,15
once 11:23 39:20
open 15:9 22:4
operating 24:16
opportunity 7:23
ordering 29:21
ordinary 8:24
original 49:22 51:3
51:8,12
Ormond 1:2 2:16
4:8 6:15 9:5,7,21
10:6,12 11:4,14
14:20,24 15:24
16:2,4 20:13,16
20:22,25 21:3
22:21 24:3 25:8
25:23 26:17 28:3
28:23 29:1,14
33:3 34:7 35:17
36:2,6 37:4,14,19
37:25 38:3,13
39:7 41:15 42:9
43:20 44:15,20,24
49:2
Ormond's 6:25
ought 30:9
out/tagged 27:3
outcome 50:16
outside 23:2,4,6
overhaul 11:18,18
11:25

Overhauling 11:23
overhauls 11:22
20:8,11
overseeing 8:21,22

**P**

P 2:1,1
p.m 11:9 25:5
PAGE 3:7,8 47:4
Pages 51:6
pain 19:12 39:14,19
40:3 42:10
painting 8:21
paper 4:23 36:12
36:23,25 37:4,9
papers 6:14 44:8
Parkway 2:4
part 50:6
particular 8:13
9:13 11:2,10
14:12 22:17,20
24:23 30:7
parties 50:8,13
51:16
parts 22:17,21
party 50:1
Pat 4:9
patience 45:21
Patricia 1:2 2:16
41:23 49:2
Patrick 2:3,10 50:3
50:3,9,9,10,10
51:9
Paul 8:11
pause 29:9
Pedro 19:22
people 15:2
percent 15:17
20:17 22:5 44:21
Perfect 32:5
period 17:18,24
18:16 35:1,3
38:12,21
permit 25:20,21
person 14:25 28:2
48:14

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

[Page 56]

personal 35:12
personally 48:11
personnel 13:25
pfackrell@jones...
  2:13
phone 43:10
physical 35:19
  39:14 40:2
physically 40:6,10
  40:16 42:10
PIC 15:3
picture 37:11 40:6
  40:7
piece 12:11 30:17
Piney 8:11
pipe 15:9,25 16:1
  17:16
piping 22:7
place 14:7 27:21
placed 4:13
Plaintiff 1:3,20 2:2
  5:7 49:3 50:9
  51:12
please 4:5,25 6:6
  31:12
PM 11:24
PMs 11:18,19,20
point 8:11 16:17
  23:8,24 37:24
  38:3,22 39:2,6,11
  40:15,16,18,20
  41:12
policy 14:8
position 10:2 21:25
positioned 19:6
  21:23
positively 17:11
  18:5 29:21
possible 42:12
Possibly 34:21
potential 6:23
  12:20,23 13:15
potentially 15:19
  23:18 33:18,21
practice 15:1
prepare 25:9

preparing 51:12
present 2:15 5:25
  19:20
pressure 13:7
preventative 11:20
preventive 11:24
primarily 11:21
probably 24:20
  41:2
problem 12:21
problems 42:10
Procedure 1:25
procedures 14:8
proceeding 50:14
process 12:2,5,6,8
  13:24 14:18 16:23
  29:15,23 31:3,9
  31:18
produced 1:19
program 31:13
project 20:19
proper 27:21
properly 27:3 30:6
  30:9,10 31:3
protect 13:18,24
protection 24:17,19
proved 48:12
provided 44:9
prying 22:4
ptx 4:25
PUBLIC 48:22
pull 25:13
pulled 16:1
purpose 12:14
  25:10 30:15
purposes 48:16
pursuant 1:24 50:5
  50:17
put 4:16 10:6 41:22

**Q**

question 29:12
  31:24 44:16
questions 6:5 45:21
  45:24

**R**

R 2:1
rails 20:18
raise 4:12
raised 7:7
Ranges 11:15
reach 11:23
read 45:24 48:1
ready 6:14,24
really 23:24 29:10
  35:13 41:19 43:20
  44:15,23
reason 6:3,4 15:7
  22:20 33:8 41:17
  47:4
reasons 51:6
recall 16:7,22 17:17
  19:14,21 20:24
  25:17 26:9,18
  27:6 28:4,21,24
  28:25 29:13 38:13
  39:7,13 40:4,12
  40:23 41:11,16
  42:15
received 44:14
RECESS 32:10
  45:17
recollect 43:4
recollection 18:5,9
  18:10,12 19:2,3,9
  19:16,17 22:2,14
  23:7 29:21 38:10
  40:20,25 44:21
record 4:3,6,15
  32:8,12 45:10,16
  45:19 46:1 49:21
  50:6,8
recorded 32:22
referring 15:5
reflected 39:15
Registration 50:23
  51:23
related 50:12
relationship 9:8
release 15:23 18:18
  18:22

released 17:3
remember 15:8
  17:1 18:3 20:1
  25:10
remote 6:4,8
remotely 5:14 6:1
removed 25:9
removing 25:11
repeat 6:5 13:21
  22:16 26:12
report 32:15 33:3,5
  33:10 44:14
reported 1:23
  32:21,24,24 33:1
  33:3,14 43:12
  44:6 45:6
reporter 4:11,14,15
  4:17,21,21 5:3
  29:11 49:17
REPORTER'S 3:8
  49:10
Reporter,State
  50:22
reporting 33:4 51:1
require 22:8
requirements
  50:17
reserve 45:23
responsibility 26:2
  26:6,10,14 27:10
responsible 14:17
  15:1
restroom 31:21
return 49:25
returned 51:3,5,8
review 6:24
Rhino 9:3,4,14,16
  9:25 10:3 11:3
  14:14
rig 38:23
right 4:12 7:11 13:2
  21:12 23:9 32:7
  33:21 34:16,25
  35:2,6 36:1,5,6,14
  37:9 39:3
Ringgold 7:9

risk 13:19,25
role 9:23 14:12
room 5:25 9:24
  14:16 19:20 24:10
  28:14 29:14 34:13
  34:17,23,23 35:2
  35:7,14 36:1,7
  37:5,16
rose 8:13
roughly 32:4
Rule 50:18 51:2,15
rules 1:25 27:20
  30:3
run 12:13,19
running 13:3,5,11
  24:20

**S**

S 2:1 3:1
safe 27:25 28:11
safety 23:9 31:17
sailed 8:12
sanction-to-test
  12:4,6,9,15 13:18
  14:13 30:7,14,20
  31:3,5
sanction-to-work
  12:3
sat 17:21,24
saw 7:22 9:10 16:9
  16:19 18:16 20:22
  26:16 34:22 36:2
  36:6,23 37:3,9,11
  41:1,25,25 42:6
  44:19,24
saying 18:5 21:12
  22:6,8,13,18
  23:25 35:16,21
  36:17 38:13,22
  39:7 43:2
schedule 38:19,20
school 8:7,10,11
seal 48:18
seaman 8:24
Seamanship 8:11
seated 22:8

**second** 10:14,17,18
   24:5
**see** 16:12 20:25
   27:2,4 35:19
   36:16,25 38:21
   39:3,10,12,14
**seeing** 17:17 22:25
   23:10,11 39:13
   43:24
**seen** 40:2 42:13,17
   42:18,18 44:2
**Senegal** 5:21
**sent** 6:18
**served** 51:16
**services** 20:11
**seven** 32:4
**share** 37:25 40:7
   44:13,20
**shared** 32:14 34:20
   36:15 38:4 43:21
**shift** 10:25 11:2,6,9
   11:14
**shock** 24:1 34:19
   35:12,17,18,19,21
   36:16
**shocked** 35:23
**shocking** 38:7
**short** 17:24 35:1
   40:25 41:7
**shorthand** 1:24
   49:16 50:22
**shortly** 38:22
**show** 40:3
**showing** 44:9
**shown** 44:8 51:16
**side** 8:16
**sign** 45:24
**signature** 3:7 47:1
   48:2 49:24 51:6
**signed** 30:21
**similar** 13:9
**single** 31:5 44:16
**sir** 5:12 7:12 20:10
   26:13 29:6 32:6
   41:2 44:5
**sitting** 17:22 18:18

21:24 22:3
**situation** 42:12
**slightest** 43:19
**somebody** 23:25
**sorry** 6:25 24:6
**sounding** 24:18
**speak** 39:16 41:3
   41:24 42:1,5
**specific** 30:3
**speed** 40:1
**spent** 37:15
**split** 40:19
**splitting** 40:15
**spoke** 43:9
**sprayed** 16:2
**spraying** 23:11
   36:21 40:1
**standing** 19:7
   21:11,16,18,21,23
**stands** 17:9 20:4
   24:9
**start** 28:23 29:14
   29:22
**started** 8:2,4,8 16:6
   16:10,24 18:13
   21:3,7 23:21 25:3
   25:4 26:11,16
   27:7,12 28:3 29:2
**Starting** 28:12
**starts** 27:22
**State** 1:23 48:8,23
   49:17
**statement** 17:4
   39:4 43:13 44:17
**stay** 37:17
**steps** 14:7 16:18
**STIPULATIONS**
   3:3
**Street** 2:11
**struck** 16:20 17:2
   17:10,15 18:13,17
   21:11,16,22
**stuff** 8:22 23:6
   36:13
**subjective** 33:2
**sublevel** 10:7

**submitted** 49:23
**subscribed** 48:14
**Suite** 2:5,11 50:24
   51:23
**supervisor** 27:13
   27:19 28:2,10
   29:1,13 35:3,8
   36:6 37:1 41:13
   42:19 43:25
**supervisory** 10:8
**supposed** 26:19
   27:19 28:14 31:4
**sure** 12:13 13:22
   15:18 17:23 18:2
   18:8 21:6 22:1,17
   24:13 25:2 26:15
   27:15,24 32:1,1
   33:20,24 35:9
   36:3 37:23 38:9
   40:16
**surprise** 19:12
**sworn** 1:20 5:8 41:7
   49:20

─────────────
**T**
─────────────
**T** 3:1,1,1 50:10
**tag** 27:4,6
**take** 23:2 32:5 45:9
**taken** 1:20 4:2 32:2
   50:7,14
**talk** 6:20,21 10:24
   34:5 35:7 36:6
   42:13
**talked** 41:19 42:20
**talking** 10:24 11:22
   15:6,16 17:20
   21:5 26:24 28:23
   29:10 36:2,16
   37:1 40:5 42:18
   43:25
**task** 20:12,15 24:23
   25:3,7 27:9
**tell** 5:8,12 6:6 8:23
   15:22 20:4 23:23
   33:5 42:11 45:8
**telling** 29:14,19

**temperature** 15:15
   15:23 17:3,10,16
   17:21 18:4,6,14
   18:18,22 21:11,16
   21:22 26:4 36:20
   37:10
**tend** 20:22 23:19
**Tennessee** 4:20
   5:15
**terms** 10:5
**test** 30:18
**testified** 5:8
**testify** 6:14,24
**testimony** 7:2
   49:21 50:7
**testing** 31:14
**tests** 31:14
**Texas** 1:4,23,25 2:5
   2:12 4:16,17,22
   48:8 49:4,17
   50:22,25 51:24
**texts** 6:14
**Thank** 5:4
**Thanks** 45:14
**therefor** 51:7
**thing** 17:17 22:4
**things** 11:15 13:1
   13:16 23:2,5,6
   34:9 40:21 41:1
**think** 18:25 22:13
   29:8 45:9
**thinking** 41:18
**third** 10:1
**third-party** 19:22
   19:23 20:6
**Thomas** 43:10
**thought** 37:7
**three** 9:18 11:8
   21:20
**three-on/three-off**
   38:19
**till** 18:22 43:6
**time** 4:3,4,13 7:24
   10:1,16 11:17
   16:11 17:18,24
   18:2,17 23:8 25:2

28:25 29:20 32:9
   32:12 35:4 37:24
   38:12,21 40:21
   43:4 45:16,22
   46:1 50:1,7
**timeline** 17:23 36:3
   41:11
**times** 30:6 32:3
**today** 6:15 45:21
**told** 18:12 23:7
   26:13 44:25
**tool** 12:10
**tough** 39:22,24
**towels** 36:13,23,25
   37:4,10
**tower** 10:20,24
   11:2,9,10 14:16
   24:6 25:1 27:16
   37:20
**trace** 30:6
**training** 30:2 31:8
**transcript** 49:20,22
   51:9,13
**TRAVIS** 48:9
**TRCP** 50:18 51:2
**trial** 45:24
**trouble** 33:22
**true** 41:4 44:17
   48:3 49:21
**trust** 41:23
**truth** 5:8
**truthful** 6:10 41:7
**try** 12:13
**trying** 22:7
**Tuesday** 46:4
**turned** 36:1,14
**two** 9:18 24:20,24
   25:15 38:11

─────────────
**U**
─────────────
**unclear** 22:14
**understand** 6:4,9
   33:8
**understanding**
   35:13
**undoing** 22:7

NICHOLAS BRIAN VANDERGRIFF  -  January 25, 2022

unspoken 41:19,20
  43:14
use 6:23 22:15

**V**

V 1:4 49:4
valve 26:22,24 27:5
valves 13:9
Vandergriff 1:12
  1:19 3:5 4:2,11
  5:6,13 45:20 47:2
  48:1,6,11 49:12
  49:19
various 13:16,16
verified 12:12
verify 14:10
vessel 8:20 9:3,5,11
  9:24 11:14 13:25
vessels 7:22 9:1,2
video 29:11 46:1
Videographer 2:17
  4:1 32:8,11 45:15
  45:18,25
videotaped 4:2
VIDEOTAPED/...
  1:11,18 49:11
visually 26:20,22
  26:23 27:24

**W**

walk 23:20
walked 35:9,10,25
  36:1,14
Walker 2:10 4:10
want 33:3,5,9 40:19
  41:3
was/was 51:3
wasn't 16:24 27:16
  32:18 33:2 36:4
  36:21 40:16 42:22
  44:6
watching 35:16
  40:8 41:15
water 15:9,10,11
  15:13,14,14,23,25
  16:2,5,6,13,21

17:3,10,16,22
  18:6,14,18 21:11
  21:16,22 23:11,14
  36:20 37:10 40:1
way 8:15,15 22:10
  23:12 33:9 40:8
  42:11 43:24
we'll 45:23,24
we're 4:3 5:14,25
  6:8 12:12,17 14:9
  15:6,7,24 40:5,14
wearing 24:17
week 4:18,22 38:11
weeks 38:11
went 16:17 33:4
  34:16 35:14
weren't 35:22 39:2
West 50:24 51:23
wet 36:20 37:4
wishes 33:4
witness 1:19 4:13
  4:16,19 5:7 47:2
  49:19,21,23,24
woman 40:7
word 36:18
words 8:2 19:5
  21:23 22:15
work 7:22 8:2,5 9:1
  9:7,10,13,15
  10:25 11:2,6,12
  13:6 14:1,10 20:8
  20:10 25:4,16
  26:3,11,16 27:7
  27:11,21,25 28:3
  28:12,15 29:10,14
  29:22 37:19 38:18
worked 7:13 8:1
  9:5,20 11:3 26:5
  29:20 33:9,15
working 5:17 7:20
  8:25 9:11,16,23
  10:20 11:8 12:18
  12:19 13:11 14:4
  19:24 20:2,12,15
  20:16,20 24:12,23
  30:18

wouldn't 33:9
  35:19 36:8,10
wound 35:22
wreck 42:24
write 43:12
writing 13:24
wrong 29:7

**X**

**Y**

yeah 4:7 7:9 19:14
  31:22 35:1
years 7:15,16,17
  8:25 9:18,19 44:9
yelled 16:14
yelling 16:10,25
  19:12
you-all 11:8 24:12
  24:17 25:4,15

**Z**

zero 18:12 19:2,3
  19:16,17 40:25
  44:1,16
Zoom 1:14,24
  49:13

**0**

0 50:3,3,3
06 11:7

**1**

1 3:3
100 2:5
12-31-18 50:23
1225 50:24 51:23
127th 1:8 49:8
130 15:17
14 8:4
1800 11:7

**2**

2 3:2
2005 8:4
2019 9:18,20,24
  10:2 14:13 32:13

43:21
2020 44:23
2021 43:7,19 44:1
2021-29362 1:1
  49:1
2022 1:13,22 4:3
  46:4 47:3 49:13
  49:23,25 50:21
  51:20
203 50:18 51:2
203.3 51:15
24 49:25
25 1:13 46:4 47:3
  49:13
2567 50:22
25th 1:21 4:3
28 38:20,20
2900 2:11

**3**

30 24:15
327 50:24 51:23
339-3966 51:25
3401 2:4

**4**

4 49:23
47 3:7
49 3:8
4th 50:20

**5**

5 3:6
50 50:3
581-7799 51:24

**6**

6:00 11:7,7,9,9 25:5
62 50:23 51:23

**7**

713 51:24
713.437.1800 2:12
713.437.1810 2:13
713.571.1146 2:6
713.571.1148 2:6
77002 2:12

77008 50:25 51:24
77016 2:5

**8**

8:33 1:22 4:4
800 51:25
811 2:11

**9**

9:07 32:9
9:13 32:12
9:29 45:16
9:34 1:22 45:19
  46:2,4

# Exhibit 3

# Patricia D. Ormond Notice of Injury to Diamond
# dated August 16, 2019

Name: Patricia D. Ormond          Position: OILER

Date: 16-Aug-19

EHS Insight Form #:
II-1908-0025

Written Statement: In your own words describe what you were doing, what you saw, heard or experienced at the time of the incident.

For a few months now I have been experiencing pain in my lower right back, cause or origin unknown. I have been seeing a doctor at the house for evaluation and treatment. Returned to work this hitch and while performing basic tasks such as sweeping and mopping, it has left me in severe pain. Reported to the medic and informed him of my current status.

Signature of employee providing statement: _Patricia Ormond_

Mark which box applies: Patient [✓]     Witness [ ]

**EXHIBIT**

**Ormond 3**

DIAMOND_ORMOND-001005

**Exhibit 4**

**Patricia Ormond Accidental Injury Questionnaire
dated January 18, 2020**

Please fax the completed questionnaire to:
The Hartford
P.O. Box 14301
Lexington, KY 40512-4301
Fax Number: 866-411-5613


THE
HARTFORD

## ACCIDENTAL INJURY QUESTIONNAIRE

| Claimant Name: PATRICIA DIANA ORMOND | Insured ID: 9005532808 |
|---|---|

Email Address: patricia.d.ormond@gmail.com

Personal Cell Telephone Number: (720) 839-7906   Alternate Telephone Number: (   )

May we have your authorization to leave confidential medical and benefit information on your personal cell phone?

(Yes)   No

*Patricia Diana Ormond*          18 JAN 2020
Signature                         Date

If your disability is the result of an injury or accident, please answer the following questions:

1. Date of Injury: Spring 2019

   Location of injury or accident:   Address of injury or accident:

   Home

   Work                             Ocean Black Rhino

   Private Property

   Retail Location

   Sporting Event

   Other Person's Residence

   Other

2. What were you doing at the time the injury occurred?

   Engine overhauls

3. Who or what contributed to your injury/accident?

4. Did you file a lawsuit or a claim?  ☐ Yes  ☒ No

   a. If a claim was filed, with whom? (provide name and address) _____

   b. If a lawsuit was filed, please send us a copy.

   c. If no lawsuit or claim has been filed, do you intend to file a lawsuit or claim against any person or company?

      Yes   No   (Unknown)

      Are you represented by an attorney?   Yes   (No)

      Name of Attorney: _____   Telephone number of Attorney: (   )

      Address of Attorney: _____

### Work Related Injuries or Accidents:

1. Were you working when the injury occurred?  (Yes)   No

2. Were you injured at your current place of employment or injured at a prior place of employment?   (Current)   Prior

3. Is your injury related to your work activities or work place?   (Yes)   No

   If you answered "yes" to the above questions:

4. Did you file a Workers' Compensation Claim?   Yes   (No)

Workers' Compensation Carrier: _____

Workers' Compensation Claim Number: _____

Workers' Compensation Adjuster: _____   Telephone number of Adjuster: (   )

What is the current status of your Workers' Compensation claim or lawsuit?

**EXHIBIT**

**Ormond 4**

The Hartford® is The Hartford Financial Services Group, Inc. and its subsidiaries, including underwriting companies Hartford Life and Accident Insuranc
Company and Hartford Fire Insurance Company. Home Office is Hartford, CT. The Hartford is the administrator for certain group benefits business writt
by Aetna Life Insurance Company and Talcott Resolution Life Insurance Company (formerly known as Hartford Life Insurance Company). The Hartford
also provides administrative and claim services for employer leave of absence programs and self-funded disability benefit plans.

LC-7495-11                          Page 1 of 4                          07/2019

000489 ORMOND

**Vehicle Accidents:**

Were you driving or in a vehicle at the time of the accident?    Yes    (No)

| Date of Accident: | How many vehicles were involved? |
|---|---|
| N/A | N/A |

Please describe how and where (Street, City, State) the accident occurred:

N/A

Was a Police Report filed?    Yes    (No)

### *** IF A POLICE REPORT WAS FILED, PLEASE ATTACH A COPY ***

| Name of your Auto Insurance carrier: | Telephone Number of Insurance Carrier: |
|---|---|
| N/A | (    ) |

Address of your Auto Insurance Carrier:

N/A

| Your Auto Insurance claim number: | Do you have no fault coverage?    Yes    No |
|---|---|
| N/A | |

If the accident was caused by the negligence or wrong of a person, firm or corporation, please provide the following information:

Name of the Person / Company at fault:

N/A

Their Address:

N/A

Their Auto Insurance Company's Name:

N/A

Their Auto Insurance Company's Address:

N/A

Telephone number:

(    )    N/A

Their Auto Insurance Claim Number:

N/A

What is the current status of your Auto claim or lawsuit?

N/A

Have you settled your claim or lawsuit?    Yes    No

If yes, please attach a copy of the settlement.

Claim ID: I5728274

000490 ORMOND

**Signature - Please read the statement that applies to your state of residence and sign the bottom of the second page.**

With the exception of any source(s) of income reported above in this form, I certify by my signature that I have not received and am not eligible to receive any source of income, except for my disability benefits from this plan. Further, I understand that should I receive income of any kind or perform work of any kind during any period The Hartford has approved my disability claim, I must report all details to The Hartford, immediately. If I receive disability income benefits greater than those which should have been paid, I understand that I will be required to provide a lump sum repayment to the Plan. The Hartford has the option to reduce or eliminate future disability payments in order to recover any overpayment balance that is not reimbursed.

**For residents of all states EXCEPT Arizona, Alabama, California, Colorado, Florida, Kentucky, Maine, Maryland, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Tennessee, Virginia and Washington:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

## For Residents of Arizona: For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**For Residents of Alabama:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**For Residents of California:** For your protection, California law requires the following to appear on this form: Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**For residents of Colorado:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**For residents of Florida:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**For residents of Kentucky:** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim or an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**For residents of Maine, Tennessee, and Washington:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines and denial of insurance benefits.

**For Residents of Maryland:** Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit and who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**For residents of New Jersey:** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties. Any person who includes any false or misleading information on an application for insurance policy is subject to criminal and civil penalties.

**For residents of Ohio:** Any person who, with intent to defraud or knowing he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**For residents of Oklahoma:** WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**For residents of Oregon:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto that the insurer relied upon is subject to a denial and/or reduction in insurance benefits and may be subject to any civil penalties available.

**For residents of Pennsylvania:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material hereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

000491 ORMOND

000059 4/13

Claim ID: 16728274

**Signature – Please read the statement that applies to your state of residence and sign the bottom of the page.**

**For residents of Puerto Rico:** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances be present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**For residents of Virginia:** Any person who, with the intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement may have violated the state law.

**For residents of New York:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

The statements contained in this form are true and complete to the best of my knowledge and belief.

_Patricia Diana Osmand_  
Signature

18 JAN 2020  
Date

Electronic Funds Transfer (EFT) is our standard method of payment. When making our claim decision we may contact you to obtain your banking information.

Claim ID: I6728274

**Exhibit 5**

**Original proof of claim of Patricia Ormond
dated August 16, 2020**

**United States Bankruptcy Court, Southern District of Texas**

Fill in this information to identify the case (Select only one Debtor per claim form):

| | | |
|---|---|---|
| ☐ Diamond Offshore Drilling, Inc. (Case No. 20-32307) | ☐ Diamond Offshore Drilling (UK) Limited (Case No. 20-32312) | ☒ Diamond Offshore Management Company (Case No. 20-32317) |
| ☐ Diamond Offshore International Limited (Case No. 20-32308) | ☐ Diamond Offshore Services Company (Case No. 20-32313) | ☐ Diamond Foreign Asset Company (Case No. 20-32318) |
| ☐ Diamond Offshore Finance Company (Case No. 20-32309) | ☐ Diamond Offshore Limited (Case No. 20-32314) | ☐ Diamond Offshore (Brazil) L.L.C. (Case No. 20-32319) |
| ☐ Diamond Offshore General Company (Case No. 20-32310) | ☐ Diamond Rig Investments Limited (Case No. 20-32315) | ☐ Diamond Offshore Development Company (Case No. 20-32320) |
| ☐ Diamond Offshore Company (Case No. 20-32311) | ☐ Diamond Offshore Holding L.L.C. (Case No. 20-32316) | ☐ Arethusa Offshore Company (Case No. 20-32321) |

<u>Modified Form 410</u>

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

| | |
|---|---|
| 1. Who is the current creditor? | **Patricia Ormond** <br> Name of the current creditor (the person or entity to be paid for this claim) <br> Other names the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☒ No <br> ☐ Yes. From whom? _____ |
| 3. Where should notices and payments to the creditor be sent? <br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br> Patricia Ormond c/o Michael Patrick Doyle, Doyle LLP, The Clocktower Building, 3401 Allen Parkway, Suite 100, Houston, Texas 77019 <br><br> Contact phone  713.571.1146 <br> Contact email  service@doylelawfirm.com | **Where should payments to the creditor be sent?** (if different) <br><br> Contact phone _____ <br> Contact email _____ |
| 4. Does this claim amend one already filed? | ☒ No <br> ☐ Yes.  Claim number on court claims registry (if known)_____  Filed on ___ / ___ / ___ <br> MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☒ No <br> ☐ Yes. Who made the earlier filing? _____ |

**EXHIBIT**

**Ormond 5**

**Part 2:**  **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☒ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____ |

| | |
|---|---|
| 7.  **How much is the claim?** | $ 10,500,000 _____ . **Does this amount include interest or other charges?**<br>☒ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>personal injury during work offshore _____ |

| | |
|---|---|
| 9. **Is all or part of the claim secured?** | ☒ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $_____<br><br>**Amount of the claim that is secured:** $_____<br><br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $_____<br><br>**Annual Interest Rate** (when case was filed) _____%<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ☒ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____ |

| | |
|---|---|
| 11. **Is this claim subject to a right of setoff?** | ☒ No<br>☐ Yes. Identify the property: _____ |

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☒ No | |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☒ No | |
| | ☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

**Signature:**   *Michael Patrick Doyle*
Michael Patrick Doyle (Aug 16, 2020 10:43 CDT)

**Email:**   service@doylelawfirm.com

_____
Signature

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | Michael Patrick Doyle |
| | First name          Middle name          Last name |
| Title | Attorney |
| Company | Doyle LLP |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 3401 Allen Parkway, Suite 100 |
| | Number          Street |
| | Houston                     TX          77019 |
| | City                     State          ZIP Code |
| Contact phone | 7135711146 |
| | Email          service@doylelawfirm.com |

**Attach Supporting Documentation** (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☐ I have supporting documentation.
   (attach below)

☒ I do <u>not</u> have supporting documentation.

PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.

IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.

Official Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                                          12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

---

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
18 U.S.C. §§ 152, 157 and 3571.

---

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**
  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at
https://cases.primeclerk.com/diamond

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate.
11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy.
11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Diamond Offshore Drilling, Inc. Claims Processing Center
c/o Prime Clerk LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

> ## Do not file these instructions with your form

# Electronic Proof of Claim_EHXKJ28784

Final Audit Report                                                                    2020-08-16

| | |
|---|---|
| Created: | 2020-08-16 |
| By: | Prime Clerk (epoc@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAjCmF00dCo7wOQ-Dhv8E-NhrxUyZKTT9u |

## "Electronic Proof of Claim_EHXKJ28784" History

Web Form created by Prime Clerk (epoc@primeclerk.com)
2020-08-16 - 3:42:15 PM GMT

Web Form filled in by Michael Patrick Doyle (service@doylelawfirm.com)
2020-08-16 - 3:48:27 PM GMT- IP address: 108.79.234.132

(User email address provided through API User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10.15; rv:79.0) Gecko/20100101 Firefox/79.0)
2020-08-16 - 3:48:29 PM GMT- IP address: 108.79.234.132

Signed document emailed to Prime Clerk (epoc@primeclerk.com) and Michael Patrick Doyle (service@doylelawfirm.com)
2020-08-16 - 3:48:29 PM GMT

**Exhibit 6**

**Email from counsel for Ms. Ormond to counsel for Diamond dated September 28, 2020**

From: Patrick Dennis
Sent: Monday, September 28, 2020 4:35 PM

To: Nofzinger, Alice <anofzinger@paulweiss.com>
Cc: Johnson, M. Shane <SJohnson@porterhedges.com>; Higgins, John F. <JHiggins@porterhedges.com>;
English, Eric M. <EEnglish@porterhedges.com>
Subject: RE: Ormond - Diamond Offshore Bankruptcy

Alice,

Thank you for setting aside the time this afternoon to speak about Patricia Ormond's claim.  Per your request, here is a brief summary of the incident that caused her injuries.  We look forward to your production of the policy and position on lifting the stay.

Diamond Offshore and its crew were negligent in their handling of an engine overhaul project on or about February 20, 2019, on the Vessel Ocean Black Rhino. Our client, Patricia Ormond (a 3rd Asst. Engineer, at the time), was injured during work on Main Engine #5.  The engine was not properly locked out when Ms. Ormond was instructed to remove the high temperature cooling water manifold.  Because it was not properly locked out, the high temperature water sprayed Ms. Ormond on the face, neck, and leg.  Ms. Ormond jumped from the area and attempted to escape by climbing on to the walkway of the upper engine room.  As a result of the incident, she suffered burns from the liquid and a back injury during physical exertion from the evacuation.  The incident also was not properly documented or investigated by rig management, even though it was witnessed.  Immediately after the incident, Ms. Ormond went to the engine control room where the injury was reported to Matt Lucius.  Pedro Chavez, who was working with her at the time, was also a witness.  In addition, another employee, Blake Clodfelter was a witness to the incident.  The size of her proof of claim is based on the strong facts establishing negligence and the nature of her injury, which is still ongoing nearly two years later.  To this day, Ms Ormond still suffers from back pain, lack of concentration, intimacy issues, complications completing everyday tasks, and a general decline in quality of life. She has received multiple treatments that have not resolved her symptoms, including injections, physical therapy, and prescription medications.  Based upon the length of time that her symptoms have continued, we anticipate that her future treatment will be significant and may include continual care and treatment, potentially including surgery.

**EXHIBIT**

**Ormond 6**

PATRICK M. DENNIS | DOYLE LLP
Partner
Direct 713.554.9076 | Mobile 281.935.3105
The Clocktower Building | 3401 Allen Parkway, Suite 100 | Houston TX 77019
www.doylelawfirm.com | pdennis@doylelawfirm.com



HOUSTON | PHOENIX

This email is confidential and may be subject to privilege and other conditions. View our disclaimer for more information.

**Exhibit 7**

**Amended proof of claim of Patricia Ormond
dated January 12, 2021**

**Fill in this information to identify the case:**

Debtor 1 ___Diamond Offshore Management Company;___

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: ___Southern District of Texas___
District of

Case number ___20-32317; 20-32313; 20-32311___

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

___Patricia Ormond___
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

___Patricia Ormond c/o Michael Patrick Doyle, Doyl___
Name

___3401 Allen Parkway, Suite 100___
Number          Street

___Houston___          ___TX___          ___77019___
City                          State                  ZIP Code

Contact phone ___713.571.1146___

Contact email ___service@doylelawfirm.com___

**Where should payments to the creditor be sent?** (if different)

_____
Name

_____
Number          Street

_____
City                          State                  ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☐ No
☑ Yes.  Claim number on court claims registry (if known) _____

Filed on ___08/16/2020___
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**

   ☑ No

   ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. **How much is the claim?**  $_____10,500,000_. **Does this amount include interest or other charges?**

   ☑ No

   ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

   Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

   Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

   Limit disclosing information that is entitled to privacy, such as health care information.

   personal injury during work offshore _____

9. **Is all or part of the claim secured?**

   ☑ No

   ☐ Yes. The claim is secured by a lien on property.

   **Nature of property:**

   ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

   ☐ Motor vehicle

   ☐ Other. Describe: _____

   **Basis for perfection:** _____

   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:**  $_____

   **Amount of the claim that is secured:**  $_____

   **Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

   **Amount necessary to cure any default as of the date of the petition:**  $_____

   **Annual Interest Rate** (when case was filed)_____%

   ☐ Fixed

   ☐ Variable

10. **Is this claim based on a lease?**

    ☑ No

    ☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $_____

11. **Is this claim subject to a right of setoff?**

    ☑ No

    ☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  1/12/2021
 MM / DD / YYYY

/s/Michael Patrick Doyle
Signature

**Print the name of the person who is completing and signing this claim:**

| | | | |
|---|---|---|---|
| Name | Michael Patrick Doyle | | |
| | First name | Middle name | Last name |
| Title | Attorney | | |
| Company | Doyle LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 3401 Allen Parkway, Suite 100 | | |
| | Number  Street | | |
| | Houston | TX | 77019 |
| | City | State | ZIP Code |
| Contact phone | 713.571.1146 | Email | service@doylelawfirm.com |

**Fill in this information to identify the case:**

Debtor 1     Diamond Offshore Company

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   District of
Southern District of Texas

Case number   20-32317; 20-32313; 20-32311

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Patricia Ormond
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Patricia Ormond c/o Michael Patrick Doyle, Doyl
Name

3401 Allen Parkway, Suite 100
Number     Street

Houston          TX          77019
City              State        ZIP Code

Contact phone 713.571.1146

Contact email service@doylelawfirm.com

**Where should payments to the creditor be sent?** (if different)

Name

Number     Street

City              State        ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ — __ __ __ __ __ — __ __ __ __ __ — __ __ __ __ __

**4. Does this claim amend one already filed?**

☐ No
☑ Yes.  Claim number on court claims registry (if known) _____

Filed on 08/16/2020
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

Official Form 410                    Proof of Claim                    page 1

**Fill in this information to identify the case:**

Debtor 1    Diamond Offshore Services Company

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: Southern District of Texas

Case number   20-32317; 20-32313; 20-32311

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Patricia Ormond
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Patricia Ormond c/o Michael Patrick Doyle, Doyl
Name

3401 Allen Parkway, Suite 100
Number   Street

Houston    TX    77019
City    State    ZIP Code

Contact phone 713.571.1146

Contact email service@doylelawfirm.com

**Where should payments to the creditor be sent?** (if different)

Name _____

Number   Street _____

City    State    ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ — __ __ __ __ __ — __ __ __ __ __ — __ __ __ __ __

**4. Does this claim amend one already filed?**

☐ No
☑ Yes. Claim number on court claims registry (if known) _____

Filed on 08/16/2020
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | | |
|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

| | | |
|---|---|---|
| 7. | **How much is the claim?** | $_____10,500,000_. **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | | |
|---|---|---|
| 8. | **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>personal injury during work offshore _____ |

| | | |
|---|---|---|
| 9. | **Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $_____<br>**Amount of the claim that is secured:** $_____<br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $_____<br><br>**Annual Interest Rate** (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |

| | | |
|---|---|---|
| 10. | **Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____ |

| | | |
|---|---|---|
| 11. | **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   1/12/2021
                    MM / DD / YYYY

/s/Michael Patrick Doyle
Signature

Print the name of the person who is completing and signing this claim:

| Name | Michael Patrick Doyle | | |
|---|---|---|---|
|  | First name | Middle name | Last name |
| Title | Attorney | | |
| Company | Doyle LLP | | |
|  | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 3401 Allen Parkway, Suite 100 | | |
|  | Number   Street | | |
|  | Houston | TX | 77019 |
|  | City | State | ZIP Code |
| Contact phone | 713.571.1146 | Email | service@doylelawfirm.com |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---------|-------------------------------------------------------------------|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____ 10,500,000 . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

personal injury during work offshore _____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

- [x] No

- [ ] Yes. *Check one:*

| | Amount entitled to priority |
|---|---|

- [ ] Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $_____

- [ ] Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $_____

- [ ] Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $_____

- [ ] Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $_____

- [ ] Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $_____

- [ ] Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.   $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:   Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

- [ ] I am the creditor.
- [x] I am the creditor's attorney or authorized agent.
- [ ] I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
- [ ] I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   1/12/2021
                   MM / DD / YYYY

/s/Michael Patrick Doyle
Signature

Print the name of the person who is completing and signing this claim:

| Name | Michael Patrick Doyle | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Attorney | | |
| Company | Doyle LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 3401 Allen Parkway, Suite 100 | | |
| | Number     Street | | |
| | Houston | TX | 77019 |
| | City | State | ZIP Code |
| Contact phone | 713.571.1146 | Email | service@doylelawfirm.com |

---

Cause No. _____

| | | |
|---|---|---|
| PATRICIA ORMOND, | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| DIAMOND OFFSHORE | § | |
| MANAGEMENT COMPANY; | § | |
| DIAMOND OFFSHORE SERVICES | § | |
| COMPANY; and DIAMOND | § | |
| OFFSHORE COMPANY | § | |
| | § | |
| Defendants. | § | ___ JUDICIAL DISTRICT |

### Plaintiff's Original Petition and Jury Demand

TO THE HONORABLE DISTRICT JUDGE & OUR JURY OF HARRIS COUNTY CITIZENS:

COMES NOW Plaintiff, PATRICIA ORMOND, and files this Original Petition and Jury Demand, and would respectfully show the following:

### ■ *DISCOVERY CONTROL PLAN* ■

1.1    PATRICIA ORMOND intends to conduct discovery under Level 2 of Texas Rule of Civil Procedure 190.  TEX. R. CIV. P. 190.3.

### ■ *PARTIES* ■

2.1    PATRICIA ORMOND ("Ms. Ormond") is a citizen and resident of the State of Mississippi.

2.2    Defendant DIAMOND OFFSHORE SERVICES COMPANY ("Diamond Offshore Marine") is a foreign for-profit company that regularly does business in a systematic and continuous manner in the State of Texas and maintains its headquarters and principal place

of business in the State of Texas. Diamond Offshore may be served with process by service upon its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

2.3     Defendant DIAMOND OFFSHORE COMPANY (also "Diamond Offshore") is a domestic for-profit company that regularly does business in a systematic and continuous manner in the State of Texas and maintains its headquarters and principal place of business in the State of Texas. Diamond Offshore may be served with process by service upon its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

2.4     Defendant DIAMOND OFFSHORE MANAGEMENT COMPANY (also "Diamond Offshore") is a domestic for-profit company that regularly does business in a systematic and continuous manner in the State of Texas and maintains its headquarters and principal place of business in the State of Texas. Diamond Offshore may be served with process by service upon its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.


## ■ *JURISDICTION AND VENUE* ■

3.1     Ms. Ormond sues for damages in excess of $75,000, and jurisdiction is proper in this Court under the Jones Act (Public Law 109-304 (H.R. 1442), formerly 46 U.S.C. § 688), the general maritime law, and pursuant to the "saving to suitors" clause.

3.2     Venue is proper in Harris County under Texas Civil Practices & Remedies Code §

Case 4:23-cv-03321 Document 1-14 Filed on 03/29/22 in TXSD Page 140 of 172
Case 2:20-cv-02233 Claim 22-1 Part 4 Filed in TXSD on 03/29/22 Property Claim Exhibit
Page 3 of 8

15.0181(c)(1), as Defendant Diamond Offshore maintains its principal offices in the State of Texas in Harris County as defined by Texas Civil Practices & Remedies Code § 15.001(a)

3.3    Ms. Ormond seeks damages within the jurisdictional limits of this Court. At this time, Ms. Ormond seeks monetary relief in an amount over $1,000,000.00. Ms. Ormond reserves the right to modify the amount and type of relief sought in the future.

■ *FACTUAL BACKGROUND* ■

4.1    This case is brought under the "Jones Act" (46 U.S.C. § 688) and the general maritime law of the United States of America. This suit is necessary to collect a legal debt and damages due and owing Ms. Ormond due to the negligence of Ms. Ormond's Jones Act employer, Diamond Offshore, and the negligence and unseaworthiness of Diamond Offshore's vessel the drill ship Ocean Black Rhino and its crew, on or about February 20, 2019, directly contributing to serious injuries to Ms. Ormond ("the Incident in Question"). On or about February 20, 2019, Diamond Offshore and its crew were negligent in their handling of an engine overhaul project on the Vessel Ocean Black Rhino.  Ms. Ormond (an Oiler placed as 3rd Asst. Engineer) was injured during work on Main Engine #5.  The engine was not properly locked out when Ms. Ormond was instructed to remove the high temperature cooling water manifold.  Because it was not properly locked out, the high temperature water sprayed Ms. Ormond on the face, neck, and leg.  Ms. Ormond jumped from the area and attempted to escape by climbing on to the walkway of the upper engine room.  As a result of the incident, she suffered burns from the liquid and a back injury

3

during physical exertion from the evacuation. The incident also was not properly documented or investigated by rig management, even though it was witnessed. To this day, Ms Ormond still suffers from back pain, lack of concentration, intimacy issues, complications completing everyday tasks, and a general decline in quality of life. She has received multiple treatments that have not resolved her symptoms, including injections, physical therapy, and prescription medications. Based upon the length of time that her symptoms have continued, Plaintiff anticipates that her future treatment will be significant and may include continual care and treatment, potentially including surgery. In all, Diamond Offshore did not properly supervise or train the crew, failed to properly man the vessel, failed to provide adequate equipment, and was generally negligently operating the vessel causing Ms. Ormond to suffer injuries.

4.2     Ms. Ormond was employed by Diamond Offshore as an Oiler placed as 3rd Asst. Engineer and regularly assigned to work in its fleet of vessels of owned and chartered vessels engaged in vessel operations. On information and belief, Diamond Offshore was the owner and operator of the Ocean Black Rhino. Diamond Offshore was responsible for its dangerous and unseaworthy conditions, which was a legal cause of Ms. Ormond's injuries. The dangerous and defective condition of the vessel violated applicable laws and regulations of the United States of America for vessels, and accordingly Diamond Offshore is liable for negligence, negligence per se, and in strict liability.

4.3     At the time of her injuries, Ms. Ormond was a Jones Act seaman more or less permanently assigned to the vessels and/or fleet of vessels of her employer, Diamond

4

Case 2:23-cv-00321 Document 59-14 Filed in TXSD on 03/29/22 Page 142 of 172
Case 2:03-cv-00321 Document 59-14 Filed in TXSD on 03/29/22 Page Claim of Exhibit
Page 5 of 8

Offshore, and her work contributed to the ultimate mission of the vessels in Diamond Offshore's fleet. Ms. Ormond would show that nothing she did or failed to do on the occasion in question caused or in any way contributed to cause her injuries. To the contrary, the occurrence in which Ms. Ormond was injured was proximately caused by the negligence, as that term is understood in law, on the part of Diamond Offshore.

### ■ *FIRST CAUSE OF ACTION—NEGLIGENCE* ■

5.1    Paragraphs 1.1 through 4.3 are incorporated by reference as though fully set forth herein.

5.2    Diamond Offshore, by and through its employees and officers, was negligent in creating the dangerous conditions that proximately resulted in Ms. Ormond's injuries and in failing to provide adequate crew and equipment, failing to supervise and train the crew, and in other respects. Under the circumstances presented by Diamond Offshore's violation of law, Diamond Offshore is also liable for negligence per se.

### ■ *SECOND CAUSE OF ACTION—UNSEAWORTHINESS* ■

6.1    Paragraphs 1.1 through 5.2 are incorporated by reference as though fully set forth herein.

6.2    The Ocean Black Rhino was a vessel for which Diamond Offshore owed Ms. Ormond a duty of seaworthiness as a seaman. Diamond Offshore breached that duty because the Ocean Black Rhino was not reasonably fit for its intended purpose, was dangerous, not reasonably safe, and unseaworthy. This unseaworthiness included Diamond Offshore's failure to provide adequate crew and equipment, failing to

5

Case 3:20-cv-00321 Document 59-14 Filed on 03/29/22 in TXSD Page 143 of 172
Case 2:23-cv-00321 Document 1-4 Filed in TXSD on 03/29/22 Property Claim Exhibit
Page 6 of 8

supervise and train the crew, and in other respects.

6.3     The unseaworthiness of the Ocean Black Rhino was a factual and legal cause of Ms.

Ormond's damages.

■ THIRD CAUSE OF ACTION—
WRONGFUL DENIAL OF MAINTENANCE AND CURE ■

7.1     Paragraphs 1.1 through 6.3 are incorporated by reference as though fully set forth

herein.

7.2     Defendants have failed to provide and continue to breach their obligations of timely

maintenance and cure payments to Ms. Ormond.  These denials, despite the plain

indications of the necessity of ongoing cure and medical care, can only be described as

willful, arbitrary, and capricious.  Accordingly, Plaintiff makes demand for maintenance

and cure, attorney fees, and such other consequential damages (including punitive damages

for arbitrary and capricious denial) permitted by law for such arbitrary and capricious

denial of maintenance and cure.

■ *DAMAGES* ■

8.1     By reason of the incident in question, Ms. Ormond sustained bodily injuries, and

because of the nature and severity of the injuries sustained, she has suffered physical pain

and mental anguish, and within reasonable probability will continue to suffer physical pain

and mental anguish in the future.  At the time of the incident in question, Ms. Ormond was

a healthy, able-bodied worker who sustained and will continue to suffer as a result of the

incident physical impairment and disfigurement.

8.2     These very painful and disabling injuries have caused Ms. Ormond to sustain a loss

6

of earnings and wage-earning capacity in the past and this condition will exist in the future. Because of the nature and severity of the injuries she has sustained, Ms. Ormond has required medical treatment in the past, and in reasonable probability she will require other and additional medical treatment in the future. Charges for such medical treatment that have been made in the past and those which of reasonable probability will be made in the future have been and will be reasonable charges made necessary by the occurrence in question.

8.3     Ms. Ormond would additionally say and show that she is entitled to recovery of pre-judgment interest in accordance with law and equity as part of her damages herein, and Ms. Ormond here and now specifically sues for recovery of pre-judgment interest from the date of the incident made the basis of this suit until the date of the judgment herein, as provided by law and equity, under the applicable provisions of the laws of the State of Texas and the United States of America.

■ *PRAYER* ■

**WHEREFORE, PREMISES CONSIDERED,** Ms. Ormond prays:

(a)     That process in due form of law according to the practice of this Honorable Court issue against the Defendants, citing them to appear and answer all and singular the matters aforesaid;

(b)     The damages provided by law for the injuries sustained by PATRICIA ORMOND.

(c)     Such other and further relief that this Court may deem appropriate.

7

Respectfully submitted,

DOYLE LLP

MICHAEL P. DOYLE
State Bar No. 06095650
PATRICK M. DENNIS
State Bar No. 24045777
JEFFREY AVERY
State Bar No. 24085185
3401 Allen Pkwy, Suite 100
Houston, Texas 77019
Phone: (713) 571-1146
Fax:     (713) 571-1148
service@doylelawfirm.com
**ATTORNEYS FOR PLAINTIFF
PATRICIA ORMOND**

## JURY DEMAND

*Ms. Ormond hereby demands a trial by jury, a right enshrined in the Constitutions of the United States of America and the State of Texas and preserved by the sacrifices of many.   The necessary jury fee has been paid.*

MICHAEL PATRICK DOYLE

**Exhibit 8**

**Plaintiff's Response to Defendant's Motion for Summary Judgment
on Plaintiff's Denial of Maintenance and Cure Claim
in the state court case**

3/28/2022 5:34 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 63031110
By: CAROL WILLIAMS
Filed: 3/28/2022 5:34 PM

Cause No. 2021-29362

| | | |
|---|---|---|
| PATRICIA ORMOND, | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| DIAMOND OFFSHORE | § | |
| MANAGEMENT COMPANY; | § | |
| DIAMOND OFFSHORE LIMITED; and | § | |
| DIAMOND OFFSHORE COMPANY | § | |
| | § | |
| | § | |
| Defendants. | § | 127th JUDICIAL DISTRICT |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S DENIAL OF MAINTENANCE AND CURE CLAIM

### I.
### Summary of the Argument

In requesting summary judgment, Diamond blatantly ignores the extraordinarily high standard set by the United States Supreme Court to defeat a claim for maintenance and cure. Indeed, the Court has made it clear – any doubt or ambiguity as to the right to maintenance and cure must be resolved in favor of the seaman.[1] Here, Diamond has



EXHIBIT
Ormond 8

---

[1] *Vaughan v. Atkinson*, 82 S.Ct. 997, 1000 (1962) (stating "Admiralty courts have been liberal in interpreting this duty 'for the benefit and protection of seamen who are its wards.' . . . the shipowner's liability for maintenance and cure was among 'the most pervasive' of all and that it was not to be defeated by restrictive distinctions nor 'narrowly confined.' When there are ambiguities or doubts, they are to be resolved in favor of the seaman."); *See also Gillikan v. United States*, 764 F. Supp. 261, 264 (E.D.N.Y. 1991) (holding "The 'broad and beneficial purposes' underlining the right have led courts to guard its boundaries closely and to avoid fine distinctions which might diminish its scope. Doubts or ambiguities relating to the right must be resolved in favor of the seaman.").

1

completely failed to mention this high standard, much less explained how it can meet its burden.

Even more so, Diamond also ignores important testimony from Ormond's coworker, Nicholas Vandergriff. Importantly, Vandergriff confirmed and corroborated Ormond's injury on the vessel – testimony that directly contradicts Diamond's position in this lawsuit, including its claim that Ormond did not suffer an injury on the vessel. Vandergriff testified:

> 17
> 9  Q.  (BY MR. DOYLE) Okay.  So what stands out is,
> 10  she gets struck by this high temperature water that's
> 11  absolutely positively capable of causing injury.  Any
> 12  doubt about that?
> 14    A.  No.
> . . .
>
> 18
> 16  Q.  Then you eventually saw her some period of
> 17  time -- don't know how long -- after getting struck by
> 18  the high water temperature release sitting up on a
> 19  catwalk?
> 20    A.  Yes.  She did get up on the catwalk.
> 21    Q.  And from where she was hit by the high
> 22  temperature release till the catwalk, how did she get
> 23  there?
> 24    A.  She had climbed up there
> . . .
>
> 22
> 17    Q.  Sure.  This particular incident, parts of it
> 18  seem to be very clear.  Am I saying that correctly?
> 19    A.  Yes.  The incident in itself, yes.
> 20    Q.  And is there a particular reason why at least
> 21  parts of what happened to Ms. Ormond that night are
> 22  clear in your mind?
> 24    A.  I would say that, I mean, the memory of -- of
> 25  seeing it happen, but other than that, everything
>            23

```
 1   happened so fast.  And, you know, the initial "Oh,
 2   crap!" factor would take a lot of the outside things
 3   away.
. . .
                        44
19   Q.  This incident, what you saw happening to
20   Ms. Ormond, what you did share with us, is it a hundred
21   percent accurate in your recollection?
22     A.  Yes.[2]
```

Despite this important testimony, Diamond did not even reach out to Vandergriff or discuss

Ormond's injury with him, until November 2021 – 15 months after Diamond received

Ormond's notice of claim.

```
                        43
 3     A.  Yes.
 4     Q.  When was the first time you can recollect ever
 5   being asked by Diamond employees about this incident?
 6     A.  Not till November.
 7     Q.  November of 2021?
 8     A.  Yes.
 9     Q.  You spoke to what Diamond employee?
10     A.  I had a phone call with Thomas Grote and Cort
11   Maddux, I believe.
12     Q.  And did you ever write out or give a reported
13   statement of any kind about this incident that you knew
14   about but was unspoken after the day?
15     A.  No.
16     Q.  Ever asked to?
17     A.  No.
18     Q.  From the day of the incident until November,
19   2021, did anybody from Diamond make the slightest effort
20   to ask you what had really happened to Ms. Ormond the
21   night in February, 2019 that you shared with us?
23     A.  Just in November.[3]
```

---

[2] Exhibit 1, Deposition of Vandergriff.
[3] *Compare* Exhibit 1, Deposition of Vandergriff *with* Exhibit 3, Proof of claim and Exhibits 4-5.

In all, for these reasons and as explained further below, Diamond has failed to act reasonably in the handling of Ormond's maintenance and cure claim, and instead, as arbitrarily denied the claim.

Therefore, summary judgment should be denied.

## II.
## Factual Background

### 1.  <u>Ormond Suffers an injury aboard the Ocean Black Rhino on February 20, 2019</u>

This is a maritime personal injury case brought by Patricia Ormond against Diamond Offshore. Ormond suffered an injury while working on the Ocean Black Rhino on or about February 20, 2019.[4] Specifically, Diamond Offshore and its crew were negligent in their handling of an engine overhaul project on the Vessel Ocean Black Rhino. Ms. Ormond – an Oiler placed as 3rd Asst. Engineer – was working on Main Engine #5.[5] The engine was not properly locked out when Ms. Ormond was instructed to remove the high temperature cooling water manifold.[6]  Because the manifold was not properly locked out, the high temperature water sprayed Ms. Ormond on the face, neck, and leg.[7]

Ormond has explained the injury as follows:

I was directed to start taking what the second engineer called the jewelry off the top of the cylinder head that we were going to start rebuilding, as we were starting on this new engine that evening.  And I was sitting on the exhaust manifold of the engine, and I had two gentlemen, Pedro and Nick, standing across me from the catwalk.  We were all working on different parts of taking little oil lines or whatnot off the cylinder head. Pedro handed me the tool that its one job is to take out the high temp water manifold pipe that is a whole manifold that runs the length of an engine and that each cylinder has its own

---

[4] Exhibit 2, Deposition of Ormond at 21:9-23:3; 113:16-19.
[5] Id.
[6] Id
[7] Id.

section of that that can come out.  And it's got brackets on both sides, so to get that out, you have to take the brackets off.  And then you, like, push the pipe into one side, and you can take it out the other. So that tool sits in a notch on the pipe that you can hit it into the one side and take it out the other. So he handed me that tool.  I just set it in place, because I wasn't done taking the brackets off yet.

Once I completed that, I put my hand on the tool.  I looked at him for confirmation, like can I go ahead and do it. He gave a thumbs up.  I bumped it, because that's all it takes is a little bump to get the pipe out.  At that time the boiling hot water started spraying everywhere. And I mean, it sprayed all the way – I was straddling the cylinder head.  So it sprayed all the way down my neck, chest, and my legs and everything. I jumped up and I twisted and I ran down the engine.  I jumped up onto the next -- like, catwalk railing, climbed over the railing.  And I just froze there until the water got shut off, pretty much  in shock. I couldn't -- they were yelling at me to do something, and I have no idea what they were telling me to do.  But I just stood there until the water got shut off.[8]

Ormond then jumped from the area and attempted to escape by climbing on to the walkway of the upper engine room.[9]  As a result of the incident, she suffered burns from the liquid and a back injury during physical exertion from the evacuation.[10]

## 2. Diamond employee Nicholas Vandergriff confirmed Ormond's testimony regarding the incident in the engine room

While Diamond has denied knowledge or record of Ormond's incident and injury, Diamond's own employee, Nicholas Vandergriff, has directly corroborated the incident. Specifically, Vandergriff testified as follows:

>                    15
> 8   Q.   What happened that night that you remember?
> 9      A.   HT water inlet pipe got open, and there was
> 10  water.
> 11      Q.   Well, water doing what?

---

[8] Exhibit 2, Deposition of Ormond at 21:9-23:3.
[9] Id.
[10] Id.

5

12   A.   Coming out of the cylinder head.
13   Q.   What kind of water?
14   A.   HT water, high-temp water.
15   Q.   "High-temp" meaning above what temperature are
16   we talking?
17   A.   I'm not a hundred percent certain, 130,
18   something like that.  I'm not sure, though.
19   Q.   Potentially dangerous if you get it on you?
20
21   A.   Yes.
22   Q.   (BY MR. DOYLE)  Tell us what happened in this
23   incident involving a release of high temperature water
24   involving Ms. Ormond that we're here on.
25   A.   So there's a jacket water inlet pipe that
                    16
1   connects head to head.  And the pipe got pulled out by
2   Ms. Ormond, and water sprayed up.  And the engine was
3   isolated and --
4   Q.   What else happened to Ms. Ormond?
5   A.   She got some water to the chest and face.
6   Q.   And when she started getting water on her chest
7   and face in this incident you recall, what did she do?
8   A.   She actually froze.  And I had jumped up on the
9   catwalk and looked down, and I still saw her.  So I
10   started yelling at her to get her to move, and at that
11   time, she had moved.[11]

Indeed, Vandergriff later made it clear – the incident on the Black Rhino was particularly

"clear" and memorable.

                    22
17   Q.   Sure.  This particular incident, parts of it
18   seem to be very clear.  Am I saying that correctly?
19   A.   Yes.  The incident in itself, yes.
20   Q.   And is there a particular reason why at least
21   parts of what happened to Ms. Ormond that night are
22   clear in your mind?
24   A.   I would say that, I mean, the memory of -- of
25   seeing it happen, but other than that, everything
                    23
1   happened so fast.  And, you know, the initial "Oh,

---

[11]

2  crap!" factor would take a lot of the outside things
3  away.
. . .
                    44
19  Q.  This incident, what you saw happening to
20  Ms. Ormond, what you did share with us, is it a hundred
21  percent accurate in your recollection?
22    A.  Yes.
23    Q.  If you had been asked, say, 2020 what really
24  happened to Ms. Ormond that you saw with your own eyes,
25  would you have told Diamond Offshore?
                    45
2    A.  Yes.
3    Q.  (BY MR. DOYLE)  Because?
5    A.  I believe in honesty and if -- if there's an
6  incident reported, then it would come out.[12]

Furthermore, after the incident, Vandergriff also confirmed that he personally saw that

Ormond was suffering from back pain.

                    38
22  Q.  What you're saying is, at some point shortly
23  after this incident you were off the rig?
24    A.  Correct.
25    Q.  And then you came back on?
                    39
1    A.  Correct.
2    Q.  So at some point, you weren't even around her
3  to see how she was doing right after the incident.  Is
4  that a fair statement?
5    A.  Yes.
6    Q.  And then when you came back at some point,
7  that's when you recall Ms. Ormond saying "My back is
8  hurting"?
10    A.  Yes.  I could -- I could see her back was
11  hurting at some point.
12    Q.  (BY MR. DOYLE)  When you say you "could see her
13  back was hurting," what do you recall actually seeing?
14    A.  I could see her in physical pain.
15    Q.  Was it reflected kind of in her face, so to

---

16  speak?
17    A.  Yes.
18    Q.  Did you believe she was exaggerating or making
19  up pain?
20    A.  Never once.
21    Q.  Because?
22    A.  She's tough.[13]

This change in Ormond's physical condition only occurred after the incident in the engine

room.

                              39
25    Q.  (BY MR. DOYLE)  Now, up until this incident
                              40
 1  with the hot water spraying her moving at some speed,
 2  had you ever seen her have any physical difficulties or
 3  show pain at all?
 4    A.  Not that I can recall.
 5    Q.  Up until this incident, if we're talking about
 6  the picture of how she was physically as a coworker, a
 7  woman out there, what's the picture you can share with
 8  her all the way up until this incident watching her?
 9    A.  She was good at what she did.
10    Q.  Physically fit and able to do her job?
11    A.  Yes.[14]

Despite this important testimony, Diamond did not even interview of speak with

Vandergriff until November 2021. [15]

### 3.  Ormond provides notice of the injury to Diamond as part of its bankruptcy proceedings

On August 16, 2020, Ormond filed a proof of claim against Diamond in its Chapter

11 Bankruptcy proceeding in the Southern District of Texas Bankruptcy Court. [16] Five

---

[13] Exhibit 1, Deposition of Vandergriff
[14] Id.
[15] Id.  at 43:3-8.
[16] Exhibit 3, Proof of claim

weeks later, Ormond's counsel sent an email to Diamond's counsel further outlining the

details of her injury, as follows:

> Diamond Offshore and its crew were negligent in their handling of an engine overhaul project on or about February 20, 2019, on the Vessel Ocean Black Rhino. Our client, Patricia Ormond (a 3rd Asst. Engineer, at the time), was injured during work on Main Engine #5.  The engine was not properly locked out when Ms. Ormond was instructed to remove the high temperature cooling water manifold.  Because it was not properly locked out, the high temperature water sprayed Ms. Ormond on the face, neck, and leg.  Ms. Ormond jumped from the area and attempted to escape by climbing on to the walkway of the upper engine room.

> As a result of the incident, she suffered burns from the liquid and a back injury during physical exertion from the evacuation.  **The incident also was not properly documented or investigated by rig management, even though it was witnessed.**  Immediately after the incident, Ms. Ormond went to the engine control room where the injury was reported to Matt Lucius.  Pedro Chavez, who was working with her at the time, was also a witness.  In addition, another employee, Blake Clodfelter was a witness to the incident. . . .

> To this day, Ms Ormond still suffers from back pain, lack of concentration, intimacy issues, complications completing everyday tasks, and a general decline in quality of life. She has received multiple treatments that have not resolved her symptoms, including injections, physical therapy, and prescription medications.  Based upon the length of time that her symptoms have continued, we anticipate that her future treatment will be significant and may include continual care and treatment, potentially including surgery.[17]

On October 26, 2020, Plaintiff's counsel again followed up with Diamond regarding

its investigation of Platini's claim.

> I have provided the date of the injury and detailed information about the incident, all of which should be verifiable by your client.  Have they taken any action over the past month to confirm employment and work status, etc. from the details outlined below?  All of those facts – name of vessel, date,

---

[17] Exhibit 4, September 28, 2020 emails

type of work, names of witnesses – should provide sufficient information for any reasonable company representative to obtain a comfort level.[18]

After the bankruptcy court ultimately lifted the stay for this case, Plaintiff then filed suit against Defendant and, as part of that petition, asserted a claim for denial of maintenance and cure.[19]

Defendants have now filed this motion for partial summary judgment.  For the reasons stated in this response, Plaintiffs request that the Court deny Defendants' motion.

### III.
### Plaintiff's Summary Judgment Evidence

| Ex | |
|----|----|
| 1 | Deposition of Nicholas Vandergriff |
| 2 | Deposition of Patricia Ormond |
| 3 | Proof of Claim |
| 4 | Email from Patrick Dennis on September 28, 2020 |
| 5 | Email from Patrick Dennis on October 26, 2020 |
| 6 | Defendants' Counter-Claim |
| 7 | Defendants' Motion |
| 8 | Plaintiff's petition |
| 9 | Plaintiff's medical billing affidavits |
| 10 | Plaintiff's Response to Interrogatories |
| 11 | Records from Dr. Rodriguez |

### IV
### Standard of Review

## 1.  Traditional Summary Judgment Standard

---

[18] Exhibit 5.
[19] Exhibit 8.

Under a traditional motion for summary judgment, the movant must prove, as a matter of law, that the nonmoving party raised no genuine issues of material fact.[20] In determining whether the movant satisfied this burden, this Court must resolve all doubts and indulge all reasonable inferences in favor of the nonmoving party—here, the plaintiffs.[21] This Court may not "consider evidence that favors the movant's position unless it is uncontroverted."[22] "Evidence that tends to support the position of the party opposing the motion is accepted as true."[23] Accordingly, Defendants' version of the facts—and its spin on the evidence—is wholly irrelevant. In reviewing a traditional summary judgment, this Court must "take as true all evidence favorable to the nonmovant, and . . . indulge every reasonable inference and resolve any doubts in the nonmovant's favor."[24]

## 2.  No Evidence Summary Judgment Standard

Under a no evidence motion for summary judgment, the nonmovant must produce evidence raising a genuine issue of material fact.[25] "If the nonmovant presents more than a scintilla of evidence supporting the disputed issue, summary judgment is improper."[26] Thus, if reasonable and fair-minded people could differ in their conclusions on the evidence given, more than a scintilla of evidence exists and a no-evidence summary judgment would

---

[20] Tex. R. Civ. P. 166a(c).
[21] *Nixon v. Mr. Prop. Mgt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985).
[22] *Bailey v. C.S.*, 12 S.W.3d 159, 162 (Tex. App.—Dallas 2000, no pet.).
[23] Id.
[24] *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).
[25] Tex. R. Civ. P. 166a(i).
[26] *Forbes, Inc. v. Granada Biosiences*, 124 S.W.3d 167, 172 (Tex. 2003) (citing *King Ranch v. Chapman*, 118 S.W.3d 742, 750 (Tex.2003) and *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.2d 502, 506 (Tex.2002)).

be improper.[27] In reviewing a no-evidence summary judgment, this Court must "examine the record in the light most favorable to the nonmovant."[28]

## V.
## Argument and Authorities

In seeking summary judgment, Defendants have challenged Plaintiff's claims related to maintenance and cure.  For background, maintenance and cure is a contractual form of compensation afforded by the general maritime law to seamen who fall ill or are injured while in the service of a vessel."[29]  "Maintenance . . . is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery."[30] Cure is generally understood to require the provision of medical treatment and similarly extends until maximum medical recovery has been reached as a result of "continued and necessary medical treatment."[31]

The U.S. Supreme Court has long held that courts should liberally interpret a shipowner's duty of maintenance and cure "for the benefit and protection of seaman," and that the duty is "among the most pervasive of all" and not to be "narrowly confined."[32] Thus, "[w]hen there are ambiguities or doubts, they are resolved in favor of the seaman."[33]

---

[27] Id. (citing *King Ranch v. Chapman*, 118 S.W. 3d 742, 751 (Tex.2003)).

[28] *Forbes, Inc.* 124 S.W.3d at 172 (citing *King Ranch v. Chapman*, 118 S.W. 3d 742, 750 (Tex.2003) and *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.2d 502, 506 (Tex.2002)).

[29] *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 212 (5th Cir. 2006).

[30] *Vaughan v. Atkinson*, 369 U.S. 527, 531, 82 S. Ct. 997, 8 L. Ed. 2d 88 (1962).

[31] *Luksich v. Misetich*, 140 F.2d 812, 814 (9th Cir. 1944); *see Crooks v. United States*, 459 F.2d 631, 632-33 (9th Cir. 1972)

[32] *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962) (quoting *Calmar S. S. Corp. v. Taylor*, 303 U.S. 525, 527 (1938) and *Aguilar v. Standard Oil Co. of N. J.*, 318 U.S. 724, 729 (1943)).

[33] Snyder v. L & M Botruc Rental, Inc., 924 F.Supp.2d 728, 734 (E.D. La. Feb. 15, 2013)

The Houston Court of Appeals has also explained that maintenance and cure "are due the seaman without regard to the negligence of the employer or the seaworthiness of the ship."[34] As a result, "[t]he cut-off date for both maintenance and cure is not the point at which the patient recovers sufficiently to take up his old employment; but rather, the time of maximum possible cure."[35]

Here, Defendants have made two separate challenges to Plaintiff's claim.  First, Defendant has denied Ormond's claim for maintenance and cure.  Second, Diamond has also argued that it was not arbitrary and capricious or unreasonable in the handling and denying of her claim.  For the reasons stated below, Diamond is wrong on both accounts.

## 1.  Diamond has denied Ormond's claim for maintenance and cure

As its first basis for summary judgment, Defendant has argued that it "has not denied . . . Ormond's maintenance and cure claim." In effect, Diamond has asserted that it is still investigating Ormond's injury – over 18-months after it first received Ormond's notice in the bankruptcy proceedings. Because Diamond has failed to conduct its investigation timely and sufficiently, its motion for summary judgment should be denied.

First, there is no doubt – an injured worker can demand maintenance and cure as part of the seaman's lawsuit. For example, in *Smith v. Omega Protein, Inc.*, a seaman first made "a demand for ongoing maintenance and cure," after "he filed this lawsuit."[36] But as that court noted, the plaintiff contended that the shipowner "did not further investigate [his]

---

[34] *Maritime Overseas Corp. v. Thomas,* 681 S.W.2d 160, 161 (Tex. App.—Houston [14th Dist.] 1984, no writ).

[35] *Brown v. Aggie & Millie, Inc.*, 485 F.2d 1293, 1296 (5th Cir. 1973).

[36] 459 F. Supp. 3d 787, 790 (S.D. Miss. 2020).

maintenance and cure claim."[37] And ultimately, the Court denied summary judgment regarding the maintenance and cure claim. [38]

Here, Ormond undisputedly asserted claim for the denial of maintenance and cure as part of her petition in May 2021, at latest. And even if Ormond first made her formal demand for maintenance and cure as part of the lawsuit, the timing of that demand does not relieve Diamond from its obligation to investigate pay benefits.  This is even more true in this case because eight months prior to the filing of the lawsuit, Plaintiff's counsel provided details about the injury and requested that Diamond investigate the incident.

> I have provided the date of the injury and detailed information about the incident, all of which should be verifiable by your client.  Have they taken any action over the past month to confirm employment and work status, etc. from the details outlined below?  All of those facts – name of vessel, date, type of work, names of witnesses – should provide sufficient information for any reasonable company representative to obtain a comfort level.[39]

Similarly, Diamond's own employee, Nick Vandergriff, has confirmed that the incident occurred, and, as a result, corroborated Ormond's claim.

                    15
 8  Q.   What happened that night that you remember?
 9     A.   HT water inlet pipe got open, and there was
10  water.
11     Q.   Well, water doing what?
12     A.   Coming out of the cylinder head.
13     Q.   What kind of water?
14     A.   HT water, high-temp water.
15     Q.   "High-temp" meaning above what temperature are
16  we talking?
17     A.   I'm not a hundred percent certain, 130,
18  something like that.  I'm not sure, though.

---

[37] *Id.*
[38] *Id*. at 796.
[39] Exhibit 5.

19    Q.   Potentially dangerous if you get it on you?
21    A.   Yes.
22    Q.   (BY MR. DOYLE)  Tell us what happened in this
23   incident involving a release of high temperature water
24   involving Ms. Ormond that we're here on.
25    A.   So there's a jacket water inlet pipe that
                    16
1   connects head to head.  And the pipe got pulled out by
2   Ms. Ormond, and water sprayed up.  And the engine was
3   isolated and --
4    Q.   What else happened to Ms. Ormond?
5    A.   She got some water to the chest and face.
6    Q.   And when she started getting water on her chest
7   and face in this incident you recall, what did she do?
8    A.   She actually froze.  And I had jumped up on the
9   catwalk and looked down, and I still saw her.  So I
10   started yelling at her to get her to move, and at that
11   time, she had moved.[40]

Indeed, Vandergriff further confirmed Ormond's physical injury based on observations of

her physical state.

                    39
12   Q.   (BY MR. DOYLE)  When you say you "could see her
13   back was hurting," what do you recall actually seeing?
14    A.   I could see her in physical pain.
15    Q.   Was it reflected kind of in her face, so to
16   speak?
17    A.   Yes.
18    Q.   Did you believe she was exaggerating or making
19   up pain?
20    A.   Never once.
21    Q.   Because?
22    A.   She's tough.[41]

Based on this testimony and her own testimony, Ormond has established that she was

working on the vessel, suffered an injury, and is entitled to maintenance cure.  In other

---

[40] Exhibit 1, Deposition of Vandergriff.
[41] Exhibit 1, Deposition of Vandergriff.

words, Diamond cannot legitimately claim that it needs to conduct further investigation or evaluation to determine whether the incident occurred on the vessel.

Next, Ormond has provided Defendant with sufficient information to conduct a reasonable investigation, including the amount of medical bills owed and a calculation of her maintenance.

| Provider[42] | Amount |
|---|---|
| Orthopaedic Institute for Spinal Disorders | $2,986.00 |
| Merit Health Wesley | $8,381.75 |
| Chiropractic Center of McComb | $330.00 |
| Dr. Byron Jeffcoat | $244.00 |
| TriTherapy Physical Therapy | $2,718.00 |

Furthermore, Dr. Rodriguez has placed Ormond on lifting restrictions based on her on-the-job injury.[43] And in an interrogatory response, Plaintiff further identified her basis and calculation for her maintenance claim, as follows:

> Plaintiff refers to her Petition, responses to disclosures (as amended or supplemented), the incident report(s), and all documents produced. Plaintiff would also refer to her medical records and bills, earning records, and tax/social security records. Defendants have refused to pay maintenance and cure at any point from the inception of injury through today. Defendants' obligation to pay cure is documented in Plaintiff's medical bills. Plaintiff would refer to her costs of living to calculate the rate of maintenance owed by Defendants. The rate of maintenance is at least approximately $56.47.

---

[42] Exhibit 9.
[43] *See e.g.* Exhibit 11 at pages 7; 12; and 15.a

16

This is based on Plaintiff's monthly expenses including, house payment ($860), electricity ($160), water ($30), internet ($92), cable ($52), and groceries ($500).[44]

In addition, Diamond's claim that its investigation has been stonewalled is inaccurate. To be clear, through the discovery process Diamond has been able to take deposition and obtain medical records regarding Ormond's history and injury. Similarly, Defendant has taken Ormond's deposition and was entitled to question her regarding any element of her maintenance and cure claim. In addition, Plaintiff presented for a defense medical examination with Defendant's retained medical expert. Based on this evidence, Defendant's motion for summary judgment should be denied.

Finally, Defendant argues that it has provided long-term disability benefits in lieu of maintenance payments. Based on that argument, Diamond asserts it is not required to pay Ormond maintenance. But Defendant has not provided any evidence in the summary judgment record showing that the disability policy was intended to satisfy Diamond's maintenance obligation. And "[i]t is clear that in the absence of an explicit contractual provision specifying that accumulated leave time pay or other wages is to be deemed a substitute for maintenance, there is no basis for crediting such earned wages against the vessel owner's maintenance obligation."[45] Indeed, "[b]enefits payable under . . . non-occupational disability are . . . in the absence of an agreement to the contrary, a form of deferred compensation."[46] In other words, "[t]hey are designed to replace lost wages, not

---

[44] Exhibit 10.
[45] *Shaw v. Ohio River Co.*, 526 F.2d 193, 199 (3rd 1975).
[46] *Id.*

to provide room and board and medical treatment."[47] As a result, "the benefits have nothing to do with the vessel owner's separate maintenance obligation, for they would be payable even if [Plaintiff] were ineligible for maintenance."[48]

2. **Defendants' denial of maintenance and cure was both (1) unreasonable and (2) arbitrary and capricious because Defendants refused to conduct a legitimate, timely, and reasonable investigation of the claim, and instead have taken contradictory positions in order to avoid paying benefits.**

Next, Diamond challenges Ormond's claim regarding its arbitrary and unreasonable denial of her maintenance and cure benefits. For background, a shipowner who refuses to pay maintenance and cure is subject to an escalating scale of liability as follows:

> [A] shipowner who is in fact liable for maintenance and cure, but who has been reasonable in denying liability, may be held liable only for the amount of maintenance and cure. If the shipowner has refused to pay without a reasonable defense, he becomes liable in addition for compensatory damages. If the owner not only lacks a reasonable defense but has exhibited callousness and indifference to the seaman's plight, he becomes liable for punitive damages and attorney's fees as well.[49]

"Courts have devised a variety of verbal formulations to describe the nature and extent of misconduct that will support a claim for punitive damages,' including 'willful,' 'wanton,' or 'outrageous.'"[50]

When evaluating whether a shipowner utilized a reasonable defense, Courts place particular emphasis whether the vessel owner conducted its investigation in good faith.

---

[47] *Id.*

[48] *Id.*

[49] *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987); *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 424-25, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009) (finding punitive damages available, as they otherwise are under common law, for "willful and wanton disregard of the maintenance and cure obligation").

[50]

18

Conduct sufficient to demonstrate bad faith in denying a claim for maintenance and cure includes: "(1) laxness in investigating a claim; (2) termination of benefits in response to the seaman's retention of counsel or refusal of a settlement offer; and (3) failure to reinstate benefits after diagnosis of an ailment previously not determined medically."[51] While a shipowner may "investigate a claim for maintenance and cure before tendering any payments to the seaman - without subjecting itself to liability for compensatory or punitive damages,"[52] "[t]he shipowner must, however, conduct any investigation in good faith and cannot avoid liability where it is guilty of laxness in investigating a claim that would have been found to be meritorious."[53]

Here, Diamond's conduct is both unreasonable and willful and arbitrary based on two reasons: Diamond failed to investigate Ormond's claim reasonable and Diamond has taken arbitrary and contradictory positions in order to avoid paying Plaintiff's benefits. Finally, Defendants have also attempted to justify their inadequate, unreasonable, and arbitrary investigation based on Ormond's lack of timely reporting.  In contrast, this lack of timely reporting is not a bar to Plaintiff's claims for unreasonable or arbitrary denial of cure. [54]

## A. Diamond completely failed to investigate Ormond's claim for maintenance and cure.

Here, Diamond's investigation regarding Ormond's claim was particularly lacking. First, when Ormond provided notice to Diamond in the bankruptcy proceeding, her counsel

---

[51] *Tullos v. Resource Drilling, Inc.*, 750 F.2d 380, 388 (5th Cir. 1985).
[52] *Boudreaux v. Transocean Deepwater, Inc.*, 721 F.3d 723, 728 (5th Cir. 2013).
[53] *Tullos*, 750 F.2d 380, 388
[54] *Williams v. Maersk Line, Ltd.*, 450 F. Supp. 3d 242, 261 (E.D.N.Y. 2020)

explained that "[t]he incident also was not properly documented or investigated by rig management, even though it was witnessed." Similarly, after Diamond questioned Ormond's claim, Ormond's counsel again requested that Diamond take steps to investigate and review the incident.

> I have provided the date of the injury and detailed information about the incident, all of which should be verifiable by your client. Have they taken any action over the past month to confirm employment and work status, etc. from the details outlined below? All of those facts – name of vessel, date, type of work, names of witnesses – should provide sufficient information for any reasonable company representative to obtain a comfort level.[55]

Despite this information, Diamond did not sufficiently investigate the incident, including failing to obtain and review the important information to determine if Ormond suffered an injury on the vessel.  By example, even though Crewmember Nicholas Vandergriff witnessed the injury and was working with Ormond on the date of the injury, Diamond failed to interview or discuss the incident with Vandergriff until November 2021.

> 43
> 4    Q.  When was the first time you can recollect ever
> 5   being asked by Diamond employees about this incident?
> 6    A.  Not till November.
> 7    Q.  November of 2021?
> 8    A.  Yes.
> 9    Q.  You spoke to what Diamond employee?
> 10    A.   I had a phone call with Thomas Grote and Cort
> 11   Maddux, I believe.
> . . .
> 18    Q.   From the day of the incident until November,
> 19   2021, did anybody from Diamond make the slightest effort
> 20   to ask you what had really happened to Ms. Ormond the
> 21   night in February, 2019 that you shared with us?
> 23    A.   Just in November.[56]

---
[55] Exhibit 5.
[56] Exhibit 1.

This is particularly important because Vandergriff confirmed the incident and confirmed that he saw Ormond in pain while working on the vessel. Furthermore, even after Vandergriff spoke with Diamond, Diamond never asked Vandergriff to provide any documentation or incident report

43

```
12     And did you ever write out or give a reported
13     statement of any kind about this incident that you knew
14     about but was unspoken after the day?
15     A.  No.
16     Q.  Ever asked to?
17     A.  No.[57]
```

In addition, Diamond has also taken contradictory – indeed, arbitrary and capricious – positions in order to avoid paying Ormond's maintenance and cure benefits.  By example, in this case, Diamond has sued Ormond for fraud.  As part of that pleading, Diamond has claimed that Ormond falsely claimed her injury occurred off-the-job and obtained insurance benefits, even though her injury occurred on-the-job.[58] Yet at the same time, Diamond has taken a contradictory position, including disputing Ormond's on-the-job injury to the bankruptcy court.[59]  In other words, Diamond has skewed its investigation and evaluation of Ormond's claim in order to avoid paying her claim, while also taken a contradictory position in this lawsuit.  As a result, Diamond has taken an unreasonable and arbitrary position.  Therefore, Diamond's motion should be denied.

**B. Ormond's lack of timely reporting her injury, alone, does not bar her claim for unreasonable or arbitrary and capricious denial of maintenance and cure**

---

[57] Exhibit 1, Deposition of Vandergriff.
[58] Exhibit 6.
[59] Exhibit 7.

21

In addition, Diamond is not entitled to summary judgment simply because Ormond did not immediately report her injury.  In effect, Defendant has argued that Ormond's own conduct preclude liability for its unreasonable investigation. Defendant is wrong.

The Eastern District of New York addressed a similar issue in *Williams v. Maersk Line, Ltd.*, 450 F. Supp. 3d 242 (E.D.N.Y. 2020).  In that case, the plaintiff suffered a back injury while working aboard the vessel, the Maersk Detroit. At summary judgment, the defendant argued that the claim for denial of maintenance and cure should fail based on the plaintiff's "own misconduct."[60]  Specifically, the defendant noted that the plaintiff failed to disclose prior back injuries both under oath and to his physicians.[61] In rejecting this argument, the Court explained that misconduct, alone, is not a basis for summary judgment. Specifically, the Court held:

> But Maersk does not cite authority showing that Williams' conduct would operate as a total bar to his claim for punitive damages, rather than just supporting a fraudulent concealment defense. Nor does Maersk address how Williams' concealment affected its alleged failure to pay maintenance and cure prior to the time Maersk learned of his concealment, given that Maersk had denied claims for maintenance and cure pertaining to back injuries for potentially a substantial period during which it was unaware of his condition. . . . Given the above, the Court finds that Maersk has not, in the instant motion, met its burden of proffering sufficient undisputed material facts and legal authority to establish that it is entitled to summary judgment on Williams' punitive damages claim based on concealment.[62]

Therefore, the court denied the defendants' motion.

---

[60] *Id.* at 263.
[61] *Id.* at 263-64.
[62] *Id.* at 264,

22

Just like *Williams*, Defendant's allegations against Ormond are not a bar to her recovery for punitive or compensatory damages regarding Defendant's denial of benefits. Of note, Defendant has placed particular emphasis on Ormond's lack of timely reporting of the injury. But Ormond explained in her deposition that she failed to report the injury because she feared she would lose her job.

> 11
> 3   Q.   Okay.   Why didn't you report the incident to
> 4   Diamond that day?
> 5        A.   I was afraid of losing my job.   I was -- I
> 6   wanted to prove that I could perform in the position
> 7   they put me in, as they temporarily bumped me up to a
> 8   third assistant engineer for those first two weeks.   I
> 9   felt that I wasn't, like, having this go -- having this
> 10   incident happen, that they wouldn't think that I was
> 11   capable of performing the job as a third assistant
> 12   engineer.[63]

Similarly, other Diamond employees, including Nicholas Vandergriff, witnessed and confirmed the incident, yet also did not report it.

> 32
> 13   Q.   (BY MR. DOYLE)   This incident February, 2019
> 14   that you've shared with us, was there an injury or
> 15   incident report?
> 16        A.   No.
> . . .
> 25   Q.   So I'm going to ask you that again.   Should
> 33
> 1   this incident have been reported?
> 2        A.   I mean, kind of subjective, I guess.   It wasn't
> 3   reported because Ms. Ormond didn't want to report it,
> 4   and I went with her wishes of not reporting it.
> 5        Q.   Did she tell you why she didn't want to report
> 6   it?
> 7        A.   No.

---

[63] Exhibit 2.

8     Q.  Did you have a reason to understand from the
9  way it worked at Diamond Offshore why she wouldn't want
10   to report it?
12     A.  No.
13     Q.  (BY MR. DOYLE)  Well, what might happen if an
14   incident like this gets reported that you were aware of,
15   having worked for Diamond Offshore?
17     A.  It would be investigated.
18     Q.  (BY MR. DOYLE)  And potentially what?
20     A.  I'm not sure.
21     Q.  (BY MR. DOYLE)  All right.  Potentially cause
22   someone to get into trouble?
24     A.  It might.  I'm not sure.  I don't know how
25   Diamond would handle it.[64]

In all, Diamond personnel witnessed and knew about Ormond's injury.  Thus, while Ormond may not have reported the incident, Defendant has not shown any prejudice based on the delayed report by Ormond, much less any legitimate reason that it has failed to pay Ormond's maintenance and cure. As a result, summary judgment should be denied.

### VI.
### Conclusion

For these reasons, Plaintiff asks the Court to deny Defendants' Motion.

Respectfully submitted,

DOYLE DENNIS LLP

*Pat M. D*

_____
MICHAEL PATRICK DOYLE
State Bar No. 06095650
PATRICK M. DENNIS
State Bar No. 24045777
JEFFREY AVERY
State Bar No. 24085185

---

[64] Exhibit 1.

EMMA R. BROCKWAY
State Bar No. 24125156
3401 Allen Parkway, Suite 100
Houston, Texas 77019
Phone: (713) 571-1146
Fax:     (713) 571-1148
service@doylelawfirm.com
**ATTORNEYS FOR PLAINTIFF
PATRICIA ORMOND**

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record on this the 28th day of March, 2022, via hand delivery, overnight courier, electronic mail, U.S. Mail, certified mail, return receipt requested, or facsimile, pursuant to the Texas Rules of Civil Procedure:

Joshua A. Norris
T. Patrick Baynham
Patrick J. Fackrell
jnorris@joneswalker.com
tpbaynham@joneswalker.com
pfackrell@joneswalker.com
JONES WALKER LLP
811 Main Street, Suite 2900
Houston, TX 77002
Phone: (713) 437-1800
Fax: (713) 437-1810

**ATTORNEYS FOR DEFENDANTS
DIAMOND OFFSHORE MANAGEMENT COMPANY,
DIAMOND OFFSHORE LIMITED, and
DIAMOND OFFSHORE COMPANY**

_____
PATRICK M. DENNIS

25

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jeffrey Avery on behalf of Michael Doyle
Bar No. 6095650
jeffavery@doylelawfirm.com
Envelope ID: 63031110
Status as of 3/29/2022 7:24 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Daniel Baldwin | | dbaldwin@joneswalker.com | 3/28/2022 5:34:17 PM | SENT |
| Becky Zepeda | | bzepeda@joneswalker.com | 3/28/2022 5:34:17 PM | SENT |
| Joshua ANorris | | jnorris@joneswalker.com | 3/28/2022 5:34:17 PM | SENT |
| T. Patrick Baynham | | tpbaynham@joneswalker.com | 3/28/2022 5:34:17 PM | SENT |
| Joshua ANorris | | jnorris@joneswalker.com | 3/28/2022 5:34:17 PM | SENT |
| Joshua ANorris | | jnorris@joneswalker.com | 3/28/2022 5:34:17 PM | SENT |
| Ashley Castillo | | acastillo@joneswalker.com | 3/28/2022 5:34:17 PM | SENT |
| Patrick J.Fackrell | | pfackrell@joneswalker.com | 3/28/2022 5:34:17 PM | SENT |
| Patrick J.Fackrell | | pfackrell@joneswalker.com | 3/28/2022 5:34:17 PM | SENT |
| T. Patrick Baynham | | tpbaynham@joneswalker.com | 3/28/2022 5:34:17 PM | SENT |
| T. Patrick Baynham | | tpbaynham@joneswalker.com | 3/28/2022 5:34:17 PM | SENT |
| Patrick J.Fackrell | | pfackrell@joneswalker.com | 3/28/2022 5:34:17 PM | SENT |